# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

---

The Humane Society of the United States,
Animal Protection Institute, Friends of
Animals and Their Environment ("FATE"),
Help Our Wolves Live ("HOWL"),
Indigenous Environmental Network, Klamath
Forest Alliance, and RESTORE: The North
Woods,

                              Plaintiffs,

vs.

Dirk Kempthorne, Secretary of the Interior,
United States Department of the Interior, H.
Dale Hall, Director of the United States Fish
and Wildlife Service, and United States Fish
and Wildlife Service,

                              Defendants.

Civil No. 06 -1279(CKK)

---

# PLAINTIFFS' MEMORANDUM IN SUPPORT
# OF MOTION FOR PRELIMINARY INJUNCTION

# ORAL ARGUMENT REQUESTED

## INTRODUCTION

In April 2006, under authority delegated by the Secretary of the U.S. Department of the Interior, the United States Fish and Wildlife Service ("FWS") issued a permit unlawfully authorizing the Wisconsin Department of Natural Resources ("Wisconsin") to kill depredating wolves in order to increase public support for wolf recovery. See Exhibit A, Federal Fish and Wildlife Permit, Permittee Wisconsin Department of Natural Resources, TE111360-0 (April 24, 2006) ("Wisconsin Permit"), attached to Affidavit of Sanne H. Knudsen ("Knudsen Aff."). The issuance of the Wisconsin Permit violates the Endangered Species Act ("ESA") and the Administrative Procedure Act ("APA").

The Wisconsin Permit was issued under ESA Section 10(a)(1)(A), which allows the FWS to authorize the taking of endangered species "for scientific purposes or to enhance the propagation or survival of the affected species." 16 U.S.C. § 1539(a)(1)(A). By authorizing lethal taking for the purpose of depredation control under ESA Section 10(a)(1)(A), the FWS dramatically expands this narrow exception to the ESA's otherwise strict prohibition against killing, harassing, or harming endangered species.

While the FWS asserts that killing depredating wolves will enhance the survival of the species by increasing social tolerance among livestock owners and decreasing illegal wolf killings, the FWS offers no support for its sociological surmise. More importantly, the use of Section 10(a)(1)(A) to kill endangered species for social policy reasons contravenes the plain language, structure, and purpose of the ESA. Moreover, by issuing the Wisconsin Permit, the FWS reverses its nearly thirty-year position that the downlisting of wolves from endangered to threatened status is a necessary prerequisite to the implementation of lethal depredation control programs.

2

Because the unlawfully issued Section 10(a)(1)(A) permit will result in the killing of an endangered species, Plaintiffs – a group of environmental organizations with an interest in wolf conservation and recovery – filed a civil action on July 19, 2006, challenging the Wisconsin Permit under the ESA and APA.  Plaintiffs submit this memorandum in support of their motion for a preliminary injunction, and respectfully request that the Court enjoin the further killing of wolves under the permit for depredation control purposes until the merits of this action are litigated.  Absent a preliminary injunction, Plaintiffs will suffer irreparable injury and endangered species will be unlawfully killed to the detriment of the public interest.

## STATEMENT OF FACTS

### FWS Attempts to Reclassify the Wolf as a Threatened Species in 2003

On March 9, 1978, the gray wolf (*Canis lupus*) was listed as an endangered species throughout the coterminous United States and Mexico, with the exception of Minnesota where the gray wolf was classified as threatened.  See Final Rule to Reclassify and Remove the Gray Wolf From the List of Endangered and Threatened Wildlife in Portions of the Coterminous United States, 68 Fed. Reg. 15804, 15806 (April 1, 2003) ("April 2003 Final Rule").

On April 1, 2003, the FWS reduced the protection afforded to the gray wolf under the ESA by reclassifying the status of the wolf from endangered to threatened.  See April 2003 Final Rule, 68 Fed. Reg. 15804.  By reclassifying the wolf, the FWS gained authority under Section 4(d) of the ESA to promulgate regulations "necessary and advisable to provide for the conservation of [the wolf]."  16 U.S.C. § 1533(d).  Because Section 4(d) applies only to threatened species, the FWS could not have implemented

regulations under Section 4(d) unless the wolf was reclassified from endangered to threatened.

Concurrent with its attempt to downlist the wolf to "threatened" status, the FWS used Section 4(d) to institute more aggressive wolf depredation control programs.[1] See Defenders of Wildlife v. Norton, 354 F. Supp. 2d 1156, 1159-60 (D. Or. 2005); April 2003 Final Rule, 68 Fed. Reg. at 15863-68. The Section 4(d) regulations that the FWS implemented as part of the April 2003 Final Rule authorized "the full spectrum of depredation control actions, from nonlethal opportunistic harassment to lethal control of depredating wolves." See April 2003 Final Rule, 68 Fed. Reg. at 15868. "All of [these] activities, which are 'takes' under the ESA, would be prohibited if the wolf retained its endangered status." Defenders of Wildlife, 354 F. Supp. 2d at 1160 n.3.

A group of environmental organizations, including Plaintiffs in this action, challenged the April 2003 Final Rule on the grounds that it violated the ESA, its implementing regulations, and the APA. See Defenders of Wildlife, 354 F. Supp. 2d 1156. The court agreed, holding that the April 2003 Final Rule violated the ESA. Id. at 1174. Because the wolf regained its rightful status as an "endangered species," the FWS lost its authority to implement depredation abatement programs under Section 4(d). Accordingly, the court also enjoined the FWS from implementing the Section 4(d) rules, recognizing that "[t]he death or injury of endangered wolves due to the [Section] 4(d) rules is irreparable injury." Id.

---

[1] In the past, the FWS used Section 4(d) as means of implementing depredation control programs in Minnesota. See 50 C.F.R. § 17.40(d)(2) (Minnesota Section 4(d) regulations).

### FWS Unlawfully Issues Section 10(a)(1)(A) Permits to Wisconsin in 2005

Because the April 2003 Final Rule was vacated, Wisconsin no longer had authority to take depredating wolves by lethal means. See Exhibit B, United States Department of Agriculture, Fish and Wildlife Service, Final Environmental Assessment for the Management of Wolf Conflicts and Depredating Wolves in Wisconsin (April 2006) ("EA"), attached to Knudsen Aff., at B-10. As a result, on February 11, 2005, Wisconsin submitted a permit application to the FWS requesting authority to use lethal and non-lethal force to control depredating wolves. See Exhibit C, Memorandum dated March 17, 2005, from Ron Refsnider, Region 3 Listing Coordinator & Wolf Recovery Coordinator, to T.J. Miller, Region 3 Endangered Species Program Manager ("Wisconsin Memo"), attached to Knudsen Aff., at C-1. The application was submitted under ESA Section 10(a)(1)(A), which allows the issuance of permits to take endangered species "for scientific purposes or to enhance the propagation or survival or the affected species." 16 U.S.C. § 1539(a)(1)(A).

The FWS has fully acknowledged that the Section 10(a)(1)(A) permit request made by Wisconsin in 2005 was a direct response to the invalidation of the Section 4(d) rules by Defenders of Wildlife. See Wisconsin Memo, Exh. C at C-1 ("This request resulted from the January 31, 2005, ruling by the U.S. District Court for the District of Oregon that vacated the Service's April 1, 2003, reclassification of Wisconsin wolves from endangered to threatened status. This vacature also terminated the implementation of the section 4(d) special regulations that allowed various forms of take of gray wolves by state and tribal authorities.") In fact, the FWS admits that the authority sought by Wisconsin under Section 10(a)(1)(A) is nearly identical to the depredation control

activities that were previously allowed under the court-enjoined Section 4(d) rules.

See Wisconsin Memo, Exh. C at C-6 (recognizing that "the depredation control take that

would be carried out by [Wisconsin] DNR . . . is identical in scope and methodology to

that which has been carried out through January 2005 . . . under the 2003 special

regulations under ESA section 4(d)"). The FWS's admissions demonstrate that it is using

Section 10(a)(1)(A) as a back door way of continuing lethal depredation control activities

enjoined by Defenders of Wildlife.

On April 1, 2005, the FWS issued a Section 10(a)(1)(A) permit to the Wisconsin

DNR authorizing the killing of up to 34 wolves in 2005. See Exhibit D, Subpermit No.

05-03 A1, dated April 1, 2005, attached to Knudsen Aff., at D-1. A group of

environmental organizations, including Plaintiffs in this case, successfully challenged the

permit on procedural grounds because the FWS failed to publish notice of the permit

application in the Federal Register and provide an opportunity for public comment, in

violation of ESA Section 10(c), 16 U.S.C. § 1539(c). See Exhibit E, Defenders of

Wildlife v. Norton, Order Granting Permanent Injunction, Civil Action No. 05-1573

(D.D.C. September 13, 2005), attached to Knudsen Aff., at E-1.[2]

At the September 13, 2005 hearing on the preliminary injunction, Judge Huvelle

of the United States District of Columbia District Court granted the Plaintiffs a

permanent injunction and vacated the permits. Id. The FWS conceded the merits of the

procedural challenge, offering no explanation for its failure to provide an opportunity for

notice and comment. See Exhibit F, Tr. of Prelim. Inj. Hr'g Before the Honorable Ellen

---

[2] The Plaintiffs in Defenders of Wildlife v. Norton, Civil Action No. 05-1573,
simultaneously challenged a similarly unlawful permit issued to the Michigan
Department of Natural Resources.

Segal Huvelle, United States District Judge ("Hearing Transcript"), attached to Knudsen

Aff., at F-12-13.  Nonetheless, arguing that lethal depredation control is necessary "to

maintain the public support in wolf recovery," the FWS requested the court to use its

equitable discretion to allow continued killing of wolves under the unlawfully issued

permits.  See Hearing Transcript , Exh. F at F-11-13.  Judge Huvelle refused to sanction

the FWS's blatant disregard for the ESA's procedural mandates.  Judge Huvelle also

questioned the substantive contention that the FWS needed to kill wolves to save wolves,

recognizing that the FWS is "assuming that people will change their behavior in some

fashion because [the government] is killing them."  See id. at F-14.  Judge Huvelle

further observed that "there is no empirical basis for [the FWS's assertion that a lethal

control program would decrease illegal killings]" and that the FWS's argument is "sort of

hypothetical at best."  Id.  At the time that the permanent injunction was granted, 29

wolves had been killed in Wisconsin under the admittedly illegally issued permit.  Id. at

F-7.

**FWS Reissues Section 10(a)(1)(A) Permit to Wisconsin after Notice & Comment**

After this Court vacated the Section 10(a)(1)(A) permit issued to Wisconsin in

2005, Wisconsin immediately resubmitted its permit application on September 14, 2005.

See Exhibit G, United States Department of the Interior, Fish and Wildlife Service,

Formal Intra-Service Section 7 Consultation: Issuance of a section 10(a)(1)(A) permit for

research, monitoring, and depredation abatement activities involving the gray wolf in

Wisconsin (April 20, 2006) ("2006 Wisconsin BiOp"), attached to Knudsen Aff., at G-2.

The permit application was published in the Federal Register, and the public comment

period ended on October 14, 2005.  Id.  The FWS prepared a draft environmental

assessment in connection with the 2006 Wisconsin permit application, which was made available for public comment on March 2, 2006. Id. In April 2006, the FWS issued the Final Environmental Assessment and an accompanying Decision and Finding of No Significant Impact. See EA, Exh. B at B-1; Exhibit H, United States Department of Agriculture, Fish and Wildlife Service, Decision and Finding of No Significant Impact for the Environmental Assessment: Management of Wolf Conflicts and Depredating Wolves in Wisconsin (April 24, 2006), attached to Knudsen Aff., at H-1.

On April 24, 2006, the FWS issued a Section 10(a)(1)(A) permit authorizing Wisconsin to implement a lethal depredation control program that includes killing endangered wolves. See Wisconsin Permit, Exh. A at A-1. The Wisconsin Permit is nearly identical to the permit issued in 2005, except that the Wisconsin Permit increases the number of depredating wolves that can be killed to 43, as compared to the cap of 34 authorized by the 2005 permit. Id. at A-2.

The FWS issued the Wisconsin Permit based on its assertion that killing depredating wolves improves social tolerance of wolves and wolf recovery. See Exhibit I, United States Fish and Wildlife Service, Set of Findings: Wisconsin Department of Natural Resources, Wolf Depredation Permit (TE 111360) (April 24, 2006) ("Set of Findings"), attached to Knudsen Aff., at I-2 to I-3. The FWS contends that livestock depredation is an impediment to wolf conservation, because "[i]f the State or Federal government does not act, livestock owners likely will act and their actions could lead to the indiscriminate killing of wolves." See Set of Findings, Exh. I at I-2 (internal citations omitted). The FWS argues that livestock depredation has increased over the last several years as the wolf population has increased and wolves have moved into more populated

8

areas. Id. According to the FWS, this increased rate of depredation brings with it "an increased possibility of public backlash," which may increase negative attitudes towards wolves and possibly increase the rate of illegal killing of wolves in Wisconsin. Id. at I-2 to I-3. It is this theoretical possibility of decreased social tolerance that the FWS uses to rationalize the killing of up to 10% of the endangered wolves in Wisconsin. Id.

Because the Wisconsin Permit unlawfully allows the killing of endangered species based on unsupported social theories, on May 9, 2006, the Plaintiffs sent a 60-day notice letter to the FWS pursuant to 16 U.S.C. § 1540 (g) requesting that the FWS rescind the permit. See Exhibit J, Plaintiffs' Notice of Intent to Sue Letter, attached to Knudsen Aff., at J-1 to J-2.

## ARGUMENT

Courts in this Circuit apply a traditional four-part test in determining whether to issue a preliminary injunction. Am. Rivers v. U.S. Army Corps of Eng'rs, 271 F. Supp. 2d 230, 248 (D.D.C. 2003). Under the test, Plaintiffs must demonstrate: (1) that there is a substantial likelihood of success on the merits; (2) that Plaintiffs would suffer irreparable injury if the injunction is not granted; (3) that an injunction would not substantially injure other interested parties; and (4) that the injunction is in the public interest. Id. Because the Wisconsin Permit was unlawfully issued, because issuance of those permits will cause irreparable harm, because Defendants will suffer minimal harm should an injunction be issued, and because preventing the unlawful killing of endangered species is in the public interest, this Court should enjoin the further killing of wolves under the depredation control provisions of the Wisconsin Permit.

I.    **PLAINTIFFS WILL SUCCEED ON THE MERITS**

Based on the speculative theory that killing depredating wolves will increase social tolerance of wolf recovery, the FWS unlawfully and dramatically expands a narrow exception to the ESA's otherwise strict prohibition on taking endangered species. In doing so -- by authorizing Wisconsin to implement a lethal depredation control program under Section 10(a)(1)(A) of the ESA -- the FWS stands the plain language, structure, and legislative history of the ESA on its head.  To support this bold departure from the ESA's statutory mandates and underlying congressional intent, the FWS offers no factual or scientific evidence demonstrating that lethal depredation control would in fact increase social tolerance or decrease illegal killings of wolves in Wisconsin. Because the Wisconsin Permit lacks any legal or factual basis, the FWS's grant of the Section 10(a)(1)(A) permit violates the ESA, is arbitrary and capricious, and must be vacated.

A.    **Killing endangered wolves to increase social tolerance violates the Endangered Species Act**

1.    **The plain language of the ESA does not authorize lethal take under Section 10(a)(1)(A).**

The ESA strictly prohibits the taking of endangered species.  16 U.S.C. § 1538(a). The broad scope of this prohibition is evident from the ESA's wide-ranging definition of "take," which means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  As a narrow exception to its otherwise sweeping prohibition against taking, the ESA authorizes the FWS to issue permits to take species "for scientific purposes or to enhance the propagation or survival of the affected species."  16 U.S.C. § 1539(a)(1)(A).

Section 10(a)(1)(A) provides a mechanism for carrying out research, reintroduction, or captive breeding programs that might be necessary for enhancing endangered species survival, but that would otherwise be prohibited under the ESA given that the Act's broad definition of taking includes capturing, trapping, and harassing. For example, Section 10(a)(1)(A) is used to authorize activities such as the capture and release of endangered individuals for purposes of population monitoring and surveying; the capture and release of endangered species to collect blood samples for disease or genetic research; the capture and transport of endangered species as part of reintroduction programs; and implementation of programs to breed endangered individuals in captivity. See, e.g., 70 Fed. Reg. 71554 (Nov. 29, 2005) (describing permit application to export and re-export live Mexican wolves for breeding and reintroduction); 71 Fed. Reg. 19893 (April 18, 2006) (granting permit to capture and transport Mexican wolves for reintroduction); 71 Fed. Reg. 34153 (June 13, 2006) (describing various permit applications to capture and release various species for surveys and ecological research).

In this case, the FWS used Section 10(a)(1)(A) of the ESA permit to authorize Wisconsin to kill depredating wolves based on unsupported sociological surmise. In particular, the FWS asserts that allowing the killing of depredating wolves in Wisconsin will enhance the survival of the species by minimizing negative attitudes toward wolf recovery and by decreasing the incidence of illegal killing that would otherwise result from a "public backlash" against wolf recovery. See Set of Findings, Exh. I at I-2-3. The FWS has not asserted that lethal depredation control in Wisconsin is necessary for any ecological, biological, or scientific purpose. In fact, as discussed below, the FWS has not shown any empirical connection between lethal depredation control in Wisconsin

11

and the enhanced survival of the species.  Rather, the FWS relies on unsupported social

theories to seize a narrow exception otherwise intended to address biological or scientific

needs.  This contravenes the plain language of Section 10(a)(1)(A) and is unlawful under

the ESA.[3]

> **2.** **Authorizing the killing of endangered wolves for depredation control under Section 10(a)(1)(A) contravenes the statutory framework of the ESA.**

---

[3] The FWS's impermissible attempt to expand the scope of Section 10(a)(1)(A) is especially troubling considering the de minimis impact of wolf predation on livestock in Wisconsin.  The most frequently preyed upon domestic species is cattle, with 31 cattle killed and 4 injured in Wisconsin in 2005.  See EA, Exh. B at B-20.  This accounts for far less than one percent of the cattle in the state (0.001%).  See Wisconsin 2005 Agricultural Statistics, United States Department of Agriculture (2005) (available at http://www.nass.usda.gov/wi/annbull/page63.pdf).  This low level of depredation is consistent with findings in other areas of the country demonstrating that, while "wolves often live near livestock . . . conflicts [are] uncommon considering the potential for depredations."  See Exhibit K, E.E. Bangs and J. Shivik, Managing Wolf Conflict with Livestock in the Northwestern United States, Carnivore Damage Prevention News, July 2001, attached to Knudsen Aff., at K-3 (cited in EA, Exh. B at B-71).  Indeed, wolf biologists summarizing the science of wolf depredation have found that "the overall impact of wolves on the livestock industry was small relative to other factors, such as disease, coyote depredation, birthing problems, weather, and accidents."  See Exhibit L, S.W. Breck and T. Meir, Managing Wolf Depredation in the United States: Past, Present, and Future, 19 Sheep and Goat Research Journal 41 (2003), attached to Knudsen Aff., at L-2 (cited in EA, Exh. B at B-26).

Most packs in Wisconsin do not prey on livestock, and "those that do are equally likely to repeat as to not repeat."  See Exhibit M, A. Treves et al., Wolf Depredation on Domestic Animals in Wisconsin 1976-2000, 30 Wildlife Society Bulletin 231 (2002), attached to Knudsen Aff., at M-9 (cited in Set of Findings, Exh. I at I-7).  This statement underscores the facts that the wolves killed under the Wisconsin Permit are being killed purely for social reasons – to give domestic livestock owners the satisfaction of punishment.  Implementing a lethal control program for the purpose of punishing endangered species is anathema to the conservation ethic that the FWS is required to uphold under the mandates of the ESA.  See, e.g., 16 U.S.C. § 1531(c)(1)(declaring "to be the policy of Congress that all Federal departments and agencies shall seek to conserve endangered and threatened species and shall utilize their authorities in furtherance of [the ESA]").  Likewise, killing up to 10% of the population of an endangered species to address a problem that impacts less than 1% of the domestic livestock population is irrational and illegal under the ESA.

The framework of the ESA – namely the varying levels of protection afforded to endangered, threatened, and experimental populations under the Act – supports a narrow reading of the scientific take exception in Section 10(a)(1)(A).  Under the ESA, there are three different categories of federally-protected species.  "Endangered" species are those species that are in danger of extinction.  16 U.S.C. § 1532(6).  "Threatened" species are those species that are likely to become endangered in the foreseeable future.  16 U.S.C. § 1532(20).  "Experimental populations," also known as "10(j)" populations, are those that are reintroduced in an area outside the current range of the endangered or threatened populations.  16 U.S.C. § 1539(j).

Among these categories, endangered species are afforded the highest level of protection.  See, e.g., Tennessee Valley Auth. v. Hill, 437 U.S. 153, 174 (1978), superseded by statute on other grounds at 16 U.S.C. § 1536(e)-(h) (recognizing that, by enacting the ESA, Congress "intended endangered species to be afforded the highest of priorities").  Corresponding to the fact that threatened species are by definition in less imminent danger of extinction, the ESA gives the FWS broader discretion in regulating threatened species.  To that end, Section 4(d) of the ESA authorizes the Secretary of Interior to "issue such regulations as [the Secretary] deems necessary and advisable to provide for the conservation of such species."  16 U.S.C. § 1533(d).  For experimental populations, Congress afforded the FWS even greater management flexibility, to encourage community and agency support for reintroduction programs.  In fact, Section 10(j) was enacted specifically to allow the FWS to implement management programs for experimental populations that would otherwise be prohibited.  See Wyoming Farm Bureau Fed'n v. Babbit, 199 F.3d 1224, 1233 (10th Cir. 2000) (explaining that Section

10(j) allows the FWS to utilize "control mechanisms (i.e., controlled takings) where the Act would not otherwise permit the exercise of such control measures against listed species").

By co-opting the limited take exception in Section 10(a)(1)(A) to implement lethal depredation control programs for endangered wolves, the FWS blurs the distinctions made by the ESA among the three categories of federally-listed species. In fact, the court in Defenders of Wildlife v. Norton, 354 F. Supp. 2d 1156 (D. Or. 2005), which vacated the April 2003 Final Rule and enjoined the FWS from implementing the Section 4(d) regulations, recognized that the lethal depredation control activities permitted under those regulations, "would be prohibited if the wolf retained its endangered status." Defenders of Wildlife, 354 F. Supp. 2d at 1160 n.3. Similarly, when enacting the ESA provisions governing experimental populations, Congress specifically states that taking for depredation control is the kind of action that would be permitted for experimental populations but would be otherwise prohibited under the Act:

> To encourage efforts to establish such experimental populations when the conservation needs of a species would be served by doing so, this amendment relaxes certain restrictions otherwise applicable to listed species . . . . The Committee also expects that, where appropriate, the regulations could allow for the directed taking of experimental populations. For example, the release of experimental populations of predators, such as red wolves, could allow for the taking of these animals if depredations occur or if the release of these populations would be frustrated by public opposition.

See H.R. Rep. No. 97-567 (1982), as reprinted in 1982 U.S.C.C.A.N. 2807, 2833-2834 (emphasis added).

Moreover, in the past, the FWS has attempted to implement lethal control programs only for threatened species. For example, as part of its unsuccessful attempt in 2003 to reclassify the status of the wolf from endangered to threatened, the FWS

implemented Section 4(d) regulations that allowed lethal depredation control. See April
2003 Final Rule, 68 Fed. Reg. at 15868 (stating that the Section 4(d) regulations that
authorized "the full spectrum of depredation control actions, from nonlethal opportunistic
harassment to lethal control of depredating wolves"). The FWS recognizes that the
Section 4(d) lethal depredation program implemented as part of the April 2003 Final Rule
is nearly identical to the lethal depredation control program that it is now attempting to
implement through Section 10(a)(1)(A). See, e.g., Wisconsin Memo, Exh. C at C-6
(stating that "the depredation control that would be carried out by [Wisconsin] DNR . . .
is identical in scope and methodology to that which has been carried out through January
2005 . . . under the 2003 special regulations under ESA section 4(d)"). See also Section
I.A.4 infra (explaining that wolves were downlisted from endangered to threatened in
Minnesota in 1978 primarily to allow the implementation of a lethal depredation control
program).

By using Section 10(a)(1)(A) to implement a lethal depredation control program
for endangered wolves in Wisconsin, the FWS expands the scope of this otherwise
limited exception to effectively erase any meaningful distinctions between the
management measures permitted for endangered, threatened, and experimental
populations. In doing so, the FWS impermissibly disregards Congress's deliberate intent
to create a hierarchy of species classifications and a corresponding hierarchy of federal
protection. In other words, these different levels of management were carefully
delineated such that species in greater danger of extinction would be afforded a
heightened level of protection under the Act. The FWS's disregard of this meticulous
scheme undermines the Act's foundation and is otherwise arbitrary and capricious.

3.      **Killing endangered species to increase social tolerance is impermissible under the ESA.**

Section 10(a)(1)(A) cannot be used as a tool for increasing social tolerance for

wolf recovery.  In the context of threatened populations, courts have already rejected the

contention that the regulated taking of threatened populations is necessary to increase

social tolerance, and therefore conserve, the species.  See Fund for Animals, Inc. v.

Turner, C.A. No. 91-2201, 1991 U.S. Dist. LEXIS 13426, at *16 (D.D.C. Sept. 27, 1991)

(unpublished opinion) (rejecting agency's assertion that a sport hunting season for grizzly

bears was necessary to conserve the species by increasing public tolerance), attached as

Exh. N to Knudsen Aff.; Sierra Club v. Clark 755 F. 2d at 614 (rejecting agency's

assertion that a sport hunting season for wolves in Minnesota was necessary to conserve

the species by increasing public tolerance).

In Sierra Club v. Clark, the FWS issued Section 4(d) regulations to establish a

public sport hunting season for the threatened wolf population in Minnesota based on the

theory that this would increase the public's perception of the value of wolves in

Minnesota.  See Sierra Club v. Clark, 577 F. Supp. 783, 790 (D. Minn. 1984), affirmed in

relevant part by 755 F.2d 608 (8th Cir. 1985).  Both the district court and the court of

appeals rejected this argument, finding that the FWS has a duty to conserve the species

based on biological factors.  The United States Court of Appeals for the Eighth Circuit

found that regulated taking could only be allowed under the ESA in limited

circumstances: "only in the extraordinary case where population pressures within the

ecosystem cannot otherwise be relieved can the Secretary permit the regulated taking of a

threatened species."  Sierra Club v. Clark, 755 F.2d at 614.

Similarly, in <u>Fund for Animals v. Turner</u> this Court rejected the argument that a public sport season for threatened grizzly bears was necessary to alleviate livestock depredation and increase social tolerance. 1991 U.S. Dist. LEXIS 13426 at *16. This Court found that direct taking of a threatened species was only permissible where the population had exceeded its habitat "in a limited ecological sense . . . rather than in a looser sense of any pressures creating conflict between bears and persons in surrounding communities." <u>Id.</u>

Congress has also rejected the concept of managing threatened and endangered species based on social tolerance. In the course of the debates during the enactment of the ESA, the Senate proposed a definition of conservation that would have incorporated traditional wildlife management concepts of balancing the needs of the species with desires of the public. The Senate's definition of conservation included instructions to manage protected species "at the optimum carrying capacity of their environment" through a variety of management techniques "including regulation and taking necessary to these ends." <u>See</u> S. 1983, 93rd Cong. § 11 (<u>as passed with amendments</u>, July 24, 1973). The Conference Committee eliminated this language from the definition of conservation, replacing it with the mandate that regulated taking could only take place "in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved." 16 U.S.C. § 1532 (3). Congress, in other words, rejected the traditional management concepts included in the Senate's proposed definition of conservation in favor of one that describes only ecological and not social factors. The court in <u>Sierra Club v. Clark</u> recognized the significance of these changes in its discussion of the legislative history of the ESA:

As the Sierra Club points out, the terms "management" and "optimum carrying capacity" are terms of art in the field of wildlife management. These terms are used to describe approaches to "manipulation [of species] . . . to produce 'harvestable surpluses' . . . for the benefit of hunters and fisherman . . . . The Conference Committee eliminated the terms "management" and "optimum carrying capacity." . . . We cannot agree with the Secretary that these changes and comments merely reflect an "unarticulated" or "nonexistent House view." Rather, they appear to have been a deliberate response to the concept of "management" in the Senate bill and an intentional limitation of the Secretary's discretion to allow the regulated taking of threatened species.

755 F.2d at 616-17.

Even though Congress and courts have rejected social factors as permissible basis for taking threatened and endangered species, the FWS nonetheless marches forward, wearing blinders to the language and structure of the ESA, asserting that social pressures demand the government kill wolves in order to save wolves. Even more striking is the FWS's impermissible reliance on speculative social policy concerns to kill wolves that are classified as "endangered" – a classification of species that is supposed to be afforded the highest protection and the greatest degree of caution under the ESA. Surely if courts have rejected social tolerance as a basis for killing threatened species, the killing of endangered species under similarly unsupported social justifications must also be rejected.

**4.      The prohibition against lethal take is inconsistent with past agency interpretation, policy, and practice.**

The FWS's issuance of the Wisconsin Permit represents a reversal of long-standing agency interpretation, policy, and practice. For example, the state wolf plans for Wisconsin, Minnesota, and Michigan, and the historic treatment of the wolf in the Great Lakes region, evidence that the FWS has previously interpreted the ESA to require downlisting endangered populations to threatened status, or delisting the endangered wolf

populations, before lethal depredation control programs could be implemented. In 1974,
the gray wolf was one of the first species to be listed as endangered under the ESA, but it
was reclassified to threatened in Minnesota in 1978, primarily to allow lethal control for
depredation purposes. Sierra Club v. Clark, 755 F.2d at 611; see also Exhibit O, Excerpts
from Minnesota Wolf Management Plan (2001), attached to Knudsen Aff., at O-6
("Wolves in Minnesota were federally reclassified as threatened in 1978, thus allowing
government trappers to kill depredating wolves under a set of strict guidelines"),
available in full at http://www.fws.gov/midwest/wolf/state-plans/mn-wolf-plan-01.pdf.

        Because wolves in Wisconsin or Michigan were not reclassified in 1978, those
states continued to manage their wolf populations in accordance with the FWS's
recognition that the ESA required reclassification before lethal control would be
permissible. For example, the 1999 Wisconsin Wolf Management Plan states that
"[f]ederal reclassification from endangered to threatened will allow [the Wisconsin
Department of Natural Resources] and USDA-WS to kill wolves causing depredation to
livestock and pets." See Exhibit P, Excerpts from Wisconsin Wolf Management Plan
(1999), attached to Knudsen Aff., at P-7 (cited in Set of Findings, Exh. I, at I-2 to I-3),
available in full at http://www.dnr.state.wi.us/org/land/er/publications/wolfplan/toc.htm.
Similarly, the Michigan Gray Wolf Recovery and Management Plan recognizes that
lethal depredation control may only be implemented "[w]hen wolves are downlisted from
endangered status." See Exhibit Q, Excerpts from Michigan Wolf Management Plan
(1997), attached to Knudsen Aff., at Q-4, available in full at
http://www.fws.gov/midwest/wolf/state-plans/mi-wolf-plan.pdf.

        In keeping with that long-standing practice, in April 2003 the FWS reclassified

the status of the wolf from endangered to threatened to gain the authority under Section 4(d) to implement "the full spectrum of depredation control actions, from nonlethal opportunistic harassment to lethal control of depredating wolves." See April 2003 Final Rule, 68 Fed. Reg. at 15868. It was not until that attempted reclassification was vacated and the accompanying Section 4(d) regulations were enjoined by Defenders of Wildlife v. Norton, 354 F. Supp. 2d 1156 (D. Or. 2005), that the FWS attempted to use Section 10(a)(1)(A) for lethal depredation control in Wisconsin. In fact, the FWS admits that the Section 10(a)(1)(A) permit issued to Wisconsin in 2005 was granted in response to its defeat in Defenders of Wildlife v. Norton, such that Wisconsin could "resume most of the wolf research and depredation control activities allowed under the previous 4(d) rule." See EA, Exh. B at B-10.

Despite its consistent practice for nearly thirty years, the FWS offers no explanation for its sudden decision to allow lethal depredation control for wolf populations that are listed as "endangered." This unexplained reversal of position is arbitrary and capricious. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 56 (1983); Pub. Citizen v. Steed, 733 F.2d 93, 99 (D.C. Cir. 1984) ("when the action involves a change in a settled course of agency behavior, the court should be satisfied both that the agency was aware it was changing its views and has articulated permissible reasons for that change, and also that the new position is consistent with the law") (internal quotations omitted); Nat'l Coalition against the Misuse of Pesticides v. Thomas, 809 F.2d 875, 883 (D.C. Cir. 1987) (vacating the EPA's reversal of a zero tolerance for a pesticide when the agency provided no explanation for its changed position).

In addition, the FWS's recent reversal of its long-standing position is further evidence that the FWS's use of Section 10(a)(1)(A) to implement lethal depredation control is nothing but an unprincipled attempt to expand a narrow statutory exception for political convenience. Killing wolves to save wolves in the name of public tolerance stands the plain language, structure, and legislative history of the ESA on its head. Moreover, expanding the scope of the Section 10(a)(1)(A) exception would jeopardize the integrity of protections afforded by the ESA, not only for the wolf but also for other endangered species. Therefore, FWS's issuance of a Section 10(a)(1)(A) permit that allows killing of endangered wolves in the name of sociological surmise cannot stand.

**B.      There is no factual basis for the argument that lethal depredation control of an endangered species will enhance the propagation or survival of the species.**

Even if killing depredating wolves for the purpose of increasing social tolerance were legally the type of action authorized by Section 10(a)(1)(A), the FWS has failed factually to demonstrate that these killings will "enhance the propagation or survival of the affected species." 16 U.S.C. § 1539(a)(1)(A). While the FWS contends that lethal depredation control is necessary to increase public tolerance for wolf recovery and prevent the illegal killing of wolves, the FWS has not shown (1) that the implementation of a lethal depredation control program in Wisconsin has or will increases social tolerance; (2) that implementation of a lethal control program decreases illegal killing; or (3) that lethal control decreases depredation rates. Because the FWS's social policy theory is unsupported by facts, the FWS's issuance of the Wisconsin Permit is arbitrary and capricious.

1.     **FWS has not demonstrated that social tolerance will be improved by the implementation of a lethal depredation control program**

The FWS has not shown that there is a link between increased depredation rates and decreased social tolerance in Wisconsin. Instead, the FWS relies on unsupported, general statements that lethal control could lead to increased social tolerance. Speculation by biologists about the social consequences of wolf management, made without any supporting data, is political guesswork, not science.

The few public opinion surveys that have quantitatively explored this question do not support the FWS's theory. For instance, a survey of Wisconsin residents in 2001 found that social "attitudes are not highly sensitive to wolf numbers or depredation frequency" and a "more fundamental process of social change in northern Wisconsin may ultimately influence support for wolf recovery." See Exhibit R, L.R. Naughton-Treves et al., Paying for Tolerance: Rural Citizens' Attitudes Toward Wolf Depredation and Compensation, 17 Conservation Biology 1500 (2003), attached to Knudsen Aff., at R-11 (cited in EA, Exh. B at B-27, 103). If social attitudes towards wolves are unlikely to change due to actual interactions with wolves, there is no basis for the FWS's conclusion that increased depredation rates would decrease social tolerance.

Moreover, the FWS has not even shown that Wisconsin residents support lethal control. In fact, even though the FWS has been operating a lethal control program in Wisconsin since 2003 – first under its unsuccessful attempt to reclassify the wolf as threatened and then under the unlawfully issued Section 10(a)(1)(A) permit – the FWS has not provided any evidence showing that public support for wolf recovery in Wisconsin increased after the implementation of lethal control. The most recent public opinion survey from Wisconsin, published in 2005 while the state was practicing lethal

control, shows that the majority of Wisconsin residents favored non-lethal methods of depredation control. See Naughton et al., Public Opinion Survey: Wolf Management in Wisconsin, 19 (2005) (hereinafter "Naughton Public Opinion Survey"), available at http://www.geography.wisc.edu/livingwithwolves/public_reports.htm, (cited in EA, Exh. B at B-103). Only commercial livestock producers responded with less than 60% support for non-lethal methods, and still 54.1% of this group supported non-lethal control. Id. at 30.

To support its theory that social tolerance would increase in Wisconsin if lethal control programs were implemented, the FWS also improperly relies on public opinion surveys from other areas of the country, and even different areas of the world. See Exh. I at I-6, citing D. Huber et al., Questionnaire on wolves in Croatia and Macedonia: comparison of public attitudes, in Wolves in Europe (C. Promberger and W. Schroder eds., 1992) and R.C. Wolstenholme, Attitudes of Residents Toward Wolves in a Rural Community in Northwestern Montana, 53 (December 1996) (unpublished Masters thesis, on file with Mansfield Library, University of Montana).[4] Because support for wolf recovery varies widely according to social group and location, see Naughton Public Opinion Survey Summary Report, supra at 3-4, the level of support for wolf recovery in Macedonia or a small rural community in Northwestern Montana is of little use when evaluating the affect of lethal control programs on social tolerance in Wisconsin.

---

[4] Another survey cited by FWS in support of its conclusions involved an entirely different species (the grizzly bear) and measured public opinion in a very distinct community (residents of the Flathead Indian Reservation). See Exh. I-6, citing J. R. Frost, Living with the Grizzly: Perceptions of Mission Valley Residents (June 1985) (unpublished Masters thesis, on file with Mansfield Library, University of Montana).

2.    **FWS has not shown that illegal killings will decrease as a result of lethal control programs.**

Not only has the FWS failed to show a link between lethal depredation control and social tolerance, but the FWS has also failed to provide any evidence that such programs would decrease the number of illegal killings. The FWS cites to no empirical studies or scientific literature demonstrating a quantitative connection between government instituted lethal take and illegal killings. Even advocates for lethal depredation control admit that there is no data on whether illegal killings decrease following the institution of lethal control. See Exhibit S, E.E. Bangs et al., Control of endangered wolves in Montana, in Ecology and Conservation of Wolves in a Changing World (L.N. Carybyn et al. eds., 1995), attached to Knudsen Aff., at S-7 (cited in EA, Exh. B at B-8-9). In analyzing the impact of lethal control in Montana, biologists admitted that whether "illegal killing of wolves has actually been reduced because of the control program is unknown" and whether "and to what extent the control program has actually enhanced wolf recovery is speculative." Id. Vague statements that illegal kill may "be on the rise" in Wisconsin are simply inadequate to justify the direct taking of an endangered species, especially without scientific support for the claim that lethal take will alleviate the problem of illegal killings. See Exhibit T, A. P. Wydeven and R. L. Jurewicz, Justification for Lethal Control Authority for Recovery Activity under Section 10(a)(1)(A) of the Endangered Species Act on Gray Wolves in Wisconsin, Wisconsin Department of Natural Resources (2005), attached to Knudsen Aff., at T-7 (cited in EA, Exh. B at B-8). Moreover, logic dictates that an individual with the propensity to disregard federal law and engage in illegal killings will not necessarily be dissuaded from such killings by a government-instituted lethal control program.

3.     **FWS has not shown that depredation rates will be reduced by lethal take.**

The scientific evidence is also weak as to whether lethal control of depredating wolves actually decreases the rate of depredation. Even biologists studying the long-standing Minnesota depredation control program express doubt as to whether lethal control decreases overall depredation rates. See Exhibit U, S.H. Fritts et al., Trends and Management of Wolf-Livestock Conflicts in Minnesota, U.S. Fish and Wildlife Service Resource Publication 181 (1992), attached to Knudsen Aff., at U-21 to U-24 (cited in EA, Exh. B at B-7). In 1992, FWS biologists found that there was no significant relationship "between the number of verified complaints in a year and the total number of wolves captured the previous year." Id. at U-23. Though the authors of the study posited that losses would have been greater without lethal take, they admitted that "no proof [could] be offered for the Minnesota wolf range as a whole" for their position. Id. Indeed, the study found that "depredations at many farms stopped even though few or no wolves were removed, but continued at other farms despite regular removal of wolves." Id. at U-22. A more recent scientific exploration of the efficiency of lethal versus non-lethal methods of depredation control found that scientists were still unable to "specifically identify which individual approach, or combination of techniques, is most important in mitigating depredation risk." See Exhibit V, M. Musiani et al., Wolves in Rural Agricultural Areas of Western North America: Conflict and Conservation, in Predators and People: From Conflict to Conservation (N. Fascione et al. eds., 2004), attached to Knudsen Aff., at V-15 to V-16 (cited in EA, Exh. B at B-26). The fact that killing depredating wolves does not necessarily reduce depredation further undermines the FWS's unsupported assertion that such killing will increase social tolerance.

II.      **THE FWS'S ACTIONS WILL CAUSE IRREPARABLE INJURY ABSENT AN INJUNCTION**

Absent an injunction in this case, wolves in Wisconsin will be killed. Because Plaintiffs are actively engaged in the research and observation of wolves in Wisconsin, they will suffer concrete aesthetic injury from the taking of wolves under ESA Section 10(a)(1)(A) permits. That the issuance of the Section 10(a)(1)(A) permits will harm wolves is undisputed. In the 2006 BiOp, the FWS fully acknowledges that "[t]he gray wolf is expected to be adversely affected by the proposed action." See 2006 BiOp, Exh. G at G-7.

Just as the death of the wolves taken under those permits is final, the injury suffered by Plaintiffs as a result of those deaths is irreparable. See The Fund for Animals, Inc. v. Espy, 814 F. Supp. 142, 151 (D.D.C. 1993) (issuing injunction and concluding that the aesthetic injury suffered by plaintiffs as a result of a research program involving the capture and slaughter of bison outside of Yellowstone was irreparable); Fed'n of Japan Salmon Fisheries Coop. Ass'n, 679 F. Supp. 37 (D.D.C. 1987) (holding that irreparable harm would result from the taking of marine mammals under a fishing permit issued in contravention of the Marine Mammal Protection Act); See The Fund for Animals v. Turner, 1991 U.S. Dist. LEXIS 13426 at *26 (holding, in a case involving threatened species, that "the loss even of the relatively few grizzly bears that are likely to be taken through a sport hunt . . . is a significant, and undoubtedly irreparable, harm").

In Defenders of Wildlife v. Norton, the district court enjoined the Section 4(d) regulations that were issued as part of the April 2003 Final Rule. 354 F. Supp. 2d at 1174. In doing so, the district court explained that an injunction was "necessary because the [Section] 4(d) rules . . . permit lethal and non-lethal harm to the gray wolf." Id.

Central to the court's decision to issue the injunction was the determination that "[t]he death or injury of endangered wolves . . . is irreparable injury." Id.

The analysis of irreparable harm in this case is not affected by the fact that the Wisconsin Permit authorizes the killing of only a finite number of wolves. In other cases involving the taking of threatened or endangered species, this Court has recognized that:

> even when there [is] not the remotest possibility that the planned agency activity during the period in which a preliminary injunction would be in place would eradicate the species, the strong congressional mandate contained in the ESA to protect endangered and threatened species support[s] the finding that the loss even the relatively few individuals that are likely to be taken through a sport hunt . . . is a significant, and undoubtedly irreparable, harm.

Am. Rivers, 271 F. Supp. 2d at 258-59 (internal quotation marks and citation omitted) (emphasis added). See also Defenders of Wildlife, 354 F. Supp. 2d at 1174 (rejecting Defendant's argument that "an injunction is not appropriate here because the impact on the gray wolf is modest").

When, as here, the taking of endangered species is at issue, irreparable harm can only be avoided by the issuance of an injunction. Id. at 259. The Supreme Court has recognized that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, that is irreparable; if such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531 (1987) (quoted in Fed'n of Japan Salmon Fisheries Coop. Ass'n, 679 F. Supp. at 48). Here, the taking of wolves under the Wisconsin Permit will cause irreparable harm absent injunction.

27

## III.    THE BALANCE OF HARMS WEIGHS IN PLAINTIFFS' FAVOR

Because this case involves the taking of endangered species under the ESA, Congress has already "spoken in the plainest of words, making it abundantly clear that it has given the policy of conservation of endangered species the highest of priorities." Am. Rivers, 271 F. Supp. 2d at 261, citing Tennessee Valley Auth. v. Hill, 437 U.S. 153 (1978) (internal quotation marks omitted). As such the balance of harms "must be struck in favor of the overwhelming need to devote whatever effort and resources [are] necessary to avoid further diminution of national and worldwide wildlife resources." Id., citing Tennessee Valley Auth. v. Hill, 437 U.S. at 177 (internal quotation marks omitted).

Even setting aside Congress' clear intent to prohibit the taking of endangered species, the balance of harms in this case weigh in Plaintiffs' favor. Absent an injunction, Plaintiffs will suffer irreparable harm caused by the lethal take of endangered wolves. Not only will taking wolves under the unlawfully issued permits cause irreparable injury to the wolves, but such takings will also injure the Plaintiffs, who are deeply committed to and actively involved in promoting wolf recovery in Wisconsin through efforts such as education, outreach, and providing input to state agencies regarding wolf management. See Declaration of Tom Herschelman ("Herschelman Decl."), attached hereto, at ¶ 6; Declaration of Karlyn Berg ("Berg Decl."), attached hereto, at ¶ 5. Taking of wolves in these state pursuant to the Wisconsin Permit "lead to the deaths of individual animals, disturb and stress intra-pack relationships, and cause a decline in the area wolf population." See Herschelman Decl. at ¶ 8; Berg Decl. at ¶ 7.

Defendants, however, will not suffer from any cognizable harm if the injunction is issued. Indeed, the only rationale that the FWS has provided for the issuance of the Section 10(a)(1)(A) permit to Wisconsin is that, without the government-sponsored

28

killing of depredating wolves, there is "the likelihood of a larger increase in illegal wolf killing and loss of public support for wolves which could result from increasing incidence of livestock depredations." See 2006 BiOp , Exh. G at G-19. As discussed above, this contention is speculative and lacks any scientific basis. Additionally, because Plaintiffs are challenging only the lethal-take provisions of the Wisconsin permit, the Wisconsin Department of Natural Resources will continue to be able to conduct scientific research or nonlethal depredation control as authorized by the permit.

Not only is the FWS's rationale speculative, but there is also no reason to think that any loss of public support resulting from a preliminary injunction would cause greater harm to wolves than killing wolves as authorized by the unlawfully issued Section 10(a)(1)(A) permits. In Fund for Animals v. Turner, this Court rejected a rationale similar to the one advanced by the FWS in this case. In Turner, this Court rejected the defendants' argument that creating a limited hunt of grizzly bears would in the long run promote conservation and recovery of the species by confining bears to their range and reducing bear-human conflicts. 1991 U.S. Dist. LEXIS 13426 at *21.

## IV.    THE PUBLIC INTEREST DEMANDS AN INJUNCTION

By enacting the ESA, Congress has already made the determination that prohibiting the taking of endangered species is in the public interest. See Tennessee Valley Auth. v. Hill, 437 U.S. at 174 ("examination of the language, history, and structure of the [ESA] . . . indicates beyond a doubt that Congress intended endangered species to be afforded the highest of priorities"); Fund for Animals v. Turner, 1991 U.S. Dist. LEXIS 13426 at *26 (recognizing that the Supreme Court in TVA v. Hill "underscore[s] the weight Congress has placed on the protection of endangered and threatened species"). Cf. Fed'n of Japan Salmon Fisheries Coop. Ass'n, 679 F. Supp. at

49 (issuing injunction preventing take of marine mammals in accordance with unlawfully issued permits because Congress, in enacting the Marine Mammal Protection Act, has already determined that takings are harmful to the environment and that protection is in the public interest).  Given that wolves are endangered species protected under the ESA's strict prohibitions against takings, there can be little doubt that issuing an injunction to prevent the taking of wolves under the unlawfully issued Section 10(a)(1)(A) permits is in the public interest.

## CONCLUSION

For the foregoing reasons, this Court should issue a preliminary injunction

preventing the lethal taking of any wolves for depredation control purposes under the

Section 10(a)(1)(A) permit issued to the Wisconsin DNR on April 24, 2006.


Dated: July 24, 2006

Patricia Lane, DC # 382842
plane@hsus.org
Jonathan R. Lovvorn, DC # 461163
jlovvorn@hsus.org
The Humane Society of the United States
2100 L Street
NW Washington DC 20037
(202) 955-3669
(202) 778-6132 (facsimile)

Brian B. O'Neill, MN # 82521
boneill@faegre.com
Richard A. Duncan, MN # 192983
rduncan@faegre.com
Elizabeth H. Schmiesing, MN # 229258
eschmiesing@faegre.com
Sanne H. Knudsen, MN # 0344552
sknudsen@faegre.com
**FAEGRE & BENSON LLP**
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-3901
(612) 766-7000
(612) 766-1600 (facsimile)

Attorneys for Plaintiffs The Humane Society
of the United States, Animal Protection
Institute, Friends of Animals and Their
Environment ("FATE"), Help Our Wolves
Live ("HOWL"), Indigenous Environmental
Network, Klamath Forest Alliance, and
RESTORE: The North Woods.

M1:1333916.05