reviewing the WWMP. If the WWMP is revised, WS will evaluate this EA to determine if WS' compliance with the revised WWMP would result in needs for action and/or impacts greater than those analyzed. Some examples of actions that might be taken when the revised WWMP is implemented that could trigger revision of this analysis include: (1) WS is requested to take a higher proportion of the wolf population than is proposed in this EA or cumulative impacts on the wolf population in WI (mortality from all known causes) exceeds that analyzed in this EA; (2) the plan results in a request for WS to conduct WDM to protect resources not analyzed in this EA; (3) the plan results in requests for WS to change or add methods of conducting WDM that would result in greater impacts on the affected environment than those analyzed in this EA; or (4) mortality from all know causes results in a precipitous decline in statewide wolf populations. If this is the case, then WS and the USFWS will revise this EA in accordance with the NEPA.

### 1.4.4   Site Specificity

This EA analyzes the potential impacts of wolf damage management on all public and private lands in Wisconsin under MOU, Cooperative Agreement, and in cooperation with the appropriate public land management agencies. Information on the counties where WS has responded to WDM complaints and a description of the role of the Wisconsin wolf management zones is provided in Section 1.4.1.

Planning for the management of wolf damage is conceptually similar to federal or other agency actions whose missions are to stop or prevent adverse consequences from anticipated future events for which the actual sites and locations where they will occur are unknown but could be anywhere in a defined geographic area. Examples of such agencies and programs include fire and police departments, emergency clean-up organizations, insurance companies, etc. Although some of the sites where wolf damage will occur can be predicted (Treves et al. 2004), all specific locations or times where such damage will occur in any given year cannot be predicted (Ruid et al. 2005). This EA emphasizes major issues as they relate to specific areas whenever possible, however, many issues apply wherever wolf conflicts and resulting management occurs, and are treated as such. The standard WS Decision Model (Slate et al. 1992) would be the site-specific procedure for individual actions conducted by WS in Wisconsin (see Chapter 3 for a description of the Decision Model and its application). The analyses in this EA are intended to apply to any action that may occur *in any locale* and at *any time* within the State of Wisconsin. In this way, WS and the USFWS believe they meet the intent of NEPA with regard to site-specific analysis and that this is the only practical way for WS and the USFWS to comply with NEPA and still be able to meet needs for assistance with WDM in a timely fashion.

The EA also addresses the impacts of WDM on areas where additional agreements may be signed in the future. Because the proposed action is to reduce damage and because the program's goals and directives are to provide services when requested, within the constraints of available funding and workforce, it is conceivable that additional wildlife damage management efforts could occur. Thus, the EA anticipates this potential expansion and analyzes the impacts of such efforts as part of the program. This EA emphasizes major issues as they relate to specific areas whenever possible, however, many issues apply wherever wolf damage and resulting management occurs, and are treated as such. The standard WS Decision Model (Slate et al. 1992) would be the site-specific procedure for individual actions conducted by WS in Wisconsin (see Chapter 3 for a description of the Decision Model and its application).

### 1.4.5  Public Involvement/Notification

As part of the public involvement process, and as required by the Council on Environmental Quality (CEQ), APHIS-NEPA, and DOI implementing regulations, this document and the subsequent Decision will be made available to the public through "Notices of Availability" (NOA) published in local media, direct mailings of NOA to parties that have specifically requested to be notified, and through agency news releases and web sites. New issues or alternatives raised after publication of public notices will be fully considered to determine whether the EA should be revisited and, if appropriate, revised. Public notification regarding the availability of the final EA and Decision will be identical to that used for the draft EA.

## 1.5     DECISION TO BE MADE

WS and the USFWS are lead agencies in the preparation of this EA. This proposal would require the participation of other agencies that have management authority and expertise related to this project (consulting agencies). The WDNR provides for the control, management, restoration, conservation and regulation of birds, fish, game, forestry and all wildlife resources of the state. The WDNR is a cooperating agency in the preparation of this EA. The Tribes exercise similar authority on tribal lands, in addition to having retained the right to hunt, fish, and gather on lands and waters within the ceded territories. Wolves also have special cultural significance for Native American Tribes. The Wisconsin Ho Chunk Nation and the Lac Du Flambeau Band of Lake Superior Chippewa accepted WS' and the USFWS' invitation to be cooperating agencies in the production of this EA. In the course of preparing the EA, both tribes determined that status as a consulting agency was a more appropriate description of their involvement in the project. The Great Lakes Indian Fish and Wildlife Commission (GLIFWC) manages/represents tribal interests in wildlife management on lands in the ceded territories. GLIFWC also agreed to be a consulting agency in the preparation of the draft EA. The lead, cooperating and consulting agencies worked together to address the following questions in the EA.

- ξ   How can WS and the USFWS best respond to the need to reduce conflicts with wolves and assist with wolf management in Wisconsin?

- ξ   What are the environmental impacts of alternatives for reducing damage by and conflicts with wolves and assisting with wolf management in Wisconsin?

- ξ   Would the proposed action have significant impacts on the quality of the human environment requiring preparation of an EIS?

Although the lead, cooperating and consulting agencies have worked together to produce a joint document and intend to collaborate on WDM in Wisconsin, each agency will be making its own decision on the alternative to be selected in accordance with the standard practices and legal requirements pertaining to each agency's decision making process.

## 1.6     OBJECTIVES FOR THE WISCONSIN WDM PROGRAM

- ξ   Respond to 100% of requests for wolf damage management assistance within 48 hours (investigate complaints within 48 hours).

- ξ   No significant adverse effects on the statewide wolf population or non-target species populations.

ξ   Contribute to understanding, ecology, biology and health of the Wisconsin wolf population.

All WDM would be conducted in compliance with appropriate federal, state, and local laws and court-mandated restrictions.

## 1.7    RELATIONSHIP OF THIS EA TO OTHER ENVIRONMENTAL DOCUMENTS

**1.7.1    ADC Programmatic EIS.** Wildlife Services has issued a final EIS (USDA 1997 Revised) and Record of Decision on the National APHIS-WS program.  This EA is tiered to the ADC Programmatic EIS.

**1.7.2    USDA-APHIS-WS Environmental Assessment: Management of Wolf Conflicts and Depredating Wolves in Wisconsin.**  Wildlife Services completed an EA to evaluate a program to reduce gray wolf (*Canis lupus*) damage in Wisconsin and a Decision and Finding of No Significant Impact (FONSI) was signed on October 31, 2004[5] (USDA 2004).  WS evaluated the need for wolf damage management in Wisconsin and the relative effectiveness of different alternatives to meet that need while accounting for the potential environmental effects (*i.e., issues analyzed in detail*) of each alternative.  The alternative selected by WS was an Adaptive Integrated Wolf Damage Management (AIWDM) approach, a strategy that uses a variety of methods either concurrently or sequentially, to reduce damage caused by wolves impacting livestock, pets, human health and safety, and other resources.  The 2004 WS EA will be replaced by the current analysis.

**1.7.3    USDA-APHIS-Wisconsin WS/USFWS Biological Opinion.**  A formal consultation occurred between the USFWS and WS on May 9, 2001 and August 12, 2003.  The USFWS determined that WS current and proposed wolf damage management program would have no effect or not likely to adversely affect listed species (not including wolves) in Wisconsin.  The USFWS also concluded that the proposed action would not jeopardize the Wisconsin wolf population (J. Smith, USFWS letter to D. Nelson, WS, August 12, 2003; L. Lewis, USFWS letter to G. Larson, WS, May 9, 2001).

**1.7.4    USDA-APHIS-Wisconsin WS/WDNR Environmental Review.**  A consultation occurred between the WDNR and WS on March 23, 2002.  The WDNR determined that WS current and proposed wolf damage management program would not adversely affect listed species in Wisconsin (S. Holtz, WDRN letter to D. Nelson, WS, March 23, 2002).

**1.7.5    USFWS Eastern Timber Wolf Recovery Plan.**  This plan (USFWS 1992) outlines management strategies and population goals for recovery of wolf populations and provides recommendations for wolf depredation control.  Pertinent information from this recovery plan is incorporated into this EA by reference.

**1.7.6    Wisconsin Gray Wolf Management Plan (WWMP) .**  The Wisconsin DNR initially listed wolves on the state list of endangered species in 1975.  A State recovery plan, initiated in 1989 and signed in 1999, set a goal for reclassifying the wolf from State endangered to threatened once the population remained at 80 or more wolves for 3 consecutive years (WDNR 1989).  The

---

[5]   Copies of the EA and Decision/FONSI are available for review from the State Director, USDA/APHIS/WS, 750 Windsor Street, Room 101, Sun Prairie, WI 53590.

Wisconsin wolf population has been at 80 or more since 1995 and downlisted to state threatened species in 1999. The WWMP (WDNR 1999), developed by the Wisconsin Wolf Advisory Committee of the WDNR and ratified by the Wisconsin Natural Resources Board on October 27, 1999, outlines management of wolves in Wisconsin for the next 10-15 years. These guidelines provide a conservation strategy for maintaining a healthy, viable gray wolf population in Wisconsin and contribute toward national recovery, while addressing problems that may occur with wolf depredation on livestock or pets. The WDNR removed wolves from the state threatened species list in 2004 and listed them as protected wild animals (nongame species). WS is cooperatively working with the WDNR and will comply with the policies and guidelines set forth in the WWMP (1999) whereby pertinent portions are incorporated by reference.

**1.7.7    Endangered Species Section 6 Cooperative Conservation Agreement Between the United States Fish and Wildlife Service and the Wisconsin Department of Natural Resources.** Effective date: September 28, 1976. Section 6 of the Endangered Species Act allows the USFWS to establish cooperative agreements with the states for the management of federally listed species. Under such agreements, any qualified and authorized employee or similarly qualified and authorized agent of a State Conservation Agency with a cooperative conservation agreement with the USFWS may take an endangered species without a permit or 4(d) rule from the USFWS provided the taking is not reasonably expected to result in: 1) the death or permanent disabling of the specimen; 2) the removal of the specimen from the state where the taking occurred; 3) the introduction of the specimen to an area outside the historical range of the species; or 4) holding the species in captivity for a period of more than 45 days. (50 CFR 17.21 (a)(5)). Wolf management activities in Wisconsin that are not covered by 50 CFR 17.21 and would require a USFWS permit or 4(d) rule include aversive conditioning using modified dog-training collars, rubber bullets and other non-lethal projectiles, and lethal removal of depredating wolves.

## 1.8    AUTHORITY AND COMPLIANCE

### 1.8.1    Authority of Agencies involved in WDM in Wisconsin

Wildlife Services and the USFWS are the lead agencies in the preparation of this EA. Wolf damage management in Wisconsin requires the participation of other agencies that have management authority and expertise related to this project (consulting agencies). The WDNR, was a cooperating agencies in the preparation of this EA. GLIFWC, the Wisconsin Ho-Chunk Nation and the Lac Du Flambeau Band of Lake Superior Chippewa were consulting agencies in the production of this EA.

#### 1.8.1.1 Wildlife Services

The mission of the USDA/APHIS/WS program is to provide federal leadership in managing conflicts with wildlife. Wildlife Services' mission, developed through its strategic planning process (USDA 1999), is: 1) *"to provide leadership in wildlife damage management in the protection of America's agricultural, industrial and natural resources, and 2) to safeguard public health and safety."* Wildlife Services' Policy Manual[6] reflects this mission and provides guidance for engaging in wildlife damage management through:

---

[6] WS' Policy Manual provides guidance for WS personnel to conduct wildlife damage management activities through Program Directives. WS Directives referenced in this EA can be found in the manual but will not be referenced as Literature Cited in Appendix A.

ξ    Training wildlife damage management professionals;
ξ    Research, development and improvement of strategies to reduce losses and threats from wildlife;
ξ    Collection, evaluation, and dissemination of management information;
ξ    Informing and educating the public on how to reduce wildlife damage; and
ξ    Providing a source for limited-use management materials and equipment, including pesticides.

The primary statutory authorities for the WS program are the Act of March 2, 1931 (46 Stat. 1468; 7 U.S.C. 426-426b) as amended, and the Act of December 22, 1987 (101 Stat. 1329-331, 7 U.S.C. 426c). WS recognizes that wildlife is an important public resource greatly valued by the American people. By its very nature, however, wildlife is a highly dynamic and mobile resource that can cause damage to agriculture and property, pose risks to human health and safety, and affect industrial and natural resources. WS conducts programs of research, technical assistance and applied management to resolve problems that occur when human activity and wildlife conflict.

WS has limited Federal authority in controlling wolf damage in Wisconsin, and must acquire State issued permits in order to collect, trap, or otherwise take wildlife in the State of Wisconsin.

Normally, individual wildlife damage management actions could be categorically excluded from further National Environmental Policy Act (NEPA) analysis, in accordance with implementing procedures for NEPA for the Animal and Plant Health Inspection Service (APHIS) (7 CFR 372.5(c), 60 Fed. Reg. 6,000, 6,003, (1995)). However, preparation of EAs serves to: 1) facilitate planning, interagency coordination, and the streamlining of program management; 2) clearly communicate to the public the analysis of individual and cumulative impacts of program activities; and 3) evaluate and determine whether there are any potentially significant or cumulative adverse impacts from the proposed program.

### 1.8.1.2  U.S. Department of Interior, Fish and Wildlife Service (USFWS)

The Mission of the U.S. Fish & Wildlife Service is to work with others to conserve, protect and enhance fish, wildlife, and plants and their habitats for the continuing benefit of the American people. Under the authority of the ESA, the USFWS acts to prevent the extinction of plant and animal species. It does this by identifying species at risk of extinction, designating ("listing") these species as threatened or endangered, providing protection for these species and their habitats, developing and implementing recovery plans to improve their status, and ultimately "delisting" these species and returning full management authority to the states and tribes. While a species is listed, most management authority for the species rests with the USFWS. However, the USFWS continues to work with other Federal agencies, states, and tribes along with private landowners to protect and recover the species. The USFWS helps ensure protection of listed species through consultations (section 7 of the ESA) with other Federal agencies. Under section 10 of the ESA, the USFWS also issues permits which provide exceptions to the prohibitions established by other parts of the Act. These permits provide for conducting various activities including scientific research, enhancement of propagation or survival, and incidental take while minimizing potential harm to the species. For species federally classified as threatened, the USFWS may also issue 4(d) rules which may allow

37

**Exhibit B-37**

for greater management flexibility for the species. The USFWS also issues grants for protection and enhancement of habitat and for research intended to improve the status of a listed species. 16 United States Code (U.S.C.) 1531 *et seq*., Endangered Species Act (ESA) of 1973, as amended; 16 U.S.C. 703-712,

### 1.8.1.3 Wisconsin Department of Natural Resources (WDNR)

The WDNR, under the direction of a Governor appointed Natural Resources Board, is specifically charged by the Legislature with the management of the State's wildlife resources. Although legal authorities of the Natural Resources Board and the WDNR are expressed throughout Wisconsin Administrative Code (WAC), the primary statutory authorities include establishment of a system to protect, develop and use the forest, fish and game, lakes, streams, plant life, flowers, and other outdoor resources of the state (s. 23.09 Wis. Stats.) and law enforcement authorities (s. 29.001 and s. 29.921 Wis. Stats.). The Natural Resources Board adopted mission statements to help clarify and interpret the role of WDNR in managing natural resources in Wisconsin. They are:

ξ    To protect and enhance our natural resources: our air, land and water; our wildlife, fish and forests and the ecosystems that sustain all life.
ξ    To provide a healthy sustainable environment and a full range of outdoor opportunities.
ξ    To ensure the right of all people to use and enjoy these resources in their work and leisure.
ξ    To work with people to understand each other's views and carry out the public will. And in this partnership consider the future and generations to follow.

After the status of wolves reverted to "endangered" in 2004 because of a court ruling, the WDNR's authority to respond to wolf-related damage and human safety concerns was provided by 50 CFR 17.21 as noted above and a permit issued under Section 10(a)(1)(A) of the Federal ESA. On September 13, 2005 the United States District Court in the District of Columbia enjoined the USFWS from allowing any activities authorized under permits issued to Michigan and Wisconsin, and the USFWS was further directed to "immediately halt any "takings" of gray wolves for depredation control purposes in Michigan and Wisconsin pursuant to these permits". At present WDNR authority for assistance with wolf depredations on livestock is limited to documenting the event and providing technical and operational assistance with non-lethal methods for resolving wolf damage including husbandry techniques (e.g., fencing, bringing animals in at night, guard dogs), and other non-lethal methods authorized under the cooperative conservation agreement between the USFWS and WDNR (Section 1.7.7).

### 1.8.1.4 Great Lakes Indian Fish and Wildlife Commission (GLIFWC)

The Great Lakes Indian Fish and Wildlife Commission is an agency of eleven Ojibwe nations in Minnesota, Wisconsin, and Michigan, with off-reservation treaty rights to hunt, fish and gather in treaty-ceded lands and waters. It exercises powers delegated by its member tribes. GLIFWC assists its member tribes in the implementation of off-reservation treaty seasons and in the protection of treaty rights and natural resources. GLIFWC provides natural resource management expertise, conservation enforcement, legal and policy analysis, and public information services. GLIFWC's member tribes include: the Bay Mills Indian Community, Keweenaw Bay Indian Community and the

38

Lac Vieux Desert Band in Michigan; the Bad River, Red Cliff, Lac du Flambeau, Lac Courte Oreilles, Sokaogon and St. Croix Bands in Wisconsin; and the Fond du Lac and Mille Lacs tribes in Minnesota. All member tribes retained hunting, fishing and gathering rights in treaties with the U.S. government, including the 1836, 1837, 1842, and 1854 Treaties.

GLIFWC's Board of Commissioners, comprised of a representative from each member tribe, provides the direction and policy for the organization. Recommendations are made to the Board of Commissioners from several standing committees, including the Voigt Intertribal Task Force (VITF). The VITF was formed following the 1983 Voigt decision and makes recommendations regarding the management of the fishery in inland lakes and wild game and wild plants in treaty-ceded lands of Wisconsin.

### 1.8.1.5 Federally Recognized Native American Tribes in Wisconsin.

If and when wolves are removed from the federal endangered species list, the Wisconsin Native American tribes will have authority for wolf management on tribal lands. The federally recognized Native American tribes in Wisconsin at the time this EA was completed include the Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation, Forest County Potawatomi Community, Ho-Chunk Nation of Wisconsin, Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin, Lac du Flambeau Band of Lake Superior Chippewa Indians of the Lac du Flambeau Reservation of Wisconsin, Oneida Tribe of Indians in Wisconsin, Red Cliff Band of Lake Superior Chippewa Indians of Wisconsin, Sokaogon Chippewa Community, St. Croix Chippewa Indians of Wisconsin, Stockbridge Munsee Community, and the Menominee Indian Tribe of Wisconsin.

## 1.8.2    Compliance with Federal and State Statutes

Several federal laws, state laws, and state regulations regulate USFWS, WDNR and WS actions. Wildlife Services, the WDNR and the USFWS comply with these laws and regulations, and consult and cooperate with other agencies as appropriate.

### 1.8.2.1  National Environmental Policy Act (NEPA).
The National Environmental Policy Act (NEPA) of 1969 (42 USC Section 4231 et seq.) is implemented by Federal Agencies pursuant to Council on Environmental Quality (CEQ) Regulations (40 CFR Sections 1500-1508) and agency implementing regulations. The USFWS and WS prepare analyses of the potential environmental impacts of program activities to meet procedural requirements of NEPA and to facilitate planning, decision-making, and public and interagency involvement.

NEPA and its supporting regulations require that an EA be a concise public document that provides sufficient evidence and analysis to determine if an EIS should be prepared, aids in WS' compliance with NEPA, describes the need for action, alternatives, and environmental impacts, and includes a list of agencies/persons consulted.

Environmental documents pursuant to NEPA must be completed before work plans consistent with the NEPA decision can be implemented. Wildlife Services also coordinates specific projects and programs with other agencies. The purpose of these contacts is to coordinate any wildlife damage management that may affect resources managed by these agencies or affect other areas of mutual concern.

39

**1.8.2.2  Endangered Species Act (ESA).**  It is Federal policy, under the ESA, that all Federal agencies seek to conserve threatened and endangered (T&E) species and utilize their authorities in furtherance of the purposes of the Act (Sec.2(c); Sec.7(a)(1)).  Where appropriate, WS conducts Section 7 consultations with the U.S. Fish & Wildlife Service (USFWS) to ensure that "*any action authorized, funded or carried out by such an agency . . . is not likely to jeopardize the continued existence of any endangered or threatened species . . . Each agency shall use the best scientific and commercial data available*" (Sec.7(a)(2)).  Wildlife Services obtained a Biological Opinion (BO) from USFWS in 1992 regarding the potential effects of the National WS program on T&E species and prescribing conservation measures and Reasonable and Prudent Measures for avoiding jeopardy (USDA 1997 Revised, Appendix F).  Wildlife Services is in the process of initiating formal consultation at the programmatic level to reevaluate the 1992 BO and to fully evaluate potential effects on T&E species listed or proposed for listing since the 1992 USFWS BO.

In addition to this programmatic consultation, Wisconsin WS has completed formal Section 7 consultations on May 9, 2001 and August 12, 2003 regarding potential effects of the proposed action for this EA (J. Smith, USFWS, August 12, 2003; L. Lewis, USFWS, WS, May 9, 2001). Furthermore, if USFWS issues a section 10(a)1(A) permit or 4(d) rule for depredation control, as described in this EA, the USFWS will complete an internal formal consultation on the issuance of that permit/rule. When this consultation is completed, WS and the WDNR will comply with all reasonable and prudent measures identified in the Biological Opinion (BO), and the extent practicable, any additional conservation recommendations.

**1.8.2.3  National Historic Preservation Act (NHPA) of 1966 as amended.**  The National Historic Preservation Act (NHPA) of 1966, and its implementing regulations (36 CFR 800), requires federal agencies to:  1) determine whether activities they propose constitute "undertakings" that can result in changes in the character or use of historic properties and, 2) if so, to evaluate the effects of such undertakings on such historic resources and consult with the State Historic Preservation Office regarding the value and management of specific cultural, archaeological and historic resources, and 3) consult with appropriate American Indian Tribes to determine whether they have concerns for traditional cultural properties in areas of these federal undertakings. Wildlife Services actions on tribal lands are only conducted at the tribe's request and under signed agreement; thus, the tribes have control over any potential conflict with cultural resources on tribal properties. All Native American tribes in Wisconsin and GLIFWC were invited to be cooperating agencies in the production of this EA.  The Lac Du Flambeau Band of Lake Superior Chippewa Indians, the Wisconsin Ho-Chunk Nation and GLIFWC chose to be consulting agencies in the preparation of this EA.  A copy of the draft EA was provided to each Native American tribe in the State to allow them opportunity to express any concerns that might need to be addressed prior to a decision.

A consultation occurred between WS and WSHPO on February 4, 2002 regarding the actions proposed in the 2004 WS EA on WDM in Wisconsin.  It was determined that the *"Project as described will have no effect on significant cultural resources"* and the proposed action does not constitute a "Federal undertaking" as defined under Section 106 of the NHPA.  Wisconsin WS would, as requested by WSHPO, halt work and contact the WSHPO if any cultural resources or human remains are discovered.  The types of actions proposed in this EA are the same as for the 2004 WS wolf damage management EA,

40

**Exhibit B-40**

therefore, WS and the USFWS have determined that this finding is still valid.

**Coastal Zone Management Act of 1972, as amended (16 USC 1451-1464, Chapter 33; P.L. 92-583, October 27, 1972; 86 Stat. 1280).** This law established a voluntary national program within the Department of Commerce to encourage coastal states to develop and implement coastal zone management plans. Funds were authorized for cost-sharing grants to states to develop their programs. Subsequent to Federal approval of their plans, grants would be awarded for implementation purposes. In order to be eligible for federal approval, each state's plan was required to define boundaries of the coastal zone, to identify uses of the area to be regulated by the state, the mechanism (criteria, standards or regulations) for controlling such uses, and broad guidelines for priorities of uses within the coastal zone. In addition, this law established a system of criteria and standards for requiring that federal actions be conducted in a manner consistent with the federally approved plan. The standard for determining consistency varied depending on whether the federal action involved a permit, license, financial assistance, or a federally authorized activity.

The USFWS and WS have determined that the proposed action would not affect coast resource and would, by default, be consistent with the State's Coastal Zone Management Program. The Wisconsin Coastal Management Program has concurred with the determination that the actions addressed in this EA are unlikely to have a significant impact on the coastal zone.

**1.8.2.4 Environmental Justice and Executive Order 12898 - *"Federal Actions to Address Environmental Justice in Minority Populations and Low Income Populations."*** Executive Order 12898, entitled, "Federal Actions to Address Environmental Justice in Minority Populations and Low Income Populations" promotes the fair treatment of people of all races, income levels and cultures with respect to the development, implementation and enforcement of environmental laws, regulations and policies. Environmental justice is the pursuit of equal justice and protection under the law for all environmental statutes and regulations without discrimination based on race, ethnicity, or socioeconomic status. Environmental Justice is a priority for all Federal Agencies. Executive Order 12898 requires Federal agencies to make environmental justice part of their mission, and to identify and address disproportionately high and adverse human health and environmental effects of Federal programs, policies and activities on minority and low income persons or populations. APHIS implements Executive Order 12898 principally through its compliance with NEPA. All WS activities are evaluated for their impact on the human environment and compliance with Executive Order 12898. Wildlife Services personnel use only legal, effective, and environmentally safe wildlife damage management methods, tools and approaches. It is not anticipated that the proposed action would result in any adverse or disproportionate environmental impacts to minority and low income persons or populations.

**1.8.2.5 Executive Order 13045 - *Protection of Children from Environmental Health and Safety Risks.*** Children may suffer disproportionately from environmental health and safety risks for many reasons, including their development, physical and mental status. Because WS makes it a high priority to identify and assess environmental health and safety risks that may disproportionately affect children, WS has considered the impacts that this proposal might have on children. The proposed WDM would occur by using only legally available and approved methods where it is highly unlikely that children

41

would be adversely affected. For these reasons, WS concludes that it would not create an environmental health or safety risk to children from implementing this proposed action.

**1.8.2.6  Removal of Wild Animals and Authorization to Remove Wild Animals Causing Damage or Nuisance.** Wisconsin regulations (Wis. Stat. 29.885) grants WDNR the authority to authorize the removal of wild animals causing damage or a nuisance. WDNR Code (WAC, Natural Resources (NR) 12.10) is established to administer Wisconsin regulations relating to the removal of wild animals causing damage or nuisance. This administrative rule defines criteria whereby landowner, lessees, or occupants may remove from lands under their control wild animals constituting a nuisance. WS assistance to those requesting assistance in reducing wolf damage, which could involve the removal of wolves, would be conducted under authority granted to WS, or landowners, lessees, or occupants, by the WDNR and USFWS.

**1.8.2.7  Wildlife Damage and Nuisance Control – Subchapter III Wisconsin Administrative Code NR 12.5-12.55.** This subchapter outlines the regulations for implementing and administering the payment of claims for damage associated with endangered and threatened species, especially gray wolves. Claimants for compensation must be in compliance with carcass disposal requirements of s. 95.50, Stats., for livestock claims and, for farm-raised deer claims, the farm-raised deer fencing requirements of ss. 9020 and 90.21, Stats.

42

## CHAPTER 2:  ISSUES

### 2.0     INTRODUCTION

Chapter 2 contains a discussion of the issues relevant to the analysis, including issues that received detailed environmental impact analysis in Chapter 4 (Environmental Consequences) and issues not considered in detail, with the rationale.  Pertinent portions of the affected environment are included in this chapter in the discussion of issues to be addressed in detail.  Additional information on the affected environment is incorporated into the discussion of the environmental impacts in Chapter 4 and the description of the current program.

### 2.1     ISSUES CONSIDERED IN DETAIL IN CHAPTER 4

The following are issues that have been identified as areas of concern requiring consideration in this EA and were used to develop alternatives:

- Effects on wolf populations in Wisconsin

- Effects on non-target species populations, including T&E species

- Effects on public and pet health and safety

- Impacts to stakeholders, including aesthetics of wildlife

#### 2.1.1     Effects on Wolf Populations in Wisconsin

The federally protected gray wolf, which currently is listed as "endangered" in Wisconsin is targeted by the proposed action.  Some persons may be concerned that WDM activities would result in the loss of local populations of wolves or have a cumulative adverse affect on the viability of Wisconsin's wolf population.  As analyzed, WS and WDNR would remove only a small percentage of the wolf population in relation to the total Wisconsin wolf population.  Additionally, natural dispersal and reproduction of wolves in Wisconsin, and wolf reproduction and dispersal from Minnesota and Michigan into Wisconsin would continue to aid in the recolonization and recovery of wolves.  The Wisconsin wolf population is estimated to have increased five fold in the past 10 years.  The USFWS, WS and WDNR anticipate that the Wisconsin wolf population will continue to increase, although this rate of increase is anticipated to slow as available habitat is occupied, and if.wolf depredation events increase.

#### 2.1.2     Effects on Non-target Species Populations, Including Threatened and Endangered Species

A common concern among members of the public and wildlife professionals, including WS, WDNR and USFWS personnel, is that the proposed action or any of the alternatives would result in removing individuals or adversely impact populations of native wildlife species, particularly State or federally listed threatened and endangered species.  Special efforts are made to avoid jeopardizing threatened and endangered species though biological evaluations of the potential effects of the alternatives and the establishment of special restrictions or standard operating procedures.  Measures intended to reduce the effects on non-target species populations are described in Sections 3.5, 4.2, and Appendix B.

43

Currently, there are 20 federally listed threatened, endangered and candidate plant and animal species and 239 state listed threatened and endangered plant and animal species in Wisconsin. In prior Section 7 consultations regarding WDM activities similar to those proposed in this EA, the USFWS concurred with WS that, with the exception of wolves, the target species, wolf damage management activities would have no effect or would be not likely adversely affect federally listed animal and bird T/E species in Wisconsin (J. Smith, USFWS, WS, August 12, 2003; L. Lewis, USFWS, WS, May 9, 2001). Likewise, the WDNR has also concurred that WDM actions similar to those proposed in this EA would have no effect or would be not likely to adversely affect State listed animal and bird T/E species (S. Holtz, WDNR, March 23, 2002).

If USFWS issues a section 10(a)1(A) permit or 4(d) rule for depredation control as described in this EA, the USFWS will complete an internal formal consultation on the issuance of that permit/rule. When this consultation is completed, WS and the WDNR will comply with all reasonable and prudent measures identified in the BO, and to the extent practicable, any additional conservation recommendations. The standard operating procedures include measures intended to reduce the effects on non-target species populations and are described in Sections 3.5, 4.2, and Appendix B.

### 2.1.3    Effects on public safety and pet health and safety

A common concern is whether the proposed action or any of the alternatives pose an increased threat to public and pet health and safety. In particular, there is concern that the methods of wolf removal (i.e., trapping, snaring, and shooting) may be hazardous to people and pets, or that continued increases in wolf populations might threaten public and pet health or safety. Wildlife Services will respond to complaints regarding wolf depredations on pets and concerns about human health and safety as outlined in the WWMP (WDNR 1999).

Firearm use is a very sensitive issue because of concerns relating to public safety and firearms misuse. To ensure safe use and awareness of firearms issues, WS employees who use firearms to conduct official duties are required to attend an approved firearms safety and use training program within 3 months of their appointment and a refresher course every 2 years afterwards (WS Directive 2.615). Wildlife Services employees who use firearms as a condition of employment, are required to sign a form certifying that they meet the criteria as stated in the *Lautenberg Amendment* which prohibits firearm possession by anyone who has been convicted of a misdemeanor crime of domestic violence.

### 2.1.4    Humaneness of methods to be used

The issue of humaneness, as it relates to the killing or capturing of wildlife is an important but complex concept. Kellert and Berry (1980) in a survey of American attitudes toward animals stated that 58% of their respondents, *". . . care more about the suffering of individual animals . . . than they do about species population levels."* Schmidt (1989) indicated that vertebrate pest control for societal benefits could be compatible with animal welfare concerns, if *" . . . the reduction of pain, suffering, and unnecessary death is incorporated in the decision making process."*. Suffering has been described as a *" . . . highly unpleasant emotional response usually associated with pain and distress."* However, suffering *" . . . can occur without pain . . . ,"* and *". . . pain can occur without suffering . . . "* (American Veterinary Medical Association (AVMA) 2001). Because suffering carries with it the implication of a time frame, a case could be made for *" . . . little or no suffering where death comes immediately . . . "* (California Department of Fish and Game (CDFG) 1999), as in the case of shooting or drug-induced euthanasia.

44

Defining pain as a component of humaneness may be a greater challenge than that of suffering. Pain obviously occurs in animals. Altered physiology and behavior can be indicators of pain, and the causes that elicit pain responses in humans would *". . . probably be cause for pain in other animals . . ."* (AVMA 1987). However, pain experienced by individual animals probably ranges from none to considerable (CDFG 1999). Wildlife Services acknowledges that some damage management methods, such as foot-hold traps and cable restraints, may cause varying degrees of pain in different animal species for varying lengths of time. However, at what point pain diminishes or stops under these types of restraint has not been measured by the scientific community.

Pain and suffering as it relates to tools used to capture animals, is often interpreted differently by professional wildlife biologists and lay people. People that receive damage or threats of damage may perceive humaneness differently, particularly if their pets or livestock are injured or killed and they contemplate the humaneness of having their pets or livestock killed by wolves. Wildlife managers and the public would both be better served to recognize the complexity of defining suffering, since *". . . neither medical nor veterinary curricula explicitly address suffering or its relief"* (CDFG 1991, 1999). Therefore, humaneness, in part, appears to be a person's perception of harm or pain inflicted on an animal, which, in turn, is governed by the person's past experiences. Different people may perceive the humaneness of an action in different ways. The challenge in coping with this issue is how to achieve the least amount of suffering with the constraints imposed by current technology, funding, workforce and social concerns. Research suggests that with some methods, such as restraint in foot-hold traps, changes in the blood chemistry of trapped animals indicate "*stress*" (USDA 1997 Revised: 3-81). However, such research has not yet progressed to the development of objective, quantitative measurements of pain or stress for use in comparing the relative humaneness of WDM techniques.

The decision making process involves tradeoffs between the aforementioned aspects of pain from damage management activities and the needs of humans to reduce wildlife damage. An objective analysis of this issue must consider not only the welfare of wild animals but also the welfare of humans and prey animals if damage and losses are not stopped.

Wisconsin WS and WDNR personnel are trained professionals who strive to use the most humane methods available to them, recognizing the constraints of current technology, workforce, funding and social concerns. In determining the damage management strategy, preference would be given to practical and effective non-lethal methods. However, non-lethal methods may not always be applied as a first response to each damage problem. The most appropriate response could be a combination of non-lethal and lethal methods, or there could be instances where application of lethal methods alone would be the most appropriate strategy.

Wildlife Services has improved the selectivity and humaneness of many management devices through research and is striving to bring new, more humane tools and methods into use. Wildlife Services, through the combined efforts of the WS state programs and the USDA, APHIS, WS, National Wildlife Research Center, has been involved in the testing and development of a number of non-lethal WDM techniques including fladry (Section 3.3.1), pyrotechnics, livestock guarding animals, remote activated guard (RAG) devices, and light-siren devices (Appendix B). The NWRC has also been conducting research on tranquilizer devices to reduce stress and injuries to animals captured in traps. However, improved WDM methods are still needed. Until new methods and tools are developed, a certain amount of animal suffering could occur (e.g., when non-lethal damage management methods are neither practical, available, or effective). Whenever possible and practical, WS also employs euthanasia methods recommended by the AVMA (2001)

45

or the recommendations of a veterinarian, even though the AVMA euthanasia methods were developed principally for companion animals and slaughter of food animals, and not for free-ranging wildlife.

### 2.1.5    Sociological Issues Including Impacts on Aesthetic Values

#### 2.1.5.1    Variations in Perception of Wildlife Damage

During the last 200 years, broad-scale changes in land-use patterns have occurred as the increasing human population settled North America. Notable is the large-scale conversion of natural landscapes to agricultural and urban environments. As humans encroach on wild habitats, they compete with wildlife for space and other resources, which increases the potential for conflicts. Concurrent with this growth and change is a desire by some segments of the public to completely protect all wildlife, which can create localized conflicts with resource managers and owners experiencing problems with some species. *The Animal Damage Control Programmatic Final Environmental Impact Statement* (EIS) (USDA 1997, Revised) summarizes the American perspective of the relationship between wildlife values and wildlife damage, as follows:

*"Wildlife has either positive or negative values, depending on varying human perspectives and circumstances . . . Wildlife is generally regarded as providing economic, recreational and aesthetic benefits . . . and the mere knowledge that wildlife exists is a positive benefit to many people. However . . . the activities of some wildlife may result in economic losses to agriculture and damage to property . . . Sensitivity to varying perspectives and value is required to manage the balance between human and wildlife needs. In addressing conflicts, wildlife managers must consider not only the needs of those directly affected by wildlife damage but a range of environmental, sociocultural and economic considerations as well."*

Biological carrying capacity is the limit of the land or habitat to support healthy populations of species without long-term degradation of either the health of the species or the associated environment (Decker and Purdy 1988). The wildlife acceptance capacity (also known as cultural carrying capacity) is the limit of human tolerance for wildlife, or the maximum number of a given species that can coexist compatibly with local human populations (Decker and Purdy 1988). These capacities are especially important in areas inhabited by humans because they define the sensitivity of a local community to a specific wildlife species/problem. For any given situation involving a wildlife conflict, individuals directly or indirectly affected by the damage will have varying degrees of tolerance for the damage and the species involved in the damage. This tolerance determines the "wildlife acceptance capacity," which is often lower than the "biological carrying capacity." For example, the biological carrying capacity of gray wolves (*Canis lupus*) in Wisconsin appears to be higher than their current population; however, for some individuals and groups, the state has as many or more wolves than can be tolerated (i.e., for these individuals, the wildlife acceptance capacity has been reached). Once the wildlife acceptance capacity of a species is reached or exceeded, humans will demand implementation of programs, both lethal and non-lethal to reduce damage or threats of damage.

The human attraction to animals has been well documented throughout history, an idea supported by prehistoric cave paintings and the domestication of wild animals. Today's

American public is no exception, as evidenced by the large percentage of households that have pets or observe wildlife. Some people also may consider individual wild mammals and birds as "pets" and exhibit affection toward these animals. They may also want to have more wild animals in their immediate environment. Some people feel a spiritual bond with wild animals. Some examples of spiritual bonds with animals include the relationship between Native Americans and wolves discussed in Section 1.3.5, and Judeo-Christian beliefs that mankind should not second-guess the judgment of God in creating wolves and that it is morally inappropriate to destroy living creatures created by God just to protect the things of man. Conversely, some people have no emotional attachment to wildlife; some may even fear the presence of wild animals in their vicinity and demand their immediate removal. Conflicting wildlife values result in highly variable public opinions about the best ways to manage conflicts between humans and wildlife, making the implementation and conduct of wildlife damage management programs extremely complex.

Ideas about how these programs are implemented and conducted are as unique as the almost infinite combinations of philosophies, psyches, aesthetic values, personal attitudes, and opinions found in humans. These differences of opinion result in concerns that the proposed action or the alternatives would result in the loss of aesthetic or cultural/spiritual benefits to the general public and resource owners.

### 2.1.5.2 Aesthetic and Sociological Values of Wildlife

Wildlife generally is regarded as a source of economic, recreational, and aesthetic benefits (Decker and Goff 1987), and the mere knowledge that wildlife exists is a positive benefit to many people. Aesthetics is the philosophy dealing with the nature of beauty, or the appreciation of beauty. Therefore, aesthetics is truly subjective, dependent on what an observer regards as beautiful. Wildlife populations provide a range of direct and indirect social and economic benefits (Decker and Goff 1987). Direct benefits are derived from a user's personal relationship or direct contact with wildlife and may include either consumptive (e.g., using or intending to use the animal such as in hunting or fishing) or non-consumptive use (e.g., observing or photographing animals) (Decker and Goff 1987). Indirect benefits, or indirect exercised values, arise without a human being in direct contact with an animal and are derived from experiences such as looking at pictures or videos of wildlife, reading about wildlife, or benefiting from activities or contributions of animals such as their use in research (Decker and Goff 1987). Two forms of indirect benefits exist according to Decker and Goff (1987): bequest and pure existence. Bequest benefits arise from the belief that wildlife should exist for future generations to enjoy; pure existence benefits accrue from the knowledge that the animals exist in the human environment (Decker and Goff 1987) or that they contribute to the stability of natural ecosystems (Bishop 1987).

Some people directly affected by problems caused by wolves insist on the lethal removal of the problem animal(s) from the area where the conflict occurs. Others have the view that all wildlife involved in conflicts should be captured and relocated to another area to alleviate the problem. Individuals not directly affected by a conflict may be supportive of affected humans, neutral, or totally opposed to any removal of wildlife from specific locations or sites.

Those who oppose removal of wildlife may do so because of emotional ties to the animals, which are similar to the bonds that may exist between a human and a pet. Some

may totally oppose WDM, especially if lethal methods are used, and want WS, the USFWS and WDNR to teach tolerance of wolves causing conflicts. These individuals generally believe that individual animals have inherent value and should not be killed to meet the desires of mankind. They may also feel that individual animals have rights similar to those of humans and that, if it is inappropriate to treat a human in a given manner, then it is also inappropriate to treat an animal in that manner.

The goal of IWDM is to provide relief from damage or threats of damage while minimizing the potential for negative impacts on the environment including aesthetic and social values. WS would only conduct WDM at the request of citizens, organizations, and others who are experiencing problems (i.e., where a need exists) and in coordination with the WDNR. When requests for WDM assistance are received, WS, the WDNR and tribes, as appropriate, and the person or agency with the damage problem consult, issues/concerns are addressed, an appropriate plan of action is developed, and reasons for selecting the action are explained. Management actions are carried out in a dedicated, humane and professional manner and as outlined in the WWMP (WDNR 1999).

## 2.2   ISSUES NOT CONSIDERED IN DETAIL AND RATIONALE FOR EXCLUSION

### 2.2.1   Impacts on Wisconsin's Biodiversity

No WS or WDNR project would be conducted to eradicate any native wildlife species or population, including wolves. Wildlife Services and the WDNR operate according to International, Federal, and State laws and regulations enacted to ensure species viability. The proposed action would be conducted on a relatively small percentage of the Wisconsin land mass. The take of any wildlife species analyzed in this EA is a small proportion of the total population and is probably insignificant to the viability and health of the population (see Section 4.3). In addition, any reduction in the local population is temporary because immigration from adjacent areas and reproduction by the remaining animals replaces the animals removed during damage management operations as long as suitable habitat exists. None of the alternatives proposed in this EA will affect the viability of wolf or non-target wildlife species populations, and, consequently, the impacts of the current WS program on biodiversity statewide and nationwide are expected to be very minor (USDA 1997 Revised).

### 2.2.2   Wolf Damage Should be Managed by Hunters and Trappers

Because wolves are federally protected, and because of the court-ordered reversion of wolves to endangered, private hunters and trappers cannot be authorized to conduct WDM in Wisconsin at the present time. If WS selects Alternatives 1-4, WS will be acting as agents of the WDNR when conducting WDM activities. Once wolves are removed from the Federal list of threatened and Endangered species in Wisconsin, the WDNR and the tribes will have authority to determine the role of hunters and trappers in WDM.

Wildlife Services provides professional wildlife damage management services at site-specific locations when requested by citizens experiencing a wildlife/human conflict. Wildlife Services personnel respond to requests for assistance in accordance with the Congressional direction provided to WS that authorizes the program. Hunters and trappers do not always have the time, resources, or training to respond to site specific problems with wolves.

48

### 2.2.3    Appropriateness of Preparing an EA Instead of an EIS for Such a Large Area

Some individuals might question whether preparing an EA for an area as large as the State of Wisconsin would meet the NEPA requirements for site specificity. If a determination is made through this EA that the proposed action would have a significant environmental impact, then an EIS would be prepared in accordance with NEPA. In terms of considering cumulative impacts, a single EA analyzing impact for the entire State should provide a better analysis of cumulative impacts than multiple EAs covering several smaller areas. In addition, WS and WDNR would only conduct WDM in a very small area of the state where damage is occurring or likely to occur, and damage may occur anywhere in Wisconsin.

## CHAPTER 3: ALTERNATIVES

### 3.0     INTRODUCTION

This chapter consists of six parts: 1) an introduction, 2) description of alternatives considered and analyzed in detail including the Proposed Action (Alternative 2), 3) a description of IWDM, 4) WDM methods that could be used or recommended, 5) a description of alternatives considered, but eliminated from detailed analysis, and 6) a table of SOPs. Alternatives were developed for consideration using the WS Decision Model (Slate et al. 1992), *"Methods of Control"* (USDA 1997 Revised, Appendix J) and the *"Risk Assessment of Wildlife Damage Control Methods Used by the USDA Animal Damage Control Program"* (USDA 1997 Revised, Appendix P). Four alternatives were recognized, developed, and analyzed in detail; and six alternatives were considered but not analyzed in detail with supporting rationale.

**Agency Decisions**

These alternatives describe the actions available to the USFWS (issuing permits or developing special section 4(d) regulations for wolves[7]) and WS and WDNR (involvement in wolf damage management). Although the agencies have worked together to produce a joint document and intend to collaborate on WDM in Wisconsin, each of the lead agencies will be making its own decision on the alternative to be selected in accordance with the standard practices and legal requirements pertaining to each agency's decision making process.

Although the agencies make independent decisions, the decisions made by the agency with regulatory authority can restrict the actions taken by the other agencies. For example, permitting decisions and 4(d) rules by the USFWS can limit the actions taken by the state and WS. WS may select an alternative that would give it access to all non-lethal and lethal WDM techniques but it would only be able to use methods allowed by the USFWS. Conversely, the USFWS may issue a permit/rule allowing for the use of non-lethal and lethal WDM techniques, but WS could select an alternative that only allowed non-lethal methods. In this instance, the permittee (WDNR) could use non-lethal and lethal WDM techniques but WS would only provide assistance with non-lethal methods.

WS would conduct WDM activities in Wisconsin as an agent of the WDNR and it is the WDNR that has applied for a permit from the USFWS. Therefore, management decisions by the state can also impact WS' actions. The USFWS would approve or deny access to methods specifically requested by WDNR. If WDNR only asks for permission to use a limited set of WDM techniques, WS' actions would be limited to that set of methods even if WS chose an alternative that allowed for the use of any WDM method. However, similar to the discussion above, WS is not obligated to use all methods permitted by WDNR. WS could select an alternative which restricted WS to using a subset of the total methods permitted by WDNR.

For simplicity and clarity of analysis, each of the alternatives below is described and its impacts are analyzed as if the lead agencies had selected the same alternative. If agencies make different decisions, the impact of the action will be intermediate to the impacts of the alternatives analyzed in the EA and would usually be most similar to the impact of the more restrictive of the various independent decisions, depending upon the relative authority of each agency.

---

[7] The USFWS may develop 4(d) rules if wolves are federally reclassified as "threatened".

The four alternatives analyzed in detail are:

**Alternative 1 - Non-lethal WDM Only**.  Under this alternative, the USFWS would issue Section 10(a)(1)(A) permits or develop and implement section 4(d) regulations authorizing the use of non-lethal WDM techniques.  This alternative may be selected with or without an option to restrict use of some non-lethal WDM techniques to WS and WDNR.  WS and WDNR would only provide technical and operational assistance with non-lethal WDM.

**Alternative 2 - Integrated WDM (No Action / Proposed Action).**  The No Action alternative serves as the baseline against which the impacts of management alternatives can be compared and can be defined as being the continuation of current management practices (CEQ 1981).  However, the current program of non-lethal WDM has only been in effect since the Federal Court Decision on September 13, 2005 (Sections 1.3.1 and 1.3.9).  Insufficient data exist at this time to adequately use current management conditions as a baseline for analysis.  In contrast, Alternative 2 was used from April 1, 2003 to September 13, 2005 and data are available on the environmental impacts of this alternative.  Therefore, for purposes of analysis, we are using Alternative 2 as the "No Action" baseline when comparing the other alternatives to determine if the real or potential adverse affects are greater, lesser or the same (Table 4-4).  Under this alternative, the USFWS would issue Section 10(a)(1)(A) permits or section 4(d) regulations authorizing the use of lethal and non-lethal WDM techniques.  The State and WS would have access to the complete range of non-lethal and lethal WDM methods.  This alternative may be selected with or without an option to restrict use of some non-lethal WDM techniques to WS and WDNR.

**Alternative 3 - Technical Assistance Only**.  The USFWS would not issue any Section 10(a)(1)(A) permits or develop and implement section 4(d) regulations for wolf damage management.  WS would not conduct operational WDM in Wisconsin but could provide technical assistance on WDM methods that do not require permits or other authorization from the USFWS (Appendix B).  Wildlife Services would also be able to conduct evaluations of potential wolf depredation sites needed to administer the wolf damage compensation program.  Because of the cooperative conservation agreement between the USFWS and WDNR, the state could still use and authorize others to use many non-lethal WDM techniques (Section 1.7.7, Appendix B).

**Alternative 4 - No Federal WDM in Wisconsin.**  Under this alternative, the USFWS and WS would provide no assistance with WDM.  The USFWS would not issue any Section 10(a)(1)(A) permits for wolf damage management.  Wildlife Services would not provide technical assistance or operational damage management services.  Because of the cooperative conservation agreement between the USFWS and WDNR, the state could still use and authorize others to use many non-lethal WDM techniques (Section 1.7.7, Appendix B).

## 3.1    DESCRIPTION OF ALTERNATIVES

### 3.1.1    Alternative 1 - Non-lethal WDM Only

Under this alternative, the USFWS would only issue permits or develop and implement section 4(d) regulations for the use of non-lethal WDM techniques, and WS would only provide operational and technical assistance with non-lethal WDM methods.  Wildlife Services would also assist the WDNR with radio-collaring and monitoring the Wisconsin wolf population.

Many non-lethal WDM techniques do not require "take" as defined by the ESA and its implementing regulations, and do not require a permit or authorization from the USFWS.  These

methods include but are not limited to animal husbandry practices, installation of fencing and use of livestock guarding animals (Section 3.2.1, Appendix B). The WDNR and their appropriately trained and designated agents have access to some non-lethal techniques involving harassment or handling of wolves without permits from the USFWS (Section 3.2.2). Authority for these methods is granted under (50 CFR 17.21) because of the wolf cooperative conservation agreement between the USFWS and WDNR (Section 1.7.7). However, some non-lethal methods require a permit or other authorization from the USFWS, specifically, dog training collars for aversive conditioning and non-lethal projectiles like rubber bullets and bean bags. In the permit/authorization the USFWS has the option of restricting the use of these methods to WS and the WDNR, or the USFWS may grant the WDNR and WS the authority to train and equip personnel outside their agencies to use these methods.

There are provisions within the regulations pertaining to the ESA that allow for the lethal take of an endangered species in response to a demonstrable (either immediate or non-immediate) threat to human safety. Response to less immediate threats and wolf predation on pets will be restricted to non-lethal methods. No lethal take of wolves for damage management could occur.

### 3.1.2    Alternative 2 - Integrated WDM (No Action/ Proposed Action)

Under this alternative, an IWDM program would be used in Wisconsin to protect livestock, pet and human safety from gray wolf damage and promote wolf conservation in accordance with the WWMP (WDNR 1999), the USFWS rules and/or permits for WDM, the Eastern Gray Wolf Recovery Plan (USFWS 1992) any WDNR guidelines for conducting depredation control (Appendix E), and all applicable policies, agreements and guidelines among WDNR, WS, USFWS and the tribes. All WDM activities would also be consistent with other uses of the area and would comply with appropriate Federal, State and local laws and conducted in cooperation with other governmental agencies and tribal governments, as appropriate.

The IWDM strategy would encompass the use of the full range of legal, practical and effective methods of preventing or reducing damage and conserving the wolf population while minimizing harmful effects of damage management measures on humans, wolves, other wildlife species, domestic animals, and the environment. Under this action, WS and the WDNR would provide technical assistance and operational damage management, including non-lethal and lethal management methods selected after applying the WS Decision Model (Slate et al. 1992). Wildlife Services would be able to assist with wolf research and population monitoring. This alternative would be similar to Wisconsin WDM practices that were conducted under the 2003 section 4(d) rule and an April 2004 permit issued by the USFWS. This strategy for WDM was discontinued on September 13, 2005 when all WDM activities allowed under the USFWS permit were enjoined by the U.S. District Court in the District of Columbia.

Wolf damage management would be conducted on private or public property in Wisconsin when the resource owners/ managers (property owners/ land managers) request assistance to alleviate wolf damage, wolf damage is verified by WS, and an *Agreement for Control* or other comparable document has been completed. The WWMP (WDNR 1999) further establishes that in order for lethal WDM methods to be used, the producer/owner must sign a depredation management plan (farm plan) for the property which includes damage abatement recommendations. The cooperator is required to agree to (sign) the plan prior to receiving financial assistance with supplies for non-lethal WDM and before any operational WDM could be conducted. Individuals and agencies with wolf damage and/or concerns about wolves would receive technical assistance in the form of instructional sessions, demonstrations, equipment loans, and information on the availability and use of non-lethal and lethal methods (Section 3.3, Appendix B). In determining the damage

52

management strategy, preference would be given to non-lethal methods when they are deemed practical and effective. Non-lethal methods used by landowners could include, but would not be limited to, changes in farm management practices and pet care/supervision, frightening devices, exclusion, guarding animals, habitat modification, and behavior modification of problem wolves. Non-lethal methods used operationally by WS and WDNR may include foot-hold traps and cable restraints (Olson & Tischaefer 2004) with "stops" (used to live capture wolves for relocation and/or attaching radio collars, and collars used to activate frightening devices), frightening devices and aversive conditioning (e.g., with modified dog training collars) and non-lethal projectiles (Appendix B). In its permit request, the WDNR has requested that USFWS grant the WDNR and WS the authority to train and equip landowners/managers to use non-lethal projectiles such as rubber bullets.

Lethal methods would be used to reduce damage after practical and appropriate non-lethal methods have been considered and determined to be ineffective or inappropriate in reducing damage to acceptable levels. In some instances, the most appropriate initial response to a wolf damage problem could involve concurrent use of a combination of non-lethal and lethal methods, or there could be instances where application of lethal methods alone would be the most appropriate strategy. Lethal methods could include shooting, calling and shooting, cable restraints, and euthanasia of wolves live-captured in foot-hold traps, cable restraints or other live-capture devices.

The WDNR has also asked for authority for lethal take of up to 10% of the annual wolf population estimate each year.[8] Actual annual lethal take of wolves for WDM is anticipated to usually be much lower than this level. The annual maximum value of 10% was estimated based on review of similar WDM program which has been in effect in Minnesota since 1986. For the period of 1993 to 2002 intentional take for WDM in Minnesota ranged from 3.9 to 9.4% (average 6.4%) of the estimated state population. During the period of 2003- 2005 when an integrated WDM approach was used in Wisconsin, annual lethal take was 17 wolves in 2003, 24 in 2004, and 29 in 2005. This level of take represents approximately 5.1, 6.4, and 6.8 percent of the late-winter Wisconsin wolf population for 2003, 2004, and 2005, respectively.

Wolves in Wisconsin are currently a federally protected "endangered" species. Except in situations of threat to human safety[9] or to aid an individual wolf[10], endangered wolves can only be taken by WDNR, or agents of the WDNR, using non-lethal means. Additional forms of take of endangered wolves, including lethal take, can be authorized by a permit from USFWS. Taking wolves by members of the public without a permit are subject to stiff penalties, including fines and imprisonment. If wolves are reclassified as a threatened species, the USFWS could grant limited authority for the take of depredating wolves in a 4(d) rule. The USFWS would issue permits or authorization via special rules under section 4(d) for the use of non-lethal (i.e., aversive conditioning and non-lethal projectiles) and lethal WDM techniques. The permits or authorizations would stipulate the number of animals that can be taken and the methods that can be used; requirements for reporting take and disposition of carcasses; and provides measures to

---

[8] These estimates are derived from surveys conducted during late winter, prior to pup production, when population size is at an annual low.

[9] While federally protected under the ESA, anyone can take a wolf in defense of human life, that is, when a wolf is attacking a person. Additionally, USFWS, Federal land management agencies, MDNR or their designated agents can take wolves in cases of non-immediate but demonstrable threats to human safety without a permit or other authorization from the USFWS.

[10] USFWS, MDNR, federal land management agencies, or their designated agents, may take a wolf to aid a sick, injured, or orphaned wolf.

**Exhibit B-53**

operate under which would minimize the risk of or prevent the unintentional take of wolves; and annual reporting requirements (Section 3.5 and Chapter 4 discussions of impacts of each alternative on wolves and non-target species). The draft permit requires that all wolf mortalities be reported within 5 calendar days. The reporting requirements and close interagency coordination enable the use of an adaptive management approach which would be able to rapidly respond to unanticipated changes in the wolf population and impacts of the program. USFWS permits for the take of wolves would have to be renewed annually after an evaluation of the wolf population and impacts of the WDM program. If a permit is issued to the WDNR, WDNR and WS and tribal coordination regarding the use of lethal WDM methods would continue to be as described in the guidelines for conducting depredation control on wolves in Wisconsin (Appendix E).

Most wolf damage management activities are likely to be conducted on private land. Wolf damage management activities are only likely to be conducted on public land if that land is within the damage management perimeter (set by USFWS permits or other USFWS authorizations and the WWMP) around the site of a verified depredation event on private land or in the rare instance that a wolf poses a threat to human safety. However, wolf trapping and radio-collaring for wolf population monitoring is usually conducted on public land.

### 3.1.3    Alternative 3 - Technical Assistance Only

The USFWS would not issue any Section 10(a)(1)(A) permits or promulgate section 4(d) regulations for wolf damage management. WS would not conduct operational WDM in Wisconsin but could provide technical assistance on WDM methods that do not require permits from the USFWS (Appendix B). WS could also do site visits and evaluations of depredation events for compensation payments. Because of the cooperative conservation agreement between the USFWS and WDNR, the State could still operationally use and authorize others to use many non-lethal WDM techniques (Section 1.7.7, Appendix B). WS would not be able to operationally assist WDNR with wolf research and population monitoring.

Wolves in Wisconsin are currently a federally protected "endangered" species. Except in situations of threat to human safety[10], or to aid an individual wolf[11], endangered wolves can only be taken by WDNR, or agents of the WDNR, using non-lethal means. Additional forms of take of endangered wolves, including lethal take, would not be authorized by the USFWS under this alternative. Taking wolves by members of the public without a permit are subject to stiff penalties, including fines and imprisonment. The technical assistance recommendations that WS and WDNR could provide would be limited to measures legally available without special authorization from the USFWS. Individuals might choose to implement these non-lethal WDM recommendations on their own, request non-lethal control actions from authorized agencies and entities other than WS, or take no action.

### 3.1.4    Alternative 4 - No Federal WDM in Wisconsin

This alternative would result in no assistance from WS or the USFWS in reducing wolf damage in Wisconsin. The USFWS would not issue any Section 10(a)(1)(A) permits or other authorizations for wolf damage management. Wildlife Services would not provide technical assistance or operational damage management services. Because of the cooperative conservation agreement between the USFWS and WDNR, the state could still operationally use and authorize others to use many non-lethal WDM techniques (Section 1.7.7, Appendix B). All requests for WDM would be referred to the WDNR or the tribes as appropriate.

54

3.2     **WOLF DAMAGE MANAGEMENT STRATEGIES AND METHODOLOGIES**

Wildlife damage management is defined as the alleviation of damage or other problems caused by or related to the presence of wildlife (USDA 1997 Revised). A general description of the wildlife damage management approaches that could be used is provided below:

### 3.2.1     Integrated Wildlife Damage Management

During more than 80 years of resolving wildlife damage problems, WS has considered, developed, and used numerous methods for reducing wildlife damage problems (USDA 1997 Revised). Wildlife Services' efforts have involved the research and development of new methods, improvement of existing methods, and the implementation of effective strategies to resolve and prevent wildlife damage. The Wisconsin WS program works closely with the researchers with the USDA, APHIS, WS, National Wildlife Research Center (NWRC). The NWRC is the research arm of the WS program. The NWRC facility at Utah State University is the leading predator research complex in the world. Scientists assigned to the facility are dedicated to the WS operational program. Research at this facility has been critical to the testing and development of non-lethal methods of WDM, and has improved the selectivity, humaneness and efficacy of capture devices (Appendix B). State WS programs assist the NWRC with research projects and, because of the close collaboration between NWRC and the state programs, the latest research findings are rapidly incorporated into state damage management programs. The WDNR also conducts research on the efficacy and impacts of WDM methods.

Usually, the most effective approach to resolve wildlife damage is to integrate the use of several methods simultaneously or sequentially. Integrated Wildlife Damage Management (IWDM) is the implementation and application of safe and practical methods for the prevention and reduction of damage caused by wildlife based on local problem analyses and the informed judgment of trained personnel. The WS Program applies IWDM, commonly known as Integrated Pest Management (IPM), to reduce damage applying the Decision Model discussed in section 3.2.3 (Slate et al. 1992). The philosophy behind IWDM is to implement effective management techniques in the most cost-effective[11] manner possible while minimizing the potentially harmful effects to humans, target and non-target species, and the environment.

IWDM draws from the largest possible array of options to create a combination of techniques for the specific situations. IWDM may incorporate cultural practices, habitat modification, animal behavior modification, removal of individual animals, local population reduction, or any combination of these, depending on the characteristics of the specific damage problems.

### 3.2.2     Integrated WDM Strategies

#### 3.2.2.1     Technical Assistance Recommendations (implementation is the responsibility of the requester):

Technical assistance includes demonstrations on the proper use of some management devices (e.g., propane exploders, electronic guards, etc.) and information on animal husbandry, wildlife habits, habitat management and animal behavior modification. Technical assistance is generally provided following an on-site visit or verbal

---

[11] The cost of control may be a secondary concern because of overriding environmental, health and legal considerations.

55

consultation with the requester. Typically, several management strategies are described to the requester for short and long-term solutions to damage problems; these strategies are based on the level of risk, need and practical application. Technical assistance may require substantial effort by agency personnel in the decision making process, but the actual implementation is the responsibility of the requester. Technical assistance also includes site visits and verification of the cause of damage as may be necessary for compensation and financial assistance (for WDM prevention equipment) programs.

Education is an important element of program activities because wildlife damage management is about finding "balance" or coexistence between the needs of people and needs of wildlife. This is extremely challenging as nature is not static balance, but rather, is in continual flux. In addition to the routine dissemination of recommendations and information to individuals or organizations sustaining damage, lectures and demonstrations are provided to farmers, homeowners, and other interested groups. Wildlife Services frequently cooperates with other agencies in education and public information efforts. Additionally, technical papers are presented at professional meetings and conferences so that WS personnel, other wildlife professionals, and the public are updated on recent developments in damage management technology, laws and regulations, and agency policies.

**3.2.2.2 Operational Damage Management**:

Operational damage management assistance is implemented when the problem cannot be resolved through technical assistance. The initial investigation defines the nature and history of the problem, extent of damage, and verifies whether or not the problem is caused by wolves. Professional assistance is often required to resolve problems effectively, especially if the problem is complex, or the management technique requires the direct supervision by or involvement of a wildlife professional. Wolf biology and behavior and other factors are considered (WS Decision Model; Slate et al 1992) when developing site specific damage management strategies.

**3.2.3    Wildlife Services Decision Model used for Decision Making.**

WS and WDNR personnel use a thought process for evaluating and responding to damage complaints that is depicted by the WS Decision Model described by Slate et al. (1992) (Figure 3-1). The Decision Model is not a written documented process, but a mental problem-solving process similar to that used by all wildlife management professionals including those in the lead and consulting agencies when addressing a wildlife damage problem. Trained personnel assess the problem; and evaluate the appropriateness and availability (legal and administrative) of damage management strategies and methods based on biological, economic and social considerations including:

ξ   Species responsible for the damage (did wolves cause the problem or was it some other species?)
ξ   Magnitude, geographic extent, frequency, historical damage and duration of the problem including review of animal husbandry practices and producer efforts at non-lethal WDM.
ξ   Status of target and non-target species, including T/E species
ξ   Local environmental conditions
ξ   Potential biological, physical, economic, and social impacts
ξ   Potential legal restrictions

**Exhibit B-56**

ξ   Costs of damage management[12]

Following this evaluation, methods deemed to be
practical for the situation are incorporated into a
management strategy. After this strategy has been
implemented, monitoring is conducted and
evaluation continues to assess the effectiveness of the
strategy. If the strategy is effective, the need for
further management is ended. When damage
continues intermittently over time, WS and/or
WDNR personnel and the requester monitor and
reevaluate the situation. If one method or a
combination of methods fails to stop damage, a
different strategy is implemented. In terms of the
WS Decision Model (Slate et al. 1992), most damage
management efforts consist of a continuous feedback
loop between receiving the request and monitoring
the results, with the damage management strategy
reevaluated and revised periodically if necessary.



Figure 3-1. APHIS, WS Decision Model

### 3.2.4    Local Decision Making Process

The WDM program in Wisconsin follows the "co-
managerial approach" to solve wildlife damage or
conflicts as described by Decker and Chase (1997).
Within this management model, trained personnel
provide technical assistance regarding the biology
and ecology of wolves and effective, practical, and
reasonable methods available to the local decision
maker(s) to reduce wildlife damage. These decision makers may include community leaders,
private property owners/managers, and public property owners/managers. This includes non-
lethal and lethal methods. Technical assistance on alleviating damage caused by wolves is also
available from other State, Federal, and private organizations. Wildlife Services and other State
and Federal wildlife or wildlife damage management agencies may facilitate discussions at local
community meetings when resources are available, and make recommendations. Resource
owners and others directly affected by wolf damage or conflicts have direct input into the
strategies to resolve the problem(s). They may implement management recommendations
provided by WS or others, or may request management assistance from WS, other wildlife
management agencies, local animal control agencies, or private businesses or organizations.
Local decision makers compare the benefits versus the damage when deciding which methods
would be implemented. Local decision makers must weigh the cost of implementing each
methodology or a series of methodologies. These decision makers may include community
leaders, private property owners/managers, and public property owners/managers.

---

[12]   The cost of management may sometimes be secondary because of overriding environmental, legal, public health
and safety, animal welfare or other concerns

**Exhibit B-57**

### 3.3    WOLF DAMAGE MANAGEMENT METHODS

USDA (1997 Revised, Appendix J) describes some methods currently available for WDM. Several of these were considered in this assessment because of their potential use in reducing wolf damage to agricultural and natural resources, property and pets, and human health and safety. A listing and more detailed description of the methods used for WDM is found in Appendix B of this EA.

A farm plan would be developed upon the first investigation of depredation by wolves. The plan includes recommendations for suitable non-lethal methods and other practices which may reduce depredation on the farm. A signed plan is required before any operational WDM could be conducted on the farm. In Wisconsin, a compensation program is available to cover cost of livestock lost to wolf predation and veterinary bills for injured animals. A limited amount of financial assistance is available from WDNR to help producers pay for abatement practices when feasible. In some cases, financial assistance may also be available from private programs like the Bailey Wildlife Foundation Proactive Carnivore Conservation Fund.

#### 3.3.1    Non-Lethal Methods Available to All Without a USFWS Permit

Some WDM methods are available to anyone without a permit. These consist primarily of non-lethal preventive methods such as cultural practices and habitat modification. Cultural practices and other management techniques are implemented by the livestock producer and property owners/managers. Livestock producers and property owners/managers may be encouraged to use these methods, based on the level of risk, need, and professional judgment on their effectiveness and practicality. Wildlife Services, WDNR and USFWS involvement in the use of these methods is usually limited to providing technical assistance. As noted above, a State compensation program pays for the cost of animals lost to wolf predation and veterinary bills for injured animals. The WSMP (WDNR 1999) requires that before compensation can be given or lethal control can be used to address confirmed depredation problems, the producer has to sign a depredation management plan for the property and follow abatement /husbandry recommendations".

**Farm Management Practices** implemented by livestock producers to prevent or reduce wolf damage might include: 1) maintaining healthy, well-fed animals, 2) pregnancy testing cattle, 3) properly disposing of dead livestock carcasses through rendering, burying, liming, or burning, 4) conducting calving or lambing operations in close proximity to the farmyard, when practical, 5) penning vulnerable livestock at night where practical, 6) monitoring livestock on a regular basis to detect any disease, natural mortality, or predation, and 7) incorporating non-lethal methods. Property owners and land managers could implement their own farm management practices or request the assistance of other agencies or private organizations to implement them, or take no action.

**Exclusion** may be used to prevent or limit access by predators to livestock pastures, calving or lambing areas, or livestock confinement areas. Several designs of anti-predator fencing have been developed and tested. Where practical and cost effective, sheep, calves or other vulnerable livestock may be penned near farm buildings at night.

**Fladry** involves installing waving flags hanging about every 20 inches from thin rope or cable stretched about 20 inches above the ground. Fladry may be used in addition to or in substitution of fences, as a new means to protect domestic animals from depredation by wolves.

**Livestock guarding animals** such as guarding dogs may be used to protect livestock from wolves. Livestock guarding animals may distract, deter, repel or attract wolves that could depredate on livestock.

**Guarding and hazing** involves guarding an area and then using pyrotechnics or other light/noisemaking devices to frighten wolves away from the site. It can be used as an aversive technique, but requires that the projectiles must be used every time the animal attempts to prey on the protected resource so they don't identify conditions when they can obtain prey without receiving a negative experience (Shivik 2004).

**Frightening devices** are methods that usually involve a light, sound, or motion device designed to deter wolves from a certain area. Strobe and flashing lights, propane exploders, sirens, and various combinations of these devices have all been used in attempts to reduce livestock losses to coyote, with wide ranging degrees of effectiveness (Linhart 1984*a*, Andelt 1987). Animal habituation (becoming accustomed) to the stimulus is one of the primary limiting factors for primary repellents. Moving the devices intermittently and randomly as well as alternating the stimuli (e.g. a different type of noise or light) may extend the effective period of the system (Shivik and Martin 2001). The period of efficacy may also be extended by using systems which are motion activated or only activated when a wolf wearing a transmitter collar comes into close proximity to the protected site (Appendix B). However, systems which require capturing the wolf and installing a special transmitter collar to activate the device are not included in the methods available to anyone without a permit (Section 3.3.2).

**Compensation for wolf damage** in the form of monetary payments to livestock producers for full or partial value for domestic animals killed. Such payments are made by State of Wisconsin for reimbursements for all verified wolf losses (confirmed or probable) on domestic animals. The Wisconsin wolf damage compensation program is funded by 3% of the state income tax return checkoff and 3% of license plate fees collected from the sale of endangered resources license plates. In some years the claims for wolf damage have exceeded the resources available from license plate revenue. Because the WDNR has been directed by the legislature to provide full compensation for wolf depredations, the WDNR Bureau of Endangered Resources has been forced to use additional program funds to make compensation payments. When this occurs, these funds are made available at a cost to other endangered species programs.

### 3.3.2    Non-lethal Methods Available without Permits for States with Cooperative Conservation Agreements with the USFWS

Some non-lethal methods and research projects (e.g., population monitoring) involve harassment or handling wolves that is considered "taking" of an endangered species as defined by the ESA. These activities would ordinarily require a permit from the USFWS. However, Section 6 of the ESA allows the USFWS to establish cooperative conservation agreements with the states for the management of federally listed species (Section 1.7.7). Appropriately trained and authorized personnel or their designated agents from states with these agreements are authorized to use some non-lethal methods that would otherwise be considered take. Methods that require capture and handling of wolves would be conducted only by personnel from the WDNR or their appropriately trained and authorized designated agents.

> **Frightening Devices** that require placing a transmitter collar on a wolf are available to the WDNR and their designated agents without a permit because of the cooperative conservation agreement. Overall efficacy and the period of efficacy of frightening devices may be improved by using systems which are motion activated or only activated

59

when a wolf wearing a transmitter collar comes into close proximity to the protected site (e.g., a Radio Activated Guard; Appendix B). Methods that do not require placing a transmitter collar or similar device on the wolf are available to anyone without a permit (Section 3.3.1).

**Capture and relocation** of problem wildlife species is a technique that is sometimes used to alleviate wildlife damage problems. The success of a relocation effort, however, depends on the potential for the problem individuals to be captured efficiently and the existence of an appropriate relocation site (Nielsen 1988). While relocation may be appropriate in some situations when the species population is small, wolves are found in much of the suitable habitat in Wisconsin and relocation is not necessary for the maintenance of viable populations. Wolves relocated into suitable habitat are very likely to encounter other wolves with established territories. Wolves are highly territorial and the newly introduced wolves may trespass into already established wolf territories and be attacked and killed by the resident pack (Mech 1970).

Relocated wolves may also disperse long distances from the release site (Fritts 1983, Bradley et al. 2005). Relocated wolves can potentially return to the damage sites from which they were removed (Fritts et. al. 1984), or after dispersal movements, cause damage problems at the dispersal site (Bradley et al. 2005). In the Northern Rockies, 27% of translocated wolves again caused predations, and only 33% joined or formed new packs (Bradley et al. 2005). In this case, the original damage problem has simply been shifted from one property to another.

During winter 2001-2002, the Wisconsin DNR received a request from the Forest County Board of Supervisors, to stop relocating wolves into Forest County, where the Wisconsin DNR had traditionally relocated many problem wolves. Since that time, Florence, Iron, Langlade, Lincoln, Marinette, Oconto, Rusk, and Taylor Counties, and the Town of Mason in Bayfield County, have passed resolutions against release of problem wolves. These resolutions are not legally binding on the WDNR, but do serve as an indication of public sentiment toward and tolerance of wolves. With most suitable wolf habitat occupied by wolf packs, the Wisconsin DNR now has limited places to relocate problem wolves.

*Foot-hold traps* can be effectively used to live capture wolves. When used as a live-capture device, wolves are either released on site (e.g., after receiving a radio-collar for research and monitoring) or may be relocated (see relocation above). Wolves live-captured by this method may also be euthanized (Section 3.3.4). Effective trap placement, pan-tension devices, and the selection and placement of appropriate lures by trained WS personnel contribute to the foot-hold trap's selectivity. WS policy requires that foot-hold traps used for WDM have offset and laminated jaws or padded jaws to reduce foot injury to captured wolves (WS Policy Manual, WS Directive 2.335-Wolf Damage Management).

*Foot snares* are devices consisting of a cable loop and a locking device that captures an animal around their foot or lower leg. The cable may be activated around the lower leg with a spring (Aldrich) or trap-type (Belisle) device. The foot snare can be modified with a stop on the cable. As with foot-hold traps, when foot snares are used as a live-capture device, wolves are either released on site (e.g., after receiving a radio-collar for research and monitoring) or may be relocated (see relocation above). Wolves live-captured by this method may also be be euthanized (Section 3.3.2).

60

**Exhibit B-60**

*Dart guns* are non-lethal capture devices that utilize a dart filled with tranquilizer fired from a specially designed rifle. Once tranquilized, the animal may be handled safely for research or relocation purposes. Under special situations, a tranquilized animal could also be euthanized if lethal removal is warranted. Use of dart guns would have no effect on non-target species because positive target species identification is made before animals are shot. Thus, WS use of dart guns is expected to continue to be virtually 100% selective for target individuals and species, and would not pose a risk to non-target species and individuals. Use of dart guns may sometimes be the only control option available if other factors preclude the setting of equipment. All WS staff involved in darting wolves or delivering immobilizing drugs have attended a 3 day accredited training course on immobilizing wildlife and they are required to receive 16 hours of continuing education every 5 years.

*Cable restraints* are snare-like devices designed to live-capture animals (Olson & Tischaefer, 2004). Cable restraints are being developed for live-trapping wolves and other carnivores (Olson & Tischaefer, 2004). These devices can be fairly selective due to loop size, height placement, and bait types. Presently in Wisconsin, WS is only allowed to use cable restraints that meet the following criteria: constructed of 1/8" diameter , 7x7 cable, 10 feet or less in length, incorporate a reverse-bend lock with a minimum outside diameter of 1 ¼ inches, incorporate an inline swivel, have a fixed stop 14 inches from the cable end and are staked in such a manner to prevent the captured animal from entangling in rooted vegetation greater than ½ inch in diameter.

### 3.3.3   Non-lethal Methods which Require Permits from the USFWS

Some animal behavior modification systems involve capturing wolves and fitting wolves with collars used to deliver or trigger repellent stimuli (i.e., aversive conditioning). Other systems involve shooting wolves with non-lethal projectiles like rubber bullets. These non-lethal techniques involve intentionally using painful stimuli to manage wolf behavior, and the USFWS has determined that, while wolves are federally protected as a threatened or endangered species, permits or other authorizations are required to use these methods. Methods that require capture and handling of wolves would be conducted only by personnel from the WDNR, WS or the tribes.

*Aversive Stimuli* are stimuli that cause discomfort, pain and/or an otherwise negative experience paired with specific behaviors to achieve conditioning against these behaviors. One example would be using something like a dog training shock collar that is activated when wolves came into close proximity to a protected area such as livestock pens (Schultz et al. 2005).

*Non-lethal Projectiles* This involves guarding an area and then using rubber bullets or other non-lethal projectiles to prevent a predation event. It can be used as an aversive technique, but requires that the projectiles must be used every time the animal attempts to prey on the protected resource so they don't identify conditions when they can obtain prey without receiving a negative experience (Shivik 2004). Methods which require around-the-clock presence of a person to guard the resource are most efficiently used when the landowner/resource manager assists with the implementation. The USFWS may choose to allow the WDNR and WS to train and authorize private individuals to use this method.

61

**Exhibit B-61**