### 3.3.4    Lethal Methods[13]:

These methods are specifically designed to lethally remove wolves in certain situations to stabilize, reduce, or eliminate damage. The use of lethal control would require a permit from the USFWS or the establishment of special 4(d) rules, and these techniques could only be used by qualified and authorized personnel from WS, WDNR, the tribes and other entities specified in the permits or special rules. The amount of removal necessary to achieve a reduction in wolf damage varies according to the effectiveness of other damage management strategies, the damage situation, and the level and likelihood of continued depredations.

If permits or other authorizations are issued by the USFWS, the WDNR would use the criteria established by the USFWS and the WWMP to determine when lethal control can be used. WS would only use lethal WDM methods with the consent of the WDNR. Under the WWMP (WDNR 1999), lethal control can be used when: 1) there have been documented, confirmed losses at a site. 2) the producer/owner has a signed depredation management plan (farm plan) for the property which includes damage abatement recommendations. 3) WS Specialists recommend euthanizing, and the WDNR approves (WDNR approval process varies depending upon the wolf management zone; Appendix E). Permits or other authorizations from the USFWS, the WWMP and the *"Wisconsin Guidelines For Conducting Depredation Control on Wolves in Wisconsin While Federal Listed as "Threatened"* or "Endangered" Status" (Appendix E) would provide restrictions on the timing and location of lethal WDM methods.

>    *Shooting* is selective for the target species and may involve the use of either a shotgun or rifle and night vision equipment, or a pistol to euthanize live-captured wolves.

>    *Cable restraints and Snares* are devices consisting of a cable loop and a locking device that are placed in travel ways. Cable restraints are a specialized form of snare designed specifically to live-capture animals (see above).

>    *Foot-hold traps and foot snares* are discussed in Section 3.3.2. When used as a lethal damage management technique, captured wolves are euthanized via shooting or administration of sodium phenobarbitol.

>    *Dart guns* are non-lethal capture devices that utilize a dart filled with tranquilizer fired from a specially designed rifle (see also Section 3.3.2). Under special situations, a tranquilized animal could also be euthanized if lethal removal is warranted.

>    *Sodium Pentobarbital* (Beuthanasia-D) is registered for euthanasia of dogs, but legally may be used on other animals if the animal is not intended for human consumption. Barbiturates depress the central nervous system in descending order, beginning with the cerebral cortex, with unconsciousness progressing to anesthesia. The primary advantage of barbiturates is the speed of action on the animal. Barbiturates induce euthanasia smoothly, with minimal discomfort to the animal (AVMA 1993) after an animal has been anesthetized.

---

[13]   No toxicants are currently registered by the United States Environmental Protection Agency for wolf damage management in Wisconsin.

3.4    **ALTERNATIVES CONSIDERED BUT NOT IN DETAIL, WITH RATIONALE**

### 3.4.1    Bounties

Payment of funds for killing wildlife (bounties) suspected of causing economic losses is not considered effective to reduce wolf damage at this time. This alternative will not be considered in detail because:

- ξ    A bounty program would not be allowed as long as wolves are a listed species.
- ξ    Bounties are generally not as effective in reducing damage because depredating individuals/local populations are not specifically targeted.
- ξ    Circumstances surrounding take of animals is largely unregulated.
- ξ    No effective process exists to prevent taking of animals from outside the damage management area for compensation purposes.

### 3.4.2    Eradication and Suppression

An eradication alternative would direct all WS program efforts toward planned, total elimination of wolves. However, this alternative will not be considered in detail because:

- ξ    The attempted eradication of established wolf populations is contrary to state and federal efforts to protect wolves and recover the species.

- ξ    Eradication of wolves is not acceptable to most members of the public. It is also not realistic, practical, or allowable under present WS policy to consider large-scale population suppression.

### 3.4.3    Damage Management through Birth Control

Under this alternative, wolf populations would be managed through the use of contraceptives. Wolves would be sterilized or contraceptives administered to limit their ability to produce offspring. A wolf contraceptive, chemosterilant or immunocontraceptive, if delivered to a sufficient number of individuals, could temporarily suppress local breeding populations by inhibiting reproduction. At present, efforts to reduce wolf populations would be contrary to state and federal wolf recovery efforts. Additionally, there are no approved chemical or biological contraceptive agents for wolves.

Reduction of local populations would result from natural mortality and inhibited reproduction. No wolves would be killed directly with this method; however treated wolves may continue to cause damage, but probably at a lower rate, because there would be no pups to feed.

Contraceptive measures for mammals can be grouped into four categories: surgical sterilization, oral contraception, hormone implantation, and immunocontraception (the use of contraceptive vaccines). These techniques would require that wolves receive either single, multiple, or possibly daily treatment to successfully prevent conception. The use of this method would be subject to approval by Federal and State Agencies. This alternative is limited because: (1) it may take a number of years of implementation before the wolf population would decline, and, damage may continue for a number of years; (2) surgical sterilization would have to be conducted by licensed veterinarians, which would therefore be extremely expensive; (3) it is difficult to effectively live trap or chemically capture the number of wolves that would need to be sterilized in order to effect

an eventual decline in the population; (4) no chemical or biological agents for contracepting wolves have been approved for use by State and Federal regulatory authorities. (5) sterilization or other forms of fertility control have an unknown impact on wolf social structure (Haber 1996).

Sterilization may be useful as an experimental technique to reduce depredation in some highly specialized situations in the future. In coyotes, breeding pairs with pups are most likely to depredate on sheep (Till and Knowlton 1983, Till 1992, Bromley and Gese 2001, Blejwas et al. 2002), and the same may be true for wolves and cattle (A. P. Wydeven, WDNR, pers. comm. 2003). Sterilized coyote (Bromley and Gese 2001) and wolf (Mech et al. 1996) packs continue to maintain territories, and do not seem to adversely affect survival of sterilized adults. In chronic areas, sterilization may reduce the need to remove problem wolves by keeping the wolf population low, and eliminating pup production (Haight and Mech 1997). Sterilization continues to be experimental and would only be done after approval from State and Federal regulatory agencies and if it can be carefully monitored.

Sterilization is not being used for WDM at this time, and would normally only be done as part of an experimental procedure, in which careful monitoring is done of the treated wolves. Any attempts to sterilize wolves would be initiated by and coordinated with WDNR, and would need USFWS approval while wolves are federally protected as a threatened or endangered species.

### 3.4.4    Non-lethal before Lethal

Under this alternative, lethal techniques would not be used unless all reasonable non-lethal methods had been tried and failed to reduce damage. This alternative was not considered in detail because, the proposed alternative, Integrated Wolf Damage Management, as outlined in the EA is similar to a non-lethal before lethal alternative because WS and WDNR would encourage and consider the use of non-lethal methods before lethal methods (WS Directive 2.101, WDNR 1999) and because of the conditions that must be met before lethal control will be authorized by WDNR. In accordance with the WWMP (WDNR 1999), lethal control can be used when: 1) there have been documented, confirmed losses at a site. 2) the producer/owner has a signed depredation management plan (farm plan) for the property which includes damage abatement recommendations. 3) WS Specialists recommend euthanizing, and the WDNR approves. The WWMP further states that lethal WDM methods can only be used if the producer has a signed depredation management plan for the property and follows abatement/husbandry recommendations. Therefore, adding a non-lethal before lethal alternative and the associated analysis would not add additional information to the analysis for the public or decision maker.

### 3.4.5    Provide Funding for Damage Prevention Supplies and Equipment

Under this alternative livestock producers would be given financial assistance with the acquisition of supplies for non-lethal wolf damage management. This alternative could work as a component of Alternatives 1, 2, and 3. This alternative was not considered in detail because funding currently only covers the current compensation program and operational wolf damage management efforts and is not sufficient to help producers purchase materials. Even if this alternative were selected, funds would likely still be needed for wolf population monitoring. Implementation of this alternative would not necessarily prevent all damage because it would be impossible to predict and equip all locations where wolves might come into conflict with humans, and non-lethal methods are not necessarily effective or applicable to all wolf conflicts. Therefore, unless the agencies were to choose to not respond to depredation events, funding will also be needed to provide operational or technical assistance to places where wolf depredation occurs. The funding remaining after these needs are met is unlikely to adequately address the potential

demand for damage prevention materials. Under select circumstances, some producers may qualify for assistance from private programs like the Bailey Wildlife Foundation Proactive Carnivore Conservation Fund administered by Defenders of Wildlife. The Fund has provided donkies, guard dogs, and alternate watering sources for Wisconsin livestock producers. Where applicable, cooperators can be provided with information on these opportunities.

### 3.4.6    Lethal Only Program

Under this alternative, the USFWS would only issue Section 10(a)(1)(A) permits or other authorizations for the use of lethal WDM techniques. WS would only provide technical and operational assistance with lethal damage management techniques. Prohibiting the USFWS and WS from permitting, using or providing technical assistance on effective and practical non-lethal WDM alternatives is not in the best interest of the recovery of the species, is contrary to agency policy and directives (WS Directive 2.101), and will not be discussed further.

## 3.5    STANDARD OPERATING PROCEDURES FOR WILDLIFE DAMAGE MANAGEMENT TECHNIQUES

Standard Operating Procedures (SOPs) improve the safety, selectivity and efficacy of wildlife damage management techniques. SOPs used by the WS program are discussed in detail in USDA (1997 Revised, Chapter 5). The following SOPs apply to some or all of the alternatives, as indicated in the columns.

- ξ    Alternative 1. Non-lethal Damage Management.
- ξ    Alternative 2. Integrated WDM (No Action/ Proposed Action)
- ξ    Alternative 3  Technical Assistance
- ξ    Alternative 4. No Federal WS WDM in Wisconsin

| Standard Operating Procedures by Alternative | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| *General Procedures and Conditions for Conducting WDM* | | | | |
| Wolf damage management would follow guidelines as specified and agreed upon in MOUs and depredation management plans and permits. | X | X | X | |
| Wolf damage management would be conducted only when and where a need exists. [1] | X | X | | |
| Wolves may be taken by anyone if they pose an immediate and demonstrable threat to human safety | X | X | X | X |
| The USFWS, Federal land management agencies, WDNR or their designated agents can take wolves in cases of non-immediate but demonstrable threats to human safety without a permit or other authorization from the USFWS. | X | X | X | X |
| Lethal WDM will not be conducted unless wolf depredation on lawfully present domestic animals is verified by appropriately trained personnel and there is reasonable expectation that the depredation at the site is likely to continue if the depredating wolves are not removed[1]. | | X | | |

| Standard Operating Procedures by Alternative | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Lethal control may not be used when wolves kill dogs that are free-roaming, hunting, or training on public lands. [1] | | X | | |
| Lethal control efforts would not be initiated until a farm management plan has been signed by the producer. | | X | | |
| If a verified depredation has not occurred in the current calendar year, lethal control shall only proceed when all of the following conditions are met: 1) Verified depredation occurred at the site or in the immediate vicinity during the previous year; 2) There is strong evidence one or more members of the depredating pack has remained in the area since the verified depredation; 3) Based on wolf behavior and other factors, the depredation is likely to be repeated; and 3) Trapping is conducted in a location and in a manner to minimize the likelihood a wolf or wolves from a non-depredating pack is captured. [1] | | X | | |
| No lethal preventive damage management would be conducted by WS unless authorized by the WDNR and/or the USFWS as appropriate. | | X | | |
| Lethal depredation control activities must occur within distances specified by the USFWS or WDNR (depending upon status of wolves) of the depredation site. | | X | | |
| Young-of-year wolves trapped before August 1 must be released. [1] | X | X | | |
| Lactating females trapped before June 1 may be released near the point of capture except those involved with chronic depredation problems where all adult wolves captured at depredation sites would normally be euthanized . [1] WS will consult with the WDNR prior to euthanizing lactating females trapped prior to June 1. | X | X | | |
| While wolves are federally listed, the accidental serious injury or mortality resulting from trapping activities to young of the year prior to August 1 may not exceed the number of individuals specified in the permit from the USFWS. In the event this number is met, all trapping activities shall cease. [1] | X | X | | |
| While federally listed, all mortalities and serious injuries, whether intentional or incidental, shall be reported to the Service's Region 3 Endangered Species Permits Biologist, the Green Bay Field Office, and the Service's Law Enforcement Office within 5 calendar days. [1] | X | X | | |
| While federally listed, an annual report of activities conducted under the authority of a USFWS permit is due on January 31. [1] | X | X | | |
| On public lands, vehicle use would be limited to existing roads unless authorized by the land management agency. | X | X | X | |
| While federally listed, wolves, or wolf parts legally taken may be transferred to Native Americans for religious and/or cultural purposes, public educational use, or scientific research purposes. Specimens not suitable, or not needed, for such use must be destroyed. | | X | | |
| *Animal Welfare and Humaneness of Methods Used by WS* | | | | |
| The use or recommendations of non-lethal methods such as guard dogs, scare devices, and other methods, would be encouraged when appropriate. [1] | X | X | X | |

66

**Exhibit B-66**

| Standard Operating Procedures by Alternative | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| While wolves are federally listed, WDNR and WS could be authorized to train landowners and resource managers in the safe and effective use of non-lethal projectiles. These methods would not be available to landowners and resource managers without specific training from WDNR and/or WS personnel. [1] | X | X | X | |
| Wolf capture, handling, and euthanizing must be carried out in a humane manner which may include the use of foot-hold traps, cable restraints, shooting, calling and shooting and lethal injection. [1] | X | X | | |
| Traps and cable restraints would be checked consistent with WDNR and USFWS requirements. At present, this includes a requirement that traps be checked at least once every 24 hours.[1] | X | X | | |
| Research would continue to improve the selectivity and humaneness of management devices and these would be implemented into the WS Program. | X | X | X | X |
| Pan-tension devices are used to reduce the incidence of smaller non-target animal capture in foot-hold traps. [1] | X | X | | |
| All trappers shall be trained in the trapping, chemical immobilization, and medical handling of animals, with emphasis on wolves, to minimize accidental injury and death of wolves. [1] | X | X | | |
| Non-lethal projectiles (e.g., rubber bullets and bean bag projectiles) may be used. | X | X | | |
| Non-lethal projectiles will not be used in a manner that would cause permanent physical damage or death to a wolf. | X | X | | |
| Personnel will be trained in the safe and appropriate use of WDM techniques and equipment. | X | X | X | |
| **Safety Concerns Regarding Use of Traps and Cable Restraints** | | | | |
| The WS' Decision Model, designed to identify the most appropriate wildlife damage management strategies and their impacts, is used. | X | X | X | |
| Traps and cable restraints would be placed so that captured animals would not be readily visible. | X1 | X | | |
| Warning signs would be posted on main roads and/or trails leading into any areas where traps or cable restraints were being used. These signs would be removed at the end of the damage management activities. | X | X | | |
| No traps or cable restraints would be used by WS within one fourth mile of any residence, community, or developed recreation site, unless requested by the owner of a privately-owned property or an official from the appropriate land management agency. | X | X | | |
| **Concerns About Impacts of WDM Activities on T/E Species, Other Species of Special Concern, and Cumulative Effects** | | | | |

67

| Standard Operating Procedures by Alternative | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Wildlife Services and WDNR consulted with the USFWS on the impacts of the program to federally listed T/E species in Wisconsin and will adopt all Reasonable and Prudent Measures established by the USFWS for the protection of threatened and endangered species. | X | X | X | X |
| Wildlife Services personnel are directed to resolve depredation problems by taking action against individual problem animals, or local populations or groups. | X | X | X | |
| Foot-hold traps or spring activated foot snares set near baits would incorporate tension devices to preclude capture of eagles and other non-target species. | X | X | | |
| No foot-hold traps or cable restraints would be set within 30 feet of any exposed bait or animal carcass to prevent capture of raptors. | X | X | | |
| No pesticides would be used by WS during WDM operations. | | X | | |
| The appropriate land manager and the USFWS would be notified as soon as possible, if a federally listed species is caught or killed. | X | X | | |
| *Cultural Resources/Native American Concerns* | | | | |
| This EA will be provided to the American Indian Tribes in a Pre-Decisional form to determine if all cultural issues have been addressed. | X | X | X | X |
| The Great Lakes Indian Fish and Wildlife Commission is a Consulting Agency in the preparation of this EA | X | X | X | X |
| On private lands within recognized reservation boundaries or negotiated buffer zones WS will notify the appropriate tribe prior to a wolf complaint investigation. The tribe, at their discretion, may co-investigate the complaint. WS and the tribe will consult regarding a course of action to address or resolve verified wolf complaints on these lands. | X | X | X | |
| Wildlife Services will comply with requirements for the notification of GLIFWC and the tribes agreed upon by the USFWS and WDNR | X | X | X | |

[1]  Items required in draft permit identified in the Conservation Measures or Terms and Conditions of the 2004 Biological Opinion on WDM from USFWS. Details may change slightly, depending upon the Alternative selected, and any permits and associated new Biological Opinions are completed

**Exhibit B-68**

## CHAPTER 4: ENVIRONMENTAL CONSEQUENCES

### 4.0    INTRODUCTION

Chapter 4 provides information needed for making informed decisions on the WDM objectives outlined in Chapter 1, the issues and affected environment discussed in Chapter 2, and the alternatives discussed in Chapter 3. This chapter analyzes the environmental consequences of each alternative and consists of 1) analysis of environmental consequences, 2) analysis of each alternative against the issues considered in detail, and 3) summary of impacts.

Under ordinary circumstance, impacts of the alternatives would be compared to the Current Program/ No Action alternative (CEQ 1981). CEQ guidance states that the "No Action" alternative can be defined as being the continuation of current management practices (CEQ 1981). However, the current program has only been in effect since the Federal Court Decision on September 13, 2005 (Sections 1.3.1 and 1.3.9). Insufficient data exist at this time to adequately use the impact of current management practices as a baseline for analysis. Alternative 2, the Proposed Action alternative was in effect for most of the period of April 1,2003 to September 13, 2005 and is similar to the proposed action. Data are available on the environmental impacts of this earlier program. Therefore, for purposes of analysis we use Alternative 2, as the "No Action" baseline when comparing the other alternatives to determine if the real or potential adverse affects of the alternatives are greater, lesser or the same (Table 4-4).

### 4.1    SOCIAL AND RECREATIONAL CONCERNS, RESOURCE USE AND IMPACTS ON HISTORIC AND CULTURAL RESOURCES

#### 4.1.1    Social and Recreational Concerns

Social and recreational concerns are discussed throughout the EA, in the WWMP (WDNR 1999), and in USDA (1997 Revised) whereby pertinent portions have been incorporated by reference. Social and recreational concerns are also addressed in the analysis of impacts on stakeholders, including aesthetics of wildlife, and impacts on humaneness for each of the alternatives analyzed in detail in Section 4.2 of this EA.

#### 4.1.2    Irreversible and Irretrievable Commitments of Resources

The following resource values within Wisconsin would not be adversely impacted by any of the alternatives analyzed in this EA: soils, geology, minerals, water quality/quantity, flood plains, wetlands, visual resources, air quality, prime and unique farmlands, aquatic resources, timber, and range. These will not be analyzed further.

Other than minor uses of fuels for motor vehicles and electrical energy for office maintenance, there are no irreversible or irretrievable commitments of resources. Based on these estimates, the Wisconsin WDM program produces very negligible impacts on the supply of fossil fuels and electrical energy.

#### 4.1.3    Alternative Consistency with Forest Service LRMPs

Before an Alternative can be considered for implementation on Forest Service System lands, it must be consistent with the land management and/or resource management plans. These are termed Land and Resource Management Plans (LRMP) or more commonly *"Forest Plans."* If

the Alternative is consistent with the LRMP, no additional action would be necessary by the Forest Service.

If an alternative that is inconsistent with the LRMP is selected in the decision process, the Forest Service could amend the LRMP to be consistent with the EA. The decision would not be implemented on the Forest until the inconsistency is resolved either through amendment of the LRMP or modification of the alternative(s). Any inconsistencies would be identified and resolved before the wolf damage management project is conducted. A work plan would be developed by WS with each National Forest before any wildlife damage management would be conducted, or in the rare instance, wolf damage management would be conducted under *emergency control only.* Wolf control trapping on USFS land in Wisconsin would only be considered, if such lands occurred within 1 mile of private land with depredation, if other suitable trapping locations are not available, and only after consultation with WDNR, WS and USFS that some such trapping will not jeopardize viability of wolf populations on the National Forest..

### 4.1.4.  Impacts on Cultural, Archaeological and Historic Resources

A consultation occurred between WS and WSHPO on February 4, 2002 regarding the actions proposed in the 2004 WS EA on WDM in Wisconsin. It was determined that the *"Project as described will have no effect on significant cultural resources"* and the proposed action does not constitute a "Federal undertaking" as defined under Section 106 of the NHPA (Dexter 2002). Wisconsin WS would, as requested by WSHPO, halt work and contact the WSHPO if any cultural resources or human remains are discovered. The types of actions proposed in this EA are similar to those proposed in the 2004 WS wolf damage management EA (USDA 2004). The activities described under any of the proposed alternatives do not cause ground disturbances nor do they otherwise have the potential to significantly affect the visual, audible, or atmospheric elements of historic properties and thus are not undertakings as defined by the NHPA. Wildlife Services and the USFWS have determined that WDM actions are not undertakings as defined by NHPA because such actions do not have potential to result in changes in the character or use of historic properties. Each of the Wisconsin Native American Tribes and GLIFWC were invited to be a cooperating agency in the production of this EA. GLIFWC, the Wisconsin Ho-Chunk Nation, and the Lac Du Flambeau Tribe agreed to be consulting agencies. These tribes have expressed concerns regarding the use of lethal WDM methods. Information from consultations with the tribes and GLIFWC is included in this EA.

## 4.2 ISSUES ANALYZED BY ALTERNATIVES

This section presents the expected consequences of each alternative on each of the issues analyzed in detail.

### 4.2.1  Alternative 1 - Non-lethal Damage Management Only

**Effects on wolf populations.** Under this alternative, the USFWS would not authorize the lethal take of wolves and WS would not use lethal methods for wolf damage management. The USFWS would authorize the use of non-lethal projectiles and aversive conditioning (e.g., dog training collars). Most non-lethal methods included in this alternative have been and are currently being utilized to reduce wolf predation on livestock in Wisconsin and do not require authorization from the USFWS (Section 1.7.7, Appendix B). Improvements in animal husbandry practices and the utilization of other non-lethal WDM methods like livestock guarding animals have the potential to reduce wolf damage, however, these methods have not always resolved the

damage problem in other areas, including Minnesota and Michigan. There are also situations where some non-lethal methods are not appropriate (e.g., the use of some noise-making frightening devices may be incompatible with land uses on adjacent properties). Bangs and Shivik (2001) reported that while non-lethal methods can be effective, many were expensive to implement and none available at the time were widely effective. A State compensation program would continue to be a valuable method for reimbursing farmers for losses and in preventing the wolf population from being an economic burden on individuals. However, there are also some difficulties with compensation programs (Section 3.3.1, Appendix B, Wagner et al. 1997).

There will be no intentional take of wolves for predation management under this alternative. However, under the ESA, anyone can take a wolf in defense of human life (i.e., when a wolf is attacking a person). Additionally, USFWS, Federal land management agencies, WDNR or their designated agents can take wolves in cases of non-immediate but demonstrable threats to human safety without a permit or other authorization from the USFWS. USFWS, WDNR, federal land management agencies, or their designated agents, may take a wolf to aid a sick, injured, or orphaned wolf. Total annual intentional take for these types of wolf management are not expected to exceed 5 wolves per year.

Regular use of techniques like non-lethal projectiles, aversive conditioning (e.g., dog training collars), and disruptive stimuli (remote activated frightening devices and guarding-and-hazing) is likely to be higher if access to lethal WDM methods is prohibited. Use of capture and relocation may also increase, but this may be a method of last resort because of difficulties with relocation discussed in Section 3.1.2 and Appendix B. Any activity that involves the capture and handling of wolves involves a risk of unintentional death of the wolf. Additional incidental take associated with capture and holding of females with pups may also occur and is as discussed for Alternative 2. There is also a low chance that the use of non-lethal projectiles could result in the death or serious injury of a wolf. WDM would be conducted in accordance with all permit conditions and other regulations established by the USFWS for the protection of wolves, and protective measures and regulations set by the WDNR. The use of traps and cable restraints to capture wolves for non-lethal WDM projects may be higher under this alternative than for Alternative 2, so incidental take of wolves for this alternative is anticipated to be low but still higher than for Alternative 2.

As discussed above, non-lethal methods are not always effective. This alternative is expected to result in a reduction in the efficacy of services provided to resolve wolf depredation conflicts; and it is reasonable to conclude will result in a reduction in tolerance of wolves by the landowners and an increase in illegal kill (Section 1.3.10). Illegal lethal control actions by private individuals are less likely to be very specific or very humane, and could potentially have more adverse impacts on the wolf population we are trying to recover than focused lethal actions by trained, authorized professionals. Any illegal lethal control by individuals is also less likely to be effective in reducing depredation events, as it would be less likely to target the specific depredating animals.

Cumulative Impacts

In summary, the removal of wolves by authorized actions will be lower than Alternative 2 because there will be no intentional take of wolves for WDM by Federal agencies[14]. However, as discussed above, there is likely to be an increase in illegal take of wolves by frustrated private

---

[14] The USFWS, Federal land management agencies, WDNR or their designated agents (WA) have the authority to remove wolves that are a demonstrable threat to human safety.

individuals. The level of illegal take is difficult to predict, and, because of the remote rural nature of much of the area used by wolves in Wisconsin, will be difficult to prevent. Furthermore, it is unlikely that this illegal take will remove the depredating wolves, thus additional illegal take may follow. It is possible that cumulative take may exceed that anticipated under Alternative 2. Attitudes of landowners in areas where wolves are present are also likely to impact attitudes of landowners in areas where the wolf population may expand and could adversely impact future growth and expansion of the Wisconsin wolf population.

As discussed for Alternative 2, WDM decisions made in Wisconsin will have impacts on public reaction to management decisions in Michigan and *vice versa*. If this alternative is selected in Wisconsin, but a less restrictive version is selected in Michigan without clear-cut reasons for the decision, it is likely to increase public dissatisfaction with wolf management in Wisconsin, and may increase the likelihood that frustrated individuals will engage in illegal killing of wolves. If the same alternative were selected for the wolf depredation permit submitted by the MDNR, the anticipated negative actions are likely to be enhanced. Those livestock owners inclined to take illegal actions would find support and justification from their counterparts in the adjacent state, potentially increasing the amount of illegal take.

**Effects on public and pet health and safety.** There would be no lethal WDM activities. However, WS and WDNR would be using traps and cable restraints to capture wolves for population monitoring. Use of non-lethal methods like aversive conditioning and remote activated frightening devices that require a collar on a wolf, and trap-and-relocate efforts may increase if access to lethal WDM is not permitted. This could increase the use of traps and cable restraints to capture wolves for non-lethal techniques over that anticipated for Alternative 2, but would likely not exceed the total agency use of traps and cable restraints (non-lethal and lethal WDM combined) anticipated for Alternative 2. As with Alternative 2, traps and cable restraints would be strategically placed to minimize exposure to the public and pets. WS and WDNR post appropriate warning signs on properties where traps or cable restraints are set to alert the public of their presence. Under this alternative, traps and cable restraints would only be used with the specific intent of keeping the captured animal alive. Measures to prevent injuries and keep wolves alive will also reduce potential risks to pets and non-target species. In general, agency impacts under this alternative are likely to be similar to or slightly lower than the risks from the Past Action/Proposed Action program (Alternative 2).

There are provisions within the regulations pertaining to the ESA that allow for the lethal take of an endangered species in response to a demonstrable (either immediate or non-immediate) threat to human safety, so response to these threats will be similar to Alternative 2. However, response to threats to and wolf predation on pets will be restricted to non-lethal methods. As discussed above, non-lethal methods are not always effective in reducing problems with wolves. If wolf populations continue to increase without an effective damage management program in place, there may be potential threats to public and pet health and safety from wolves that enter people's yards or attack their pets. Therefore, risks to human and pet safety from wolves would likely be similar to or higher for this alternative than Alternative 2 because fewer WDM methods would be available. Additionally, frustrated individuals may attempt to solve wolf damage problems through illegal shooting, trapping, snaring, or poisoning. As a result of these illegal actions, there could be increased risks to public and pet safety from improper or unscrupulous efforts to resolve perceived problems with wolves. Poisons, especially, have high risks of severe adverse impacts on public and pet health and safety, as well as on non-target wildlife species.

**Humaneness of methods to be used.** While wolves are federally listed, this alternative would be considered more humane than Alternative 2 by many people that are opposed to lethal WDM

techniques. However, because of personal beliefs that foot-hold traps and cable restraints are inherently inhumane, their use to capture wolves for research and non-lethal WDM projects, will cause some individuals to consider this alternative inhumane. When capturing wolves for population monitoring and non-lethal WDM efforts, wolves would be humanely captured by experienced WS and WDNR personnel using the best methods available. Tranquilizer trap devices (TTDs) can be used on wolf traps to reduce the incidence of self-inflicted injuries by captured animals (Appendix B). All activities would be conducted in accordance with USFWS permit requirments and Wisconsin wolf trapping guidelines which require that traps be checked at least once every 24 hours. Daily trap checks minimize the amount of time target and non-target animals remain in traps, and improve the likelihood that a non-target animal may be released unharmed. Some individuals would prefer that cage traps be used to capture wolves and would perceive this method as being more humane than traps and cable restraints. Unfortunately, the use of cage traps to capture wolves is usually impractical and ineffective because it is extremely difficult to get a cage trap big enough for an adult wolf into remote locations, and because it is rare to capture an adult wolf in a cage trap.

Even though wolves are federally protected as a threatened or endangered species, some property owners may take illegal action against localized populations of wolves out of frustration with continued damage and lack of legal access to the full range of WDM methods. Some illegal methods, like poisons, may be less humane than methods used by experienced agency personnel.

**Impact to stakeholders, including aesthetics of wildlife.** The impacts of this alternative to stakeholders would be variable depending on their values towards wildlife and relationship to the problem. For example, individuals directly impacted by wolf predation may be less tolerant of wolves than individuals whose property and pets are not at risk. While wolves are federally protected individuals experiencing damage from wolves would likely oppose this alternative because they would likely feel that their access to an effective management alternative was being unduly restricted. They would probably be less opposed to this alternative once wolves are removed from the Federal list of threatened and endangered species because access to lethal WDM techniques would likely be available from entities other than WS in accordance with the WWMP (WDNR 1999).

Some individuals would prefer this alternative because they believe it is morally wrong to kill animals for any reason. However, there may still be concern about the use of traps and cable restraints to capture wolves for population monitoring and/or attachment of collars required for some non-lethal WDM methods. If wolves are removed from the Federal list of threatened and endangered species, lethal WDM techniques may be available in accordance with the WWMP and perceptions of this alternative by individuals opposed to lethal WDM would likely be the same as Alternative 2. However, this alternative may still be preferable to Alternative 2 for individuals who are specifically opposed to federal (WS) involvement in the operational use of lethal WDM techniques.

Some people would support this alternative because they enjoy seeing wolves, or having wolves nearby, and while wolves are federally listed, this alternative would prohibit the lethal removal of wolves. However, they might still be affected by relocation of depredating wolves. As discussed above, there is strong evidence from previous years and actions in other states that this alternative will not result in a decline in wolf density in Wisconsin and any difference in wolf viewing opportunities is likely to be negligible. Other opportunities to view, call and aesthetically enjoy wolves will be available to people who make the effort to visit sites with adequate habitat adjacent to the immediate area where the wolf relocation occurred.

**Effects on non-target species populations, including T&E species.** While federally listed, there would be no lethal WDM activities. However, WS and the WDNR would use traps and cable restraints to capture wolves for wolf population monitoring and some non-lethal WDM methods. Lack of access to lethal WDM techniques may result in increased use of traps and cable restraints associated with non-lethal techniques over that anticipated for Alternative 2, but would likely not exceed the total agency use of traps and cable restraints (non-lethal and lethal WDM combined) anticipated for Alternative 2. As with Alternative 2, trap and cable restraint selection, settings (stops on cable restraints, pan tension devices, etc.), placement and lures will be designed to minimize risks to non-target species. Unfortunately, despite these precautions, traps and cable restraints may occasionally capture non-target species such as white-tailed deer (*Odocoileus virgianus*), black bear, bobcat (*Lynx rufus*), coyote and dogs (Table 4-3). Overall risks to non-target species from legal WDM actions would be similar to or slightly lower than Alternative 2 (no action / proposed action). Under this alternative, traps and cable restraints would only be used with the specific intent of keeping the captured animal alive. Measures to prevent injuries and keep wolves alive will also reduce risks to non-target species. These risks are very low and take is anticipated to be well below the sustainable harvest level for non-target species populations. Measures to reduce risks to non-target species are included in the SOPs described in Chapter 3 and discussed in Appendix B. All actions would be conducted in accordance with USFWS permit requirements and Wisconsin wolf trapping guidelines which require that traps be checked at least once every 24 hours. Daily trap checks minimize the amount of time target and non-target animals remain in traps, and improve the likelihood that a non-target animal may be released unharmed.

Some individuals frustrated with wolf management policies might attempt to illegally shoot, trap, snare, or poison wolves with potential detrimental effects on non-target species including T/E species (Schueler 1993, USDA 1997, Revised). Illegal use of toxicants represents one of the cheapest forms of predator removal, but it also presents the greatest environmental risks (Allen et al. 1996). Under this alternative and while wolves are federally listed, risks to T/E and other non-target species from illegal actions would probably be greater than Alternative 2.

The USFWS has concurred that the WS WDM methods are not likely to adversely affect the bald eagle (*Haliaeetus leucocephalus*), will not jeopardize the continued existence of Canada lynx (*Lynx canadensis*) and are not anticipated to result in the incidental take of lynx (J. Smith, USFWS, August 12, 2003; L. Lewis, USFWS, May 9, 2001). WS has determined that the proposed action will have no effect on all other federally listed non-target species and critical habitat in Wisconsin with the exception of wolves (target species discussed above). WS and WDNR will adhere to all Conservation Measures, Terms and Conditions and other provisions identified in the Biological Opinion currently being prepared by the USFWS for the protection of federally listed species. The WDNR is reviewing this EA to verify that WS' WDM activities would have no effect on or are not likely to adversely affect state listed T/E species. Any recommendations made by the WDNR to protect state listed species would be incorporated into WS' WDM and wolf population monitoring efforts. Standard Operating Procedures intended to reduce the risks to non-target species are provided in Chapter 3.

### 4.2.2    Alternative 2 - Integrated WDM (No Action / Proposed Action)

**Effects on wolf populations.** This alternative was used for most of the period of April 1, 2003 to September 13, 2005 (Section 1.3.9). However, since the September 13, 2005 court injunction prohibiting WDM efforts that were covered under specific authorization from the USFWS, the WDNR, WS and USFWS have only been providing technical assistance on non-lethal methods that can be used in Wisconsin without a permit from the USFWS. Integrated wolf control

management strategies and methods proposed for use under this alternative would ensure resolution of the highest number of damage incidents with minimal negative environmental impacts. A State compensation program would continue to be a valuable method for reimbursing farmers for losses to wolves to help prevent the wolf population from being an economic burden on individual livestock producers. However, there are some difficulties with compensation programs (Section 3.3.1, Appendix B, Wagner et al. 1997). Livestock producers would be provided information about farm management practices (animal husbandry) and non-lethal methods to help reduce the potential for wolf damage at farms or mitigate such damage. Wolf damage management actions would be conducted in accordance with all Federal and State requirements for the conservation of gray wolves including permit conditions and other regulations established by the USFWS in 10(a)(1)(A) permits and 4(d) rules, and requirements of the WWMP..

### Environmental Baseline for Wisconsin Wolf Population

Throughout the range of the wolf, generally three factors dominate wolf population dynamics: food, people, and source populations (Fuller et al. 2003). These factors are likely to play the primary role regulating Wisconsin's wolf population, as well.

#### Food

Prey density and vulnerability are important in determining what areas wolves inhabit and at what level. It appears that, over time, absent severe human persecution, wolf numbers are mainly limited only by food (Fuller et al. 2003). Eventually in the core areas of wolf range in Wisconsin and Michigan, density of wolves will probably be limited by food availability (ungulate biomass). However, as wolf pack establishment occurs on the edge of the primary wolf range in more fragmented habitat the level of direct and indirect human related mortality is likely to increase (Jensen et al. 1986, Mech et al. 1988, and Mech 1989, Mladenhoff et al. 1999). Because the Wisconsin population continued to grow at approximately 12% annually over the last 5 years (Figure 1-2), it is unlikely that prey is currently limiting the expansion of the wolf population in the State.

#### People

The indirect or direct killing of wolves by humans also is important in determining the location and density of wolf populations (Fuller et al. 2003). Direct killing of wolves still occurs, however at much lower rates than was experienced in the past. In Wisconsin, there were 41 known wolves killed as a result of poaching from 2000 to 2004.

Wolf populations do not appear to be greatly affected by other human factors such as snowmobiles, vehicles, or logging activities, except when they result in accidental or intentional killing of wolves or changes to prey density (Fuller et al. 2003). If the wolf population is large enough, even when these factors have an adverse affect on individuals, these activities seem to have little effect on the wolf population (Fuller et al. 2003). From 2000 – 2004, 78 wolves are known to have been killed in Wisconsin as a result of vehicle collisions. This level of mortality has apparently not inhibited the continued increase of the Wisconsin wolf population over the same period (Figure 1-2).

Traditionally the landscape factor that seemed to correlate most closely to wolf pack presence in the Great Lakes region was road density (Thiel 1985, Fuller et al. 2003, Mladenoff et al. 1995, 1999, & 2005, Potvin et al. 2005). Early research suggested maximum road density of

75

0.6 km/ km$^2$ for suitable wolf habitat (Thiel 1985, Mladenoff et al. 1995), but recent research suggests road densities as high as 0.7 km / km$^2$ are suitable for wolf pack territories (Mladenoff et al. 1999, Potvin et al. 2005). Recent surveys in Minnesota indicate that road densities and forest cover appear to have stabilized the spread of the Minnesota wolf population (pers. comm. John Erb, April 2005). Human caused mortality tends to be higher near roads and in areas with higher road density (Wydeven et al. 2001). Wolves don't necessarily avoid roads, and in fact readily use forest and logging roads for travel corridors, but road density apparently provides a good measure of likely level of human contact. Higher levels of human contact apparently relate to higher levels of intentional and accidental killing of wolves by humans (Wydeven et al. 2001). Other measures of human contact/ presence such as human population densities also correspond well to areas occupied by wolf packs (Fuller et al. 1992, Mladenoff et al. 1995). Apparently structural or vegetation components do not predict wolf habitat as well as indices that measure human influence as long as prey is adequately abundant (Potvin et al. 2005).

Source Populations

Source populations are important in establishing new populations and maintaining populations that are heavily harvested or experience high mortality from other causes (Fuller et al. 2003). As Wisconsin has had a resident wolf population for over 20 years and is not presently subject to heavy harvesting or other forms of excessive mortality, connectivity with source populations in Michigan, Minnesota, and Canada is probably of lesser importance at this time. However, it is important to note that Wisconsin wolves are not an isolated population. Immigration and emigration of wolves among the Wisconsin, Michigan Upper Penninsula, Minnesota and Canada wolf populations occurs. Immigration from a source population in Minnesota was the basis for the re-establishment of the Wisconsin wolf population (Wydeven et al. 1995). Immigration may not have a large annual effect on the Wisconsin wolf population but it likely contributes to the long-term sustainability of the population.

Other Factors

Natural mortality is a factor affecting the Wisconsin wolf population. The two main sources of natural wolf mortality described by Fuller et al. (2003) were starvation and intraspecific strife. Natural mortality factors were responsible for an average of 48% of all known mortality in Wisconsin wolves from 200-2004 (Table 4-1). From 2000 to 2004, WDNR documented that natural mortality resulting from mange is the cause of 26% of all radio-collared wolf deaths in Wisconsin (Table 4-1). In Wisconsin, natural mortality of wolves does not seem to be adversely impacting the wolf population as it continues to increase by approximately 12% annually over the last 5 years.

Table 4-1. Natural mortality of radio collared wolves in Wisconsin 2000 – 2004 (Adrian Wydeven, WDNR, pers. comm. March 2005). Number in parenthesis is percentage of total mortality (natural and human caused) observed in radio collared wolves.

| Mortality Factor | 2000 | 2001 | 2002 | 2003 | 2004 | Total[1] |
|---|---|---|---|---|---|---|
| Mange | 4 | 4 | 2 | 6 | 3 | 19 (26%) |
| Other disease | 1 | 2 | 1 | 2 | - | 6 (7%) |
| Malnutrition | - | - | 2 | - | - | 2 (2%) |
| Other wolves | 3 | 2 | 1 | 1 | 1 | 8 (11%) |
| Accident | - | - | 1 | - | - | 1 (1%) |
| Total | 8 | 8 | 7 | 9 | 4 | 36 (48%) |

[1] Proportion of all known mortality attributable to this cause.

It is unknown how the addition of human-caused mortality would affect natural mortality rates. However, as compensation operates in wolf populations as in other populations, an increase in human caused mortality likely would result in a decrease in natural mortality. In any case, the demonstrated annual rate of increase in the Wisconsin wolf population has occurred in spite of all causes of mortality and cumulative impacts on the population including WDM.

The Eastern timber wolf has exceeded the numerical recovery goals as listed in the Federal and State recovery plans (Section 1.3.2). The Federal plan requires that at least two viable wolf populations must exist within the eastern United States. One of these populations must be reestablished outside of Minnesota and Isle Royale. The Federal recovery plan provides two alternatives for reestablishing this second viable wolf population. If the wolf population is more than 100 miles from the Minnesota population, it must contain 200 wolves for at least 5 consecutive years (USFWS 2003). If the wolf population is less than 100 miles from the Minnesota population, it must contain at least 100 wolves for at least 5 consecutive years (USFWS 2003). The Michigan/Wisconsin wolf population is less than 100 miles from Minnesota and recent surveys indicate more than 800 wolves in these two states. A minimum population of at least 100 wolves has been exceeded for twelve consecutive years (Fig 1-3). Also, while no numerical individual state recovery criteria for Michigan and Wisconsin are listed in the Federal plan, State subgoals were incorporated. For Wisconsin and Michigan, the subgoals are 80 and 80 – 90 wolves, respectively (USFWS 1992). Current populations in both these States are more than four times these numerical subgoals. Recent data indicate that the wolf population in Wisconsin and Michigan continues to increase.

The Federal recovery plan also required that the wolf population in Minnesota be stable or growing, and that its continued survival must be assured. In Minnesota, the wolf population size is not surveyed or estimated annually, however during the winter of 2003-2004, the Minnesota Department of Natural Resources (MNDNR) conducted a new survey of wolf distribution and abundance in Minnesota (Erb and Benson 2004). The survey estimated that there could now be as many as 3,020 wolves (range 2,300 – 3,700) in the state, but cautioned that during 2001-2003 Minnesota's wolf population may have actually stabilized around 2,500 wolves due to wolf mortality from a significant outbreak of sarcoptic mange. A wolf depredation control program, similar to the preferred alternative for this EA, has been conducted in Minnesota since 1978 when wolves were reclassified as threatened and a 4(d) regulation was promulgated. After 25 years of wolf damage management including lethal removal of wolves, the Minnesota wolf population has still increased by 245%, or almost 2 ½ times the 1979 population and at present is believed to be relatively stable.

77

**Exhibit B-77**

The primary factors influencing wolf recovery in Wisconsin are prey density, human related mortality, and natural mortality. The current rate of population increase will likely not continue into the foreseeable future. As the wolf population in Wisconsin expands to fill all available habitat, or as the cultural carrying capacity is approached, the rapid population growth rate is expected to slow and eventually stop. At that time we would expect to see negative growth rates (that is, wolf population declines) in some years, due to short-term fluctuations in birth and mortality rates. However, adequate wolf monitoring programs, as identified in the WWMP (WDNR 1999), should identify excessively high mortality rates or low birth rates and would trigger timely corrective action (e.g., reductions in allowable take for WDM, measures to address the source of the high mortality rates or low birth rates) when necessary.

**Impact of Proposed Action**

Intentional Take

For most of the period from 2003 until the court order in September 2005, the WDNR and Michigan Department of Natural Resources (MDNR) operated wolf damage management programs under the authority of a special 4(d) rule or a 10(a)(1)(A) permit. The level of intentional lethal take of wolves at depredation sites in Wisconsin ranged from 5.1 to 6.8% of the late winter wolf population (Table 4-2). Under this alternative, an annual maximum of 10% of the previous late-winter winter wolf population would be intentionally lethally taken for all types of WDM[15]. For a Wisconsin wolf population of 425 individuals, maximum annual lethal take would be 43 individuals. Actual annual take of wolves for WDM is anticipated to usually be lower than this level. However, as the wolf population in Wisconsin increases, WS, WDNR and the USFWS anticipate that requests for WDM assistance will also increase. The annual maximum value of 10% was estimated based on review of a similar program which has been in effect in Minnesota since 1986. For the period of 1993 to 2002 intentional take for WDM in Minnesota ranged from 3.9 to 9.4% (average 6.4%) of the estimated state population. As stated above, this level of WDM did not prevent the Minnesota wolf population from expanding to its current level.

Data from previous Wisconsin WDM activities indicates that some of the animals euthanized during the period of 2003-2005 were in fact young of the year taken after August 1, and, thus, were members of an age group not yet in existence at the time of the late winter count. Therefore calculations of the proportion of the wolf population taken by WDM that are calculated by dividing the total number of wolves taken by the previous late winter wolf population estimate are an over-estimate. The actual number of young of the year to adults lethally taken at Wisconsin depredation sites was 8 of 17 in 2003, 4 of 24 in 2004, and 9 of 29 in 2005. Therefore, the number of wolves greater than one year of age lethally taken in 2003 was 9, out of a late-winter population total of 335, or 2.7 percent. In 2004, this number was 20 out of 373, or 5.4 percent, and in 2005, 20 out of 425, or 4.7 percent. For the three years combined, lethal take represented approximately 4 percent of the individuals in the late winter population.

---

[15] Includes take by designated agencies for the protection of human safety. Does not include euthanization of sick or injured wolves (injuries that are not related to actions proposed in this EA) that does not require a permit or other authorization from the USFWS because these wolves were likely to die even if agency action was not taken.

Table 4-2. Wisconsin estimated wolf population and known mortality from all causes and wolf mortality from wolf damage management.

| Year | Estimated Wolf Population | Total Known Mortality (includes wolves euthanized for damage management) | Total % Known Mortality for Population | Mortality from Damage Management | % of Mortality from Damage Management |
|------|------|------|------|------|------|
| 2000 | 248 | 25 | 10.1% | 0 | 0% |
| 2001 | 257 | 26 | 10.1% | 0 | 0% |
| 2002 | 323 | 59 | 18.3% | 0 | 0% |
| 2003 | 335 | 53 | 15.8% | 17 | 5.1% |
| 2004 | 373 | 66 | 17.7% | 24 | 6.4% |
| 2005 | 425 | 65 | 15.3 | 29 | 6.8% |

Incidental Take

Incidental take is the unintentional injury or death of wolves as a result of management activities. Sources of incidental take from non-lethal WDM methods include death or serious injury of a wolf from a poorly placed or close range shot from a non-lethal projectile, potential injuries associated with aversive conditioning methods like dog shock collars, and injury or death of wolves captured for population monitoring or attachment of collars used for non-lethal WDM methods like Radio Activated Guard (RAG) boxes. Incidental take associated with lethal WDM methods includes injury or death of young of year taken prior to August 1; indirect injury or death of pups if lactating females are captured (prior to June 1) and die or are not released in a timely fashion; and indirect injury or death of pups if lactating females (repeat depredators) are euthanized. Implementation of the Conservation Measures and Reasonable and Prudent Measures permit conditions or other requirements that could be established in future 4(d) rules by the USFWS would minimize incidental take. The estimates provided below are based on past experiences combined with a prediction of future wolf depredation control needs and are the best estimates currently available.

Non-lethal projectiles (rubber bullets and bean-bag projectiles) are among the methods available under this alternative. Use of this method requires that the projectiles be used every time the wolf attempts to prey on the protected resource so the wolf does not identify conditions when they can obtain prey without receiving a negative experience (Shivik 2004). Consequently, this method is most effective when the landowner/resource manager(s) assist with the implementation. The USFWS may choose to allow the WDNR and WS to train individuals in the use of this method. Anyone using this method would be required to go through a training course on the safe and effective use of this technique. These projectiles can be deadly at very close range or if a vulnerable spot on the body is hit, although the likelihood of this type of injury is very low (Bangs, USFWS, pers. comm., Bangs et al. (2004) Appendix B). In the Western U.S., the USFWS has issued approximately 200 permits to landowners for the use of non-lethal projectiles after the landowner had received special training in the use of the method. In that time, only a few dozen wolves have been shot at and less than 5 have been hit. All of the wolves ran away, and none of the wolves appeared to have been seriously injured (Bangs, USFWS, pers. comm.). Based on past experience, risks to wolves from this technique are considered to be extremely low (<1 wolf death/5 years).

Some non-lethal techniques like frightening with RAG boxes and aversive conditioning with dog training collars (Appendix B) require the placement of a transmitter collar on the wolf. Wolves are also captured and transmitter collars installed as part of WDNR wolf research and population monitoring. WDNR estimates that about 15-30 wolves annually will be collared in Wisconsin. Wolves are typically captured using foot hold traps, anesthetized, collared, and then released. Use of cage-type live-capture devices is not very effective and, because of the size of the trap required and the remote location of many trapping sites, it is also impractical. Although this activity is similar to trapping for lethal control of wolves, the intent of this activity is not to harm, but rather to gather information and release the animal unharmed. Injury to or death of a wolf from the capture, handling and anesthesia process can occur but incidence of these occurrences is very low. From 1993 to 2004, the WDNR and their agents' trapping efforts resulted in the incidental death of eight wolves or an annual average of less than 1 wolf per year but has been as high as 2 wolves in one year. Based on past records and anticipated increases in the wolf population and associated efforts to capture and handle wolves for research and non-lethal WDM, total annual lethal incidental take of wolves for this factor is anticipated to be up to 5 wolves per year.

Although the occasional trapping of lactating females could cause incidental death of pups, if pups are near weaning age other pack members will help feed pups (Packard 2003). During early lactation, the female generally remains close to the den, reducing risk of capture (Packard 2003). Thus in general, incidental death of pups due to capture of lactating females would be a relatively rare mortality factor for Wisconsin wolf pups. Records indicate that during the last 3 years there have been 70 wolves euthanized during WDM efforts. Only two of these 70 wolves were lactating females. One was captured on June 19 when pups were likely to be able to survive without the female. One was captured on May 22 when the risk of pup mortality was higher.

Under the proposed action, lactating females captured prior to June 1 would be released unless the female was believed to be involved in repeat depredation. The average litter size in Wisconsin is 5 pups. We anticipate that incidental take of these pups would usually be in the form of harm or minor injury, not necessarily death since most lactating females will be released within 24 hours. If a lactating female was captured and intentionally euthanized because of repeat involvement in depredation or is unintentionally killed during capture and release, up to 5 pups may be incidentally killed. Based on the WDM records for Wisconsin we anticipate that a maximum of 1 lactating female might be unintentionally killed per year before June 1 and that there will be years when no lactating females are lethally taken prior to June 1.

WDNR records indicate that for the interval of 2003-2005 0, 3, and 5 pups respectively were captured during WDM activities conducted before August 1. Incidental take associated with trapping young of year wolves would likely be in the form of harm and injury, but not death, as young would be released within 24 hours. Based on previous records of total annual take of young of the year (before and after August 1) and anticipated increases in the WI wolf population, we anticipate that no more than 15 young of year wolves may be captured prior to August 1 annually. Total annual take was used in this consideration because take of young of the year depends primarily on the location of the rendezvous site and not time of the year. Of the 15 young-of-the-year potentially captured prior to August 1, an incidental take via death or serious injury of up to 5 wolves would be allowed in the permit. Because of their smaller size, risks to young-of-the-year from WDM activities may be greater than those to adults. This represents a worst-case scenario and actual take of young-of-the year is likely to be

80

lower. In the past three years only 2 young-of-the-year were seriously injured or killed during WDM efforts. Even though not all of the 5 young-of-the year are likely to be killed, for purposes of estimating cumulative impacts on the wolf population below, seriously injured wolves will be treated as if there were killed.

In summary, total incidental take in the form of death or serious injury (lethal take) to adult wolves from the proposed action would not exceed 6 adults (less than one female per year incidentally taken prior to June 1, less than one adult per year incidentally taken from normally non-lethal WDM methods like RAG boxes and non-lethal projectiles, and up to 5 wolves per year incidentally taken from research and relocation) and 10 young-of-the-year (5 associated with death of female prior to June 1 and 5 from capture prior to August 1).

<u>Impacts on the Wisconsin Wolf Population</u>

We anticipate that annual lethal take of wolves would be 10% of the wolf population estimate from the previous winter for intentional take and an additional 5 adults and 10 young-of-the-year via lethal incidental take. Using the 2005 population estimate and including the take of young-of-the-year that were not present during the late winter population survey, the maximum level of take (intentional and incidental) that could have occurred in 2005 under the proposed action would be 13.4% of the late-winter population (42 intentional plus 15 unintentional). From 2003 to 2004 the Wisconsin wolf population increased 11.3% even though 5.1% of the wolf population was taken for WDM. Similarly from 2004 to 2005, the Wisconsin wolf population increased 13.9% even though 6.4% of the population was taken for WDM. For the two years for which there has been lethal take at depredation sites in Wisconsin and population data for the subsequent year, the wolf population continued to grow and it is unclear if these depredating wolves had not been removed, whether there would have been greater increase in the population. Compensatory mortality factors may be affecting wolves, that is, as lethal controls increase other mortality factors decline. Wolves in agricultural areas occupy areas of higher road densities, where risk of human-caused mortality can be fairly high (Wydeven et al. 2001). Also without governmental lethal controls available, retaliatory and illegal kill may have been higher, possibly causing even greater mortality. It would not be reasonable to add the percentage wolves removed through depredation control activities to the subsequent year population and assume there would be that many more wolves in the population if not for lethal controls. The interactions and compensation factors affecting wolf mortality survival rates are too complex for making this kind of comparison. All that can be said with certainty is that while 5.1 to 6.4 % of the winter wolf population were removed, wolf numbers still increased by 11.3 and 13.9% in the following years. Overall rates as high as 13.4 % are not likely to negatively impact wolf populations that could potentially tolerate annual removals as high 30% or greater (Fuller et al. 2003)

The estimate that cumulative wolf mortality may be up to 13.4% of the population is probably an overestimate of the impact on the population because the estimate of the number of wolves that might be taken includes young-of-the-year, but the estimate of the population that the removal might impact does not include young-of-the-year. With pups included, the actual wolf population at the time WDM is conducted may be much higher than the count from the previous winter. Wolves normally undergo drastic fluctuations in their annual abundance. If the Wisconsin wolf population in 2004 with 373 wolves included 108 breeding females (108 breeding packs), and each female produced 5 pups, then the early spring population would have been about 913 wolves. But generally only 30 % of pups survive to the end of their first year, and annual adult survival is about 70% (Wydeven et al. 2003).

81

Using these calculations, the population would be expected to be 423 wolves by late winter. This compares closely to the actual estimation of 425 wolves. Early mortality rates for young-of-the-year are high and, but by late fall when the need for WDM is greatly diminished pup survival rates have usually stabilized to rates similar for adults. The addition of pup mortality as a result of control actions is unlikely to substantially increase total pup mortality rates.

Many studies have examined various levels of mortality and harvest and the impacts these mortality levels have on gray wolf populations:

- ξ Mech (1970) suggests that over 50% of wolves older than 5-10 months must be killed to "control" the wolf population, but other researchers have indicated declines may occur with human-caused mortality at 40% or less of fall wolf populations (Ballard et al. 1987, Peterson et al. 1984). Control in this instance means keeping the wolf population below the level to which it would rise without human caused mortality.
- ξ Gasaway et al. (1983) recorded stable wolf populations after early winter harvests of 16 to 24%, and wolf population declines of 20 – 52% after harvests of 42 - 61%.
- ξ Ballard et al. (1997) suggests that the wolf population remained stable at 53% winter mortality, which included both natural and human-caused mortality.
- ξ Fuller (1989) observed stable or slight increases in the wolf population at an annual human caused mortality rate of 29%. It appears that 30 to 35 % human caused mortality of late fall or winter population can be tolerated by most wolf populations without causing population declines (Fuller et al. 2003).
- ξ During the period of 1993-2002, the USDA WS program in Minnesota has lethally taken an average of 6.4% of the winter wolf population as part of implementing a depredation control program in Minnesota. Despite this level of take for WDM, the Minnesota wolf population increased from an estimated 1,500 wolves in 233 packs in 1988-98 to 2,445 wolves in 385 packs in 1997-1998 and 3,020 wolves in an estimated 485 packs in 2004. This increase occurred while the WS control program occurred, and while other natural and human caused mortality occurred and while this population provided most, if not all, of the source wolves for Wisconsin and Michigan.
- ξ Haber (1996) reported that wolf populations may not be able to withstand repeated annual reductions of 25-50%. He believes these removals, in the form of hunting, trapping, and government control efforts, may have impacts on wolf population dynamics, social interactions, and the long-term health of the population. Haber also reported that it is difficult to fully understand the impacts of wolf exploitation because detailed comparative information on behavior from both exploited and protected wolf populations is scarce (Haber 1996).
- ξ Haight et al. (2002) modeled the impacts of various wolf removal strategies for WDM including reactive removal (wolves removed after depredation occurs), preventive removal (wolves removed in winter from areas with a history of wolf conflicts); and population size management (wolves removed annually from all territories near farms). None of the strategies threatened wolf populations unless the wolf population was isolated because WDM was confined to the area near farms. For isolated populations, reactive removal was the only alternative that ensured damage reduction and population conservation. The model predicted that population could withstand a sustained harvest of 20-25%. The authors considered this to be a conservative estimate and that the model likely underestimated compensatory factors in wolf population biology.

82

**Exhibit B-82**

As discussed previously, compensatory mortality operates within the wolf population. Compensatory mortality suggests that if more wolves are killed for depredation control purposes, fewer wolves will die from starvation, interspecific strife, or other natural causes. Therefore, based upon the various studies cited previously, it is the belief of WS, USFWS, and WDNR that the removal of 14% of the population annually will not increase total mortality by 14%, and will not greatly influence gray wolf numbers in Wisconsin. Even if a large portion of the 14% take is additive mortality, this additional mortality might result in a decreased rate of population growth, but is not expected to reduce the recovery or survival of the wolf population in Wisconsin.

A given wolf population's productivity is likely the most important factor in determining the annual percentage of a wolf population that can be killed by humans without reducing the population (Fuller et al. 2003). The higher the population's productivity, the higher the level of mortality the population may sustain. Currently, the Wisconsin wolf population is highly productive. Over the past 5 years the wolf population in Wisconsin increased at an average of 12% annually (Figure 1-2).

Furthermore, wolf mortality due to poaching may decrease with the implementation of the depredation compensation program. In the absence of a compensation program, it is more likely that wolves perceived to be causing depredation would be illegally killed. Illegal killing likely would be less selective and may remove more individuals than is necessary to curtail depredation activities. Hence, a reduction in poaching may off-set some of the mortality associated with the depredation control program.

Cumulative Impacts on the Wolf Population

One of the best predictors of the cumulative impact of WDM and all other factors on the Wisconsin wolf population is the impact of similar wolf damage management programs in Minnesota and Michigan. In Minnesota, the wolf population size is not surveyed or estimated annually, however in 2004 Minnesota Department of Natural Resources (MNDNR) estimated the wolf population had reached approximately 3,020 individuals. The previous estimate (for the winter of 1997-98) estimated a Minnesota wolf population of 2,445 wolves. A wolf depredation control program, similar to the one described for Wisconsin in this EA, has been conducted in Minnesota since 1978 when wolves were reclassified as threatened and a 4(d) regulation was promulgated. As discussed above, for the period of 1993 to 2002 intentional take for WDM ranged from 3.9 to 9.4% (average 6.4%) of the estimated state population. For most of the last 25 years of wolf damage management including lethal removal of wolves, the Minnesota wolf population increased and it is only in the last few years that the population has stabilized. This level of take does not appear to have hindered the recovery of the gray wolf in Minnesota or the establishment and recovery of the gray wolf populations in Wisconsin and Michigan.

In Michigan, the wolf population has also been increasing (Figure 1-3). For most of the period from early 2003 until the court order in September 2005, the WDNR and MDNR operated a wolf damage management program under the authority of a special 4(d) rule or a 10(a)(1)(A) permit. The level of intentional take of wolves at depredation sites in Michigan has been 1.2, 1.6, and 0.5% of the late-winter Michigan wolf population for 2003, 2004, and 2005, respectively. During this same period, the Michigan wolf population has experienced annual growth rates of 15.5%, 12.2% and 12.8%, respectively. The observed levels of population increase have occurred despite all known and unknown (cumulative) impacts on the wolf populations in these states.

Like WDNR, the MDNR has also sent the USFWS a request for permission to use non-lethal projectiles, aversive conditioning and lethal WDM methods. An analysis of alternatives for addressing wolf damage and conflict management in Michigan has been released for pubic comment. If the Integrated WDM Alternative (both non-lethal and lethal control) is selected for both states, management of the respective wolf populations would be similar to the management that has occurred in Minnesota for the past 25 years. Existing data strongly indicates that the wolf population in all three states would continue to increase, or at a minimum (i.e., in Minnesota), remain stable. At the same time, it is believed that if this alternative were implemented in both Michigan and Wisconsin, public acceptance of the wolf population would be greater than for any of the other alternatives because there would be an effective legal recourse to depredation problems and assurance that management agencies would be able to protect human safety and domestic livestock.

Although this alternative is not anticipated to result in a reduction in the state wolf population, this alternative could result in a localized decrease in the wolf population at the specific site where the damage management occurs. New wolves would likely recolonize removal sites as long as suitable habitat exists. Dispersing wolves can establish new territories if suitable areas and mates are available. Such areas are either unoccupied spaces or sections at the edge of existing territories. The amount of time until new wolves move into the area would vary depending on the habitat type, time of year, and the population density of wolves in nearby areas. Local population reductions as the result of depredation control activities would not result in a decline in the overall Wisconsin wolf population, but may decrease rates of growth. The cumulative and indirect impacts of this program are also discussed the Eastern Timber Wolf Recovery Plan (USFWS 1992).

Wolf populations in Michigan, Wisconsin and Minnesota have exceeded state and federal recovery goals and are expected to continue to increase until suitable habitat has been saturated. Recovery criteria in the Federal Wolf Recovery Plan require that at least two viable wolf populations must exist within the eastern United States. Furthermore, these two populations must satisfy the following conditions. First, the survival of the wolf in Minnesota must be stable or growing, and its continued survival must be assured. Second, another population must be reestablished outside of Minnesota and Isle Royale. The Plan provides two alternatives for reestablishing this second viable wolf population. If the population is beyond 100 miles from Minnesota population, it must contain 200 wolves for at least 5 consecutive years (USFWS 1992, 2003a). If the population is within 100 miles of the Minnesota population, it must contain at least 100 wolves for at least 5 consecutive years (USFWS 1992). While the Plan identifies no numerical recovery criterion for Minnesota, the Plan does identify State subgoals for use by land managers and planners. For Minnesota, the Plan's subgoal is 1,251 to 1,400 wolves. The Minnesota wolf population currently is estimated to be more than double that numerical goal. The Michigan/Wisconsin wolf population is less than 100 miles from Minnesota and recent surveys indicate more than 830 wolves in these two states. The combined Michigan/Wisconsin population has contained over 100 wolves since 1994. Also, while no numerical individual state recovery criteria for Michigan and Wisconsin are listed in the Plan, State subgoals were incorporated. For Wisconsin and Michigan, the Plan's subgoals are 80 and 80 – 90 wolves, respectively (USFWS 1992). Current populations in both these States are more than four times these numerical subgoals.

84

Wolves in Michigan and Wisconsin have the same Federal recovery status; the wolf populations in both states have exceeded State and Federal recovery goals; and both States have requested permits for WDM. Management decisions made in one State will have impacts on public reaction to management decisions in the other State. For example, if the same management alternative is selected for both states, there is unlikely to be any public reaction other than that directly related to individual perceptions of the alternative. However, selection of differing alternatives without clear-cut reasons for the decision is likely to increase public dissatisfaction with wolf management, and, in the area with the most restrictive management alternative, may increase the likelihood that frustrated individuals will engage in illegal killing of wolves.

All indications from the literature and the analysis above indicate that, given that WDM would be conducted in accordance with all permit conditions and other regulations established by the USFWS for the protection of wolves, and Conservation Measures and Reasonable and Prudent measures proposed by the USFWS in the draft permit and associated Biological Opinion, implementation of this alternative is not likely to threaten the continued persistence of the wolf population, and would likely still allow for some level of population increase. Based on the rate of increase for the Michigan and Wisconsin wolf populations, the wolf population is large enough and healthy enough that even while the proposed action and all other mortality factors have adverse affects on individuals, they will not result in a reduction in the state wolf population. The following factors were of primary importance in this determination:

1)  The wolf population in Michigan, Wisconsin, and Minnesota has surpassed recovery goals and the wolf population continues to increase in all three States.
2)  The average annual rate of increase for the Michigan and Wisconsin wolf population over the last 5 years is approximately 12%.
3)  Based on literature and experiences from the Minnesota and the Northern Rockies wolf depredation control programs and assessments above, the proposed level of take is unlikely to cause a decline in the wolf population. This rate represents only about 1/3 the potential human mortality that a wolf population could sustain (Fuller et al. 2003). The current rate of increase in the Wisconsin population may slow as a result of the proposed action.
4)  In 2003 and 2004, WDNR employed the same lethal methods discussed here to resolve selected wolf depredations. Those measures appear to have had limited impact on the overall Wisconsin wolf population.
5)  Implementation of the proposed action will help to preserve current levels of human tolerance for the species in Wisconsin, which is expected to reduce illegal take of wolves that may otherwise occur in the absence of lethal control of depredating wolves. This action is expected to stabilize or reduce that component of the current mortality rate, which will partially off-set the additional mortality that will occur as a result of the proposed action.
6)  We believe that the proposed action is unlikely to cause a substantial decline in annual recruitment and will not appreciably reduce the survival or recovery of the wolf in Wisconsin.

**Effects on public and pet health and safety.** WS conducted a formal risk assessment of methods proposed for use in this EA (USDA 1997 Revised). The assessment concluded that when traps, cable restraints, firearms and frightening devices are used by appropriately trained and authorized personnel, in accordance with applicable laws, regulations and agency policy, the proposed WDM methods pose minimal or no risk to public health and safety. The greatest risks

85

to human health and safety from the use of WDM techniques are incurred by the specialists who use these methods. There have been no reported injuries to WS or WDNR personnel or the public from wolf management activities in Wisconsin.

Firearm use is a very sensitive issue and a public concern because of fears regarding the potential for misuse of firearms. To ensure safe use and awareness, WS employees who use firearms to conduct official duties are required to attend an approved firearms safety and use training program within 3 months of their appointment and a refresher course every 2 years afterwards (WS Directive 2.615). All firearm safety precautions are followed by WS and WDNR when conducting damage management and WS and WDNR comply with all laws and regulations governing the lawful use of firearms. Shooting with shotguns or rifles would sometimes be used to reduce wolf damage when lethal methods are determined to be appropriate. Firearms would be used to euthanize captured wolves in a humane manner. Wildlife Services employees, who use firearms as a condition of employment, are required to certify that they meet the criteria as stated in the *Lautenberg Amendment* which prohibits firearm possession by anyone who has been convicted of a misdemeanor crime of domestic violence. Shooting is virtually 100% selective for target species and may be used in conjunction with spotlights and night vision equipment.

Wildlife Services' traps and cable restraints are strategically placed to minimize exposure to the public and pets. Appropriate warning signs are posted on access routes to properties where traps or cable restraints are set to alert the public of their presence.

This alternative also could provide relief from damage or threats to public health and safety to people who would have no relief from such damage or threats if non-lethal methods were ineffective or impractical. Many people directly affected by wolf depredations on domestic animals, especially pets that are killed in their yards, express concern for human safety and insist upon the removal of wolves from their property when they cause damage. Wolves that have become habituated to humans (bold) are especially unpredictable (Section 1.3.8). In many situations where wolves may pose a risk to human health and safety, management of human behavior and non-lethal techniques may be sufficient to resolve the problem (Section 1.3.8) however, in some situations, removal of the problem individual may be the most appropriate solution. In addition to authorizations required from the USFWS, the WDNR also requires that it review and approve use of lethal methods to address cases of wolf depredation on pets and non-immediate risks to human safety on a case-by-case basis. (See also Appendix E and the WWMP).

86

**Exhibit B-86**

Table 4-3. Number of Non-target Species Taken by WS Personnel in Wisconsin Compared to Public Take (FY 03-FY 05).

| Species | WS Take of Nontarget Species Killed(Released) | | | Fur Harvest / Public Take | | |
|---|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2002-2003 | 2003-2004 | 2004-2005 |
| Black Bear | 0 | (2) | 1(4) | 2,798 | 3,063 | 2,940 |
| Coyote | 13 (2) | 25(2) | 61 | 13,597 | 17,837 | 23,148 |
| Bobcat | 0 | 0 | (1) | 253 | 371 | 364 |
| Red Fox | 1 | 0 | 2 | 5,196 | 7,743 | 7,527 |
| Badger | 0 | (1) | (1) | ----- | ----- | ----- |
| Striped skunk | 0 | 1 | 1 | 214 | 562 | 581 |
| Raccoon | 3 | 4(5) | 5(3) | 150,861 | 214,043 | 203,374 |
| Wild turkey | 0 | 1 | 1 | 50,196 | 55,524 | 57,839 |
| Common crow | 0 | 0 | 1 | 74,080 | 74,007 | 59,218 |
| Cow (calf) | 0 | 0 | (1) | ----- | ----- | ----- |
| Feral cat | 0 | 1 | 0 | ----- | ----- | ----- |
| Dog | 0 | 0 | (3) | ----- | ----- | ----- |

[1] Harvest seasons occur over 2 years for furbearers harvested in winter.
[2] Harvest estimates are from registered harvest for bear, bobcat, and turkey; Fur Trapper Harvest for furbearers; and Small Game Harvest for other species
http://dnr.wi.gov/org/land/wildlife/harvest/harvest.htm

**Humaneness of methods to be used.** Wildlife Services and WDNR personnel are experienced and professional in their use of WDM methods. Under this alternative, wolves would be trapped, captured by cable restraints, or shot by experienced personnel as humanely as possible using the best methods available. Tranquilizer trap devices (TTDs) can be used on wolf traps to reduce the incidence of self-inflicted injuries by captured animals. All activities would be conducted in accordance with USFWS permit requirements and Wisconsin wolf trapping guidelines which require that traps be checked at least once every 24 hours. Daily trap checks minimize the amount of time target and non-target animals remain in traps, and improve the likelihood that a non-target animal may be released unharmed.

Some individuals would consider this alternative inhumane because they oppose all lethal methods of damage management. Others will be opposed to this alternative because they object to specific lethal WDM methods like traps and cable restraints and perceive these methods as being unjustifiably cruel and inhumane. Some individuals would prefer that cage traps be used to capture wolves and would perceive this method as being more humane than traps and cable restraints. Unfortunately, the use of cage traps to capture wolves is both impractical and ineffective because it is extremely difficult to get a cage trap big enough for an adult wolf into remote locations, and because it is rare to capture an adult wolf in a cage trap. Individuals with animals that have been injured, threatened or killed by wolves may see this alternative as being more humane because it has the greatest likelihood of preventing futher injuries to their livestock and pets.

**Impacts to stakeholders, including aesthetics of wildlife.** Public reaction would be variable and mixed because there are numerous philosophical, aesthetic, and personal attitudes, values,

and opinions about the best ways to reduce conflicts/problems between humans and wildlife. The impacts of this alternative to stakeholders would primarily depend on their values towards wildlife and their relationship to the damage problem. This alternative would likely be favored by property owners who are experiencing damage because this alternative has the greatest likelihood of successfully resolving wolf conflicts, but others would be saddened if the wolves were removed. Individuals not directly affected by the threats or damage may be supportive, neutral, or totally opposed to any removal of wolves from specific locations or sites. Some individuals would strongly oppose this alternative because they believe it is morally wrong to kill or use animals for any reason or they believe the benefits from wolves outweigh the associated damage. Individuals totally opposed to lethal WDM methods want agencies to teach tolerance for wolf damage and threats to public and pet health or safety, and that wolves should never be killed.

As discussed in Section 2.1.5.2, wolves have high nonconsumptive (viewing, calling, photographing) and indirect values (e.g., spiritual, and existence values) for many people. The ability to view and aesthetically enjoy wolves at a particular site could be temporarily limited if the wolves are removed. New animals would most likely use the site in the future, although the length of time until new wolves arrive is variable, depending on the habitat type, time of year, and population density of wolves in nearby areas. Given the increasing number of wolf packs in Wisconsin and that this action will not reduce the Wisconsin wolf population, other opportunities to view, call and aesthetically enjoy wolves will be available to people who make the effort to visit sites with adequate habitat outside of the damage management area.

The IWDM approach, which includes non-lethal and lethal methods as appropriate, provides relief from threats to public safety attacks on pets to people who would have no relief from such damage or threats if non-lethal methods were ineffective or impractical. Many people directly affected by problems and threats caused by wolves insist upon their removal from the property or public location when the wildlife acceptance capacity is reached or exceeded. Some people will have the opinion that wolves should be captured and relocated to a rural area to alleviate damage or threats. Some people would strongly oppose removal of wolves regardless of the nature of the damage problem.

**Effects on non-target species populations, including threatened and endangered species.** Of the WDM methods proposed for use, foot-hold traps and cable restraints pose the greatest risk to non-target species. Some non-target wildlife species, such as raccoons, black bear, bobcat, and coyotes may be captured during WDM (Table 4-3). Wildlife Services does not expect the rate of non-target species take to substantially increase above current program levels. The take of non-target animals by WS is well below the sustainable harvest level for the wildlife species captured. The number of animals taken by WS relative to the number taken for sport harvest is negligible. Using available harvest data and the annual take by WS (USDA 1997, Revised), the magnitude of impact for the proposed action is considered extremely low (USDA 1997, Revised).

Not all coyote reported as killed in Table 4-3 were unintentionally killed by the WDM method. Most coyotes were live captured and subsequently euthanized because the property also had a history of problems with coyote predation on livestock. In these instances, the livestock producer may request that WS euthanize all coyotes captured while WS is working to solve depredation problems with wolves.

The USFWS has concurred that WS' WDM methods are not likely to adversely affect the bald eagle, will not jeopardize the continued existence of Canada lynx and are not anticipated to result in the incidental take of lynx (J. Smith, USFWS, August 12, 2003; L. Lewis, USFWS, May 9,

88

2001). WS has determined that the proposed action will have no effect on all other federally listed non-target species and critical habitat in Wisconsin. Impacts on wolves (target species) are discussed above. WS and WDNR will adhere to all Conservation Measures, Terms and Conditions and other provisions for the protection of federally listed species provided in the 2001 and 2003 Section 7 consultations with the USFWS. The SOPs in Chapter 3 include measures intended to reduce the effects on non-target species populations and to avoid jeopardizing T/E species' populations. Measures to reduce risks to non-target species are also discussed in Appendix B. All activities would be conducted in accordance with USFWS permit requirements and Wisconsin wolf trapping guidelines which require that traps be checked at least once every 24 hours. Daily trap checks minimize the amount of time target and non-target animals remain in traps, and improve the likelihood that a non-target animal may be released unharmed.

### 4.2.3    Alternative 3 - Technical Assistance Only

**Effects on wolf populations.**

Under this alternative, the USFWS would not issue any Section 10(a)(1)(A) permits or other authorization for wolf damage management. Wildlife Services would not conduct operational WDM in Wisconsin but could provide technical assistance on WDM methods that do not require permits or other authorization from the USFWS (Appendix B). Wildlife Services would also be able to conduct evaluations of potential wolf depredation sites needed to administer the wolf damage compensation program. The WDNR would have access to non-lethal techniques that are allowed without a permit or which are permitted because of the cooperative conservation agreement between the WDNR and the USFWS (Section 1.7.7). As with Alternative 1, there could be limited intentional take of wolves for the protection of human safety and to aid a sick or injured wolf. Non-lethal techniques that require permits or other authorization from the USFWS would not be available so there would be no incidental take from these methods. Consequently, impacts of agency actions on the wolf population would be similar to or slightly lower than Alternative 1.

As discussed above, non-lethal methods are not always effective. This alternative is expected to result in a reduction in the efficacy of WDM efforts; and it is reasonable to conclude will also result in a reduction in tolerance of wolves by the landowners and an increase in illegal kill (Section 1.3.10). Illegal lethal control actions by private individuals are less likely to be very specific or very humane, and could potentially have more adverse impacts on the wolf population we are trying to recover than focused lethal actions by trained, authorized professionals. Any illegal lethal control by individuals is also less likely to be effective in reducing depredation events, as it would be less likely to target the specific depredating animals.

Cumulative Impacts

Authorized take will be much lower than Alternative 2. However, because of anticipated increases in illegal take discussed above, cumulative impacts on the wolf population from all sources of mortality are likely to be similar to or slightly higher than Alternative 2. As discussed for Alternative 2, WDM decisions made in Wisconsin will have impacts on public reaction to management decisions in Michigan and *vice versa*. If this alternative were selected for both Michigan and Wisconsin, the results are likely to be similar to that described for Alternative 1, only amplified because the frustration among livestock owners and others is likely to be even greater.

89