**Effects on public and pet health and safety.** Wildlife Services would not provide operational assistance with WDM, so there would be no risks to humans or pets from WS' use of WDM methods. The USFWS would not issue permits or other authorizations for WDM so WDM methods would be resticted to non-lethal techniques including those allowed because of the cooperative conservation agreement between the WDNR and the USFWS (Section 1.7.7). Under this alternative, there would be no use of non-lethal projectiles and no trapping to capture wolves and attach collars for aversive conditioning, so there would be no risk to the public or pets from these methods. However, even under Alternative 1, use of these methods is anticipated to be low, so the reduction in the already very low risk to public and pet health and safety from agency actions is likely to be negligible. Risks associated with actions of individuals dissatisfied with the program will be as described for Alterantive 1. Cumulative impacts of WDM methods on public health and safety under this alternative are likely to be similar to Alternative 1.

There are provisions within the regulations pertaining to the ESA that allow for the lethal take of an endangered species that is a demonstrable (either immediate or non-immediate) threat to human safety and response to these issues will be as described for Alternative 2. Response to predation on pets will be restricted to non-lethal methods allowed without special authorization from the USFWS. As discussed above, non-lethal methods are not always effective in reducing problems with wolves. If wolf populations continue to increase without an effective damage management program in place, there may be potential threats to public safety and pets from wolves that enter people's yards or attack their pets. Therefore, risks to human and pet safety from wolves would likely be similar to or higher for this alternative than Alternative 2 because fewer WDM methods would be available. Additionally, frustrated individuals may attempt to solve wolf damage problems through illegal shooting, trapping, snaring, or poisoning. As a result of these illegal actions, there could be increased risks to public and pet safety from improper or unscrupulous efforts to resolve perceived problems with wolves.

**Humaneness of methods to be used.** WS would not provide operational assistance with WDM, so the issue of humaneness as it relates to WS use of control methods under this alternative is not applicable. However, operational WDM assistance with non-lethal WDM techniques allowed without permits or under the authorities of the cooperative conservation agreement between WDNR and the USFWS would still be available. These methods could involve the use of traps and cable restraints to live-capture wolves and public perceptions of the humaneness of these non-lethal WDM methods would be as described for Alternative 1. Some individuals may perceive this alterantive as less humane than Alternative 1 because access to some non-lethal method would be prohibited. Others may perceive the use of non-lethal projectiles which cause pain in the animal struck and the shock administered by the modified dog training collars used for aversive conditioning as being inhumane. As with Alternative 1, frustrated individuals may attempt to solve wolf damage problems through illegal shooting, trapping, snaring, or poisoning. Some of these methods are likely to be less humane than the methods that could be used by agency personnel. Overall, the perceptions of the humaneness of this alternative will be as described for Alternative 1.

**Impact to stakeholders, including aesthetics of wildlife.** The impacts of this alternative to stakeholders would vary depending on individual values toward wildlife, and the relationship of the individual to the damage problem. Property owners who are experiencing damage from wolves may oppose this alternative because they may perceive it as restricting their access to WDM assistance. Some people would support this alternative because WS would not be using Federal resources for WDM and would have no direct impact on wolf populations. Others would oppose this alternative because they believe property owners would resort to illegal, inhumane, or environmentally unsafe wolf control methods.

As with Alternative 1, some individuals would prefer this alternative because they believe it is morally wrong to kill animals for any reason. However, there may still be concern about the use of traps and cable restraints to capture wolves for population monitoring and/or attachment of collars required for some non-lethal WDM methods. If wolves are removed from the Federal list of threatened and endangered species, lethal WDM techniques would be available in accordance with the WWMP and perceptions of this alternative by individuals opposed to lethal WDM would likely be the same as Alternative 2. However, this alternative may still be preferable to alternative 2 for individuals who are specifically opposed to federal (WS) involvement in the use of lethal WDM techniques.

Some people would support this alternative because they enjoy seeing wolves, or having wolves nearby, and while wolves are federally protected under the ESA, this alternative would prohibit the lethal removal of wolves except in the rare instance of demonstrable risks to human safety and to aid a sick or injured wolf. However, individuals might still be affected by relocation of depredating wolves. As discussed above, this alternative is not anticipated to result in a decline in wolf density in Wisconsin and any difference in wolf viewing opportunities is likely to be neglible. Other opportunties to view, call and aesthetically enjoy wolves will be available to people who make the effort to visit sites with adequate habitat outside of the damage management area.

**Effects on non-target species populations, including T&E species**

Wildlife Services would have no direct impact on non-target and T&E species from the use of control methods. This work would be likely be conducted by WDNR and risks to non-target and T/E species from WDM methods would be similar to Alternative 1. If and when wolves are no longer federally protected, management of wolf damage would depend upon the provisions of the state (WWMP) and tribal wolf management plans and policies. The state may choose to allow individual property owners/mangers or their designated agents to remove depredating wolves. In this instance, risks to non-target and T/E species would be variable, but could be higher than Alternative 2 if individuals with limited WDM experience attempt to manage wolf conflicts. Risks may be lower than Alternative 4 if individuals chose to seek and use technical assistance from the lead and consulting agencies.

Property owners who are experiencing damage from wolves may oppose this alternative because they may perceive it as restricting their access to WDM assistance. As discussed above, depending upon budget and personnel limitations, the state and tribes may not be able to provide the same level of prompt assistance as a WS program. Frustrated individuals may attempt to solve wolf damage problems through illegal shooting, trapping, snaring, or poisoning with potential detrimental effects on non-target species or T/E species. Use of illegal pesticides (Schueler 1993, Allen et al. 1996, USDA 1997 Revised), is a relatively cheap form of predation control that represents one of the greatest threats to the environment, T/E species, domestic animals, and public safety.

### 4.2.4 Alternative 4 - No Federal WDM in Wisconsin

**Effects on wolf populations.** Under this alternative, the USFWS would not issue any permits or other authorizations for WDM and there would be no WS WDM program. While wolves are federally protected under the ESA there would be no lethal WDM in Wisconsin and use of non-lethal projectiles and aversive conditioning (dog training collars) would be prohibited. The WDNR would be restricted to the use of non-lethal techniques for wolf damage management that

they can access via authorities granted under 50 CFR 17.21. While federally protected under the ESA, overall impacts of this alternative will be similar to Alternative 1 and identical to Alternative 3.

As discussed above, non-lethal methods are not always effective. This alternative is expected to result in a reduction in the efficacy of WDM efforts; and it is reasonable to conclude will also result in a reduction in tolerance of wolves by the landowners and an increase in illegal kill (Section 1.3.10). Frustration with wolf management and levels of wolf poaching may be highest for this alternative because of what individuals may perceive as a federal refusal to respond to problems caused by Federal [federally protected] wolves. Illegal lethal control actions by private individuals are less likely to be very specific or very humane, and could potentially have more adverse impacts on the wolf population we are trying to recover than focused lethal actions by trained, authorized professionals. Any illegal lethal control by individuals is also less likely to be effective in reducing depredation events, as it would be less likely to target the specific depredating animals.

Cumulative Impacts

Authorized take will be much lower than Alternative 2. However, because of anticipated increases in illegal take discussed above, cumulative impacts on the wolf population from all sources of mortality are likely to be similar to or slightly higher than Alternative 2. As discussed for Alternative 2, WDM decisions made in Wisconsin will have impacts on public reaction to management decisions in Wisconsin and *vice versa*. If this alternative is selected in Wisconsin, but a less restrictive version is selected in Michigan without clear-cut reasons for the decision, it is likely to increase public dissatisfaction with wolf management in Wisconsin, and may increase the likelihood that frustrated individuals will engage in illegal killing of wolves. If this alternative were selected for both Michigan and Wisconsin, the results are likely to be similar to that described for Alternative 1, only amplified because the frustration among livestock owners and others is likely to be even greater.

If WDNR wolf program personnel are forced to spend much more time on non-lethal control efforts on problem wolves, work on the state wolf population monitoring would suffer. Non-lethal control work by WDNR, without the aid of WS or other federal agents is likely to be very time consuming and very costly, and therefore may reduce flexibility of State wolf management. Thus the ability of the WDNR to determine wolf population size and distribution, changes in population growth rates, changes in mortality factors, and other characteristics of the wolf population would be reduced. If the WDNR does not maintain adequate surveys of the wolf population, proper management of wolves would be difficult and public confidence in wolf management by the WDNR would decline.

**Effects on public and pet health and safety.** No permits or other authorizatons would be issued for the use of lethal WDM techniques, non-lethal projectiles or aversive conditioning (e.g. dog training collars). However, under the authority granted under 50CFR 17.21, WDNR would still be able to trap and relocate depredating wolves, conduct the wolf population monitoring program and use all other non-lethal WDM techniques. As with Alternative 1 use of non-lethal methods like remote activated frightening devices that require a collar on a wolf, and trap-and-relocate efforts may increase if lethal WDM alternatives are not available. This could increase the wolf capture effort associated with non-lethal techniques over that anticipated for Alternative 2, but would likely not exceed the cumulative agency wolf capture effort (non-lethal and lethal WDM combined) anticipated for Alternative 2. As with Alternative 2, traps and cable restraints would be strategically placed to minimize exposure to the public and pets. Under this alternative, traps

and cable restraints would only be used with the specific intent of keeping the captured animal alive. In general, while wolves are federally listed as a threatened or endangered species, risks to human and pet safety from the use of WDM techniques would be lower than Alternatives 2 and 3 because there would be no lethal WDM by any agency, no use of non-lethal projectiles, and no trapping effort to attach training collars. Wildlife Services would have no impact on public and pet safety from the use of control methods because WS would not be invovled in any aspect of WDM.

Non-lethal WDM techniques are not always adequate to resolve conflicts with wolves. It is also possible that, depending upon budget and personnel limitations, the State and Tribes may not be able to provide the same level of prompt assistance as a WS program. Frustrated individuals may attempt to solve wolf damage problems through illegal shooting, trapping, snaring, or poisoning. As a result of these illegal actions, there could be increased risks to public and pet safety from improper or unscrupulous use of these methods.

Under this alternative, WS would not be able to assist with threats to public or pet health and safety. While wolves are federally protected, the WDNR would have access to most non-lethal WDM methods to reduce risks from wolves. However, depending upon budget and personnel limitations, these entities may not be able to provide the same level of prompt assistance as a WS program. These agencies would not have access to the full range of WDM methods and may not be as effective in reducing some wolf conflicts as with Alternative 2 or 3.

**Humaneness of methods to be used.** This alternative would be considered humane by many people that are opposed to lethal WDM. However, WDNR would still use traps and cable restraints to capture and relocate problem wolves, and to radio collar wolves for population monitoring and non-lethal WDM techniques which require a collar on the wolf (exclusive of dog training collars). When capturing wolves for population monitoring and non-lethal WDM efforts, wolves would be humanely captured by experienced WS and WDNR personnel using the best methods available. Tranquilizer trap devices (TTDs) can be used on wolf traps to reduce the incidence of self-inflicted injuries by captured animals (Appendix B). All activities would be conducted in accordance with USFWS permit requirments and Wisconsin wolf trapping guidelines which require that traps be checked at least once every 24 hours. Daily trap checks minimize the amount of time target and non-target animals remain in traps, and improve the likelihood that a non-target animal may be released unharmed. As explained for Alternative 1, cage traps are usually impractical and not effective in capturing wolves.

Even though wolves are federally protected under the ESA, some property owners may take illegal action against localized populations of wolves out of frustration with continued damage and lack of legal access to the full range of WDM methods. Some illegal methods, like poisons, may be less humane than methods used by experienced agency personnel.

**Impact to stakeholders, including aesthetics of wildlife.** Wildlife Services would have no impact on stakeholders, or the aesthetic value of wildlife. The impacts of this alternative to stakeholders would be variable depending on their values towards wildlife and relationship to the problem. Individuals directly impacted by wolf predation may be less tolerant of wolves that individuals who's property and pets are not at risk. While wolves are federally protected individuals experiencing damage from wolves would likely oppose this alternative because they would likely feel that their access to an effective management techniques and Federal (WS) assistance was being unduly restricted. Access to WDM methods would be even more restricted under this alternative than under Alternative 1 because non-lethal projectiles and aversive conditioning (dog training collars) could not be used. They would likely be less opposed to this

alternative once wolves are removed from the Federal list of threatened and endangered species because access to lethal WDM techniques would likely be available from entities other than WS in accordance with the WWMP.

Some individuals would prefer this alternative because they believe it is morally wrong to kill animals for any reason. However, there may still be concern about the use of traps and cable restraints to capture wolves for population monitoring and/or attachment of collars required for some non-lethal WDM methods. If wolves are removed from the Federal list of threatened and endangered species, lethal WDM techniques would be available in accordance with the WWMP and perceptions of this alternative by individuals opposed to lethal WDM would likely be the same as Alternative 2. However, this alternative may still be preferable to alternative 2 for individuals who are specifically opposed to federal (WS) involvement in the use of lethal WDM techniques.

Some people would support this alternative because they enjoy seeing wolves, or having wolves nearby, and while wolves are federally listed, this alternative would prohibit the lethal removal of wolves. However, they might still be affected by relocation of depredating wolves. As discussed above, this alternative is not anticipated to result in a decline in wolf density in Wisconsin and any difference in wolf viewing opportunities is likely to be neglible. Other opportunties to view, call and aesthetically enjoy wolves will be available to people who make the effort to visit sites with adequate habitat outside of the damage management area.

**Effects on non-target species populations, including T&E species.**

No operational WS activities would be conducted pursuant to this alternative so there would be no risks to non-target or T/E species from WS. The Tribes and WDNR could provide assistance with most non-lethal WDM methods although access to non-lethal projectiles and training collars would be prohibited. Since capture and handling of wolves is required for the use of some aversive stimuli (e.g., attaching collars) so risks to non-target species will be similar to or slightly lower than Alternative 1.

Non-lethal methods are not always effective in resolving damage problems and, depending upon budget and personnel limitations, the Tribes and WDNR may not be able to provide the same level of prompt assistance as a WS program. Some individuals frustrated with wolf management policies might attempt to illegally shoot, trap, snare, or poison wolves with potential detrimental effects on non-target species or T/E species. Lacking professional assistance, some individuals might use illegal pesticides (Schueler 1993, Allen et al. 1996, USDA 1997 Revised), a cheaper form of predation control that represents one of the greatest threats to the environment, T/E species, domestic animals, and public safety.

## 4.3 SUMMARY OF IMPACTS

Table 4-4 highlights the potential impacts of each alternative for the issues that were analyzed in detail. Cumulative impacts are discussed in relationship to each of the wildlife species and the environmental impacts analyzed in this chapter. This EA recognizes that the total annual removal of individual animals from wildlife populations by all causes is the cumulative mortality. No single or cumulative adverse environmental consequences are expected to result from the proposed action. When used in accordance with all appropriate Federal, State and WS requirements and guidance, impacts on non-target species from the proposed methods would be extremely low. None of the federally protected threatened, endangered, or candidate species listed by the USFWS or WDNR in Wisconsin would be jeopardized by the proposed action (J. Smith, USFWS, August 12, 2003; L. Lewis, USFWS, May 9, 2001). Economic and social impacts would primarily be beneficial, although some segments of the human population might be opposed to the killing of wolves. Negative impacts to the physical environment would be non-existent.

Any localized reduction of wolf populations would likely soon be replaced and habitats reoccupied as IWDM would only be conducted in specific areas near the location where the specific conflict has occurred. All actions would be conducted in strict compliance with the requirements set by the USFWS for wolf management and associated policies and agreements between WDNR, WS, and USFWS. The proposed action may have negative effects on individual wolves but will not result in declines in the state wolf population, and in fact is expected to result in a net benefit to the Wisconsin wolf population. Based on past experience with IWDM programs in Minnesota, Wisconsin and Michigan, the Wisconsin wolf population will continue to grow even with the intentional and incidental take anticipated for the preferred alternative and all other cumulative impacts on the wolf population.

**Table 4-3. Summary of Impacts**

| Issues/Impacts | Alternative 1: Non-lethal Only | Alternative 2: IWDM Program (Proposed Action/No Action) | Alternative 3: Technical Assistance | Alternative 4: No Program |
|---|---|---|---|---|
| **Wolf populations** | No lethal removal of wolves. Increased risk that frustrated individuals may use illegal WDM methods. Because of increased risk of illegal take, cumulative population impacts will be greater than for Alternative 2. | Possible temporary reduction in local populations, no reduction in statewide population. Risk of illegal action still possible but least likely for this Alternative. Evidence to date indicates State wolf population will contine to increase. Impacts similar with and without federal protection of wolves. | No impact by WS. Technical assistance available from WS. Operational assistance with non-lethal available from others. Increased risk that frustrated individuals may use illegal WDM methods. Because of increased risk of illegal take, cumulative population impacts will be greater than for Alternative 2. | No lethal removal of wolves. No WS involvement in WDM. Operational assistance with non-lethal available from others. Most non-lethal methods available to WDNR. Because of increased risk of illegal take, cumulative population impacts will be increased due to illegal take which will cause greater impacts to wolf population than Alternative 2. The ability of WDNR to monitor wolf population may be reduced. |
| **Non-target Species, Including T&E Species** | Low risk to non-target species from use of traps and cable restraints for non-lethal WDM and wolf population monitoring. Risks from authorized WDM lower than Alternative 2. Risks to non-target species from illegal actions likely higher than Alternative 2. | Low risks to non-target species from some WDM methods. No adverse impact to T&E or non- target species populations. Risk of illegal action still possible but least likely for this Alternative. Impacts similar with and without federal protection of wolves. | No effects by WS. Low risk to non-target species from use of traps and cable restraints for non-lethal WDM and wolf population monitoring. Risks from authorized WDM lower than Alternative 2. Risks to non-target species from illegal actions likely higher than Alternative 2. | No effects by WS. Low risk to non-target species from use of traps and cable restraints for non-lethal WDM and wolf population monitoring by authorized agencies. Risks from authorized WDM lower than Alternative 2. Risks to non-target species from illegal actions likely higher than Alternative 2. |



Exhibit B-96

| | | | | |
|---|---|---|---|---|
| **Public and Pet Safety** | Risk from agency use of WDM methods similar to or lower than Alternative 2. Variable risks from illegal lethal WDM methods used by others. Overall risk from WDM methods similar to Alternative 2. Risks from wolves would likely be slightly higher than Alternative 2 because of restrictions in WDM methods | Very low risk from WDM methods. Best reduction of risks from wolves. Impacts similar with and without federal protection of wolves. | No effect by WS. Variable risks from illegal lethal WDM methods used by others. Risks from wolves would likely be slightly higher than Alternative 2 because of restrictions in WDM methods. | No effect by WS. Risk from WDM methods and wolves dependent upon actions of other agencies. |
| **Humaneness of Method** | Agency actions probably considered more humane by most people than lethal measures. There will still be concerns about the use of traps and cable restraints for live capture of wolves. Illegal use of lethal methods by others may increase. These methods may be less humane than methods proposed under Alternative 2. | Agencies will use the most humane methods available. Some will perceive lethal methods and the use of traps and cable restraints for live capture of wolves as inhumane. Perceptions of humaneness similar with and without federal protection of wolves. | No WS involvement in operational WDM but non-lethal methods including the use of traps and cable restraints for live capture can be conducted by others. Alternative may be perceived as more humane by people opposed to lethal measures and Federal involvement in WDM. Illegal use of lethal methods by others may increase. These methods may be less humane than methods proposed under Alternative 2. | No WS involvement in WDM but non-lethal methods including the use of traps and cable restraints for live capture can be conducted by others. Alternative may be perceived as more humane by people opposed to lethal measures and Federal involvement in WDM. Illegal use of lethal methods by others may increase. These methods may be less humane than methods proposed under Alternative 2. |
| **Impact to Stakeholders, Including Aesthetics** | Variable. Those with wolf conflicts may be glad to have some assistance but frustrated by lack of access to all WDM methods. Some may prefer this Alternative to Alternative 2 because no lethal WDM. | Variable. Those receiving damage would probably favor this alternative. Some animal advocates would oppose this alternative because it includes use of lethal methods and WS (Federal) involvement in lethal WDM. | Variable. Those receiving damage probably oppose this alternative because of restrictions in access to WDM methods. Some animal advocates may prefer this alternative because there will be no use of lethal WDM and very limited WS involvement in WDM. | Variable. Those receiving damage probably oppose this alternative because of restrictions in access to WDM methods. Some animal advocates may prefer this alternative because there will be no use of lethal WDM and no WS involvement in WDM. |



Exhibit B-97

# CHAPTER 5: LIST OF PREPARERS AND PERSONS CONSULTED

## 5.1 Preparers

| | |
|---|---|
| Peter Fasbender | U.S. Fish and Wildlife Service – Region 3 |
| Jeff Gosse | U.S. Fish and Wildlife Service – Region 3 |
| Ron Refsnider | U.S. Fish and Wildlife Service – Region 3 |
| David Ruid | USDA Wildlife Services – Wisconsin |
| Jason Suckow | USDA Wildlife Services – Wisconsin |
| Joel Trick | U.S. Fish and Wildlife Service – Wisconsin |
| Kimberly K. Wagner | USDA Wildlife Services – Wisconsin |
| Robert Willging | USDA Wildlife Services – Wisconsin |
| Adrian Wydeven | Wisconsin Department of Natural Resources |

## 5.2 Persons Consulted

| | |
|---|---|
| Ritchie Brown | Wisconsin Ho-Chunk Nation |
| Christie Deloria | U.S. Fish and Wildlife Service – Michigan |
| Peter David | Great Lakes Indian Fish and Wildlife Commission |
| Carl Edwards | Lac Du Flambeau Tribe of Lake Superior Chippewa Indians |
| Jeff Lehmkuhler | Extension Beef Cattle Specialist, Department of Animal Science, University of Wisconsin-Madison, Member Wisconsin Wolf Science Team |
| William Paul | USDA Wildlife Services – Minnesota |
| Gregory Palmquist, DVM, | Grantsburg Animal Hospital, Grantsburg, WI. Member Wisconsin Wolf Science Team |

# CHAPTER 6: SUMMARY OF RESPONSES TO PUBLIC COMMENTS

This chapter contains issues raised by the public during the comment period for this EA and the agencies' response to each of the issues. Comments from the public are numbered and are written in bold text. The agencies' response follows each comment and is written in standard text.

**1. Some wolves are acceptable, but state is currently or is starting to be over-populated. Wolf population must be controlled.**

Scope of EA is to address specific instances of wolf predation on domestic animals and risks to human safety. Analysis in the EA indicates that the proposed action will not result in a reduction in the state wolf population. Overall wolf population management is outside the scope of the EA. The issue of wolf population management is addressed in the State's Wolf Management Plan which will be the guiding document for wolf management in the state when wolves are removed from the Federal list of threatened and endangered species. This EA only addresses WS and USFWS involvement in wolf management while wolves are federally protected. This analysis will need to be reviewed and revised when wolves are removed from the Federal list of threatened and endangered species.

**2. Economic losses to producers are trivial and compensation programs are in place to handle the losses that do occur. EA offers very little hard data to prove that wolves are having a substantial negative impact on livestock, game farm animals, pets or human safety. Wolves only kill sick and injured livestock.**

A problem does not have to be widespread or common to merit assistance for the individual experiencing the problem. Although the losses to wolves are relatively small in comparison to total livestock production, as addressed in EA Section 1.3.7, the cost of wolf depredation is not spread out across all farms. The impacts on individual producers can be substantial. Impacts of wolf predation on livestock producers also include indirect costs and impacts in addition to the direct loss of livestock. Material to address these indirect impacts has been added to EA Section 1.3.7.

While it is generally true that in any group of animals, the young, sick and old are generally more vulnerable to predation than healthy adults, wolf predation on livestock is not restricted to sick or injured animals. In most instances when WS responds to a case of wolf predation, there is no evidence that the animal was sick or injured. In the process of domesticating animals, humans have often selected for traits which make animals better suited to our needs but less able to defend themselves from predation. Consequently, even healthy adult domestic livestock may be easier prey and provide better food returns for the energy expended than wild prey items.

The State compensation program is discussed in EA Sections 3.3.1 and also Appendix B. These sections discuss the limitations of compensation programs in general and the Wisconsin program in particular. The Wisconsin wolf damage compensation program is funded by 3% of the state income tax return check off and 3% of license plate fees collected from the sale of endangered resources license plates. In some years the claims for wolf damage have exceeded the resources available from license plate revenue. Because the WDNR has been directed by the legislature to provide full compensation for wolf depredations, the WDNR Bureau of Endangered Resources has been forced to use additional program funds to make compensation payments. When this occurs, these funds are made available at a cost to other endangered species programs.

**3. Wolves should be left alone and will regulate themselves. Nature will come to its own balance without interference from man.**

Commenter prefers Alternative 4. The issue addressed in this EA is not whether the wolf population will or could come into balance with available habitat or natural prey populations, but rather the management of individual wolves or local groups of wolves that have learned to prey on domestic animals and the rare instances when a wolf might pose a demonstrable threat to human safety. See also response to Comments 12, 24 and 49.

Prey density and human caused mortality regulate wolf numbers in developed landscapes. If wolves prey on domestic animals, these in turn would be prey that influences the size of wolf populations. As wolves spread into agricultural landscapes WDM controls will be necessary to keep depredation on domestic animals to low levels.

**4. Interests of all people in the state and not just special interest groups should be considered. Livestock producers who are living in wolf habitat cannot be the only 'voice' used in wolf management.**

The EA does consider the interests of all people in the state. The EA addresses the issue that some individuals will feel that lethal WDM is morally or philosophically objectionable in Section 2.1.5, and in the discussion of the impacts of each alternative on stakeholders in Chapter 4. The EA also considers the importance of wolves in Native American culture. The Ho-Chunk Nation, Lac du Flambeau Band of Lake Superior Chippewa Indians and GLIFWC have expressed that, on moral and cultural grounds they do not wish lethal WDM methods to be used, or have substantial reservations about and want strict restrictions on the use of lethal WDM methods (Section 1.3.5).

**5. Wolves belong in the state. In a time of increasing development, it is good to know that something as quintessentially wild as wolves is still allowed to roam the state unmolested.**

Analysis in Chapter 4 of the EA indicates that the proposed alternative will not jeopardize the wolf population in the State. Most wolves in the State do not prey on domestic animals and will not be impacted by depredation management activities. The purpose of the EA is to address wolf depredation on domestic animals and activities which result in a threat to human safety.

**6. WDNR should play the dominant role in wolf management in the State.**

While wolves are Federally listed as an endangered species, the USFWS retains primary management authority for wolves, and may issue special permits for wolf take under Section 10(a)(1)(A). When and if wolves are reclassified as threatened species, the USFWS would retain ultimate management authority for wolves, but could designate additional management authority to state and tribal natural resource agencies via section 4(d) rules under the ESA. While wolves are federally protected, the WDNR has been and will continue to be an essential partner in wolf recovery. When wolves are removed from the Federal list of threatened and endangered species, the WDNR and Tribes will have full authority for wolf management in the state. (EA Section 1.4.1). WS works as an agent of the state for WDM.

**7. Commenter wants full accountability and a written record for all instances where lethal WDM would be used.**

WS and the WDNR keep written records on all WDM for both lethal and non-lethal controls. Permits and 4(d) rules issued by the USFWS also stipulate the USFWS be promptly notified when a wolf is killed or injured and that the agency acting under the permit/rule provide an annual report of activities conducted under the permit/rule. Summaries of all lethal control activities are listed in annual reports produced by the WDNR. http://dnr.wi.gov/org/land/er/publications/wolfreports/

**8. Improved monitoring and law enforcement followed by stiff penalties for violations are more likely to enhance the survival of the species than lethal WDM. Why cite lawbreakers in EA? Agencies should shut down web site.**

There already exist stiff penalties for taking listed species, including prison time. However, the much of the area in Northern Wisconsin where wolves are located is very sparsely populated. Illegal actions can easily go unnoticed even if law enforcement personnel were greatly increased. In addition, if legal remedies are unavailable to owners suffering depredation events, public sympathy will gravitate to their perspective, making law enforcement even more difficult. Conversely, if there are reasonable and effectively legal alternatives to depredation, the general population will be more inclined to assist law enforcement personnel when illegal take does occur.

The citation and text from the web site was provided as an example of why agencies are concerned about public attitudes towards wolves and wolf recovery. We are aware that the company that makes the agricultural chemical discussed in the site has been looking into getting the site shut down. One of the difficulties is that the site was written by someone outside the U.S. Additional difficulties exist because the agencies would have to prove that the author was conducting an illegal activity. The author states that he, personally, isn't advocating poisoning wolves, just that people may want to think about this and take matters into their own hands.

**9. It doesn't make sense to punish wolves for engaging in natural behavior. Wolves do not kill for fun. They only kill to meet their needs.**

Wildlife damage management is not based on punishing offending animals but as one means of reducing damage. The agencies view the purpose of the EA as being the management of wolf depredation on domestic animals, and risks to human safety.

**10. The USFWS cannot issue permits for wolves while endangered because the State/EA has failed to establish that lethal control, used as a tool to reduce damage and prevent declines in public tolerance of wolves, will enhance the propagation or survival of wolves in the wild. To qualify for a Section 10 exemption, it is not sufficient that a program merely "enhance the propagation" of the species affected, it must also "conserve" that species within the meaning of the ESA. The ESA clearly states that the taking of a species can be considered conservation only under the most extraordinary circumstances. No reasonable reading of the ESA or its legislative history supports the conclusion that this provision should be broadly interpreted to allow the killing of an endangered species to mollify public attitudes or reduce livestock depredation.**

Section 10(a)(1)(A) established the following criteria for the issuance of a permit for the take of an endangered species:

1. The activity is for scientific purposes or to enhance the propagation or survival of the affected species.
2. The permit was applied for in good faith.
3. The activity will not operate to the disadvantage to the species.
4. The activity permitted will be consistent to the purposes and policy of the Act.

The following issuance criteria found in 50 CFR §17.22(a)(2) are also used by the Fish and Wildlife Service in determining whether to issue permits for scientific purposes, enhancement of propagation or survival:

1. The purpose for which the permit is required is adequate to justify removing from the wild or otherwise changing the status of the wildlife sought to be covered by the permit.
2. The probable direct and indirect effect which issuing the permit would have on the wild populations of the wildlife sought to be covered by the permit.
3. Whether the permit, if issued, would in any way, directly or indirectly, conflict with any known program intended to enhance the survival probabilities of the population from which the wildlife sought to be covered by the permit was or would be removed.
4. Whether the purpose for which the permit is required would be likely to reduce the threat of extinction facing the species of wildlife sought to be covered by the permit.
5. The opinions or views of scientists or other permits or organizations having expertise concerning the wildlife or other matters germane to the application.
6. Whether the expertise, facilities, or other resources available to the applicant appear adequate to successfully accomplish the objectives stated in the application.

The USFWS' Findings regarding these issues and the permit application are included as Appendix F of the Final EA. See also response to Comments 11 and 33 and Section 1.3.10.

**11. Wolves are an endangered species and States cannot prove/have failed to prove how proposed WDM would enhance the propagation and survival of wolves so permits cannot be issued under the ESA. States must establish "clear link" or extraordinary circumstances discussed below, or that the environment is being overwhelmed by population pressure in order to justify permit.**

Negative public attitudes have prompted the types of indiscriminate killing which historically threatened wolf populations. Effective resolution of wolf-related conflicts helps prevent development of negative public attitudes and thus reduces indiscriminate killing of wolves. Thus, the proposed action would enhance the survival of the species and is therefore consistent with Section 10 of the ESA. The consistency of the proposed action with ESA is outlined at length in a Statement of Findings, in the EA, and in letters submitted by the WDNR and Michigan Department of Natural Resources (MDNR) in support of their permit applications. See also response to Comment 10.

**12. Agencies should exhaust all non-lethal alternatives before attempting lethal methods.**

Under the alternative suggested by the commenter, all non-lethal methods would have to be attempted and proven ineffective prior to using lethal WDM methods even though, in the professional judgment of WS and WDNR personnel, some methods that would have to be attempted would be impractical (e.g., would incur costs in excess of value of stock protected), inappropriate (e.g., use of a light siren device in areas near other residences) or likely to be ineffective for the particular situation (e.g., situations where animal appears to have habituated to human activity). This alternative will not be addressed in detail for a number of reasons including that: 1) time and resources of agencies and individuals experiencing damage may be unnecessarily expended for purpose of proving methods ineffective; 2) The potential that additional losses could be incurred by animal owners while experimenting with non-lethal methods may be unacceptable to some and would likely result in an increase in individuals seeking to solve their own problems instead of working with the lead or cooperating agencies; and 3) experimenting with non-lethal approaches may not be the most appropriate answer in the rare instance of a wolf-related risk to human safety. See also response to Comment 13.

**13. Lethal control should only be used after all feasible non-lethal methods have been exhausted. Commenter wants full analysis of an alternative that would require that all feasible non-lethal methods be exhausted before lethal is used.**

This alternative differs from that discussed in Comment 12 in that it does not require an attempt to use non-lethal methods which appropriately qualified staff from WS or WDNR have determined are impractical or likely to be ineffective for the specific damage situation. This alternative is addressed in Section 3.4.4. In brief, this alternative was not considered in detail because the proposed alternative is similar to an "All Feasible Non-lethal Before Lethal" alternative because WS and WDNR would encourage and consider the use of non-lethal methods before lethal methods (WS Directive 2.101, WDNR 1999) and because of the conditions that must be met before lethal control will be authorized by WDNR (Appendix E). Therefore, adding a non-lethal before lethal alternative and the associated analysis would not add additional information to the analysis for the public or decision maker.

**14. Major factor in decision to do lethal WDM is need to minimize negative attitudes and illegal wolf killing, but people who would illegally kill wolves will do so anyway no matter what WDM is in place. Agencies have no proof that illegal killing would increase in absence of preferred alternative. Commenter does not concur with assertion that killing wolves will change the "social" perceptions of wolves. Commenter does not agree that it is necessary to kill wolves to save wolves.**

The agencies are aware that illegal killing does occur in all protected wolf populations and discuss the impact of illegal killing on the wolf population in Section 4.2.2. The agencies realize that a very small portion of the population will kill wolves no matter what WDM program is in place. However, we also believe that prompt, professional, effective resolution of conflicts with wolves will help maintain public tolerance of wolves and wolf population expansion, will prevent an increase in untrained individuals attempting WDM on their own, and should prevent an increase in anti-wolf behaviors by intolerant stakeholders. It is generally only when people feel they have no legal access to their problems that illegal options are considered and most people would rather take advantage of an effective legal WDM program that take illegal action. The agencies believe that an integrated WDM program which includes access to lethal WDM methods would be the most effective in resolving conflicts with wolves. Social studies by Kellert (1999) in Minnesota and Shanning et al. (2003), Naughton-Treves et al. (2003), and Naughton et al.(2005) in Wisconsin show strong public support for lethal control of problem wolves by government agents. Illegal lethal control actions by private individuals are less likely to be very specific or very humane, and could potentially have more adverse impacts on the wolf population than focused lethal actions by trained, authorized professionals. Any illegal lethal control by individuals is also less likely to be effective in reducing depredation events, as it would be less likely to target the specific depredating animals. State and Federal law enforcement personnel are striving to prevent illegal killing of wolves, but the remote nature of much of Northern Wisconsin, which makes it desirable habitat for wolves also makes it difficult to protect wolves from illegal actions.

The Wildlife Society, an international organization of professional wildlife biologists, especially focused on North America, states that "Control of wolves preying on livestock and pets is imperative and should be prompt and efficient if illegal killing is to be prevented and human tolerance of the presence of wolves is to be maintained (Peek et al. 1991). The International Union of Nature and Natural Resources or World Conservation Union has established a "Manifesto on Wolf Conservation". The "Manifesto" was published in International Wolf Magazine in 1994 (Anonymous 1994). The 7th Principle for wolf conservation stated "It is recognized that occasionally there may be a scientific established need to reduce non-endangered wolf populations; further it may become scientifically established that in certain endangered wolf populations specific individuals must be removed by appropriate conservation authority for the benefit of the wolf population." In an extensive literature review of strategies for reducing carnivore/ livestock conflict by Norwegian biologists, it was concluded that lethal control should be considered on endangered carnivores such as wolves to prevent expansion into areas of high conflict (Linnell et al. 1996). Lethal control activities by government agents have been authorized on wolves in Minnesota since 1978, when they were listed as a threatened population (Fritts et al 1992). This selective removal of problem wolves resulted in the capture of 2,430 wolves, and killing of 2,261 wolves between

1979 and 2003 (Paul 2003). Annual number of captured and killed wolves ranged from 6 in 1979 to 216 in 1997, but declined to 125 in 2003 (Paul 2003). Despite these lethal controls, the Minnesota wolf population increased from an estimated 1,235 in 1979 to 3,020 in 2004 (Erb and Benson 2004). Although wolf numbers have continued to rise, the distribution of the wolf population has stabilized to heavily forested portions of the state, and the previous spread into agricultural areas where conflicts are most likely has halted; this is possibly due in part to the control activities, reducing presence of wolves in areas of conflict. See Section 1.3.10 in the EA for additional information. See also Comment

There is some indication that illegal killing was on the rise before an integrated WDM program was authorized in 2003 at which point illegal killing appears to have dropped off. In Wisconsin, the highest illegal kill detected in recent years occurred in 2002, just prior to the establishment of the 4(d) rule for wolf management, when at least 15 illegally shot wolves were found in the state. The rate of collared illegal kill in 2005 suggests that illegal kill may again be on the rise, possibly reflecting frustrations with delays in federal delisting of wolves and the federal court actions. In March 2005, poisoned dog food, probably set for wolves, was found in several locations in Ashland and Price Counties, Wisconsin suggesting attempts to reduce wolf numbers shortly after the 4(d) rule was eliminated and lethal control ceased. State and Federal law enforcement personnel are striving to prevent illegal killing of wolves, but the remote nature of many sections of northern Wisconsin, which makes it desirable habitat for wolves, also makes it difficult to protect wolves from illegal actions. Concerns that illegal take may increase in the absence of an effective WDM program are part of reasoning behind the proposed management plan.

**15. It is not appropriate to compare impacts of WDM in other states with much higher wolf populations to predict impacts in Wisconsin. Such a comparison would require a comparison of the specific criteria that would allow for the killing of wolves, information on who is to make the determination as to when lethal WDM is to be used and the agency responsible for the actual killing.**

The comment is made specifically in reference to the use of information on the WDM program in Minnesota to make predictions about the impact of the proposed action on the Wisconsin wolf population. Similar programs of lethal and non-lethal WDM methods have been used in Idaho, Montana, and Wyoming when their wolf populations were much lower than the current Wisconsin population, yet these other wolf populations have also grown. Information on the impact of wolf removals is addressed in the EA and in much of the scientific literature as a proportion of the population which allows for comparisons among populations of differing sizes. The wolf damage management program is Minnesota is less restrictive than that used in Wisconsin. Minnesota WS handles all requests for WDM in Minnesota with little (no) case-by-case review by Minnesota Department of Natural Resources or USFWS prior to taking action. This is similar to or somewhat less restrictive than the system that will be used in Wisconsin while wolves are federally protected by the USFWS. In Minnesota, criteria that would allow for the killing of wolves are similar to those used in Wisconsin in that there has to be a verified depredation on the site and that there has to be a reasonable expectation of future damage.

The Wisconsin and Minnesota WS staff work and train together (the Minnesota WS program is currently an administrative district of the Wisconsin WS program) and the methods used for site evaluation and determination of WDM strategies (with the exceptions noted above) are similar between the two programs. Based on this information, we do not believe it is inappropriate to use information on the Minnesota WS program when making predictions regarding the impacts of the proposed action on the Wisconsin WS program. Additionally, the EA does not rely exclusively on information on the Minnesota program for its determination of potential impacts on the Wisconsin wolf population. The agencies also use information on the status of the Wisconsin and Michigan wolf population during the three years when lethal WDM was used in Wisconsin and Michigan in their analysis.

**16. Cumulative impacts of WDM on top of other environmental challenges faced by the species will be excessive.**

The agencies and EA consider the impact of all known and unknown forms of mortality and adverse impacts on the wolf population through wolf population monitoring. The agencies cannot partition out the impacts of every factor on the wolf population but we can say that the Wisconsin wolf population has increased in spite of the cumulative impacts of all quantified (e.g., mortality from WDM) and unquantified (e.g., impacts of development and habitat loss) factors on the wolf population. This determination is similar to that for Minnesota where an integrated WDM program similar to that proposed for Wisconsin has been in place for over 20 years. Based on analysis in the EA, we conclude that the proposed action will not have a substantial cumulative adverse impact on the wolf population.

**17. Commenter does not believe proposed alternative will provide benefits to Wisconsin producers beyond what could be achieved via a non-lethal or primarily non-lethal approach. Non-lethal methods have the potential to provide long-term solutions to problems. All problems can be adequately resolved with non-lethal methods. The EA fails to give adequate consideration to non-lethal alternatives.**

Non-lethal means of controlling depredating wolves are generally more readily accepted by the public. But non-lethal controls have not been adequately developed to eliminate the need for lethal controls (Fritts et al. 2003). We agree that some non-lethal methods like exclusion can provide long-term solutions to predation problems. However, all non-lethal methods are not practical or effective in every situation. Strengths and limitations of non-lethal methods are discussed in Appendix B. Disadvantages of non-lethal methods can include that many are costly or time-consuming, and the effectiveness of methods like frightening devices declines over time. Although extensive research has been conducted to develop effective non-lethal control techniques, none have been developed that can be broadly used in a wide variety of wolf depredation situations (Schultz et al. 2005, Shivik 2004, Shivik et al. 2003). Most non-lethal procedures are most useful if they can be applied before wolves have started killing domestic animals, and have habituated to human activity.

Alternative 1 is a fully analyzed alternative which only allows for the use and permitting of non-lethal WDM methods by the Federal agencies. Non-lethal methods are described in detail in Appendix B.

**18. The indiscriminate use of lethal controls will hurt wildlife populations and diminish the integrity of ecosystems.**

The proposed lethal control methods are not indiscriminate. They are designed to target individual wolves associated with livestock depredation. Previous efforts from April 2003 through December 2005 using methods almost identical to those of the proposed action had no measurable detrimental impacts on the Wisconsin wolf population. Analysis in the EA indicates that the proposed action would not result in a reduction in the wolf population and, therefore, will not adversely impact the role of wolves in the ecosystem. See also response to section 2.2.1 and analysis of impacts of each alternative on non-target species in Chapter 4.

**19. The federal government must develop a reasonable range of alternatives and include among the alternatives at least one that supports the public's interest in wildlife protection and conservation. Alternatives must weigh competing interests of the public, balance the potential harms of the agency's actions and consider a whole realm of economic social and environmental knowledge.**

We believe the alternatives do weigh the competing interests of the public because they cover the full range of WDM options including an alternative anticipated to be the most effective in addressing wolf conflicts because it allows access to the full range of WDM techniques, an alternative which recognizes the objections of some individuals to lethal WDM methods and only allows for the use of non-lethal

WDM, and an alternative which eliminates Federal involvement in WDM. The EA in chapters 2 and 4 considers a wide range of issues relevant to the management of conflicts with wolves.

**20. In order to ensure the integrity of the range of alternatives, WS must first discuss a purpose and need for lethal wolf control especially when conducted without first attempting non-lethal methods.**

The need for action is clearly defined in Section 1.2. "The need for action in Wisconsin is based on wolf predation on and threats to livestock, game farm animals and pets, and potential risks to human health and safety from potentially hazardous or threatening wolves. A prompt, professional, effective program to resolve wolf conflicts is needed in order to minimize negative attitudes toward wolf recovery in Wisconsin and enhance wolf conservation efforts…" The need for action is not to use lethal WDM. Lethal and non-lethal WDM methods are components of alternatives analyzed to meet the need for action. Comment 17 addresses the request to resolve all wolf conflicts with non-lethal methods.

**21. Given the economics of the program and the destruction to habitats and wildlife, we will be surprised if it can provide a rational and valid purpose and need for the proposed action.**

The need for action is clearly stated in EA Section 1.2. The commenter has the decision-making process in reverse. The alternatives, including the proposed action, are developed in response to the stated need for action. The need for action is not developed for an alternative. The WDM methods proposed in the EA would not result in destruction of habitats, ecosystems or biodiversity (See response to Comment 18). The analysis in the EA chapter 4 indicates that the proposed alternative would not result in reductions in the population of wolves or non-target species. While economics of management alternatives are one of the factors that is considered when developing site specific management plans, the EA states in Section 3.2.3 that, "The cost of management may sometimes be secondary because of overriding environmental, legal, public health and safety, animal welfare or other concerns" including, in this case, the status of wolves as a federally protected species (Slate et al. 1992, USDA 1997 Revised). In Wisconsin, wolf losses to livestock since 2003 have remained relatively stable despite rapid increase in numbers of farms with depredation due to IWDM programs by USDA-WS. In Minnesota and Michigan, the IWDM approach also appears to have been effective in reducing damage by wolves. Although the number of properties with verified wolf depredation complaints has increased, the number of verified losses to wolf predation did not increase over the period of 2003-2005 when IWDM assistance was available to livestock producers.

**22. WS is justifying need for lethal WDM based on perceived threats and little or no empirical data.**

Empirical data on the number of verified instances of wolf predation on domestic animals and on the economic cost of wolf depredations in Wisconsin is provided in Section 1.3.7. As described in Section 3.5 of the EA and the *Wisconsin Guidelines For Conducting Depredation Control On Wolves In Wisconsin While Federal Listed As "Threatened" Or "Endangered" Status*, lethal WDM would only be used in response to confirmed instances of wolf predation on livestock and then only if there is a reasonable expectation that the depredation would be repeated. The lethal control would only be used to address instances of wolf depredation on dogs if wolf depredation is verified and it is likely that depredation will be repeated and only if wolves have killed dogs that were leashed, confined, or under the owners control on the owner's land. Lethal control will not be used when wolves kill dogs that are free-roaming, hunting, or training on public lands. The agencies do not require that an individual be attacked before they can use lethal WDM in response to a threat to human health and safety. However as stated in Section 1.3.8 most concerns regarding perceived threats to human safety can and have been managed by addressing human behavior or using non-lethal WDM methods. Only once, in the case of a sick/injured

wolf, has lethal WDM been used in response to a threat to human health and safety. These actions and restrictions do not constitute the use of lethal WDM in response to unsubstantiated conflicts and archaic beliefs regarding wolves.

**23. History has demonstrated that wolves are very vulnerable to lethal control. The final EA must clarify the historical role of government predator control programs in the decline of the wolf in the lower 48 states.**

We agree. However, the culture in which we live and the importance we, as a society, place on wolves is not the same as the culture which supported wolf eradication efforts in the past. The USFWS and WDNR have been charged with the preservation and recovery of the gray wolf population and have worked hard to achieve success. The USFWS, WS and WDNR have been heavily involved in the recovery of the wolf in Wisconsin and have no intention of taking or allowing any action that would jeopardize the wolf population. The preferred alternative only allows highly restricted use of lethal WDM methods in response to specific confirmed depredation events and only when specific conditions are met. This bears no resemblance to the widespread, largely unregulated, killing of wolves that occurred in the past that was intended to reduce or eliminate entire predator populations. The EA proposes and evaluates specific limits on the number of wolves that can be taken. Analysis in the EA (Section 4.2.2) and experience from similarly limited use of lethal WDM in Michigan, Wisconsin and Minnesota indicates that the proposed action will not jeopardize or result in a reduction in the wolf population. Additional material on the role of government predation management programs has been added to EA section 1.3.1.

**24. EA should offer more detailed qualifications of threat in regards to human safety to prevent overzealous use of wolf control. Concerned that a "threat" could be determined just because a wolf is in the area.**

WS and WDNR will use such controls sparingly. Between 2003-2005, of 70 euthanized problem wolves, only one was euthanized for human safety when a wolf that attacked 2 different dogs approached a child near a home.

**25. Agencies continue to give priority to lethal control despite the fact that this is the chief cause of wolves becoming endangered in the first place. Had national wolf recovery efforts been based on just such emotional and inaccurate perceptions, the wolf would never have been protected, allowed to inhabit the northern woods of Minnesota, and ultimately allowed to return to Wisconsin and Michigan.**

The proposed action has nothing in common with the measures used in previous centuries which resulted in the extirpation of the wolf from most of its former range in the US (See response to Comment 23). Priority is not given to lethal control, rather, under the preferred alternative, preference would be given to non-lethal methods where practical and effective. An integrated WDM program including lethal removal of depredating wolves has been conducted in Minnesota since 1978. The program in Minnesota is similar to but slightly less restrictive than that proposed for Wisconsin in the preferred alternative. Despite an ongoing WDM program which included lethal removal of wolves, the Minnesota wolf population has increased and, as the commenter noted, has been the source population for wolves returning to Wisconsin and Michigan.

**26. An EIS is needed to fully analyze the impacts of the proposed action.**

The impacts of the proposed action are fully analyzed in the draft EA. An EIS is necessary if there is indication that there would be significant impacts to the human environment. The data presented in the EA indicate that the proposed action will have only minor impacts on the human environment and on the

MI wolf population, which is expected to increase under the proposed action. Therefore, an EIS will not be prepared.

**27. If intention is to have "minimum impact on wolves" then non-lethal methods would be mandatory not just given "consideration" as in preferred action and lethal taking would only be method of last choice. Proposed action will encourage unnecessary use of lethal methods.**

We agree that practical non-lethal methods should be used first if there is good potential for success and that lethal control should only be used if practical non-lethal methods have not been successful, or if the professional determination is that there is little potential for success with non-lethal methods. Under the proposed alternative, preference is given to non-lethal WDM methods where practical and effective. We do not believe that expecting non-lethal methods to be practical and effective would encourage unnecessary use of lethal methods. The *Wisconsin Guidelines For Conducting Depredation Control On Wolves In Wisconsin While Federal Listed As "Threatened" Or "Endangered" Status* establishes that compensation for wolf damages and financial assistance with damage prevention materials will not be provided unless the landowner has signed a depredation management plan for the farm, which includes recommendations for suitable non-lethal methods and other practices that may reduce depredation on the farm. Analysis of impacts of the alternatives on the wolf population provided in Chapter 4 and summarized in Table 4-3 indicates that illegal killing of wolves in response to a perceived lack of effective assistance with WDM may result in take of more individuals than the preferred alternative. As stated in the complete referenced paragraph, while the impact to an individual wolf may be as great (i.e., death), the impact to the overall wolf population will be minimal.

**28. EA wrongly states that number of depredations increases as the wolf population increases. This is not true since depredations in Michigan and Wisconsin have declined since 2003 although the wolf population has increased. It is inaccurate and simplistic to assume that wolf depredations will increase as populations increase.**

Verified wolf complaints have increased in Wisconsin as the wolf population has increased (Table 1-4). In Wisconsin the number of farms with verified livestock depredations per year has increased from 3 in 2001 to 25 in 2005. Total verified losses to wolf predation increased until 2003 when wolves were listed as threatened and a 4(d) rule was in effect which allowed for the use of integrated WDM including lethal wolf removal in response to wolf damage and conflicts (Figure 1-1, Table 1-4). During the period of 2003-2005 when an integrated WDM approach was used in Wisconsin, losses to wolf predation remained relatively stable even though the number of complaints continued to increase. This would appear to indicate that the WDM efforts were successful in reducing damage.

**29. There should be no lethal control in response to predation on free-roaming hunting dogs or for any predation on public lands even if dog is leashed. Predation on pets is the result of poor animal care by the owner of the pet.**

The Standard Operating Procedures detailed in Section 3.5 state that lethal control would not be used if wolves kill dogs that are free-roaming, hunting, or training on public lands. WDNR will continue to provide information on areas where wolves have killed dogs to help owners of hunting dogs avoid problem areas.

The use of lethal WDM methods in response to depredations on dogs is further clarified in the State's depredation control guidelines (Appendix E)

***Wolf Control on Depredation to Dogs.***

*a) Control could be conducted on wolves killing dogs leashed, confined, or under the owner's control on the owner's land if there is likeliness of additional depredation.*
*b) No control trapping would be conducted on wolves killing dogs that are free-roaming, roaming at large, hunting or training on public lands, and all other land, except land owned or leased by the dog owner.*
*c) Other abatement and aversive conditionings will be considered on public lands where depredation occurs on dogs or other domestic animals.*
*d) Guard animals would be treated as other domestic animals for verification and control purposes.*

Lethal control on wolves killing dogs would only occur on wolves attacking dogs in residential areas, and only if additional dogs exist that are at risk of attacks by wolves. We agree that cats are safest when kept indoors and dogs are best protected when on a leash with owners. Unfortunately, wolf predation on pets has also occurred in situations where the animals were under a reasonable degree of control by their owners. The agencies are aware of situations where dogs have been attacked in a yard when standing with the owner or out walking with owners. Although these instances are relatively uncommon, proximity to owner or residence is not necessarily sufficient protection from wolf predation. These situations are of particular concern because they not only pose a risk to the pets being threatened but are also indicative of a wolf or wolves which have lost their fear of humans and which may pose a risk to human safety. (See also Comment 24).

**30. The low number of depredations caused by wolves even in states like Minnesota with high densities of wolves clearly demonstrates it is wrong to assume that all or most wolves will commit depredations.**

We concur. That is why under the proposed action, WDM activities would target wolves associated with depredation incidents and why the agencies are not proposing to conduct wide-scale population control in response to wolf damage. It should also be noted that the current low levels of depredation in the areas noted by the commenter are what has occurred with WDM programs in place. Agencies were able to use non-lethal and lethal methods to respond to wolf depredation and complaints in Wisconsin and Michigan from 2003-2005. An integrated WDM program has been in place in Minnesota since the late 1970s. While it is extremely difficult to determine exactly what depredation levels would have been in the absence of management (USDA 1997 Revised), depredation levels would likely be higher if the agencies had not been able to effectively respond to wolf damage and conflicts.

**31. EA does not specifically mention Best Management Practices (BMPs) although it does discuss animal husbandry and farm management practices that can reduce the risk of predation.**

Commenter appears to use "Best Management Practices" as a term to define sound farm management practices that will reduce risks of wolf predation. We are not aware of any universal list of best management practices approved by livestock specialists that likely reduce wolf depredation under most circumstances. We have avoided the use of this phrase in the EA because of the potential for confusion with the BMPs most commonly published for livestock production. These BMPs place an emphasis on healthy and successful livestock production but are not necessarily intended to prevent predation. Some recommendations commonly found in cattle BMPs may include actions contrary to the prevention of predation risks. For example, BMPs general advise against practices that repeatedly concentrate animals in smaller areas as might occur if night penning is used to prevent predation and calving in buildings or corrals may reduce depredation, but could increase disease risk. See also Section 1.3.7 information on indirect impacts of wolf predation.

**32. The EA states that "where appropriate" non-lethal methods and farm management practices could be "recommended" to reduce damage. Nowhere in the EA is there an emphasis that producers use sound farm management practices. Commenter finds it impossible to imagine any situation where even a single non-lethal method would be appropriate. Producers should be required to use best management practices P7, 9**

The EA states in Section 3.5 and Appendix E that lethal WDM will not be used at sites with repeat wolf depredation problems unless a farm management plan has been developed which outlines practices the producer can implement which may reduce risk of predation at the site. WS and WDNR regularly recommend animal husbandry and farm management practices to producers as a means of reducing conflicts with wolves. However, in some situations, wolf depredation occurs even though the producer is employing the farm management practices likely to be practical and effective for their situation. In these situations, repeating recommendations for methods that have proven ineffective would not be productive.

**33. It is wrong for taxpayer dollars to be used to bring a species back just so people can kill it. Species that are brought back with taxpayer money should be protected.**

Wolves have an important role in ecosystems and are a part of the Nation's natural resources heritage. Their recovery has been based on these factors not on the need to establish a hunting season for wolves. Recreational hunting of wolves would not be permitted while wolves are federally protected and is outside scope of this analysis.

**34. It is unreasonable to expect to prevent all losses. The only way to prevent all losses is to kill every wolf. Producers must accept that at least some losses to predation are a cost of doing business.**

The agencies do not expect to prevent all losses, nor are they proposing lethal WDM as a solution to all depredation incidents. Tolerance of at least some loss is implicit in the requirement that death of or injury to livestock be verified before agency initiation of lethal WDM. However, every WDM method has its strengths and weaknesses and every damage management situation is unique. During more than 80 years of resolving wildlife damage problems, WS has considered, developed, and used numerous methods for reducing wildlife damage problems (USDA 1997 Revised). Usually, the most effective approach to resolve wildlife damage is to integrate the use of several methods simultaneously or sequentially. Integrated Wildlife Damage Management (IWDM) is the implementation and application of safe and practical methods for the prevention and reduction of damage caused by wildlife based on local problem analyses and the informed judgment of trained personnel. The agencies believe that a management alternative that allows access to the full range of effective WDM methods will best enable them to develop site-specific management strategies that will effectively respond to wolf depredations and conflicts with wolves.

**35. Wolves which prey upon game-farm animals should not be controlled. Preying on wild-type cervids is a natural behavior and should not be punished with lethal control. Game farms should be required to have predator-proof fencing to protect their animals. Individuals raising cervids, even behind fences, should not expect compensation for deer or elk killed by wolves.**

Game farm owners in Wisconsin must have fencing in accordance with applicable state regulations. Since game farm animals are classified as livestock by the state, owners of game farm animals are statutorily entitled to the same assistance with wolf predation as other livestock producers. However, in accordance with State regulations, compensation payments and financial assistance with damage prevention materials will not be available to game farms where fencing is not in compliance with state

requirements. If wolf depredation control activities are conducted for game farms, all control activity will take place inside of the fence. Any wolves trapped after a first-time depredation will be radio-collared and released if suitable habitat exists nearby. If suitable habitat does not exist nearby, WS and WDNR, in consultation with GLIFWC (when farm is in the ceded territories) will decide whether wolves caught in the game farm can be released in other locations or would need to be euthanized. Wolves captured a second time in response to repeated depredation may be euthanized if allowed under state and federal permits and regulations.

**36. Saying that non-lethal methods will be used when practical or appropriate prejudges non-lethal methods as ineffective. EA overemphasizes difficulties with non-lethal WDM methods. Commenter provides citations on papers which describe efficacy of non-lethal methods.**

We do not agree that the EA prejudges non-lethal methods as being ineffective. We agree that non-lethal methods can be an effective way to reduce and/or prevent predation problems, and sympathize with the desire to avoid killing wolves for WDM. An alternative which would involve only using non-lethal methods was presented as a management alternative considered in detail in the EA. The EA discusses a wide range of non-lethal methods that can be effective when used properly. However, there are specific limitations on when and where any WDM technique can be used and the period of efficacy of every technique and the agencies feel it is important to make the public aware of these limitations. The agencies are also aware of a common misconception that non-lethal methods are adequate to resolve all depredation problems. Agency experience and data from some of the studies noted in Appendix B indicates that wolf depredations can occur even when sound animals husbandry practices and other non-lethal methods are in use. We do not feel the EA places excessive emphasis on the limitations of non-lethal methods. The agencies have supplemented the text in Appendix B to include material presented by the commenter and to make sure the limitations of lethal control are also presented.

**37. Use of unmodified foothold traps and neck snares can result in frequent injury and even death of some captured individuals and devastating effects on nontarget animals. EA must address fact that leg-hold traps, leg snares and neck snares have the potential to cause serious injury and a prolonged, painful death. Discussion of humaneness of WDM and incidence of serious injuries from capture methods is inadequate.**

The methods used to capture and release wolves for research are the same methods used to capture depredating wolves. The same procedures for protecting wolves that will be captured and released are also used for depredating wolves. Humaneness and risk of serious injury to wolves are discussed in EA Sections 2.1.4, 2.1.5, and in permit and EA discussions of incidental take. Risks to non-target species are addressed in EA Section 2.1.2 and in analysis of impacts associated with each alternative in Chapter 4.

**38. The proposed action of this EA seems to be focused on maximizing the number of wolves that may be killed rather than minimizing the number that may need to be removed. There should be limits on the number of wolves taken and that lethal control should be targeted at specific depredating individuals, and should only be conducted if there is proof that significant depredation has occurred.**

Lethal WDM will only be conducted if wolf damage or a demonstrable threat to human safety has been verified by WS and WDNR staff. The EA (Section 3.5, Appendix E) and permit set specific limits on when, where and how lethal WDM methods will be used and the number of animals that have been taken. Furthermore, over the period of 2003-2005 when lethal WDM was permitted, WS and MDNR take of wolves was consistently much lower than the maximum permitted, indicating that the lethal take of wolves for WDM was only conducted when needed and in accordance with established restrictions on the use of lethal WDM. This evidence is directly contradictory to accusations that the agencies might be

trying to take the maximum number of animals possible in some vague attempt to reduce wolf numbers. As stated in the EA, the maximum number of wolves that could be taken was established based on data from similar programs in other states (e.g., MN).

**39. There is no reason to believe that human tolerance decreases as wolf populations increase. There is outcry against wolf populations at any level.**

We agree that there are some individuals that will object to the presence of any wolves just as there are individuals who object to management in response to any incident of wolf damage. However, the opportunity for interactions, both positive and negative, between wolves and humans increases as the wolf population increases. As stated in the EA, response of the communities which are currently, or may in t the future, support wolf populations will depend on the expectation that conflicts with wolves can and will be promptly and professionally resolved.

**40. Level of human tolerance is being inappropriately determined by heeding the input from a limited minority segment of the human population. Wildlife acceptance capacity usually reflects the views of a minority of people that already have contempt for the wolf or live where wolf conflicts occur and ignores the majority of the public that also have a stake in the outcome of wolf management and do support recovery. Wolf management should be based on sound science and not the unwillingness of some people to coexist with wildlife or the desires of some individuals to reduce the wolf population.**

Rapid, effective assistance to problems is critical to maintaining support for predator populations, not just among affected stakeholder groups but the public in general. For example, data from a survey of 9,900 Michigan residents conducted in fall 2005 indicate a strong majority of Michigan residents support removal of wolves involved in depredation (R.B. Peyton, Michigan State University, unpublished data). Similar research by Naughton et al. (2005) show strong public support for lethal control on problem wolves in Wisconsin (Section 1.3.10). Although the agencies agree that wolves are a public resource belonging to all citizens of the U.S., they also acknowledge that it is the response of individuals in the areas where wolves occur that may have the greatest impact on wolf recovery efforts. These individuals have the greatest opportunity to illegally take wolves if they feel sufficiently provoked and/or frustrated with agency actions in response to wolf damage and conflicts with wolves (EA Section 1.3.10). The purpose of the proposed action is not to limit the size of the Wisconsin wolf population and based upon data from Minnesota, Wisconsin, and Michigan, there is no evidence supporting the concept that the Wisconsin wolf population will be limited by the proposed action.

**41. Wolf depredation management should target the specific depredating wolf involved in damage. How can you be certain only depredating wolves will be taken?**

WS and WDNR staff are highly trained in the methods of identifying wolf depredations, and use the sound scientific information for assessing wolf depredation (Acorn, R. C. and M. J. Dorrance 1990). WS strives to target the specific wolves involved in depredation but cannot guarantee that the wolf taken is always the specific individual involved in the depredation. Identification of depredating individuals is complicated by the pack hunting behavior of wolves. In instances when a pack is involved in a depredation incident, multiple individuals may have been involved in the predation event. Likelihood of capturing individuals or packs involved in the depredation is improved by restricting the placement of equipment to a set radius (0.5 miles) around the depredation site, placement of capture equipment based on sign and activity of wolves at the site. Sign from the depredation site can be used to determine if the depredation was caused by an individual wolf or a pack. Traps will be set close to kill sites, and normally wolf packs responsible for making the kills would be the ones most likely visiting such kills. Because wolves are very territorial, with typical territories being 6 to 10 miles across, most farms occur within

only one pack territory, and strange wolves would not likely enter another packs area or feed on kills made by other packs. Trapping near the depredation site would thus target the pack responsible for making the kill.

**45. Agencies must continue public education efforts through distribution of educational materials to resource owners about ways to prevent conflicts with wolves. Problems with social tolerance can be addressed with educational programs and it is not acceptable to use unnecessary lethal control instead.**

We agree that education is an important component of maintaining support for wolf populations and is discussed in Section 3.2.2.1. WDNR and WS have produced publications to educate farmers and dog hunters, as well as numerous news releases, and other reports with information on living with wolves. However, education alone is not sufficient to prevent the development of negative public attitudes among stakeholders, especially livestock producers experiencing actual depredation problems. Maintenance of public support demands effective resolution of these problems, at whatever frequency they occur.

Education and public outreach activities by the WDNR and WS include a pamphlet for farmers, "Wolves and Farm Country", http://dnr.wi.gov/org/land/er/mammals/wolf/wolvesinfarms.htm, a pamphlet for hunters who hunt with dogs http://dnr.wi.gov/org/land/er/mammals/wolf/ wolfhuntdog.htm, and periodic new releases, and presentations to farmers and hunters by DNR & WS.

**46. Concept of social carrying capacity should be recognized as being completely subjective and hence, invalid as a modeling tool or criterion. EA disregards ecological information on biological carrying capacity in favor of mythical sociological carrying capacity.**

The idea of sociological carrying capacity is a well established concept in the field of human dimensions of wildlife management (Decker et al. 2001). Biological carrying capacity for wolves would include all resources and sites that wolves could theoretically access including domestic animals. To state that domestic animals should not be considered part of the prey base to support a wolf population is to impose a sociological carrying capacity limit on the population. Similarly, McNay (2002) and the EA Section 1.3.8 discuss that risks of adverse interactions increase with increased contact and interaction between wolves and humans. Placing restrictions on where wolves may best coexist with humans as detailed in the Wisconsin Wolf Management Plan is also the establishment of sociological carrying capacity. The agencies do not believe it is unreasonable or subjective to recognize that people in wolf range do not consider domestic animals to be an acceptable part of the prey base for wolves, nor is it unreasonable to work to limit some areas of wolf range and associated risks of adverse interactions between wolves and humans.

**47. EA leaves open the possibility that recreational hunting may be allowed if wolves are delisted.**

The scope of the EA is limited to analyzing impact of federal agency alternatives for managing wolf damage and conflicts with wolves. Hunting is not an option that is considered. At such time as the wolf is removed from the Federal list of threatened and endangered species, the State and Tribes would have the option to allow limited hunting of wolves provided that the overall population would remain above target levels. However, that is beyond the scope of this EA.

**48. Commenters do not approve of the use of sport hunting or any other means of reducing wolf densities for the protection of ungulate/other game species.**

The scope of this EA is limited to agency response to wolf depredations on livestock and pets and risks to human safety. Establishment of WDM in response to predation on game animals is outside the scope of this EA.

**49. Wants wolves managed at biological carrying capacity.**

The proposed action is intended to provide relief from specific incidents of wolf depredation on livestock and pets and risks to human safety. The proposed action is not anticipated to result in a decrease in the wolf population. Thus, the issue of wolf population management and long-term population management objectives is outside the scope of the EA.

**50. Worried about impacts of wolf removal on pack structure.**

While it is true that wolf removal can have a short-term disruptive impact on pack structure, that disruption does not appear to result in adverse impact on the overall wolf population. In Minnesota where lethal wolf removal has been used as part of an integrated wolf damage management program since the late 1970s, the wolf population increased from an estimated 1,500 wolves in 233 packs in 1988-98 to 2,445 wolves in 385 packs in 1997-1998 and 3,020 wolves in an estimated 485 packs in 2004. Similarly the wolf populations in Michigan and Wisconsin continued to increase although lethal removal of wolves was used as a WDM technique from 2003-2005.

**51. There is scientific disagreement about just how much human-caused mortality can be tolerated before a break-point can be reached. The assumption that wolf populations can sustain 28-30% human removal should be viewed with skepticism because it doesn't take into account the impact of such removal on factors like genetic viability, the proportion of wolves that disperse, stability of pack territories, age-sex structure of population, and the potential of changes in any of these variables to affect the likelihood of wolves coming into contact with livestock or humans.**

The scientific literature does provide differing estimates of mortality a wolf population can sustain without declining. These estimates are derived from analyses of wolf populations representing a broad range of sizes, dispersal capability and environmental conditions. Differences in estimates are based on differences in the complexity, assumptions and data used in the calculations. The EA provides and uses a thorough review of these studies and their differing ranges of sustainable human-caused and total mortality. Although the data ranges vary, the human-caused take proposed under the preferred alternative is below all thresholds identified in Section 4.2.2 – Impacts on the Wisconsin Wolf Population. It should also be noted that some of these models analyze the impacts that the winter population of wolves can sustain when population numbers are likely at a minimum. Section 4.2.2 – Impacts on the Wisconsin Wolf Population also states that wolf population levels in Wisconsin during the period when most WDM occurs include young-of-the year and are higher than late winter population estimates. Some of the permitted take includes individuals that were not in the late-winter population estimate.

The determination that the wolf population can sustain the proposed level of take is also based on data on the similar WDM programs that were in place in Wisconsin, Michigan and Minnesota during 2002-2003. The wolf population in these areas increased (Wisconsin and Michigan) or was stable to increasing (Minnesota) in spite of the cumulative impacts of WDM efforts and all other known and unknown impacts on these populations. As stated in Comment 55, there is also no evidence to indicate that WDM efforts are making depredation problems worse.

**52. Based on data presented for MI and MN the level of permitted intentional take of the wolf population is too high.**

As stated in the EA, the estimate of annual maximum intentional take was estimated based on review of a similar WDM program which has been in effect in Minnesota since the late 1970's. Analysis in Section 4.2.2 indicates that this level of take will not result in a decline of the Wisconsin wolf population. It should be noted that permission to take a set level of wolves does not mean that the WDNR and WS will take the maximum number of wolves permitted if wolf depredations do not merit that level of control. In Wisconsin, Michigan and Minnesota where limited lethal take of wolves has been permitted as a WDM method, take has usually been below the maximum level allowed under permits and regulations.

**53. EA should say kill instead of "take".**

Take is a legal term which encompasses several types of activities (e.g., kill, trap, harass) which would be conducted under the proposed action. The broader term of 'take' is therefore more appropriate than 'kill' in many cases.

**54. Wolf recovery levels were set too low and must be reset to a more realistic figure.**

Wolf management and recovery plans are outside scope of the analysis. The State and Federal population recovery goals were established by teams of experts in the field of wolf management. However, wolf population goals were re-examined in 2004-2005, by the Wisconsin Wolf Science Committee, and wolf plan goals fell within the middle of public opinion on accepted goals. The current goals maintain wolves well above levels needed to maintain viability. The goal will be re-examined at least every 5 years.

**55. Losing pack members to predator control the pack may have reduced efficiency in obtaining natural prey and may increase efforts to kill livestock.**

In Michigan and Wisconsin, previous WDM efforts (2003-2005) were almost identical to those of the proposed action. Increased depredation by affected packs did not occur. Furthermore, in MN where lethal WDM methods have been used since the late 1970's, there is also no evidence that WDM would result in increased losses to wolf predation. Bradley (2004) determined that packs where alphas were removed were no more likely to depredate again within the same year as packs where non-alphas removed.

**56. EA fails to address the concept of population sources and sinks is hinted at in EA but is not discussed in detail. Wolf management areas will be population sinks and these areas will never be permanently occupied due to perpetual removal of problem wolves. If sink areas appear to be optimal to the wolves, source populations could constantly immigrate into these areas and this process could result in local extinction of both source and sink populations.**

In order for this assumption to be accurate, every wolf that recolonized the site must prey on livestock. Only a small portion of the wolf population engages in livestock depredation, but there is some evidence to indicate that some sites may be prone to repeat depredation. Generally less than 10% of state wolf packs are involves in livestock depredation (Wydeven et al. 2004), and WS generally traps wolves on only half the sites where trapping is atempted, thus in most years less than 5 % of packs are likely to act as "sinks" and over 90% of packs are likely to act as "source" populations. Bradley (2004) observed that in the majority (86%) of instances where sites were recolonized after a pack was removed for depredation management the new pack also engaged in depredation. The agencies are aware of instances in Wisconsin where particular sites have been prone to repeat depredation. However, as has been repeatedly stated in the EA, in Minnesota, where lethal WDM methods have been used for over 20 years and repeat depredation also occurs at some sites, the wolf population continued to increase. In Wisconsin and Michigan where lethal WDM methods were used from 2003-3005, the wolf populations have also increased. More importantly, at sites which are prone to chronic problems, WS and the WDNR work

with the landowner on obtaining resources for and using practical and effective non-lethal methods for preventing additional depredation problems. This has, on occasion, included seeking funding assistance from entities like the Bailey Wildlife Foundation Proactive Carnivore Conservation Fund.

**57. Commenter does not believe that increase of wolves from 325 in 2002 to 425 in 2005 could really be reason for 250% increase in livestock losses.**

Yes wolves have grown from 257 in 2001 to 425 in 2005, while numbers of farms with wolf depredation have grown from 5 to 25 farms. The increase in farms with wolf conflicts is not solely attributable to the increase in the wolf population but is also related to the nature of the areas that are being colonized by wolves. Until the early 2000s, wolves usually occupied large wild areas in northwest Wisconsin. The wolf population has subsequently been expanding into more developed landscapes with many farms where the potential for interactions with humans increases. The pattern of increasing wolf depredations with increased range expansion into agricultural areas is consistent with data from Minnesota. Harper et al. (2005) studied patterns in wolf depredations and wolf distribution in Minnesota to determine if increases in wolf depredations could be attributed to wolf range expansion, wolf colonization of new areas within long-existing wolf range, and/or learning by wolves in established wolf range. All three factors seemed to be contributing to the observed increase. They noted that the increase in depredations was lower over the interval of 1979-1988 than for 1989-1998. They attributed this pattern to the fact that during the first period wolves primarily occupied forested areas with few farms, while in the later interval the wolf population expanded into more agricultural areas.

**58. Deer in his area have gotten out of control because of lack of wolves. Wolves will help control the deer population which is the real damage risk in the state.**

Wolves are not likely to have much impact on deer except on localized basis in heavily forested areas. Wolves are not likely to impact deer on a statewide or regional basis. Even Minnesota with 3,000 wolves is seeing record high deer numbers.

**59. Wolf depredations are the farmer's fault for having livestock in areas known to have wolves and not adequately protecting their livestock.**

Wolves are colonizing areas that have not had wolves for many decades or over the last century, but have been devoted to livestock production for many generations of farmers. Agency experience in Wisconsin indicates that wolf depredations do occur even when farmers are employing sound livestock management practices appropriate for the size and nature of their particular operation.

**60. Lethal WDM methods are cheaper and easier than non-lethal. The more expensive non-lethal methods will not be given adequate consideration.**

We do not believe it is accurate to state that lethal methods are always less expensive than non-lethal. Staff time required for proper placement of wolf capture devices and compliance with 24 hour trap-check requirements can make these methods more expensive than the installation of a fladry fence, placement and producer training in the use of electronic guards, and technical assistance with farm management practices. Under the preferred alternative WS and WDNR would continue to give preference to all reasonable and effective non-lethal controls, unless methods are extremely expensive, unsuited to the particular site, or unlikely be effective in resolving the specific depredation/conflict. For example, surrounding large cattle farms with wolf-proof fences, or trapping and fitting all the local wolves with shock collars would probably not be practical, but the agencies have installed fladry fences, electronic guards and referred producers to sources for livestock guarding dogs.

**61. Killing wolves will result in a permanent solution to the problem while it may take several tries to get a system of non-lethal methods that will work which will provide further incentive to not adequately use and consider non-lethal methods.**

Producers are generally most interested in using controls that work. While the killing of wolves may eliminate problem wolves for a year or more, in areas with highly quality habitat, wolves will probably eventually return. Killing wolves is a permanent solution to the problem with a particular wolf but is not necessarily a long-term solution for all predation problems at the site. Studies by Harper (2004) and Haight et al. (2005) indicate that while lethal removal of depredating individuals can reduce damage during the year/depredation season when the removal is conducted, there were no differences in depredation incidents between treated and untreated sites in the next year. Unless producers follow good animal husbandry and non-lethal controls, along with lethal controls, good solutions to wolf depredation problems would not be possible. The killing of wolves by WDNR or WS would not occur on farms that do not follow wolf depredation management recommendations.

**62. It is not the job of WS or any other agency to provide protection for farmers' "stock". It should be up to the individual producer to protect their animal. This is a cost of business and should not be a burden on taxpayers.**

The presence of a wolf population has broad public benefits for ecological, scientific, social, recreational and esthetic values, but generally does not directly benefit individual farmers. Individual farmers generally have little control over the ability of wolves to live next to them. Because of the broad public benefits of wolves and possible disproportionate costs to individual farmers from wolves, we feel it is appropriate for public funds to be used to control problems to farmers. Furthermore, WS is the Federal agency authorized by Congress to conduct wildlife damage management to protect American agricultural, industrial and natural resources, property and human health and safety from damage associated with wildlife (Act of March 2, 1931 as amended 46 Stat. 1486; 7 USC 426-426c). As such, it is entirely appropriate for WS to assist with WDM.

**63. A modified version of Alternative 1 that would require sequential use of non-lethal methods that starts with the least invasive to wolves and escalates to more invasive methods like non-lethal projectiles only if less invasive methods are proven ineffective should be used. Relocation should only be used as method of last resort. Using soft-release of relocated family groups would increase survivorship and decrease homing behavior of relocated individuals,**

Appropriate WDM methods need to be used quickly and affectively. A gradual escalation can be costly, logistically difficult, very frustrating to producers, and may allow wolves to learn to adapt to frightening devices and become more affective predators on domestic animals. The WDM methods used should be the ones most likely to be effective based on landscape features, pack depredation history, logistical constraints, local wolf behavior, preference for practical and effective non-lethal methods, potential for a long-term solution, and experience and training of WS wildlife specialists. We agree that relocations should be used as a last resort and that soft-release practices may reduce some of the problems with relocation. However, habitat in areas where wolves would be less likely to cause problems with people is mostly saturated, and few places exist where wolves can be released in Wisconsin. We expect this practice to rarely be used in Wisconsin.

**64. Lethal methods are not needed to prevent illegal action in response to wolf depredations. Prompt response to depredation claims will alleviate much of the problem. As long as producers feel there is something they can actively do to protect their livestock they should be less likely to attempt their own controls. The key to preventing illegal take is support and dissuasion.**