wildlife9-13-05.txt
    1

 1

 2                    UNITED STATES DISTRICT COURT

 3                    FOR THE DISTRICT OF COLUMBIA

 4 -----------------------------X

 5 DEFENDER OF WILDLIFE, et al.,    Civil Action No.

 6                  Plaintiffs           05-1573

 7            v.

 8 GALE NORTON, et al.,

 9                  Defendants,

10 -----------------------------X    Washington, D.C.
                                     Tuesday, Sept. 13 2005
11                                   11:30 A.M.

12

13        TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
          BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
14              UNITED STATES DISTRICT JUDGE

15 APPEARANCES:

16 For the Plaintiffs:        SANNE KNUDSEN, ESQUIRE
                              ELIZABETH SCHMIESING, ESQUIRE
17                            Faegre & Benson, LLP
                              2200 Wells Fargo Center
18                            90 South 7th Street
                              Minneapolis, MN  55402
19                            (612)766-7956

20

21

22 Court Reporter:           Lisa Walker Griffith, RPR
                             U.S. District Courthouse
23                           Room 4802-A
                             Washington, D.C.  20001
24                            (202) 898-0168

25 Proceedings recorded by mechanical stenography, transcript
   produced by computer.
    2

 1 APPEARANCES:  (Cont'd.)

 2

 3 For the Plaintiffs:        JASON C. RYLANDER, ESQ.
                             Defenders of Wildlife
 4                           1130 17th Street, N.W.
                                   Page 1

Exhibit F-1

```
                              wildlife9-13-05.txt
                              Washington, D.C.   20036
 5                            (202) 682-9400

 6

 7 For the Defendants:       JIMMY RODRIGUEZ, ESQUIRE
                             U.S. Dept. of Justice
 8                           P.O. Box 7369
                             Washington, D.C.   20044
 9                           (202) 305-0342

10

11                           DAVID GAYER, ESQUIRE
                             Office of the Solicitor General
12                           U.S. Dept. of Interior
                             Washington, D.C.
13

14

15

16

17

18

19

20

21

22

23

24

25
    3


 1                    P R O C E E D I N G S

 2           THE DEPUTY CLERK:   This is Civil Action 05-1573.

 3 Defenders of Wildlife et.al versus Gale Norton, et.al.

 4           Ask counsel to please identify yourselves for the

 5 record.

 6           MS. KNUDSEN:   Your Honor, I'm Sanne Knudsen for

 7 plaintiffs.

 8           MR. RODRIGUEZ:   Jimmy Rodriguez for the federal

 9 defendants.
```

Page 2

Exhibit F-2

wildlife9-13-05.txt
10          THE COURT:  With you please, both of you?  Can you
11     identify the people with you?
12          MS. KNUDSEN:  Sure.  With me at counsel's table are
13     Betsy Schmiesing and Jason Rylander.
14          MR. RODRIGUEZ:  With me today is David Gayer for the
15     Department of Interior, Office of the Solicitor.
16          THE COURT:  Okay.
17          Before me today is the issue of preliminary
18     injunction, plaintiffs moved for preliminary injunction on
19     the grounds that the defendants have failed to comply with
20     the statute, the endangered species statute.  I believe
21     we're talking basically about Section 10(c).  There has not
22     been Notice and Comment, I take it from the last filing that
23     came my way, the government is undertaking to do that now.
24          I will hear from the plaintiffs I guess, first.
25          MS. KNUDSEN:  Good morning, Your Honor.  My name is
       4

1     Sanne Knudsen from the law firm of Faegre & Benson,
2     representing plaintiffs.
3          My clients are coalition of organizations dedicated
4     to wolf conservation and recovery.  On their behalf, I'm
5     here today requesting that you enjoin the Fishing Wildlife
6     Service from allowing any more wolves to be killed or
7     otherwise taken under permits that the Service has already
8     conceded were you unlawfully issued to state agencies in
9     Michigan and Wisconsin.
10          Before I address the need for an injunction, it is
11     important to understand the connection between the permits
12     at issue in this case and the Service's recently
13     unsuccessful attempt to diminish protections afforded to the
14     wolf under the Endangered Species Act.  In April of 2003,
15     the Service issued a Final Rule attempting to downlist gray
                              Page 3

wildlife9-13-05.txt

16  wolves from endangered to threatened species.

17          THE COURT:  You don't need to re-plead, I read your

18  pleadings.  If there is anything you want to say to respond,

19  go ahead.

20          MS. KNUDSEN:  Okay.

21          Your Honor, the Fish and Wildlife Service asserts

22  that under the preliminary injunction analysis, plaintiffs

23  have failed to show irreparable harm because they failed to

24  show jeopardy to the entire species.  This is an incorrect

25  statement of the law and it stands the ESA on its head.
    5

1          This Court has on at least two occasions explicitly

2  recognized that the strong congressional mandates under ESA

3  to protect the endangered species supports the finding that

4  even the loss of relatively few individuals is a significant

5  and undoubtedly irreparable harm.  Those cases are American

6  Rivers v. Army Corps of Engineers and Fund for Animals v.

7  Turner.

8          The Fish and Wildlife Service has already been told

9  once this year by a federal court that killing wolves

10  pursuant the lethal control programs constitutes irreparable

11  harm.  The District Court of Oregon, that recently struck

12  down the downlisting rules, specifically held that killing

13  wolves pursuant to lethal depredation control programs

14  constitutes irreparable injury.

15          In that case, the Service contended that there was

16  no irreparable harm because killing of the wolves under

17  Section 4(d) regulations would be modest.  The Court

18  rejected that contention and enjoined the implementation of

19  the Section 4(d) regulations.

20          The 4(d), the lethal control program under the

                              Page 4

wildlife9-13-05.txt
21  4(d)regulations do not differ in any material respect with
22  regard to irreparable harm analysis from the lethal control
23  provisions at issue in the permits here.
24          Indeed, the record in this case shows that the
25  Wisconsin DNR and the Michigan DNR requested Section 10(a)
    6

 1  permits so that they could continue the lethal control
 2  programs that were part of the enjoined Section 4(d)
 3  regulations.
 4          By suggesting that plaintiffs must show jeopardy to
 5  the entire species, the Fish and Wildlife Service ignores
 6  the most fundamental substantive provisions of the ESA
 7  While it is true that the ESA seeks to ensure the existence
 8  of an entire species, Congress has also recognized the
 9  importance of protecting individual members of an endangered
10  species, as is evident through its strict and sweeping
11  prohibition on takings.
12          If courts were to adopt the Service's standard for
13  irreparable harm, then the government, as well as private
14  individuals such as developers would get a free pass from
15  injunctions until they took so many individual members of an
16  endangered species that they actually jeopardize the
17  existence of the species.
18          Surely the Fish and Wildlife Service cannot mean
19  for the Court to adopt an irreparable harm standard that
20  would require species returning to the brink of extinction
21  before injunctive relief could be granted.
22          Because the plaintiffs need only show under case
23  law and under the ESA that individual members of an
24  endangered species are harmed in order to show irreparable
25  harm and the lethal taking of wolves under the permits at
    7
                        Page 5

Exhibit F-5

wildlife9-13-05.txt

1  issue here is not in dispute, the plaintiffs have therefore
2  shown irreparable harm.

3        The Fish and Wildlife Service also argues that the
4  balance of harm favors denial of an injunction because of
5  the states' interests in depredation control programs and
6  because of the loss of public support for wolf conservation
7  that would result from an injunction.

8        First, the ESA recognizes no exception to its
9  strict prohibitions or its unambiguous procedural mandates
10 on account of states' interests in wolf management.  If that
11 were the case, then protections afforded under ESA would
12 crumble, given that states have, since the inception of ESA,
13 mounted political pressure on federal agencies to allow
14 implementation of wolf killing programs.

15       For example, back in 1978, shortly after wolves
16 were afforded protection under the ESA, Minnesota enacted
17 regulations creating a sport hunting season for wolves.
18 when challenged, both the Minnesota DNR and the Fish and
19 wildlife Service claimed that sport hunting would enhance
20 the public's view of wolves and reduce human/wolf conflicts.
21 Both that rationale and the regulations were squarely
22 rejected by the district court in Sierra Club v. Clark.

23       Not only does the ESA provide no exception for
24 state interest in wolf management, but it is also not the
25 role of the Fish and Wildlife Service, as guardians of
   8

1  wolves and other endangered species, to allow political
2  pressure to undermine the protections of the ESA.

3        The Service's loss of support for wolf conservation
4  argument is also a red herring, given that any loss of
5  public support that would be caused by the preliminary

Page 6

wildlife9-13-05.txt

6  injunction is speculative at best.  There is also no record
7  evidence to support the argument that the Fish and Wildlife
8  Service has to kill wolves in order to save them.

9       The Fish and Wildlife Service essentially asks the
10  Court to sanction lethal taking under illegal permits in
11  order to prevent the possibility that third parties may take
12  the law into their own hands.  In other words, the Fish and
13  Wildlife Service asks for permission to break the law so
14  that others won't.

15       With death of endangered species on one side of the
16  balance and political pressure or other speculative loss of
17  public support on the other, the balance of harm favors the
18  plaintiffs in this case.

19       THE COURT:  Was there some reason why this case --
20  these permits were issued in April, and here we are in
21  August.  Is there some reason for not having moved sooner?
22       MS. KNUDSEN:  Your Honor, it is just an issue of
23  being able to organize a coalition and move into Court.
24       THE COURT:  Have there been takes so far under these
25  permits?
9

1       MS. KNUDSEN:  Yes, as of one week ago today,
2  September 6th, there were 29 wolves taken in Wisconsin and
3  two wolves taken in Michigan.  The permits allow in
4  Wisconsin for there to be 34 wolves taken.  And for there to
5  be 20 wolves taken in Michigan.

6       THE COURT:  And do you know, I know this is probably
7  for Mr. Rodriguez but they're now getting this Notice and
8  Comment out I take it.  Do you know what the timeframe is?
9       MS. KNUDSEN:  It is not clear from that notice, Your
10  Honor, whether those permits would just be re-issued through
11  the remaining, allowing taking through the remainder of this
                              Page 7

**Exhibit F-7**

wildlife9-13-05.txt

12   year, whether those are open-ended permits.

13          THE COURT:  The ones that are at issue in the latest

14   supplemental pleading you mean?

15          MS. KNUDSEN:  That's right.  There are no dates.

16   There is also no indication of any caps on the amount of

17   wolves that would be allowed to be under those notice

18   permits.

19          THE COURT:  There are no caps?

20          MS. KNUDSEN:  Not listed in that notice, not that I

21   could see, Your Honor.

22          THE COURT:  Okay.  You are supposed to send comments

23   within 30 days, I take it.  I don't know when this starts.

24   I'll ask Mr. Rodriguez.

25          Okay.  Anything further?
     10

1           MS. KNUDSEN:  Yes, Your Honor, only that the public

2    interest warrants issuance of an injunction in this case.

3           By drafting the ESA to included the procedural

4    requirements of section 10(c),  Congress has already spoken

5    that the opportunity to be heard and comment before the

6    issuance of Section 10(a)1(A) permits is in the public

7    interest.

8           Further, the strict prohibition on takings shows

9    that Congress has already determined that preventing the

10   illegal killing of endangered species is in the public

11   interest.

12          The public interest does not and cannot demand that

13   the Fish and Wildlife Service be allowed to ignore

14   Congressional mandates, especially when the procedural

15   requirements that have been violated here are the ones that

16   give the public a voice in decisions made to protect natural

Page 8

**Exhibit F-8**

wildlife9-13-05.txt

17    resources on their behalf, and especially when the Fish and

18    Wildlife Service shows blatant disregard for the

19    non-discretionary mandates of Section 10(c) which comes on

20    the heels of their controversial and unsuccessful attempt to

21    downlist the gray wolves.

22         Because the Michigan DNR and the Wisconsin DNR

23    have, since April, been killing endangered species pursuant

24    to permits that the defendants concede were unlawfully

25    issued, absent an injunction, endangered species will

11

1    continue to be harmed.

2         Plaintiffs respectfully request that the Court

3    issue injunction to prevent the further taking of wolves

4    pursuant to unlawfully issued permits.  We further ask the

5    Court to direct the Fish and Wildlife Service to notify the

6    state agencies that the permits are invalid and that further

7    taking of wolves under those permits is prohibited.

8         THE COURT:  Remind me, the underlying lawsuit raises

9    what issue again?

10        MS. KNUDSEN:  The downlisting or our specific

11    claim--

12        THE COURT:  Your complaints.

13        MS. KNUDSEN:  Our complaint resolves around Section

14    C of the ESA which requires that any time the Fish and

15    Wildlife Service issues a permit under Section 10, which

16    they did here, that they have to provide notice of receipt

17    of the applications from the states and also 30 day notice

18    and comment period, and an opportunity to review the

19    materials that were submitted by the states along with the

20    application for permit.

21        THE COURT:  You mean if they go through this

22    procedure, that will moot out the complaints?  I thought you

Page 9

wildlife9-13-05.txt

23  had another issue on the substance.

24       MS. KNUDSEN:  Your Honor, if they go through that

25  procedure it won't moot out the complaints in the sense that
    12

1   these permits that we're talking about today were issued

2   without the notice and comment.  And even though they

3   propose to allow notice and comment at this point, the ESA

4   requires that we have the opportunity to comment before the

5   permits are issued, which is important.

6        THE COURT:  I thought that's what they're about to

7   do by virtue of what came to me recently by fax.

8        MS. KNUDSEN:  Well, certainly that would put them on

9   the road to complying with the Section 10(c) requirements

10  for any permits that they issue in the future.  But that

11  does not make the current, that does not salvage the current

12  permits.

13       THE COURT:  If I enjoin the current permits as they

14  have requested--I'm lost.  If those permit don't exist and

15  don't permit continued killing of the wolves --

16       MS. KNUDSEN:  Then you are correct, Your Honor.

17  Assuming that you enjoin the current permits, then if they

18  follow the proper notice and comment procedures for any

19  future permits, that resolves our procedural challenge.

20       THE COURT:  Mr. Rodriguez, let me hear from you.  I

21  thought you told me you were going to get this matter

22  resolved, the whole matter.  What happened?

23       MR. RODRIGUEZ:  We had hoped to reach an agreement.

24  We hoped to be able to do something that would address all

25  of the parties' concerns.  But the primary reason, and the
    13

1   only reason why we were unable to reach an agreement is that

Page 10

wildlife9-13-05.txt

2   the Fish and Wildlife Service feels that the ability of the

3   states to control depredating wolves, wolves that are

4   preying on livestock and people's pets, the ability to

5   control these problem wolves is so important that they do

6   not want to leave the states without a viable management

7   tool with which to address this concern.

8           THE COURT:  Nobody says they're going to be left

9   without it.  It's just that you have to comply with the law.

10  I am baffled by the government's position here.  I have to

11  be perfectly frank.  I have a hard time understanding the

12  notion you kill the wolves to save the wolves.

13          MR. RODRIGUEZ:  I think I can add some context to

14  that, that would hopefully shed some light.

15          THE COURT:  What I don't understand, let's start

16  with the premise that there has been a violation of law.

17  Basically you are saying I should ignore it because of the

18  states' interest in wolf depredation.  But could you do it

19  right?  Why does the government not just do it right?

20          MR. RODRIGUEZ:  With respect to high public interest

21  with wolf recovery, we have taken steps and that is what the

22  notice that we provided to you is about.

23          THE COURT:  That's what you should have done the

24  first time, right?  I'm not here to decide whether the

25  ultimate results would be right or wrong.  My concern is
    14

1   whether you do it properly, right?

2           MR. RODRIGUEZ:  Yes, Your Honor.  In the procedural

3   context of this case, that we're at an emergency preliminary

4   injunction stage, we would ask that the Court sitting in

5   equity weigh the factors, the harms that would fall upon the

6   states, the state citizens and the public interests in

7   general.

Exhibit F-11

wildlife9-13-05.txt

8       THE COURT:  And those factors would be that they are
9   not able to kill some wolves?  Because the wolves are
10  killing the livestock?
11      MR. RODRIGUEZ:  If I may, Your Honor, these wolves,
12  the wolves that are in Wisconsin and Michigan, are actually,
13  are doing very well.  They have far exceeded the recovery
14  goals that have been established by the Fish and Wildlife
15  Service in the recovery plan.
16      The depredation control that we're talking about,
17  is limited in both scope and in numbers.  So we're not
18  talking about giving the states a blank check to go out and
19  kill wolves.
20      In addition, the depredation control of problem
21  wolves is specifically called for in the recovery plan for
22  these wolves.  And in light of all of the factors --
23      THE COURT:  Let me ask you this.  If you do it the
24  right way, I assume you are doing it under this August 12
25  letter, how long is it going to take you?  You'll have to
    15

1   have a period of notice.  If you had done this back in
2   April, you would have had the plan underway.  I'm baffled
3   about why you didn't do it right.  There is no explanation.
4   All you are doing is saying, I should balance the equities
5   .  But what would have been the harm of doing it right?
6       MR. RODRIGUEZ:  In retrospect, Your Honor, of
7   course, the Services, in light of the high public interest,
8   would have put this out for notice and comment.
9       THE COURT:  Why?  Is there a good reason or somebody
10  just wanted to do something quick?
11      MS. KNUDSEN:  No, because we did not save time.
12  That was adequate time to provide notice and comment.  The

Page 12

wildlife9-13-05.txt
13  Service issued sub-permit to the states.  And the new permit

14  will be full-fledged Section 10 permits.  They clearly fall

15  under Section 10(c) requirements for notice and comment.

16          There was the issue at the time when they received

17  the original applications, whether or not that in fact

18  triggered the notice and comment requirement, in light of

19  fact that they were going to issue sub-permits.  That was

20  the thinking at the time.  We're not raising those arguments

21  now.  As Your Honor has read our papers, we can see the

22  likelihood of success on the permits.

23          If I could explain briefly what the new notice and

24  new permits are going to do, I think that would also assist

25  the Court.
    16

1           We put this notice out, it is available to appear

2   in the Federal Register tomorrow.  It will be out for notice

3   and comment for 30 days as required.   The Service will take

4   those comments, review the most current data, and then make

5   a determination as to the number of wolves, if any, that

6   they're going to allow to be taken for depredation control.

7           They anticipate the new full-fledged Section 10

8   permit to supersede those applied for 2006 and maybe parts

9   of 2005 depending upon when they actually come out, the

10  Service--

11          THE COURT:  But in the interim, conceivably under

12  what is existing, you are saying that I should authorize a

13  take of 18 wolves in Michigan and maybe five or so in

14  Wisconsin in order to protect the wolves?

15          MR. RODRIGUEZ:  In order to--

16          THE COURT:  From illegal takes.

17          MR. RODRIGUEZ:  In order to maintain the public

18  support in wolf recovery in general, we ask that you not
                        Page 13

**Exhibit F-13**

wildlife9-13-05.txt

19  enjoin the sub-permits that are at issue now.  That goes

20  into the concern about people frankly taking matters into

21  their own hands which --

22        THE COURT:  But that's illegal.  One has to, you are

23  saying I have to assume that people are going to violate the

24  law unless I allow somebody else to kill the wolves first.

25  There is a certain illogic, Mr. Rodriguez, that is very

    17

1   difficult.

2         MR. RODRIGUEZ:  I understand how it could be

3   counter- intuitive.  But you think it is the difference

4   between having a professionally managed through a wildlife

5   agency depredation control program and human manner and

6   perhaps problem wolves--

7         THE COURT:  How do I know that won't happen if you

8   are not killing them?  That's assuming that people will

9   change their behavior in some fashion because you are

10  killing them.  But there is no empirical basis for that.

11        MR. RODRIGUEZ:  It is the opinion of the biologists

12  and experts within the Fish and Wildlife Service you have

13  now of many, many years of move management.  And hearing the

14  concerns of the public, it is their opinion that that might

15  occur.

16        THE COURT:  It might occur, to, if you only permit

17  things that are more out there than they need to go -- It is

18  sort of hypothetical at best.

19             Are you aware of any case where there is a clear

20  procedural violation of the statutes and someone enjoins,

21  does not issue a preliminary injunction?  A clear violation

22  of statute, not anything that comes sort of arguably where

23  you have likelihood of success on the merits?

                          Page 14

Exhibit F-14

wildlife9-13-05.txt

24          MR. RODRIGUEZ:  I cannot at this time.

25          THE COURT:  I appreciate your candor.  The Court
    18

1    find this to be much simpler case than the ordinary

2    endangered species case.  I don't see how I can allow a

3    clear cut procedural violation of the statute to go

4    unrestrained where it could have been done right.  There was

5    nothing to prevent it from being done right.  To adopt your

6    position, even if I assume that the wolf is not on the brink

7    of extension, it is still listed now as an endangered

8    species.  So it would be like giving a blank check to the

9    government to violate the statute because maybe -- actually,

10   the government has done a pretty good job of the wolves.  I

11   don't know see why you should have a pass just because they

12   have done better as compared to other species.

13          It seems like a precedence that is fraught with

14   danger.  Absolutely fraught.  It would say you can go ahead

15   and do whatever you want to do procedurally violate the

16   statute, as long as I can't find that they're going to

17   become extinct.  It is impossible in most cases because you

18   never have a biological opinion on the principles of

19   extinction.  I have yet to see one.

20          So basically you would be able to do as you wish

21   because there is never going to be a biological opinion,

22   likelihood that there is success on the merits.

23          There has been a violation of 10(c).  When I get to

24   a balancing, and I accept the notion that injunction is not

25   automatically just because there has been procedural
    19

1    violation.  Appears the laws recognizes it.  The balance of

2    hardship still cannot in any fashion come out in favor of

3    the defendant.

                    Page 15

wildlife9-13-05.txt

4       This is an endangered species.  I'm not willing to

5   give the government free right -- I'm not willing to do that

6   when it is a clear cut violation.  The public interest

7   demands the government obey the law.  There is no good

8   reason why the government did not obey the law.

9       Therefore, I think the public depends on the

10  government to do what you have to do in conformance with the

11  requirement of the statute.  You will undoubtedly, I have no

12  doubt reach a similar conclusion.  But you have to do it

13  right because that's what Congress has mandated by passing

14  the law.  They have told us that the court is to protect the

15  endangered species, whether it is wolves, state depredation

16  or protecting livestock.  It is not my job.  It is the

17  government's job to do what is right under the law.

18      So Mr. Rodriguez, this case should be settled.  I

19  am going to enjoin the permits and enjoin the government

20  from allowing these kills correctly.

21      I was not sure from Ms. Knudsen what was left for

22  me to do under this lawsuit.  I don't see any problem with

23  the order that they have issued.

24      I would also say that the law is really strong in

25  this area in terms of plaintiff's position.  I regret that
   20

1   in some way or another somebody saw fit to even litigate the

2   matter, because I can't find any case law on the other side

3   of the fence for anything.

4       You were in front of Judge Sullivan.  I suspect he

5   was no more patient with the notion than this Court.  Anyway

6   -- So that I will sign this preliminary injunction.

7       Is this case still alive?

8      MR. RODRIGUEZ:  Your Honor, it is my understanding

Page 16

wildlife9-13-05.txt
9  that the only claims that plaintiffs have raised in their
10  complaints are with respect to the procedural violation at
11  issue.
12        I would just point out to Your Honor that the
13  permits that they have challenged are set to expire the end
14  of the calendar year.  And I would ask any injunctions, of
15  if the permits are superseded by subsequent permits--
16        THE COURT:  I'm only enjoining these permits, if
17  they no longer exist, is this case over?  This is a
18  permanent injunction of these permits under the present
19  circumstances.  I don't need to call it a preliminary
20  injunction.  I'm enjoining these permits because they've
21  been issued in violation of the law.
22        MS. KNUDSEN:  Your Honor, with the permanent
23  injunction, there are no further counts under this
24  complaint.
25        THE COURT:  Can I treat it as a motion for
   21

1  injunction?
2        Mr. Rodriguez, you are welcome to appeal.  It seems
3  to me, though, that we're really talking about, there is
4  nothing that is going to cause me to change my mind to
5  change a preliminary injunction into a denial of an earlier
6  injunction.
7        MR. RODRIGUEZ:  No, Your Honor.  If Your Honor makes
8  no ruling with respect to any subsequent rulemaking actions
9  or--
10        THE COURT:  No, no, that's not before me.  It
11  wouldn't be before me at this time, since it has not
12  happened.  So the Court is permanently enjoining any
13  killings of the gray wolf in either Wisconsin, permit 3505
14  or 3505 B.  So with the entry of an injunction, I believe
                        Page 17

wildlife9-13-05.txt

15  this resolved the matter.

16          That is correct?  Okay.  Thank you very much

17  counsel.

18          MR. RODRIGUEZ:  Thank you, Your Honor.

19          MS. KNUDSEN:   Thank you.

20          (Whereupon, at 12:14 p.m, the hearing concluded.)

21

22

23

24

25
    22


1                    CERTIFICATE OF REPORTER

2          I, Lisa Walker Griffith, certify that the foregoing is

3 a correct transcript from the record of proceedings in the

4 above-entitled matter.

5

6

7

8

9

10 _____   _____
   Lisa Walker Griffith, RPR                    Date
11

12

13

14

15

16

17

18

19

wildlife9-13-05.txt

20

21

22

23

24

25

Page 19

**Exhibit F-19**