**DECISION
AND
FINDING OF NO SIGNIFICANT IMPACT
FOR THE ENVIRONMENTAL ASSESSMENT:**

**MANAGEMENT OF
WOLF CONFLICTS AND DEPREDATING WOLVES
IN WISCONSIN**

Gray wolf (*Canis lupus*) populations in North America, including the wolf population in Wisconsin, have undergone a dramatic recovery in recent years due to protection from persecution. However, the combination of an increasing Wisconsin wolf population, human encroachment on wild habitats and conversion of natural landscapes to agricultural and urban landscapes has led to increased conflicts between wolves and humans. Conflicts with wolves include predation on livestock and pets, and risks to human safety from potentially hazardous or threatening wolves. Management of conflicts with wolves is addressed in the Wisconsin Wolf Management Plan (WWMP; WDNR 1999) and in the United States Department of the Interior, Fish and Wildlife Service (USFWS) Eastern Timber Wolf Recovery Plan (USFWS 1992). Prompt, professional management of damage and conflicts with wolves is an important component of wolf recovery efforts because it facilitates local public acceptance and tolerance of wolves (Fritts 1993, Mech 1995, WDNR 1999, 50 CFR 17.40(o)). The United Stated Department of Agriculture, Animal and Plant Health Inspection Service (APHIS), Wildlife Services (WS), the United States Department of Interior, Fish and Wildlife Service (USFWS) and the Wisconsin Department of Natural Resources (WDNR) have prepared an environmental assessment (EA) evaluating ways by which the agencies may work together to resolve conflicts with wolves in Wisconsin. The EA documented the need for wolf damage management (WDM) in Wisconsin and assessed potential impacts on the human environment from the various alternatives for responding to wolf damage problems in Wisconsin, including the USFWS issuance of permits and establishment of 4(d) rules allowing the lethal removal of wolves for WDM under authorities in Section 10(a)(1)(A) of the Endangered Species Act. The EA analyzes the potential environmental and social effects of alternatives for protecting domestic animals and human safety on private and public lands throughout the State.

WS was the lead agency in the preparation of the EA, and the USFWS and WDNR were cooperating agencies  The Great Lakes Indian Fish and Wildlife Commission (GLIFWC), Wisconsin Ho-Chunk Nation, and the Lac du Flambeau Band of Lake Superior Chippewa Indians were consulting agencies in the production of the EA. The USFWS has the primary statutory authority, under the Federal Endangered Species Act (ESA), for managing federally protected species including wolves. While wolves are federally protected as an endangered or threatened species, permits or special 4(d) rules must be issued by the USFWS before select non-lethal (aversive conditioning and non-lethal projectiles) and all lethal WDM techniques may be used. WS is the Federal program authorized by law to provide assistance with the reduction of damage caused by wildlife. The Wisconsin Department of Natural Resources provides for the control, management, restoration, conservation and regulation of birds, fish, game, forestry and all wildlife resources of the state. The Tribes exercise similar authority on tribal lands, in addition to having retained the right to hunt, fish, and gather on lands and waters in the ceded territories. The GLIFWC represents tribal interests in wildlife management on lands in the ceded territories.

1

The agencies prepared the EA to assist in planning WDM activities; to clearly communicate with the public the analysis of cumulative effects for a number of issues of concern in relation to alternative means of meeting needs for such management in the State, including the potential cumulative impacts on wolves and other wildlife species; and to meet the requirements of the National Environmental Policy Act (NEPA). The analysis in the EA covers current and future WDM actions by WS, the USFWS, and the WDNR while wolves are federally protected under the ESA[1]. Comments from the public involvement processes for the EA and permit application were reviewed for substantive issues and alternatives which were considered in developing this decision (Chapter 6 of the EA).

The proposed action (EA Alternative 2) of WS, the WDNR, and the USFWS is to permit and conduct an Integrated Wildlife Damage Management (IWDM) program for wolves on public and private lands in Wisconsin. The IWDM approach, commonly known as Integrated Pest Management (WS Directive 2.105), involves the simultaneous or sequential use or recommendation of a combination of methods to reduce damage. Wolf damage and conflict management is not based on punishing offending animals but as one means of reducing damage and is used as part of the WS Decision Model (Slate et al. 1992, USDA 1997 revised, WS Directive 2.201). The WDNR, organizations, associations, groups, and individuals have requested USFWS and WS assistance with the management of wolf conflicts and wolf damage in Wisconsin. All wolf damage management activities would be conducted in compliance with relevant laws, regulations, policies, orders and procedures, including the Endangered Species Act of 1973.

## COOPERATING AND CONSULTING AGENCIES

The USFWS and WDNR were cooperating agencies in the production of the EA. The GLIFWC, Wisconsin Ho-Chunk Nation, and Lac du Flambeau Band of Lake Superior Chippewa Indians were consulting agencies. The role and authority of these agencies is as follows:

### Wildlife Services

WS is the Federal program authorized by law to reduce damage caused by wildlife (the Act of March 2, 1931 (46 Stat. 1468; 7 U.S.C. 426-426b) as amended, and the Act of December 22, 1987 (101 Stat. 1329-331, 7 U.S.C. 426c)). The mission of the USDA/APHIS/WS program is to provide federal leadership in managing conflicts with wildlife. Wildlife Services' mission, developed through its strategic planning process (USDA 1999), is: 1) *"to provide leadership in wildlife damage management in the protection of America's agricultural, industrial and natural resources, and 2) to safeguard public health and safety."* WS recognizes that wildlife is an important public resource greatly valued by the American people. By its very nature, however, wildlife is a highly dynamic and mobile resource that can cause damage to agriculture and property, pose risks to human health and safety, and affect industrial and natural resources. WS conducts programs of research, technical assistance and applied management to resolve problems that occur when human activity and wildlife conflict. WS is involved in wolf management and research in Wisconsin as a designated agent of the WDNR.

---

[1] While wolves are federally protected under the Endangered Species Act, actions taken by the WDNR will depend upon the management decisions (permits, 4(d) rules) of the USFWS which are subject to the requirements of NEPA. WS' involvement in WDM in Wisconsin is also subject to the requirements of NEPA.

**U.S. Department of the Interior, Fish and Wildlife Service (USFWS)**

The Mission of the U.S. Fish & Wildlife Service is to work with others to conserve, protect and enhance fish, wildlife, and plants and their habitats for the continuing benefit of the American people. Under the authority of the ESA, the USFWS acts to prevent the extinction of plant and animal species. It does this by identifying species at risk of extinction, designating ("listing") these species as threatened or endangered, providing protection for these species and their habitats, developing and implementing recovery plans to improve their status, and ultimately "delisting" these species and returning full management authority to the states and tribes. While a species is listed, most management authority for the species rests with the USFWS. However, the USFWS continues to work with other Federal agencies, states, and tribes along with private landowners to protect and recover the species. The USFWS helps ensure protection of listed species through consultations (Section 7 of the ESA) with other Federal agencies. Under Section 10 of the ESA, the USFWS also issues permits which provide exceptions to the prohibitions established by other parts of the Act. These permits provide for conducting various activities including scientific research, enhancement of propagation or survival, and incidental take while minimizing potential harm to the species. For species federally classified as threatened, the USFWS may also issue 4(d) rules which may allow for greater management flexibility for the species. The USFWS also issues grants for protection and enhancement of habitat and for research intended to improve the status of a listed species. 16 United States Code (U.S.C.) 1531 *et seq.*, Endangered Species Act (ESA) of 1973, as amended; 16 U.S.C. 703-712.

**Wisconsin Department of Natural Resources (WDNR)**

The WDNR, under the direction of a Governor appointed Natural Resources Board, is specifically charged by the Legislature with the management of the State's wildlife resources. Although legal authorities of the Natural Resources Board and the WDNR are expressed throughout Wisconsin Administrative Code (WAC), the primary statutory authorities include establishment of a system to protect, develop and use the forest, fish and game, lakes, streams, plant life, flowers, and other outdoor resources of the state (s. 23.09 Wis. Stats.) and law enforcement authorities (s. 29.001 and s. 29.921 Wis. Stats.). The Natural Resources Board adopted mission statements to help clarify and interpret the role of WDNR in managing natural resources in Wisconsin. They are:

ξ     To protect and enhance our natural resources: our air, land and water; our wildlife, fish and forests and the ecosystems that sustain all life.
ξ     To provide a healthy sustainable environment and a full range of outdoor opportunities.
ξ     To ensure the right of all people to use and enjoy these resources in their work and leisure.
ξ     To work with people to understand each other's views and carry out the public will. And in this partnership consider the future and generations to follow.

After the status of wolves reverted to "endangered" in 2004 because of a court ruling, the WDNR's authority to respond to wolf-related damage and human safety concerns was provided by 50 CFR 17.21 and a permit issued under Section 10(a)(1)(A) of the Federal ESA. On September 13, 2005 the United States District Court in the District of Columbia enjoined the USFWS from allowing any activities authorized under permits issued to Michigan and Wisconsin, and the USFWS was further directed to "immediately halt any "takings" of gray wolves for depredation control purposes in Michigan and Wisconsin pursuant to these permits". At present WDNR authority for assistance with wolf depredations on livestock is limited to documenting the event and providing technical and operational assistance with non-lethal methods for resolving wolf damage including husbandry techniques (e.g., fencing, bringing

**Exhibit H-3**

animals in at night, guard dogs), and other non-lethal methods authorized under the cooperative conservation agreement between the USFWS and WDNR.

**Great Lakes Indian Fish and Wildlife Commission (GLIFWC)**

The Great Lakes Indian Fish and Wildlife Commission is an agency of eleven Ojibwe nations in Minnesota, Wisconsin, and Michigan, with off-reservation treaty rights to hunt, fish and gather in treaty-ceded lands and waters. It exercises powers delegated by its member tribes. GLIFWC assists its member tribes in the implementation of off-reservation treaty seasons and in the protection of treaty rights and natural resources. GLIFWC provides natural resource management expertise, conservation enforcement, legal and policy analysis, and public information services. GLIFWC's member tribes include: the Bay Mills Indian Community, Keweenaw Bay Indian Community and the Lac Vieux Desert Band in Michigan; the Bad River, Red Cliff, Lac du Flambeau, Lac Courte Oreilles, Sokaogon and St. Croix Bands in Wisconsin; and the Fond du Lac and Mille Lacs tribes in Minnesota. All member tribes retained hunting, fishing and gathering rights in treaties with the U.S. government, including the 1836, 1837, 1842, and 1854 Treaties.

GLIFWC's Board of Commissioners, comprised of a representative from each member tribe, provides the direction and policy for the organization. Recommendations are made to the Board of Commissioners from several standing committees, including the Voigt Intertribal Task Force (VITF). The VITF was formed following the 1983 Voigt decision and makes recommendations regarding the management of the fishery in inland lakes and wild game and wild plants in treaty-ceded lands of Wisconsin.

**Wisconsin Ho-Chunk Nation, Lac du Flambeau Band of Lake Superior Chippewa Indians**

Wolves play an important role in tribal culture and spiritual beliefs. Tribal wolf management decisions are outside the scope of this analysis and decisions made in this EA do not alter the tribes' authority or rights relating to wolf management. However, this analysis does include the types of assistance WS may offer the tribes, if requested. Additionally, wolves move freely across boundaries of tribal lands and the WDM actions proposed in this EA can impact tribal wolf management and vise versa. The Lac du Flambeau Band of Lake Superior Chippewa Indians is also one of the tribes with off-reservation treaty rights to hunt, fish and gather in treaty-ceded lands and waters. The Ho-Chunk Nation do not have formal reservation boundaries, but own and occupy scattered parcels across central Wisconsin, especially within the Central Forest wolf range. The Ho-Chunk have been monitoring the wolf population in cooperation with the WDNR and have donated radio collars for tracking wolves. The health of the Central Wisconsin wolf population is of great concern to the Ho-Chunk Nation. It is for these reasons that the Wisconsin Ho-Chunk and Lac du Flambeau Band of Lake Superior Chippewa Indians chose to be consulting agencies in the production of this EA.


**MONITORING**

The USFWS, WS, and the WDNR will monitor the impacts of their activities on wolves and non-target species that could be affected by WDM activities. The USFWS will annually assess the impacts of WDM actions to ensure that they do not impact the long-term sustainability of the wolf population. This will be done primarily by reviewing annual reports and permit requests submitted by the WDNR. The EA will also be reviewed each year to ensure that there are no new needs, issues or impacts meriting additional analysis.

4

**PUBLIC INVOLVEMENT**

The WDNR application for an endangered species permit was made available for a 30 day comment period by the USFWS on September 14, 2005. Responses to comments made on the WDNR permit application were incorporated in the draft EA as appropriate. The USFWS' responses to comments made on the permit application are available at http://www.fws.gov/midwest/wolf/depredation/mi_permitapp_comm.htm. The draft EA was made available for public comment on March 2, 2006 and the comment period closed on April 3, 2006. The draft EA was made available to the public through "Notices of Availability" published in the *Wausau Daily Herald*, *Ashland Daily Press*, *Milwaukee Journal Sentinel*, *Eau Clair Leader-Telegram*, *Wisconsin State Journal*, *Green Bay Press Gazette*, *La Crosse Tribune*, and *Marinette EagleHerald*, direct mailings of the NOA to parties that had specifically requested to be notified, through agency statewide news releases, and at the USFWS web site http://www.fws.gov/midwest/wolf.

A total of 56 comment letters were received, 25 supporting the proposed action and 31 opposed. All comments were analyzed to identify substantial new issues, alternatives, or to redirect the program. Responses to specific comments are included in Chapter 6 of the EA. All letters and comments are maintained at the Wildlife Services State Office, 732 Lois Dr., Sun Prairie, WI 53590.

**MAJOR ISSUES**

The EA describes the alternatives considered and evaluated using the identified issues. The following issues were identified as important to the scope of the analysis.

- Effects on wolf populations in Wisconsin
- Effects on non-target species populations, including threatened and endangered species
- Effects on public and pet health and safety
- Humaneness of methods to be used
- Sociological issues including impacts on aesthetic values

**AFFECTED ENVIRONMENT**

The scope of this EA is to evaluate the potential impacts of alternatives for the USFWS, WS and WDNR involvement in WDM in Wisconsin while wolves are federally protected under the ESA. Ordinarily, the actions of state agencies are not subject to the requirements of the National Environmental Policy Act. However, while wolves are federally protected under the ESA, actions taken by the WDNR will depend upon the management decisions (permits, 4(d) rules) of the USFWS which are subject to the requirements of NEPA. Under the Proposed Action, wolf management could be conducted on private, Federal, State, tribal[2], county, and municipal lands in Wisconsin with the permission of the appropriate land owner/manager. Most wolf damage management activities would be conducted on private land. Wolf damage management activities are only likely to be conducted on public land if that land is within the damage management perimeter (set by USFWS permits and the WWMP) around the site of a verified depredation event on private land, in the unlikely instance that a wolf preys on livestock legally present

---

[2] WS wolf damage management would only be conducted on tribal lands with the Tribes request/consent and only after appropriate documents had been signed by WS and the respective Tribe.

on public lands[3], or in the rare instance that a wolf is exhibiting behavior that poses a threat to human safety. For example, of the 26 properties where WS conducted damage management actions (23 for the protection of livestock, 2 for the protection of pets, 1 for human safety) in FY 2005, in only 3 instances (protection of livestock) was damage management conducted on adjacent public land. It is more likely that wolf trapping and radio-collaring for wolf population monitoring and research could be conducted on public land (state, county and national forest lands). The public lands where wolf trapping for the purpose of radio-collaring and population monitoring has been conducted include Great Divide Ranger District of the Chequamegon–Nicolet National Forest, as well as County and WDNR land in Bayfield, Douglas, Marinette and Oneida Counties.

It is anticipated that the Federal status of wolves in Wisconsin (currently federally listed as endangered) may change. As authority for wolf management is returned to the state and tribes, the importance of the WWMP increases. Wildlife Services is cooperatively working with the WDNR and will comply with the policies and guidelines set forth in the WWMP (WDNR 1999) whereby pertinent portions are incorporated in this EA by reference. The WDNR is currently reviewing the WWMP. If the WWMP is revised, WS will evaluate this EA to determine if WS' compliance with the revised WWMP would result in needs for action and/or impacts greater than those analyzed. Some examples of actions that might be taken when the revised WWMP is implemented that could trigger revision of this analysis include: (1) WS is requested to take a higher proportion of the wolf population than is proposed in this EA or cumulative impacts on the wolf population in WI (mortality from all known causes) exceeds that analyzed in this EA; (2) the plan results in a request for WS to conduct WDM to protect resources not analyzed in this EA; (3) the plan results in requests for WS to change or add methods of conducting WDM that would result in greater impacts on the affected environment than those analyzed in this EA; or (4) mortality from all known causes results in a precipitous decline in statewide wolf populations. If this is the case, then WS and the USFWS will revise this EA in accordance with the NEPA.


## ALTERNATIVES THAT WERE FULLY EVALUATED

The following four alternatives were developed to respond to the issues. Six additional alternatives were considered but not analyzed in detail (EA Section 3.4). Each of the lead and cooperating agencies will make its own decision regarding the alternative to be selected. The alternative selected by each of the agencies may impact the alternatives available to the other agencies. A description of each alternative and a discussion of how the selection of each alternative by one agency affects the management actions of the other agencies is provided in Section 3.0 of the EA. A detailed discussion of the effects of the alternatives on the issues is described in Chapter 4 of the EA. The following is a summary of the alternatives.

**Alternative 1 - Non-lethal WDM Only**. Under this alternative, the USFWS would issue Section 10(a)(1)(A) permits or develop and implement section 4(d) regulations authorizing the use of non-lethal WDM techniques. This alternative may be selected with or without an option to restrict use of some non-lethal WDM techniques to WS and WDNR. WS and WDNR would only provide technical and operational assistance with non-lethal WDM.

**Alternative 2 - Integrated WDM (No Action / Proposed Action)**. The No Action alternative serves as the baseline against which the impacts of management alternatives can be compared and can be defined as

---

[3] WS is aware of a limited number of instances where livestock is or has been allowed to graze on State and county land.

6

being the continuation of current management practices (CEQ 1981). However, the current program of non-lethal WDM has only been in effect since the Federal Court Decision on September 13, 2005 (Sections 1.3.1 and 1.3.9). Insufficient data exist at this time to adequately use current management conditions as a baseline for analysis. In contrast, Alternative 2 was used from April 1, 2003 to September 13, 2005 and data are available on the environmental impacts of this alternative. Therefore, for purposes of analysis, we are using Alternative 2 as the "No Action" baseline when comparing the other alternatives to determine if the real or potential adverse affects are greater, lesser or the same (Table 4-4). Under this alternative, the USFWS would issue Section 10(a)(1)(A) permits or section 4(d) regulations authorizing the use of lethal and non-lethal WDM techniques. The State and WS would have access to the complete range of non-lethal and lethal WDM methods. This alternative may be selected with or without an option to restrict use of some non-lethal WDM techniques to WS and WDNR.

**Alternative 3 - Technical Assistance Only**. The USFWS would not issue any Section 10(a)(1)(A) permits or develop and implement section 4(d) regulations for wolf damage management. WS would not conduct operational WDM in Wisconsin but could provide technical assistance on WDM methods that do not require permits or other authorization from the USFWS (Appendix B). Wildlife Services would also be able to conduct evaluations of potential wolf depredation sites needed to administer the wolf damage compensation program. Because of the cooperative conservation agreement between the USFWS and WDNR, the state could still use and authorize others to use many non-lethal WDM techniques (Section 1.7.7, Appendix B).

**Alternative 4 - No Federal WDM in Wisconsin.** Under this alternative, the USFWS and WS would provide no assistance with WDM. The USFWS would not issue any Section 10(a)(1)(A) permits for wolf damage management. Wildlife Services would not provide technical assistance or operational damage management services. Because of the cooperative conservation agreement between the USFWS and WDNR, the state could still use and authorize others to use many non-lethal WDM techniques (Section 1.7.7, Appendix B).


**DECISION AND FINDING OF NO SIGNIFICANT IMPACT**

I have carefully reviewed the EA prepared for this proposal and the input from the public involvement process. Changes were made to the EA where appropriate based on information from the public involvement process. The revisions that were made to the EA did not substantially change the analysis. I believe that the issues identified in the EA are best addressed by selecting Alternative 2 - Integrated WDM (No Action / Proposed Action) and applying the associated standard operating procedures discussed in Chapter 3 of the EA. Alternative 2 is selected because (1) it best enables the management agencies to provide prompt, professional assistance with wolf conflicts and will help maintain local public tolerance of wolf recovery in Wisconsin thereby enhancing wolf conservation efforts; (2) it offers the greatest chance at maximizing effectiveness and benefits to resource owners and managers while minimizing cumulative impacts on the quality of the human environment that might result from the program's effect on target and non-target species populations; (3) it presents the greatest chance of maximizing net benefits while minimizing adverse impacts to public health and safety; and (4) it offers a balanced approach to the issues of humaneness and aesthetics when all facets of these issues are considered.

The analysis indicates that there will not be a significant impact, individually or cumulatively, on the quality of the human environment as a result of this proposed action. I agree with this conclusion and therefore find that an EIS need not be prepared. This determination is based on the following factors:

7

1. Wolf damage management as proposed in the EA is not regional or national in scope.

2. Analysis of the cumulative impacts for this or other anticipated actions within the State or other Mid-west states indicates that the proposed action would not threaten the continued existence of the wolf population and would likely still allow for some level of population increase. Based on the rate of increase for the Michigan and Wisconsin wolf populations, the wolf population is large enough and healthy enough that even while the proposed action and all other mortality factors have adverse affects on individuals, they are not likely to result in a reduction in the state wolf population.

3. The proposed action would pose minimal risk to public health and safety. Risks to the public from WS' WDM methods were determined to be low in a formal risk assessment (USDA 1997 Revised, Appendix P).

4. There are no unique characteristics such as park lands, prime farm lands, wetlands, wild and scenic areas, or ecologically critical areas that would be significantly affected. Built-in mitigation measures that are part of the action agencies' standard operating procedures and adherence to laws and regulations will further ensure that the agencies' activities do not harm the environment.

5. The effects on the quality of the human environment are not highly controversial. Although there is opposition to wolf damage management proposed in the preferred alternative, this action is not highly controversial in terms of size, nature, or effect. Public controversy over wolf management has been acknowledged and addressed in the EA.

6. Based on the analysis documented in the EA and the accompanying administrative file, the effects of the proposed damage management program on the human environment would not be significant. The effects of the proposed activities are not highly uncertain and do not involve unique or unknown risks.

7. The proposed action would not establish a precedent for any future action with significant effects. Permits issued by the USFWS while wolves are federally classified as an endangered species will have to be reviewed and reissued annually.

8. No significant cumulative effects were identified through this assessment. The EA discussed cumulative effects on non-target species populations and concluded that such impacts were not significant for this or other anticipated actions to be implemented or planned within the State.

9. The proposed activities would not affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places, nor would they likely cause any loss or destruction of significant scientific, cultural, or historical resources. If an individual activity with the potential to affect historic resources is planned under the selected alternative, then site-specific consultation as required by Section 106 of the NHPA would be conducted as necessary (EA Section 1.8.2).

10. The USFWS has determined that with the exception of wolves, the target species, the proposed program would have no effect on or is not likely to adversely affect any Federal listed threatened or endangered species. This determination is based upon an Intra-Service Section 7 consultation

8

**Exhibit H-8**

completed by the USFWS for this EA. In addition WS and the WDNR have determined that the proposed program will not adversely affect any State-listed threatened or endangered species.

11. The proposed action will be in compliance with all federal, state, and local laws. The proposed action is consistent with the Wisconsin Coastal Zone Management Program.

Therefore, it is my decision to implement the proposed action (Alternative 2) as described in the Final EA. Copies of the Final EA are available upon request from the Wisconsin Wildlife Services State Office, 732 Lois Dr, Sun Prairie WI 53590, (608) 837-2727, on the USFWS Region 3 website at: http://www.fws.gov/midwest/wolf, or from the U.S. Fish and Wildlife Service, Ecological Services, 1 Federal Drive, Fort Snelling, MN 55111.


Charles S. Brown, Regional Director
USDA-APHIS-WS, Eastern Region

4/24/06
Date

**Exhibit H-9**

**LITERATURE CITED:**

Council on Environmental Quality (CEQ). 1981. Forty most asked questions concerning CEQ's NEPA regulations. (40 CFR 1500-1508) Federal Register 46(55):18026-18038.

Fritts, S. H. 1993. Controlling wolves in the Greater Yellowstone Area. Pp. 173-233 in R. S. Cook, ed. Ecological Issues on Introducing Wolves into Yellowstone National Park. Sci. Mono. NPS/NRYELL/NRSM-93/22. USDI, Nat. Park Service, Denver, CO 328pp.

Mech, L. D. 1995. The challenge and opportunity of recovering wolf populations. Conservation Biology; 9(2):1-9.

Slate, D.A., R. Owens, G. Connely, and G. Simmons. 1992. Decision making for wildlife damage management. Trans. N.A. Wildl. And Nat. Res. Conf. 57:51-62.

USDA (United States Department of Agriculture). 1997, Revised. Final Environmental Impact Statement. USDA, Animal and Plant Health Inspection Service, Wildlife Services, Operational Support Staff, 4700 River Road, Unit 87, Riverdale, MD 20737.

USFWS (United Stated Fish and Wildlife Service). 1992. Recovery plan for the eastern timber wolf. Twin Cities, MN. 73 pp. USFWS. 1994. Final Environmental Impact Statement for the reintroduction of gray wolves to Yellowstone National Park and central Idaho. Denver, CO.

WDNR. 1999. Wisconsin Wolf Management Plan. Wisconsin Department of Natural Resources PUBL-ER-099 99, Madison, Wisconsin. 74pp.

**Exhibit H-10**