Case 1:06-cv-01279-CKK    Document 6-10    Filed 07/25/2006    Page 1 of 15

Get a Document - by Citation - 1991 U.S. Dist. LEXIS 13426    Page 1 of 15

Service: **Get by LEXSEE®**
Citation: **1991 U.S. Dist. LEXIS 13426**

*1991 U.S. Dist. LEXIS 13426, **

THE FUND FOR ANIMALS, INC., et al., Plaintiffs, v. JOHN H. TURNER, et al., Defendants

C. A. No. 91-2201 (MB)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

1991 U.S. Dist. LEXIS 13426

September 27, 1991, Decided
September 27, 1991, Filed

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff animal rights activists sought a preliminary injunction declaring invalid 50 C.F.R. § 17.40(b)(1)(i)(E), promulgated by defendant Department of the Interior through the United States Fish and Wildlife Service (FWS), because it violated the Endangered Species Act (ESA), 16 U.S.C.S. §§ 1532-1544. The regulation authorized a sport hunt of grizzly bears in parts of northwestern Montana.

**OVERVIEW:** The State of Montana Department of Fish, Wildlife and Parks (MDFWP) scheduled a hunting season in the fall of 1991. The court granted the preliminary injunction requested by the animal rights activists because they had shown a likelihood of success on the merits of their challenge that this regulation violated the Endangered Species Act (ESA), 16 U.S.C.S. §§ 1532-1544. There was no rational finding of population pressures on grizzly bears in 1986 to justify this regulation. While a limited hunt could serve legitimate conservation goals, the ESA did not authorize hunting whenever it would be a sound conservation tool. Congress specifically limited the hunting of a threatened or endangered species to extraordinary cases of population pressures. The court was constrained to enforce that legislative restriction. Because grizzly bears were a threatened species, the loss even of a few grizzly bears through a sport hunt during the time it would take to reach a final decision in this case could cause irreparable harm.

**OUTCOME:** The court granted the preliminary injunction on the sport hunting of grizzly bears requested by animal rights activists.

**CORE TERMS:** regulation, grizzly bear, grizzly, species, hunting, hunt, preliminary injunction, administrative record, conservation, sport, ecosystem, endangered species, rational basis, season, memorandum, policy statement, endangered, injunction, livestock, issuance, relieved, depredation, authorize, standard of review, extraordinary case, carrying capacity, biological, regulated, habitat, likelihood of success

### LexisNexis(R) Headnotes ♦ Hide Headnotes

Civil Procedure > Justiciability > Standing > General Overview
Constitutional Law > The Judiciary > Case or Controversy > General Overview
Environmental Law > Natural Resources & Public Lands > Endangered Species Act > Enforcement > Citizen Suits
**HN1** The Endangered Species Act expressly authorizes any person to bring a civil action to enjoin violations of the statute, 16 U.S.C.S. § 1540(g)(1)(A). Congress therefore

**Exhibit N-1**

Case 1:06-cv-01279-CKK    Document 6-10    Filed 07/25/2006    Page 2 of 15

Get a Document - by Citation - 1991 U.S. Dist. LEXIS 13426    Page 2 of 15

intended to provide for standing to the limits of Art. III. More Like This Headnote

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions
HN2± In considering whether a preliminary injunction should issue, the following four factors must be evaluated: (1) plaintiffs' likelihood of success on the merits; (2) the potential irreparable injury in the absence of an injunction; (3) the balance of hardships among the parties; and (4) the public interest. More Like This Headnote |
Shepardize: Restrict By Headnote

Environmental Law > Natural Resources & Public Lands > Endangered Species Act > General Overview
Environmental Law > Natural Resources & Public Lands > Fish & Wildlife Protection
International Trade Law > Trade Agreements > Environmental Provisions > Endangered Species
HN3± The Endangered Species Act (ESA) requires the Secretary of the Interior to determine whether particular species should be classified as endangered or threatened and, if so, to adopt measures for the conservation and recovery of such species. A threatened species is defined in the ESA as one which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range. 16 U.S.C.S. § 1532(20). An endangered species is defined as one that is in danger of extinction throughout all or a significant portion of its range. 16 U.S.C.S. § 1532 (6). More Like This Headnote | Shepardize: Restrict By Headnote

Environmental Law > Natural Resources & Public Lands > Endangered Species Act > Enforcement > General Overview
Environmental Law > Natural Resources & Public Lands > Endangered Species Act > Takings
International Trade Law > Trade Agreements > Environmental Provisions > Fish
HN4± With respect to species that have been designated as threatened, the Endangered Species Act (ESA) requires the Secretary of the Interior and, by delegation, the Director of the United States Fish and Wildlife Service to issue such regulations as he deems necessary and advisable to provide for the conservation of such species. 16 U.S.C.S. § 1533(d). The term conservation is specifically defined in the ESA as the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary. 16 U.S.C.S.§ 1532(3). The statutory definition of conservation provides that such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking.Taking is a term of art under the ESA and includes the harming, hunting, shooting or capturing of a member of the animal kingdom. 16 U.S.C.S. § 1532(19). More Like This Headnote |
Shepardize: Restrict By Headnote

Environmental Law > Natural Resources & Public Lands > Endangered Species Act > General Overview
International Trade Law > Trade Agreements > Environmental Provisions > Endangered Species
International Trade Law > Trade Agreements > Environmental Provisions > Fish
HN5± Since 1975, the United States Fish and Wildlife Service (FWS) classifies the grizzly bear as a threatened species under the Endangered Species Act. 40 Fed. Reg. 31,734-36 (1975). The FWS found that the range of the grizzly bear, which at one time was much of the western United States, is now confined to isolated regions in Montana, Idaho and Wyoming. More Like This Headnote | Shepardize: Restrict By Headnote

Criminal Law & Procedure > Defenses > Self-Defense
Governments > Federal Government > Employees & Officials
Real Property Law > Inverse Condemnation > Regulatory Takings

**Exhibit N-2**

Get a Document - by Citation - 1991 U.S. Dist. LEXIS 13426    Page 3 of 15

Case 1:06-cv-01279-CKK    Document 6-10    Filed 07/25/2006    Page 3 of 15

**HN6** United States Fish and Wildlife Service (FWS) regulations generally prohibit the taking of any species that has been classified as endangered or threatened. 50 C.F.R. §§ 17.21, 17.31. As part of the 1975 regulations listing the grizzly bear as a threatened species, the FWS promulgates a series of exceptions to this general prohibition. The regulations provide that a grizzly bear could be taken in self-defense or in defense of others. 40 Fed. Reg. 31,375. The regulations provide that grizzly bears could be taken to remove demonstrable, but non-immediate, threats to human safety or to prevent significant depredations of livestock, provided that reasonable efforts to capture and remove the bears fail and that the taking is done by a state or federal official. These exceptions, with certain minor modifications, remain in place. 50 C.F.R. §§ 17.40(b)(1)(i)(B), 17.40(b)(1)(i)(C). More Like This Headnote

Environmental Law > Natural Resources & Public Lands > Endangered Species Act > Takings
Environmental Law > Natural Resources & Public Lands > Fish & Wildlife Protection
**HN7** The final exception contained in the 1975 regulations provide that a limited number of grizzly bears could be hunted in accordance with Montana law in certain portions of a geographical region described as the Bob Marshall Ecosystem (BME), in northwestern Montana. 40 Fed. Reg. 31,735 (1975). The United States Fish and Wildlife Service (FWS) bases this regulation authorizing a limited hunt on a finding that the BME satisfies the test set forth in 16 U.S.C.S. § 1532(3), that is, the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved. 40 Fed. Reg. 31,735 (1975). The FWS finds that the grizzly bear population in the BME is large enough that bears are now wandering into settled areas where they threaten human safety and commit significant depredations on legally present livestock. Grizzly bear population pressures definitely exist in the BME. The regulations provided that sport hunting in the BME would be stopped when the total number of grizzly bears killed by whatever cause in a given year reaches 25, although no basis for arriving at this particular number is provided. 40 Fed. Reg. 31,735 (1975). More Like This Headnote | Shepardize: Restrict By Headnote

Environmental Law > Natural Resources & Public Lands > Fish & Wildlife Protection
Real Property Law > Inverse Condemnation > Regulatory Takings
**HN8** In 1985, the United States Fish and Wildlife Service (FWS) determines that the 1975 regulations relating to the taking of grizzly bears need to be revised on an emergency basis in order to ensure the conservation of the species in all areas where it occurs. 50 Fed. Reg. 35,087 (1985). In this emergency rule, applicable only to the 1985 hunting season, the FWS reaffirms its earlier finding of population pressures, but reduces the number of bears that could be killed to 15 total or six female bears. 50 Fed. Reg. 35,088 (1985). The FWS also refines the geographical area in which the hunting would be allowed, which is now described as the Northern Continental Divide Ecosystem NCDE. More Like This Headnote | Shepardize: Restrict By Headnote

Environmental Law > Natural Resources & Public Lands > Fish & Wildlife Protection
Real Property Law > Inverse Condemnation > Regulatory Takings
**HN9** In 1986, the United States Fish and Wildlife Service (FWS) issues new permanent regulations relating to the taking of grizzly bears in the Northern Continental Divide Ecosystem (NCDE). 51 Fed. Reg. 33,753-60 (1986). These regulations further refine the boundaries of the geographical area in which hunting would be allowed, and reduces the known annual kill limit from 15 to 14 bears or six female bears. 51 Fed. Reg. 33,754-55 (1986). In addition, the 1986 regulations require the FWS, in cooperation with the State of Montana Department of Fish, Wildlife and Parks (MDFWP), to annually review all grizzly bear mortality data to assess the impact of such mortality in this area. 51 Fed. Reg. 33,760 (1986). There are no subsequent modifications to the 1986 regulations by the FWS, and, in a July 12, 1991 policy statement, the FWS and MDFWP reaffirm their belief in and commitment to the existing regulatory program. Accordingly, the 1986 regulation authorizing the hunting of up to 14 grizzly bears or six females is still in

**Exhibit N-3**

Get a Document - by Citation - 1991 U.S. Dist. LEXIS 13426     Page 4 of 15

Case 1:06-cv-01279-CKK     Document 6-10     Filed 07/25/2006     Page 4 of 15

effect. More Like This Headnote | *Shepardize:* Restrict By Headnote

Administrative Law > Agency Rulemaking > General Overview
Administrative Law > Judicial Review > Standards of Review > Abuse of Discretion
Administrative Law > Judicial Review > Standards of Review > Arbitrary & Capricious Review

**HN10** The standard of review of agency rulemaking is highly deferential. The agency action must be upheld unless it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C.S. § 706. The court is not to substitute its judgment for that of the agency. If the agency complies with the governing law, and there is a rational basis for its action, that action must be upheld. 5 U.S.C.S. § 706. More Like This Headnote

Environmental Law > Natural Resources & Public Lands > Endangered Species Act > Takings
International Trade Law > Trade Agreements > Environmental Provisions > Fish
Real Property Law > Inverse Condemnation > Regulatory Takings

**HN11** Under the Endangered Species Act, the United States Fish and Wildlife Service can authorize a sport hunt of a threatened species such as the grizzly bear, but only in the extraordinary case where population pressures within a given ecosystem cannot otherwise be relieved. 16 U.S.C.S. § 1532(3). More Like This Headnote

Administrative Law > Judicial Review > Standards of Review > General Overview
Environmental Law > Litigation & Administrative Proceedings > Judicial Review

**HN12** Given the United States Fish and Wildlife Service's expertise in the area of wildlife conservation and management and the deferential standard of review, the court begins with a strong presumption in favor of upholding the regulation. Nevertheless, a reviewing court must engage in a substantial inquiry into the facts, one that is searching and careful, to determine whether the agency has a rational basis for its action. More Like This Headnote

Environmental Law > Natural Resources & Public Lands > Fish & Wildlife Protection

**HN13** The United States Fish and Wildlife Service itself takes the position, in the course of explaining its 1986 regulation, that the movement of grizzly bears out of their natural range and into inhabited areas could be due to any of numerous factors, only one of which is an actual increase in bear population. This movement may be attributable to one or a combination of factors, such as availability of bear foods along riparian zones, artificial food sources, climatic changes, loss of previously utilized habitat, or an actual increase in the size of the overall bear population and consequent dispersal. 51 Fed. Reg. 33,755. More Like This Headnote

Environmental Law > Natural Resources & Public Lands > Endangered Species Act > General Overview
International Trade Law > Trade Agreements > Environmental Provisions > Endangered Species

**HN14** Congress, in the Endangered Species Act, refers to population pressures in a limited ecological sense, where the animal exceeds the carrying capacity of its particular ecosystem, rather than in a looser sense of any pressures creating conflict between the animal and persons in surrounding communities. More Like This Headnote

Environmental Law > Natural Resources & Public Lands > Endangered Species Act > General Overview
International Trade Law > Trade Agreements > Environmental Provisions > Endangered Species

**HN15** The environmental impact statement by the State of Montana Department of Fish, Wildlife and Parks in 1986 states that excessive population pressure appears to be basically a social consideration, not solely a biological one. The problem is really a social one in that we must balance bear numbers with what society, especially those living with the bears, will accept, at the same time attaining recovery levels to meet the

**Exhibit N-4**

Case 1:06-cv-01279-CKK   Document 6-10   Filed 07/25/2006   Page 5 of 15

Get a Document - by Citation - 1991 U.S. Dist. LEXIS 13426                                    Page 5 of 15

requirements of the Endangered Species Act. More Like This Headnote

Environmental Law > Natural Resources & Public Lands > Endangered Species Act > Recovery Plans
Environmental Law > Natural Resources & Public Lands > Endangered Species Act > Species Lists
Environmental Law > Natural Resources & Public Lands > Endangered Species Act > Takings
HN16 The Endangered Species Act requires the Secretary of the Interior to develop and implement recovery plans for the conservation and survival of all species that have been listed as endangered or threatened. 16 U.S.C.S. § 1533(f). More Like This Headnote

Administrative Law > Judicial Review > Standards of Review > General Overview
Administrative Law > Judicial Review > Administrative Record > General Overview
Environmental Law > Litigation & Administrative Proceedings > Judicial Review
HN17 If a court is to review an agency's action fairly, it should have before it neither more nor less information than did the agency when it made its decision. More Like This Headnote

Environmental Law > Natural Resources & Public Lands > Fish & Wildlife Protection
HN18 A limited hunt can serve legitimate conservation goals. 51 Fed. Reg. 33,755. 50 Fed. Reg. 35,087. 40 Fed. Reg. 31,735. More Like This Headnote

Environmental Law > Natural Resources & Public Lands > Endangered Species Act > Enforcement > General Overview
Environmental Law > Natural Resources & Public Lands > Endangered Species Act > Takings
Real Property Law > Inverse Condemnation > Regulatory Takings
HN19 The Endangered Species Act, as currently interpreted, does not authorize hunting whenever it would be a sound conservation tool. Congress specifically limits the hunting of a threatened or endangered species to extraordinary cases of population pressures, and the court is constrained to enforce that legislative restriction. More Like This Headnote
| Shepardize: Restrict By Headnote

Environmental Law > Natural Resources & Public Lands > Endangered Species Act > Takings
Environmental Law > Natural Resources & Public Lands > Fish & Wildlife Protection
International Trade Law > Trade Agreements > Environmental Provisions > Endangered Species
HN20 The Endangered Species Act indicates beyond doubt that Congress intends endangered species to be afforded the highest of priorities, and a threatened species is one that the Secretary of the Interior believes likely to become endangered within the foreseeable future. More Like This Headnote

Environmental Law > Natural Resources & Public Lands > Fish & Wildlife Protection
Real Property Law > Inverse Condemnation > Defenses
Real Property Law > Inverse Condemnation > Regulatory Takings
HN21 There exist regulations allowing for the taking of grizzly bears in self-defense or defense of others, and for the taking of bears constituting a demonstrable, but non-immediate threat, to human safety or committing significant depredations to lawfully present livestock, crops, or beehives. 50 C.F.R. §§ 17.40(b)(1)(i)(B), 17.40(b)(1)(i)(C). More Like This Headnote

## JUDGES: [*1]

Michael Boudin, United States District Judge.

**OPINIONBY:** BOUDIN

Exhibit N-5

Get a Document - by Citation - 1991 U.S. Dist. LEXIS 13426　　　　　　　　　　　　Page 6 of 15

Case 1:06-cv-01279-CKK　　Document 6-10　　Filed 07/25/2006　　Page 6 of 15

**OPINION:** MEMORANDUM OPINION

In this case, plaintiffs n1 challenge a regulation promulgated by the Department of the Interior, through the United States Fish and Wildlife Service ("FWS"), authorizing a sport hunt of the grizzly bear in parts of northwestern Montana. Plaintiffs contend that the regulation is invalid because it contravenes the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1532-1544 (1988). They seek a preliminary injunction declaring the regulation invalid and enjoining defendants from authorizing a fall hunt of the grizzly bear, which is scheduled to begin October 1, 1991. The State of Montana has been granted leave to intervene as a defendant.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 Plaintiffs, as they are described in the complaint, are The Fund for Animals, Inc., a 200,000 member non-profit organization based in New York City and Silver Spring, Maryland; Swan View Coalition, a non-profit organization of approximately 75 members, the majority of whom live in Montana; and D.C. "Jasper" Carlton, a naturalist, conservation writer and director of the Biodiversity Legal Foundation, a non-profit conservation organization based in Colorado.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [*2]

The Court has reviewed the memoranda and exhibits submitted by the parties, including the intervenor-defendant, and the administrative record filed herein. In addition, a hearing was held on September 20, 1991, at which the Court heard argument from all parties. This is a close case which involves tension between perceived congressional intent and the latitude normally afforded to a respected government agency seeking to carry out a difficult mandate. Nevertheless, concluding that congressional intent must prevail, the Court finds that the criteria for a preliminary injunction have been met. This memorandum constitutes the Court's findings of fact and conclusions of law. n2

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 In its opposition to the motion for a preliminary injunction, the State of Montana challenges plaintiffs' standing to maintain this action. The State argues that the allegations in the complaint, "even if perhaps sufficient to withstand a motion to dismiss," are so conclusory and speculative as to counsel against the issuance of a preliminary injunction. State of Montana's Opposition to Motion for Preliminary Injunction at 5, 7. At the same time, however, the State acknowledges that <sup>HN1</sup>the ESA expressly authorizes "any person" to bring a civil action to enjoin violations of the statute, 16 U.S.C. § 1540(g)(1)(A), and that Congress therefore intended to provide for standing to the limits of Article III. The State does not challenge any of the factual allegations relating to standing in the complaint, nor has the State cited any case in which a plaintiff in a citizen suit under the ESA has been denied standing based on allegations similar to those in the complaint in this case. For these reasons, the Court believes that, at this juncture, plaintiffs are likely to prevail in establishing that they have standing to maintain this action.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*3]
I. STANDARD FOR PRELIMINARY INJUNCTION.

<sup>HN2</sup>In considering whether a preliminary injunction should issue, the following four factors

Exhibit N-6

Get a Document - by Citation - 1991 U.S. Dist. LEXIS 13426

Case 1:06-cv-01279-CKK    Document 6-10    Filed 07/25/2006    Page 7 of 15

Page 7 of 15

must be evaluated: (1) plaintiffs' likelihood of success on the merits; (2) the potential irreparable injury in the absence of an injunction; (3) the balance of hardships among the parties; and (4) the public interest. Friends For All Children, Inc. v. Lockheed Aircraft Corp., 746 F.2d 816, 834-35 (D.C. Cir. 1984); National Ass'n of Farmworkers Organizations v. Marshall, 628 F.2d 604, 613 (D.C. Cir. 1980).

II. LIKELIHOOD OF SUCCESS ON THE MERITS.

A. Statutory Scheme.

HN3 The ESA requires the Secretary of the Interior to determine whether particular species should be classified as "endangered" or "threatened" and, if so, to adopt measures for the conservation and recovery of such species. n3 A threatened species is defined in the ESA as one "which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). An endangered species, in turn, is defined as one "which is in danger of extinction throughout all or a significant [*4] portion of its range . . . ." Id. at § 1532(6).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 The Secretary of the Interior has delegated duties under the ESA to the Director of the FWS.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

HN4 With respect to species that have been designated as threatened, the ESA requires the Secretary and, by delegation, the Director of the FWS to "issue such regulations as he deems necessary and advisable to provide for the conservation of such species." Id. at § 1533(d). The term "conservation" is specifically defined in the ESA as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." Id. at § 1532(3). The statutory definition of "conservation" goes on to provide, in the language that is most pertinent to this litigation:

Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, [*5] propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking.

Id. (emphasis added). "Taking" is a term of art under the ESA and includes the harming, hunting, shooting or capturing of a member of the animal kingdom. Id. at § 1532(19).

B. The Challenged Regulation.

HN5 In 1975, the FWS classified the grizzly bear as a "threatened" species under the ESA. See 40 Fed. Reg. 31,734-36 (1975). The FWS found that the "the range of the grizzly bear, which at one time was much of the western United States, is now confined to isolated regions in Montana, Idaho and Wyoming." Id. at 31,734. The FWS's decision to classify the grizzly bear as a threatened species has not been challenged.

HN6 FWS regulations generally prohibit the taking of any species that has been classified as endangered or threatened. 50 C.F.R. §§ 17.21, 17.31. As part of the 1975 regulations listing the grizzly bear as a threatened species, the FWS promulgated a series of exceptions to this general

**Exhibit N-7**

Get a Document - by Citation - 1991 U.S. Dist. LEXIS 13426   Page 8 of 15

Case 1:06-cv-01279-CKK    Document 6-10    Filed 07/25/2006    Page 8 of 15

prohibition. For instance, the regulations provided **[*6]** that a grizzly bear could be taken in self-defense or in defense of others. See 40 Fed. Reg. at 31,375. In addition, the regulations provided that grizzly bears could be taken to remove demonstrable but non-immediate threats to human safety or to prevent significant depredations of livestock, provided that reasonable efforts to capture and remove the bears have failed and that the taking is done by a state or federal official. See id. These exceptions have not been challenged in this lawsuit, and, with certain minor modifications, remain in place. See 50 C.F.R. §§ 17.40(b)(1)(i)(B), 17.40(b)(1)(i)(C).

**HN7** The final exception contained in the 1975 regulations provided that a limited number of grizzly bears could be hunted in accordance with Montana law in certain portions of a geographical region described as the Bob Marshall Ecosystem ("BME"), in northwestern Montana. See 40 Fed. Reg. at 31,735. The FWS based this regulation authorizing a limited hunt on a finding that the BME satisfies the test set forth in 16 U.S.C. § 1532(3), that is, "the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved." **[*7]** 40 Fed. Reg. at 31,735. Specifically, the FWS found:

[The] grizzly bear population [in the BME] is large enough that bears are now wandering into settled areas where they threaten human safety and commit significant depredations on legally present livestock. Thus, grizzly bear population pressures definitely exist in the [BME].

Id. The regulations provided that sport hunting in the BME would be stopped when the total number of grizzly bears killed by whatever cause in a given year reaches 25, although no basis for arriving at this particular number is provided. See id.

**HN8** In 1985, the FWS determined that the 1975 regulations relating to the taking of grizzly bears needed to be revised on an emergency basis "in order to ensure the conservation of the species in all areas where it occurs." 50 Fed. Reg. 35,087 (1985). In this emergency rule, applicable only to the 1985 hunting season, the FWS reaffirmed its earlier finding of population pressures, but reduced the number of bears that could be killed to 15 total or six female bears. Id. at 35,088. The FWS also refined the geographical area in which the hunting would be allowed, **[*8]** which is now described as the Northern Continental Divide Ecosystem ("NCDE"). Id.

**HN9** In 1986, the FWS issued new permanent regulations relating to the taking of grizzly bears in the NCDE. 51 Fed. Reg. 33,753-60 (1986). These regulations, among other things, further refined the boundaries of the geographical area in which hunting would be allowed, and reduced the "known annual kill limit" from 15 to 14 bears or six female bears. Id. at 33,754-55. In addition, the 1986 regulations required the FWS, in cooperation with the State of Montana Department of Fish, Wildlife and Parks ("MDFWP"), to "annually review all grizzly bear mortality data . . . to assess the impact of such mortality in this area." Id. at 33,760. The FWS has made no subsequent modifications to the 1986 regulations and, in a July 12, 1991 policy statement, the FWS and MDFWP reaffirmed their belief in and commitment to the existing regulatory program. n4 Accordingly, the 1986 regulation authorizing the hunting of up to 14 grizzly bears or six females is still in effect, and it is this regulation, 50 C.F.R. § 17.40(b)(1)(i)(E), that is challenged in this lawsuit. **[*9]** The MDFWP, which administers the hunting program authorized in the FWS regulation, has scheduled its fall hunting season to begin on October 1, 1991.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 The parties appear in agreement that because this 1991 policy statement is the most recent agency action relating to the regulation authorizing the taking of grizzly bears, the administrative record in this case consists of all information relied upon by the agency up to the issuance of the 1991 statement. The administrative record that was supplied to the Court, however, contains only materials up to the promulgation of the 1986 regulation, although the federal defendants

**Exhibit N-8**

Get a Document - by Citation - 1991 U.S. Dist. LEXIS 13426
Case 1:06-cv-01279-CKK    Document 6-10    Filed 07/25/2006    Page 9 of 15
Page 9 of 15

have indicated that they may submit a supplement to the record containing material up to 1991.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

C. The Standard of Review.

**HN10** The standard of review of agency rulemaking such as the FWS's grizzly bear hunt regulation is highly deferential. The agency action must be upheld unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706; Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson, 685 F.2d 678, 685-86 (D.C. Cir. 1982). **[*10]** The court is not to substitute its judgment for that of the agency. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971). Rather, if the agency has complied with the governing law and there is a rational basis for its action, that action must be upheld. Id.; Ethyl Corp. v. EPA, 541 F.2d 1, 34 (D.C. Cir.), cert. denied, 426 U.S. 941 (1976).

D. The Merits.

**HN11** Under the ESA, the FWS can authorize a sport hunt of a threatened species such as the grizzly bear only in the "extraordinary case where population pressures within a given ecosystem cannot otherwise be relieved." 16 U.S.C. § 1532(3); Sierra Club v. Clark, 755 F.2d 608, 613-18 (8th Cir. 1985) (rejecting, after lengthy analysis of the statutory scheme and the legislative history, the FWS's argument that it had discretion under the statute to authorize a regulated taking of a threatened species whenever it found such a taking "necessary and advisable"). n5 The central issue in this case, therefore, is whether the FWS's determination that the NCDE represents an "extraordinary case" of grizzly bear "population pressures" is **[*11]** arbitrary and capricious. n6

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 Defendants do not dispute that, as the Eight Circuit held in Sierra Club, a finding of population pressures is a statutory prerequisite to the authorization of a hunt of a threatened species.

n6 This memorandum does not address the second issue under the statute, namely, whether the FWS's conclusion that population pressures could not be "otherwise . . . relieved" was rationally supported.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**HN12** Given the FWS's expertise in the area of wildlife conservation and management and the deferential standard of review, the Court begins with a strong presumption in favor of upholding the regulation. Nevertheless, a reviewing court "must engage in a 'substantial inquiry' into the facts, one that is 'searching and careful,'" to determine whether the agency had a rational basis for its action. Ethyl Corp., 541 F.2d at 35 (quoting Citizens to Preserve Overton Park, 401 U.S. at 415)). Based on this preliminary review, the Court concludes that plaintiffs have **[*12]** shown a likelihood -- although not a certainty -- of success on the merits.

Direct evidence of the existence or nonexistence of population pressures would consist of a comparison of the actual number of grizzly bears with the carrying capacity of the ecosystem. However, there does not appear to be reliable data that would permit this comparison. Indeed, at the same time that it promulgated its initial 1975 regulation authorizing a sport hunt, the FWS

**Exhibit N-9**

Get a Document - by Citation - 1991 U.S. Dist. LEXIS 13426                Page 10 of 15

Case 1:06-cv-01279-CKK    Document 6-10    Filed 07/25/2006    Page 10 of 15

candidly stated that

> there appear to be certain gaps in the scientific information relating to grizzly bears. Specifically lacking are better data on habitat condition or carrying capacity, total numbers, annual reproduction and mortality, and most importantly, annual turnover and population trends. This lack of information greatly hinders the present management program for grizzly bears . . . .

40 Fed. Reg. 31,734. n7 Defendants contend, however, that such data should not be a necessary condition to a finding of population pressure. They argue that the FWS's authorization of a regulated grizzly bear hunt in the NCDE was not arbitrary and capricious because it was premised upon evidence in the administrative record [*13] that increasing numbers of grizzly bears had been observed moving outside the bears' traditional range, which had resulted in an increased number of bear-human conflicts and increased incidents of property damage and livestock depredation.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n7 Similarly, an environmental impact statement prepared by the MDFWP in 1986, which is part of the administrative record in this case, states, "It does not appear that grizzly bear population pressure (or lack of pressure) can be biologically demonstrated at present or in the immediate future." MDFWP, Final Programmatic Environment Impact Statement: The Grizzly Bear in Northwestern Montana (March 1986) at 164 (Administrative Record No. 91).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Defendants offer two theories as to why the FWS's finding of population pressures was rationally based on this underlying datum. First, defendants argue that the movement of bears outside their natural range is a "secondary effect" of population pressures -- i.e., that population pressures within the range are what is causing an increasing [*14] number of bears to move elsewhere. The difficulty with this argument in this case is that HN13 the FWS itself has taken the position, in the course of explaining its 1986 regulation, that the movement of grizzly bears out of their natural range and into inhabited areas could be due to any of numerous factors, only one of which is an actual increase in bear population:

> This movement may be attributable to one or a combination of factors, such as availability of bear foods along riparian zones, artificial food sources (livestock carcass dumps, beehives, etc.), climatic changes, loss of previously utilized habitat, or an actual increase in the size of the overall bear population and consequent dispersal.

51 Fed. Reg. 33,755. No basis has been supplied for attributing the movement of bears in this instance to a population increase -- let alone to an excess of bears in the ecosystem -- as opposed to any of the numerous other factors listed by the FWS. Indeed, in the 1986 statement, the FWS continued to express concern and uncertainty about actual existing bear population. See id. ("In order to achieve recovery of the grizzly population in the NCDE, the conservation program [*15] must be geared toward increasing the existing population rather than just maintaining stability.").

Defendants' second argument is that increased movement of bears into inhabited areas and increased bear-human conflicts constitute "population pressures" in and of themselves. That is, defendants would define "population pressures" broadly to include not merely the limited notion of more bears than the ecosystem could support, but also other pressures upon the bear population that create conflict between bears and humans living in the same area. n8 As presently advised, the Court does not believe that this interpretation of the statutory language is supportable. In the conference report submitted with the ESA, the "population pressures"

Exhibit N-10

Get a Document - by Citation - 1991 U.S. Dist. LEXIS 13426

Case 1:06-cv-01279-CKK    Document 6-10    Filed 07/25/2006    Page 11 of 15

Page 11 of 15

provision in section 1532(3) is explained as follows:

In extreme circumstances, as where a given species exceeds the carrying capacity of its particular ecosystem and where this pressure can be relieved in no other feasible way, this "conservation" might include authority for carefully controlled taking of surplus members of the species. To state that this possibility exists, however, in no way is intended to suggest that this extreme situation **[*16]** is likely to occur -- it is just to say that the authority exists in the unlikely event that it ever becomes needed.

Conf. Rep. No. 740, 93rd Cong., 1st Sess. 23, reprinted in 1973 U.S. Code Cong. & Admin. News 2989, 3001-02 (emphasis added). This language indicates that $^{HN14}$Congress was referring to "population pressures" in a limited ecological sense -- where the animal "exceeds the carrying capacity of its particular ecosystem" -- rather than in a looser sense of any pressures creating conflict between bears and persons in surrounding communities.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n8 This broad notion of population pressures is explicit in $^{HN15}$the environmental impact statement prepared by the MDFWP in 1986, which states:

Excessive population pressure . . . appears to be basically a social consideration, not solely a biological one . . . . Therefore, the problem is really a social one in that we must balance bear numbers with what society (especially those living with the bears) will accept, at the same time attaining recovery levels to meet the requirements of the ESA . . . .

MDFWP, Final Programmatic Environmental Impact Statement, supra note 7, at 164 (emphases in original).

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*17]**

Thus, it appears unlikely that the explanations offered by FWS provide a rational basis for concluding that population pressures in the sense intended by Congress existed in the NCDE as of 1986. The Court has made an additional, preliminary effort to examine the administrative record on its own to see whether there is nevertheless sufficient evidence in that record to support a finding of population pressures. This effort, however, has not been fruitful; in fact, material in the administrative record may corroborate the conclusion that no rational finding of population pressures could be made in 1986. For example, the FWS's 1982 recovery plan for the grizzly bear n9 states that there is

no evidence to indicate that numbers of grizzly bears in the [NCDE] are increasing. When the added stress of increasing habitat encroachment by increasing numbers of people is considered, the trend may be a decreasing population and the need for action is obvious.

FWS, Grizzly Bear Recovery Plan (Jan. 29, 1982) at 12 (Administrative Record No. 17). Similarly, an undated report by a task force set up in 1983 to study grizzly bear population trends in this region concluded:

The available population **[*18]** data did not permit the task force to estimate total numbers of bears, to detect any significant trend or even to confirm stability in the grizzly bear population of the Northern Continental Divide Ecosystem.

Northern Continental Divide Grizzly Bear Ecosystem Population Size and Trend . . . A Task Force Report (undated) at 1 (Administrative Record No. 38). n10

**Exhibit N-11**

Get a Document - by Citation - 1991 U.S. Dist. LEXIS 13426

Case 1:06-cv-01279-CKK    Document 6-10    Filed 07/25/2006    Page 12 of 15

Page 12 of 15

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n9 **HN16** The ESA requires the Secretary to develop and implement "recovery plans" for the conservation and survival of all species that have been listed as endangered or threatened. 16 U.S.C. § 1533(f).

n10 A memorandum written by the FWS's Grizzly Bear Recovery Coordinator prior to the issuance of this task force report indicates that the FWS was hopeful that the report would provide "a biological basis for the legal hunt [of the grizzly bear] in [Montana] for the first time." Memorandum from FWS Grizzly Bear Recovery Coordinator to Assistant Regional Director, Federal Aid/Endangered Species (Jan. 3, 1984) (Administrative Record No. 41).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Although as noted **[*19]** earlier the administrative record submitted to the Court stops in 1986, see supra note 4, the parties have submitted post-1986 material in the form of exhibits and affidavits. It is not clear, however, which of these materials were before the agency and therefore part of an arguable post-1986 expansion of the administrative record. Accordingly, although the Court has reviewed these materials, their usefulness at this stage is not clear. See Walter O. Boswell Memorial Hospital v. Heckler, 749 F.2d 788, 792 (D.C. Cir. 1984) ("**HN17** If a court is to review an agency's action fairly, it should have before it neither more nor less information than did the agency when it made its decision."). Nevertheless, because the post-1986 material submitted by the FWS -- an affidavit of its Grizzly Bear Recovery Coordinator, and attached exhibits -- is most likely to incorporate material that may become part of the ultimate record in this case, the court has given it particular consideration.

It is true that there may be some support in this material for the existence of population pressures in the Rocky Mountain East Front ("RMF"), a sub-region of the NCDE. See Affidavit of **[*20]** Christopher Servheen, Exhibit 1 to Federal Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction at para. 6. The hunting authorized by the challenged regulation, however, is not limited to this area. Moreover, any argument that the FWS has relied upon post-1986 information to fill a gap in the biological evidence of population pressures that existed in 1986 is dubious in light of the FWS's July 12, 1991 policy statement explaining its continued support for the 1986 regulation. In this policy statement, the FWS does not mention the RMF or population pressures generally; instead, its explanation for the hunt is limited to the following:

The limited fall and spring hunt in a portion of the [NCDE] is a sound biological approach to the management of the grizzly. Some grizzly bears do move onto private lands and cause repeated damage to private property. They have, in some instances, become aggressive and dangerous and a threat to human health and safety when they occupy areas close to people and lose their normal avoidance behaviors. A successful grizzly bear recovery program must allow for an increasing population while minimizing direct aggression towards people **[*21]** and their property. There is no other feasible way to maintain the grizzly bear's natural human avoidance behaviors than by maintaining a selective low level hunter harvest over a portion of the population. This coupled with removal of those nuisance grizzly bears . . . will insure the recovery of the grizzly bear in the NCDE.

FWS and MDFWP Joint Policy Statement (July 12, 1991), Exhibit F to Plaintiffs' Memorandum in Support of Their Motion for a Preliminary Injunction.

Defendants forcefully argue that a limited hunt of the grizzly bear creates a wariness of humans, which protects the bears by confining them to their range and reducing bear-human conflicts, and which, in the long run, promotes the conservation and recovery of the species. This rationale

**Exhibit N-12**

Get a Document - by Citation - 1991 U.S. Dist. LEXIS 13426

Case 1:06-cv-01279-CKK    Document 6-10    Filed 07/25/2006    Page 13 of 15

Page 13 of 15

for the hunt is set forth by the FWS in its published explanations of the grizzly bear hunt in 1975, 1985 and 1986, along with, in the latter two years, citation to studies supporting the notion that [HN18] a limited hunt can serve legitimate conservational goals. See 51 Fed. Reg. 33,755; 50 Fed. Reg. 35,087; 40 Fed. Reg. 31,735. The 1991 policy statement, quoted above, reaffirms this [*22] rationale.

The difficulty is that [HN19] the statute, as currently interpreted, does not authorize hunting whenever it would be a sound conservational tool. Congress has specifically limited the hunting of a threatened or endangered species to extraordinary cases of population pressures, and the Court is constrained to enforce that legislative restriction. See Sierra Club v. Clark, 577 F. Supp. 783, 790 (D. Minn. 1984) (concluding that "reducing the level of wolf-human contact" is not a valid basis for authorizing a regulated taking under the ESA), aff'd in part and rev'd in part on other grounds, 755 F.2d 608 (8th Cir. 1985).

Finally, the federal defendants argue that the FWS regulation authorizing a sport hunt has already been upheld by the Ninth Circuit in Christy v. Hodel, 857 F.2d 1324 (9th Cir. 1988), cert. denied, 490 U.S. 1114 (1989). In Christy, a sheep rancher was fined $ 2500 for violating FWS regulations by shooting a grizzly bear that he believed to have been attacking his flock. See id. at 1326-27. Christy argued that the FWS regulations relating to the taking of grizzly [*23] bears violated his right to equal protection of the laws because on the one hand they allowed limited sport hunting of grizzly bears, while on the other they prevented Christy from taking a bear in defense of his property. Id. at 1332. The Ninth Circuit, applying a lenient standard of review under which the regulatory classification would be upheld if it has some "rational basis" and "any state of facts can be conceived to justify it," id. at 1331-32 (citing Dandridge v. Williams, 347 U.S. 471, 485 (1970)), concluded that the grizzly bear hunt regulation withstood the sheep rancher's equal protection challenge and had a "rational basis," id. at 1334.

Despite the rational basis language, there is no indication that the court in Christy was faced with the frontal challenge made in this case. Here, the plaintiffs persuasively set forth a narrow interpretation of the statutory language, and then in detail seek to undermine the agency's reasoning offered to satisfy the demands of that narrow reading. This kind of challenge simply does not appear to have been made in Christy, and the Court therefore does not believe [*24] that the issue in this case was embraced in the Ninth Circuit's holding.

III. IRREPARABLE INJURY, THE PUBLIC INTEREST AND THE BALANCE OF HARMS.

Plaintiffs argue that once the Court finds a likelihood that agency action is in violation of the ESA, irreparable injury is presumed; the Court must enjoin the action and does not possess the traditional equitable discretion to balance the equities. Plaintiffs rely on the Supreme Court's decision in Tennessee Valley Authority v. Hill, 437 U.S. 153 (1978) ("TVA").

The Court does not believe that TVA compels the Court to issue an injunction in this case upon a finding of likelihood of success. In TVA, it was stipulated that completion of the construction project at issue -- the Tellico Dam on the Little Tennessee River -- would result in the complete elimination of an endangered species. See id. at 171. Thus, the question presented in TVA was "whether the [ESA] requires a court to enjoin the operation of a virtually completed federal dam . . . when . . . the Secretary of the Interior has determined that operation of the dam would eradicate an endangered species." Id. at 156. [*25]

In this case, by contrast, there is not the remotest possibility that the limited hunting of the grizzly bear during the period in which a preliminary injunction would be in place will eradicate the species. Defendants estimate that approximately three bears are likely to be taken during the fall hunt; in no event could that number be more than nine. The FWS's most recent estimate is that there are between 440 and 680 bears in this ecosystem. See FWS, 1990 Draft Grizzly Bear Recovery Plan, Exhibit A to Plaintiffs' Memorandum in Support of Their Motion for a Preliminary Injunction at 5. Accordingly, the Court does not believe that the Supreme Court's

**Exhibit N-13**

Get a Document - by Citation - 1991 U.S. Dist. LEXIS 13426    Page 14 of 15

Case 1:06-cv-01279-CKK    Document 6-10    Filed 07/25/2006    Page 14 of 15

decision in TVA compels the issuance of an injunction. n11

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n11 Moreover, the language in TVA suggesting that an injunction is compelled under the ESA in light of the facts of that case was addressed to a permanent injunction following trial, rather than a preliminary injunction at the outset of the litigation. See TVA, 437 U.S. at 193-94.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - [*26]

Nevertheless, TVA does underscore the weight Congress has placed on the protection of endangered and threatened species. As the Court stated, "HN20 the [ESA] indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities," id. at 174, and a threatened species is one that the Secretary believes likely to become endangered within the foreseeable future. In light of this Congressional mandate, the loss even of the relatively few grizzly bears that are likely to be taken through a sport hunt during the time it will take to reach a final decision in this case is a significant, and undoubtedly irreparable, harm.

On the other side of the scale, the Court is sensitive to the harms articulated by defendants that may result from the issuance of a preliminary injunction. The success of the grizzly bear conservation program depends upon the continued support of the people of the State of Montana, who live and work in close proximity to the bears, and who must have confidence that they have the flexibility to deal with the difficult problems that arise in managing the bear population. This confidence, it is said, would be undermined [*27] by an eleventh-hour injunction upsetting a federal-state program that has been in place for a number of years.

These concerns, although not without merit, are tempered by HN21 the existence of regulations, unchallenged in this litigation, allowing for the taking of grizzly bears in self-defense or defense of others, and for the taking of bears "constituting a demonstrable but non-immediate threat to human safety or committing significant depredations to lawfully present livestock, crops, or beehives . . . ." 50 C.F.R. §§ 17.40(b)(1)(i)(B), 17.40(b)(1)(i)(C). These regulations give Montanans considerable flexibility in managing the bear population; the only activity that is being enjoined here pending a final decision on the merits is the sport hunting of the bears. n12

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n12 The Court has been advised that 1991 is the first year that Montana has scheduled two hunting seasons, spring and fall, for the grizzly bear. In years past, only a fall hunting season has been held. The spring 1991 hunting season already has taken place. Thus, even with the preliminary injunction, there will be one grizzly bear hunting season in 1991, as in the preceding years.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*28]
IV. CONCLUSION

For the foregoing reasons, the Court concludes that the standard for a preliminary injunction has been met. Accordingly, an order will issue preliminarily declaring 50 C.F.R. § 17.40(b)(1)(i)(E) invalid and enjoining the federal defendants from authorizing the sport hunting of grizzly bears in the NCDE pendente lite.

**Exhibit N-14**

Get a Document - by Citation - 1991 U.S. Dist. LEXIS 13426

Case 1:06-cv-01279-CKK    Document 6-10    Filed 07/25/2006    Page 15 of 15

Page 15 of 15

ORDER - September 27, 1991, Filed

This matter comes before the Court on plaintiffs' motion for a preliminary injunction. The Court has reviewed the memoranda in support and opposition thereto, and the entire record herein. Based on the explanation, findings of fact and conclusions of law set forth in the Court's Memorandum Opinion issued on this date, which is incorporated herein, it is hereby

ORDERED that plaintiffs' motion for a preliminary injunction is GRANTED; and it is further

ORDERED that until a final decision has been reached in this case, 50 C.F.R. § 17.40(b)(1)(i)(E) is declared invalid and the Department of the Interior and the Fish and Wildlife Service are enjoined from authorizing the hunting of grizzly bears in the NCDE.

*IT IS SO ORDERED.*

Service: **Get by LEXSEE®**
Citation: **1991 U.S. Dist. LEXIS 13426**
View: Full
Date/Time: Thursday, July 13, 2006 - 11:15 AM EDT

\* Signal Legend:
● - Warning: Negative treatment is indicated
■ - Questioned: Validity questioned by citing refs
▲ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
ⓘ - Citation information available

\* Click on any *Shepard's* signal to *Shepardize®* that case.



About LexisNexis | Terms & Conditions
Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

**Exhibit N-15**