UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HUMANE SOCIETY OF THE UNITED STATES,  et al.,<br><br>　　　　　Plaintiffs,<br>　　v.<br><br>DIRK KEMPTHORNE, et al.,<br><br>　　　　　Defendants | )<br>)<br>)<br>)<br>)　　Civ. No. 06-1279 (CKK)<br>)<br>)<br>)<br>)<br>)<br>) |

**FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

PAGE

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.     STATUTORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.    FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      A.    Recovery Progress Under the Recovery Plan for the Eastern United States . . . . . 6

      B.    Controlling Depredating Gray Wolves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III.   LEGAL STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      A.    Grant of a Preliminary Injunction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      B.    The Court Retains Equitable Discretion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      C.    The Applicability of the Administrative Procedure Act . . . . . . . . . . . . . . . . . . . 15

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

I.     PLAINTIFFS HAVE NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON
      THE MERITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      A.    The Wisconsin permit represents a lawful exercise of the FWS's Section
            10(a)(1)(A) permitting authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      B.    The FWS's factual determination that the depredation control program will
            enhance the survival of the species as a whole was correct and is entitled to
            substantial deference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      C.    The FWS's interpretation of Section 10(a)(1)(A) is consistent with past agency
            practice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      D.    Section 10(a)(1)(A) permits are not the regulatory equivalent of the enjoined
            4(d) rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

II.    PLAINTIFFS HAVE FAILED TO DEMONSTRATE IRREPARABLE HARM . . . . . 29

III.   THE ISSUANCE OF AN INJUNCTION WILL HARM OTHER INTERESTED
       PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

IV.    AN INJUNCTION WILL NOT SERVE THE PUBLIC INTEREST . . . . . . . . . . . . . . 33

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

## TABLE OF AUTHORITIES

<u>CASES</u>                                                                                                    <u>PAGE</u>

<u>American Iron & Steel Inst. v. EPA</u>, 115 F.3d 979, 1005 (D.C. Cir.1997) . . . . . . . . . . . . . . . . . 3

<u>Animal Legal Defense Fund, Inc. v. Glickman</u>, 204 F.3d 229, 235 (D.D.C. 2000) . . . . . . . . 2, 23

<u>Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon</u>, 515 U.S. 687 (1995). . . . . . 5, 19

<u>Baltimore Gas & Elec. Co. v. NRDC</u>, 462 U.S. 87, 103 (1983) . . . . . . . . . . . . . . . . . . . . . . . . 2

<u>Barnhart v. Walton</u>, 535 U.S. 212, 220 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

<u>Bradshaw v. Veneman</u>, 338 F.Supp.2d 139, 141 (D.D.C.2004) . . . . . . . . . . . . . . . . . . . . . . . . 13

<u>Chevron U.S.A., Inc. v. Natural Resources Defense Council</u>, 467 U.S. 837, 843-44 (1984) . . . . 3

<u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402 (1971) . . . . . . . . . . . . . . . 15, 16

<u>Coal Employment Project v. Dole</u>, 889 F.2d 1127, 1131 (D.C.Cir.1989) . . . . . . . . . . . . . . . . . 19

<u>Cobell v. Norton</u>, 391 F.3d 251, 258 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

<u>Davis v. Latschar</u>, 202 F.3d 359, 365 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

<u>Defenders of Wildlife v. Norton</u>, 354 F. Supp. 2d 1156, 1170-71 . . . . . . . . . . . . . . . . . . . . . . 7, 8

<u>Fund for Animals v. Norton</u>, 374 F. Supp. 2d 91, 98 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . 12, 13

<u>Fund for Animals, Inc. v. Turner</u>, 1991 WL 206232, *8 (D.D.C. 1991) . . . . . . . . . . . . . . . . . . 30

<u>Granny Goose Foods, Inc. v. Teamsters</u>, 415 U.S. 423, 442-43 (1974) . . . . . . . . . . . . . . . . . . 12

<u>GTE Corp. v. Williams</u>, 731 F.2d 676, 679 (10th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

<u>Kansas Health Care Ass'n, Inc. v. Kansas Dept. of Social and Rehabilitation Services</u>,
  31 F.3d 1536, 1543-44 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 31

<u>Louisiana Ass'n of Independent Producers v. FERC</u>, 958 F.2d 1101, 1117
  (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Lydo Enters., Inc. v. City of Las Vegas, 745 F.2d 1211, 1213 (9th Cir. 1984) . . . . . . . . . . . . . 13

Majorica, S.A. v. R.H. Macy & Co., 762 F.2d 7, 8 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . 13

Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Nat'l Ass'n of Farmworkers Orgs. v. Marshall, 628 F.2d 604, 613 (D.C. Cir. 1980) . . . . . . . . 13

Nat'l Council of Arab Americans v. City of New York, 331 F. Supp. 2d 258, 265
   (D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

National Ass'n of Home Builders v. Norton, 298 F.Supp.2d 68, 72 (D.D.C. 2003) . . . . . . . . . . 5

National Trust for Historic Pres. v. Dole, 828 F.2d 776, 781 (D.C. Cir. 1987) . . . . . . . . . . . . 15

National Wildlife Federation v. Norton, 2005 WL 2000712 (D.Vt. 2005) . . . . . . . 8, 9,10, 11, 12

New York v. U.S. E.P.A., 852 F.2d 574, 580 (D.C.Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

North Slope Borough v. Andrus, 486 F. Supp. 325, 329 (D. D.C. 1979) . . . . . . . . . . . . . . . 14, 15

OSG Bulk Ships, Inc. v. United States, 132 F.3d 808, 814 (D.C.Cir.1998) . . . . . . . . . . . . . . . 19

Serono Labs., Inc. v. Shalala, 158 F.3d 1313, 1317-18, 332 U.S. App. D.C. 407
   (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Sierra Club v. Clark, 755 F.2d 608, 614 n. 8 (8th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Southern Co. Services, Inc. v. FCC, 313 F.3d 574, 580 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . 16

Southwest Center for Biological Diversity v. United States Forest Serv., 100 F.3d 1443, 1449
   (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Tennessee Valley Authority v. Hill, 437 U.S. 153, 180 (1978) . . . . . . . . . . . . . . . . . . . . . . . 4, 14

Underwater Exotics, Ltd. v. Secretary of the Interior, 1994 WL 80878
   (D.D.C. February 28, 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc., 182 U.S. App. D.C. 220, 559
   F.2d 841, 843 (D.C. Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Water Keeper Alliance v. United States Dep't of Defense, 271 F.3d 21, 34 (1st Cir. 2001) . . . 30

World Wildlife Fund v. Hodel, 1988 WL 66193 (D.D.C. June 17, 1988) . . . . . . . . . . . . . . . . . 15

STATUTES AND REGULATIONS

16 U.S.C. § 1531(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
16 U.S.C. § 1532(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 29, 34
16 U.S.C. § 1532(19) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 18
16 U.S.C. § 1533 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
16 U.S.C. § 1533(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
16 U.S.C. § 1538(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 18
16 U.S.C. § 1539(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 6, 18, 29, 30, 31
16 U.S.C. § 1539(a)(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

50 C.F.R. § 17.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
50 C.F.R. § 17.22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
50 C.F.R. § 17.31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
50 C.F.R. § 402.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
50 C.F.R. § 424.02(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

39 Fed. Reg. 1158 (Jan. 4, 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 6
41 Fed. Reg. 17740 (April 28, 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
43 Fed. Reg. 9607 (March 9, 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
68 Fed. Reg. 15812 (April 1, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

LEGISLATIVE HISTORY

House Report No. 97-567 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

v

## INTRODUCTION

Plaintiffs, the Humane Society of the United States, et al., have asserted claims pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (2), and the Endangered Species Act ("ESA"), 16 U.S.C. § 1533, et seq., claiming that Defendants, Secretary of the Interior Dirk Kempthorne, the United States Department of the Interior, H. Dale Hall, Director of the United States Fish and Wildlife Service ("FWS" or the "Service"), and the FWS, erred in issuing a permit under Section 10(a)(1)(A), 16 U.S.C. § 1539(a)(1)(A), to the state of Wisconsin ("Wisconsin permit"). See Plaintiffs' Complaint at ¶¶ 40-45. The Wisconsin permit authorizes the take of a limited number of gray wolves, *Canis lupus,* for scientific and depredation abatement purposes. See Wisconsin Permit, Administrative Record ("AR") 7 at 1-2 (Exhibit 1). On July 25, 2006, Plaintiffs filed a motion for a preliminary injunction asking the Court to enjoin the effect of the Wisconsin Permit. See Plaintiffs' Motion for a Preliminary Injunction and Memorandum in Support of Motion for a Preliminary Injunction ("Pls' Mem"), Docket No. 5. Federal Defendants hereby oppose Plaintiffs' motion for preliminary injunction because, as demonstrated in detail below, they have no likelihood of success on the merits and they have not carried their burden of demonstrating that the balance of hardships tip in their favor.[1]

The Section 10(a)(1)(A) permit issued to the state of Wisconsin marks the culmination of a rulemaking process that drew upon the collective knowledge and expertise of FWS biologists, the Wisconsin Department of Natural Resources, other federal agencies, tribes, members of the Eastern Gray Wolf Recovery Team, and the careful evaluation of independent evidence and

---

[1] Further, Defendants have no objection to the Court consolidating its ruling on Plaintiffs' motion for a preliminary injunction with a decision on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2).

available data.  The Administrative Record demonstrates that the FWS has proceeded with great caution in deciding to issue the Wisconsin permit.  The issuance of the Wisconsin permit is based upon the recognized need for depredation control actions: actions that have become necessary only as a result of the remarkable steps toward recovery achieved by the gray wolf over the last three decades of ESA protection.  Subspecies of the gray wolf were included in the first list of species protected under the ESA.  39 Fed. Reg. 1158 (Jan. 4, 1974) (listing as endangered the Eastern timber wolf, *Canis lupus lycaon*, and the Northern Rocky Mountain wolf, *Canis lupus irremotus*).  Since that time, the FWS has developed successful recovery programs for the gray wolf in the eastern United States and the Northern Rocky Mountains that have brought these populations from the brink of extinction to the brink of full recovery.  <u>See Proposal to Remove the Western Great Lakes Distinct Population Segment of the Gray Wolf from the List of Endangered and Threatened Wildlife</u>, 71 Fed. Reg. 15266 (March 27, 2006) (noting that the gray wolf population in Minnesota, Wisconsin, and Michigan "greatly exceeds the numerical recovery criteria established in its recovery plan").

      In deciding to issue the Wisconsin permit, the FWS reasonably relied on the judgment and expertise of its biologists to sift through available scientific data and guide the agency toward a final decision.  <u>See</u> <u>Animal Legal Defense Fund, Inc. v. Glickman</u>, 204 F.3d 229, 235 (D.D.C. 2000); <u>New York v. U.S. E.P.A.</u>, 852 F.2d 574, 580 (D.C.Cir.1988).  In the course of evaluating Wisconsin's application, the FWS stood at the "frontiers of science," a place where reviewing courts are at their "most deferential."  <u>Baltimore Gas & Elec. Co. v. NRDC</u>, 462 U.S. 87, 103 (1983).  In such circumstances, courts have consistently deferred to the agency, finding that in a battle of conflicting viewpoints, a federal agency must have the discretion to rely upon

the reasonable opinions of its own qualified experts, even if, as an original matter, a court might

find other views more persuasive.  See Marsh v. Oregon Natural Resources Council, 490 U.S.

360, 378 (1989); Animal Legal Defense Fund, 204 F.3d at 235 (noting that "[w]here Congress

delegates power to an agency to regulate on the borders of the unknown, courts cannot interfere

with reasonable interpretations of equivocal evidence; courts are most deferential of agency

readings of scientific evidence") (internal quotations and citation omitted).

      The issuance of the Wisconsin permit also required the FWS to interpret certain

undefined terms and ambiguous provisions of the ESA.  Specifically, the FWS had to determine

whether the ESA authorizes the issuance of a Section 10(a)(1)(A) permit for depredation control

purposes.  In such circumstances, the Supreme Court has concluded that an agency's

interpretation of a statute that it administers and of its own regulations are entitled to

"considerable weight," because where "Congress has explicitly left a gap for the agency to fill,

there is an express delegation of authority to the agency to elucidate a specific provision of the

statute by regulation."  Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S.

837, 843-44 (1984).  The FWS's interpretation of Section 10(a)(1)(A) – that wolf depredation

control actions enhance the survival of the species as a whole – is accorded particular deference

because it is consistent with the FWS's longstanding interpretation of the ESA.  See Barnhart v.

Walton, 535 U.S. 212, 220 (2002) (noting that "this Court will normally accord particular

deference to an agency interpretation of 'longstanding' duration") (citation omitted).

      The Court should deny Plaintiffs' request for a preliminary injunction because the

decisions reflected in the Wisconsin permit were based upon a lawful interpretation of ESA

Section 10 and its implementing regulations, and the permit represents a reasonable choice in

light of the applicable law and relevant facts.  See American Iron & Steel Inst. v. EPA, 115 F.3d 979, 1005 (D.C. Cir.1997).  Although Plaintiffs have successfully demonstrated that they disagree with the FWS's decision to permit Wisconsin to implement a limited depredation control program, they cannot carry their heavy burden of demonstrating that the FWS's decision was arbitrary and capricious.  Consequently, because Plaintiffs have no likelihood of success on the merits of their claim, and for all the reasons discussed below, Plaintiffs' request for emergency injunctive relief should be denied.

## BACKGROUND

### I.    STATUTORY BACKGROUND

Enacted in 1973, the Endangered Species Act, is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."  Tennessee Valley Authority v. Hill, 437 U.S. 153, 180 (1978).  Among the congressionally identified purposes of the Act are: (1) "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and (2) "to provide a program for the conservation of such endangered species and threatened species."  16 U.S.C. § 1531(b).  The terms "conserve," "conserving," and "conservation" are defined as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary."  16 U.S.C. § 1532(3); 50 C.F.R. § 424.02(c).  Such methods and procedures may include, but are not limited to, scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, transplantation, and, in the appropriate circumstances, regulated taking.  Id.

Section 9 of the ESA makes it unlawful for any person (including the federal government) to "take" a listed species.  16 U.S.C. § 1538(a)(1)(B); 50 C.F.R. § 17.31 (extending "take" prohibition to threatened species).  "Take" is defined in the statute as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect . . . ."  16 U.S.C. § 1532(19).  "Harm" has been further defined to include "significant habitat modification or degradation" that "actually kills or injures wildlife."  50 C.F.R. § 17.3; see Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon, 515 U.S. 687 (1995).  "Harass" has been defined to include an act or omission that "creates the likelihood of injury to wildlife by annoying it so such an extent as to significantly disrupt normal behavioral patterns, which include . . . feeding."  50 C.F.R. § 17.3.

Section 10(a)(1)(A) of the ESA authorizes the Secretary to permit certain activities that would otherwise be prohibited under Section 9.  16 U.S.C. § 1539(a)(1)(A).  Specifically, under Section 10(a)(1)(A), the Secretary "may permit . . . any act otherwise prohibited by [Section 9] for scientific purposes or to enhance the propagation or survival of the affected species." 16 U.S.C. § 1539(a)(1)(A).[2/]  The FWS has issued regulations, which set forth the following factors that the FWS considers in determining whether to issue a Section 10(a)(1)(A) permit:

> (i) Whether the purpose for which the permit is required is adequate to justify removing from the wild or otherwise changing the status of the wildlife sought to be covered by the permit;
>
> (ii) The probable direct and indirect effect which issuing the permit would have on the wild populations of the wildlife sought to be covered by the permit;
>
> (iii) Whether the permit, if issued, would in any way, directly or indirectly, conflict with any known program intended to enhance the survival probabilities of the population from which the wildlife sought to be covered by the permit was or

---

[2/] The Section 10(a)(1)(A) permits are typically referred to as either scientific or "recovery" permits.  See  National Ass'n of Home Builders v. Norton, 298 F.Supp.2d 68, 72 (D.D.C. 2003).

would be removed;

(iv) Whether the purpose for which the permit is required would be likely to reduce the threat of extinction facing the species of wildlife sought to be covered by the permit;

(v) The opinions or views of scientists or other persons or organizations having expertise concerning the wildlife or other matters germane to the application; and

(vi) Whether the expertise, facilities, or other resources available to the applicant appear adequate to successfully accomplish the objectives stated in the application.

50 C.F.R. §17.22.  Once a Section 10(a)(1)(A) permit is issued, it is subject to revocation if the

FWS finds that the permittee is not in compliance with the terms and conditions of the permit. 16

U.S.C. § 1539(a)(2)(C).

## II.     FACTUAL BACKGROUND

The Fish & Wildlife Service listed subspecies *Canis lupus lycaon* and *Canis lupus irremotus* as endangered species on the first list of species protected under the ESA, 39 Fed. Reg. 1158 (Jan. 4, 1974), and added *Canis lupus baileyi* and *Canis lupus monstrabilis* to the list of endangered species in 1976.  41 Fed. Reg. 17740 (Apr. 28, 1976).  In March 1978, the FWS published a rule re-listing the gray wolf at the species level (*Canis lupus*) to eliminate problems inherent in the prior practice of listing the gray wolf by subspecies.  43 Fed. Reg. 9607 (March 9, 1978).  Under the 1978 rulemaking, the gray wolf was listed as threatened in Minnesota and endangered throughout the remaining 47 conterminous United States and Mexico.  Id.

### A.     Recovery Progress Under the Recovery Plan for the Eastern United States

The FWS has developed three recovery plans for the gray wolf -- a recovery plan for the gray wolf in the eastern United States, a recovery plan for the gray wolf in the Northern Rocky Mountain states, and a recovery plan for the gray wolf in the southwestern United States and

Mexico.   The recovery plan for the gray wolf in the eastern United States -- the population to

which the wolves subject to the permit at issue in this case belong -- covers a geographical

region extending from Minnesota to Maine and into northeastern Florida and focuses on

recovering the gray wolf population that survived in, and has expanded outward from,

northeastern Minnesota.  Recovery Plan for the Eastern Timber Wolf ("Recovery Plan").  <u>See</u>

AR 15 (Exhibit 2).   The eastern gray wolf population had exceeded the numerical criteria for

both downlisting and delisting set forth in the recovery plan.  71 Fed. Reg. 15266; 68 Fed. Reg.

15804, 15812 (Apr. 1, 2003); <u>Defenders of Wildlife v. Norton</u>, 354 F. Supp. 2d 1156, 1170-71

(D. Or. 2005) (finding that "[t]he Western Great Lakes and Northern Rockies populations

achieved the recovery goals . . .").  With respect to gray wolves in Wisconsin, the wolf

population was at 373 animals in 2004 and at 425 animals in 2005.  <u>See</u> Biological Opinion

("BiOp"), AR 3 at 11-12 (Exhibit 3).  The average annual rate of growth for the Wisconsin wolf

population has been greater than 17% over the past 10 years.  <u>Id</u>.  Based on these numbers, the

Wisconsin wolf populations have greatly exceeded the recovery goals set forth in the Eastern

Timber Wolf Recovery Plan.  <u>See</u> <u>Proposal to Delist</u>, 71 Fed. Reg. 15266.[3]

> **B.**     **Controlling Depredating Gray Wolves**

The FWS has long recognized that depredation control is a key component of its

comprehensive wolf recovery strategy.  <u>See</u>, <u>e.g.</u>, 1978 Recovery Plan, AR 15; 1988 Interim

---

[3]   The recovery plan describes two delisting criteria.  These criteria are identified as "[a]t least
two viable populations within the 48 United States satisfying the following conditions: (1) the
Minnesota population must be stable or growing, and its continued survival must be assured and,
(2) a second population outside of Minnesota and Isle Royal must be re-established, having at
least 100 wolves in late winter if located within 100 miles of the Minnesota wolf population, or
having at least 200 wolves if located beyond that distance." Recovery Plan, AR 15 at 4.

Wolf Management Plan, AR 14; and Wisconsin Management Plan, AR 16.  The rationale

supporting this position is that, in the absence of adequate measures to control known

depredating wolves, public support for wolf recovery and wolf reintroduction programs will

likely erode and individuals will resort to illegal killing to protect their pets and livelihood.  Id.;

see also infra, Argument at § I.B.  In order to avoid this situation, and thereby enhance the

propagation and survival of the species, the FWS has utilized its authority under Section 10 of

the ESA to accomplish the necessary task of controlling, and, if necessary, taking depredating

wolves.  See, e.g., Availability of the Reassessment of the Interim Wolf Control Plan for the

Northern Rocky Mountains, 64 Fed. Reg. 60453 (Nov. 5, 1999) (noting that, in the Northern

Rockies, FWS "conduct[s] control of problem wolves through our section 10 permit authority ...

[which has] been carried out for 11 years to control problem wolves"); see also infra, Argument

at § I.C.

 Recently, in conjunction with its attempt to reclassify certain population segments of the

gray wolf, the FWS issued a Section 4(d) rule which allowed depredating wolves to be taken in

limited circumstances.  See 68 Fed. Reg. at 15,863.  The 4(d) rule was beneficial to the long-

term survival and recovery of the species because it encourages human tolerance by providing a

legal mechanism for addressing wolf-human conflicts.  68 Fed. Reg. at 15864, 15867, 15868.

These regulations were enjoined and the rule reclassifying certain population segments of the

gray wolf was vacated and remanded back to the agency.  See Defenders of Wildlife v. Norton,

354 F. Supp. 2d at 1159-60; National Wildlife Federation v. Norton, 03-340, 2005 WL 2000712

(D.Vt. Aug. 19, 2005).

 In response to the vacature of the rule reclassifying gray wolves and injunction

prohibiting the continued use of the 4(d) rule, the FWS returned to operating under the legal regime that was in place prior to the issuance of the 4(d) rule.  That is, FWS began to once again use its authority to issue permits under section 10 allowing wolves to be taken in very limited circumstances.

In April of 2005, the FWS issued subpermits to the Wisconsin Department of Natural Resources ("DNR") and Michigan DNR under the authority of the Section 10(a)(1)(A) permit granted to Region 3 of the FWS.  See Defenders of Wildlife v. Norton, Order Granting Permanent Injunction, Civil Action No. 05-1573 (D.D.C. Sept. 13, 2005) (Plaintiffs' Exhibit E).  The subpermits allowed the states to live-trap wolves and, in limited circumstances, take wolves for scientific research and depredation abatement purposes.  Id.  A group of plaintiffs challenged the permits in the United States District Court for the District of Columbia.  Id.  In that case, plaintiffs asserted that the public had not been provided the opportunity to comment on the subpermits in violation of the ESA.  Id.  On September 13, 2005, the Court agreed and enjoined the subpermits because the FWS had not complied with the notice and comment requirement of the ESA prior to their issuance.  Id.[4]

On September 14, 2005, the FWS published notice announcing the receipt of applications from the states of Wisconsin and Michigan for Section 10(a)(1)(A) permits for wolf depredation control and invited the public to comment.  70 Fed. Reg. 54401 (Sept. 14, 2005).  With respect to Wisconsin, the Federal Register notice informed the public that the state had applied for a

---

[4] Plaintiffs cite to portions of the preliminary injunction hearing transcript in Defenders v. Norton in support of their claims.  Pls' Mem at 6-7.  However, the issue of whether Section 10(a)(1)(A) permits could be utilized for depredation control purposes was not before Judge Huvelle; nor was the issue mentioned in the court's injunction order.

Section 10 permit to take gray wolves "for research, monitoring, and depredation abatement activities" and established a 30-day comment period. Id. In addition to this notice, an Environmental Assessment ("EA") of the proposed issuance of the Wisconsin permit was developed by USDA-APHIS Wildlife Services in cooperation with the FWS and the Wisconsin DNR, and with input from the Great Lakes Indian Fish and Wildlife Commission, the Lac du Flambeau Tribe, and the Ho Chunk Nation and made available for public comment. See Set of Findings, AR 8 at 1 (Exhibit 4). Further, prior to the issuance of the permit, FWS engaged in formal consultation pursuant to Section 7 of the ESA in order to determine whether the actions authorized by the permit would jeopardize the continued existence of the gray wolf. See BiOp, AR 3 at 1. The consultation process concluded with the issuance of a Biological Opinion (BiOp) for the permit issued to Wisconsin DNR wherein the Service concluded that the actions authorized by the permit were not likely to jeopardize the continued existence of the gray wolf. BiOp at 21.

On April 24, 2006, the FWS issued a permit to Wisconsin DNR under the authority of Section 10(a)(1)(A) of the ESA. See Wisconsin Permit, AR 7. The permit allows Wisconsin DNR to take wolves for monitoring, research, and depredation abatement purposes. Id.; BiOp, AR 3 at 3. Among other actions, the permit authorizes Wisconsin DNR to trap wolves, collect blood samples, radio-collar or ear tag a limited number of wolves, aerially track radio-tagged wolves, euthanize wolves that are infected with serious contagious disease, and euthanize wolves that are verified to be involved in depredation of domestic animals such as pets and livestock.[5]

_____

[5] Wildlife Services ("WS"), a program of the U.S. Department of Agriculture's Animal and Plant Health Inspection Service ("APHIS"), is authorized to act as an agent of Wisconsin DNR.

See Wisconsin Permit; BiOp at 3-7. To minimize the adverse effects of the authorized actions, the FWS has placed specific conditions on any control actions conducted pursuant to the permit. For example, lethal control actions must be proceeded by verification that the targeted wolves were involved in the depredation; wolf handling and euthanizing must be carried out in a humane manner; depredation control activities must occur within ½ mile of the verified depredation site; a maximum of 43 wolves may be taken for depredation control purposes; pups of the year captured prior to August 1 must be released unharmed; and Wisconsin DNR must report any lethal take – whether intentional or incidental – to the FWS within 5 days.[9] See Permit at 2; BiOp at 3-7.

In addition, the actions authorized by the permit is part of a comprehensive wolf management strategy that further limits the circumstances under which lethal control measures may be utilized. See Findings, AR 8 at 2; EA, AR 5 at 52-53. This comprehensive strategy includes, among other things, the Recovery Plan, the Wisconsin Wolf Management Plan, and Wisconsin's Guidelines for Conducting Depredation Control on Wolves in Wisconsin. Permit, AR 7 at 2; EA, AR 5 at Appendix E at 152 (Exhibit 5). In general, the damage management activities authorized by the permit proceed as follows. The process is initiated when property owners or land managers request assistance to alleviate wolf damage. EA, AR 5 at 52-53. In response to a request, WS investigates and verifies the complained-of damage. Id. If the damage is confirmed, an appropriate damage management strategy is developed. Id. In

---

[9] As of August 1, 2006, seventeen (17) wolves have been taken for depredation control pursuant to the Wisconsin permit. Naturally, this data is not in the Administrative Record because it is post-decisional. It is based on communications received by Counsel for Defendants from the FWS.

developing this strategy, preference is given to non-lethal methods that are practical and effective. Id.; Findings at 2. These non-lethal methods may include, but are not limited to, changes in farm management practices, frightening devices, guarding animals, habitat modification, and behavior modification of problem wolves (e.g., frightening devices and adverse conditioning). Id. Lethal methods are utilized to reduce damage only after non-lethal methods have been considered and determined to be ineffective or inappropriate in reducing damage to acceptable levels.[7] Id.

### III.    LEGAL STANDARDS

#### A.    Grant of a Preliminary Injunction

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004). Plaintiffs have the burden of proving the need for injunctive relief; defendants bear no burden to defeat the motion. Granny Goose Foods, Inc. v. Teamsters, 415 U.S. 423, 442-43 (1974). "[B]ecause interim injunctive relief is an extraordinary form of judicial relief, courts should grant such relief sparingly." Fund for Animals v. Norton, 374 F. Supp. 2d 91, 98 (D.D.C. 2005).

In this Circuit, four factors must be considered in determining whether to grant a preliminary injunction: (1) the likelihood of a plaintiff's success on the merits; (2) the possibility that the plaintiff will suffer irreparable injury if relief is denied; (3) the extent to which the balance of hardships favor the respective parties; and (4) whether the public interest will be

---

[7] In some instances the most appropriate initial response to a wolf damage problem could involve lethal methods, but only after non-lethal methods have been considered and rejected as ineffective or inappropriate.   EA at 53.

advanced by preliminary relief.  See Serono Labs., Inc. v. Shalala, 158 F.3d 1313, 1317-18, 332 U.S. App. D.C. 407 (D.C. Cir. 1998) (citing Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc., 182 U.S. App. D.C. 220, 559 F.2d 841, 843 (D.C. Cir. 1977));  Nat'l Ass'n of Farmworkers Orgs. v. Marshall, 628 F.2d 604, 613 (D.C. Cir. 1980).  The factors "must be viewed as a continuum, with more of one factor compensating for less of another." Bradshaw v. Veneman, 338 F.Supp.2d 139, 141 (D.D.C.2004).  Thus, "[i]f the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." Serono Labs., 158 F.3d at 1318; see also Fund For Animals v. Norton, 374 F.Supp.2d 91, 105 (D.D.C. 2005) (in denying a motion for preliminary injunction, holding that "while plaintiffs have made a compelling showing of irreparable harm, the defendants' likelihood of success on the merits is so significant that it outweighs the other factors").

In addition, the timing of a plaintiff's request for injunctive relief may be considered as a factor in weighing the merits of the request.  A plaintiff's delay in seeking injunctive relief can undermine its claim of irreparable injury.  Accordingly, courts have noted that "'[a]s a general proposition, delay in seeking preliminary relief cuts against finding irreparable injury.'"  Kansas Health Care Ass'n, Inc. v. Kansas Dept. of Social and Rehabilitation Services, 31 F.3d 1536, 1543-44 (10th Cir. 1994) (citation omitted). See also GTE Corp. v. Williams, 731 F.2d 676, 679 (10th  Cir. 1984) (same); Majorica, S.A. v. R.H. Macy & Co., 762 F.2d 7, 8 (2d Cir. 1985) (lack of diligence, standing alone, may preclude the granting of preliminary injunctive relief); Lydo Enters., Inc. v. City of Las Vegas, 745 F.2d 1211, 1213 (9th Cir. 1984) (preliminary injunction should not issue where plaintiffs had delayed seeking injunctive relief).

**B.     The Court Retains Equitable Discretion.**

District courts in this Circuit retain some equitable discretion in determining whether an injunction should issue, even in ESA cases.  In <u>Tennessee Valley Authority v. Hill</u>, the Supreme Court altered the district courts' exercise of traditional equitable discretion in reviewing ESA Section 7 claims. 437 U.S. 153, 173 (1978).  Although <u>TVA v. Hill</u> underscores the weight Congress has placed on the protection of endangered and threatened species, subsequent decisions within the D.C. Circuit recognize that all four prongs of the court's traditional analysis remain applicable when construing Section 7 of the ESA in the context of a motion for a preliminary injunction.  Therefore, this Court retains equitable discretion in the instant case.

In an ESA Section 7 case decided virtually on the heels of <u>TVA v. Hill</u>, plaintiffs sought to prevent the sale of oil and gas leases in the Beaufort Sea and made a substantial showing that the lease sale would jeopardize the existence of an endangered species in violation of the Endangered Species Act and that the Department of the Interior had failed to comply with the requirements of the National Environmental Policy Act.  <u>North Slope Borough v. Andrus</u>, 486 F. Supp. 326, 329 (D.D.C. 1979).  The court specified that a court should consider

> (1) whether Plaintiffs have demonstrated a substantial likelihood that they will ultimately prevail on the merits; (2) whether Plaintiffs will suffer irreparable harm absent injunctive relief; (3) whether injunctive relief will harm other interested parties; and (4) whether the public interest favors the issuance of injunctive relief pending a determination of the merits.

<u>Id</u>. at 329.

Even if a plaintiff succeeds in showing a substantial likelihood of success on the merits, an injunction does not automatically ensue.  A plaintiff must also demonstrate that, "absent such relief they face serious irreparable harm prior to a final determination of the merits."  <u>Id</u>. at 330.

-14-

Furthermore, the court recognized that "[i]n weighing the issuance of preliminary injunctive relief, the Court must consider as well the interest of third parties." Id. at 331. The court was persuaded that the "economic interests of the State of Alaska cut against the issuance of preliminary relief." Id. In denying injunctive relief, the court proceeded with balancing the propriety of injunctive relief, and concluded that

> final relief, if appropriate, will be sufficient to vindicate the public interests that
> Congress has sought to further through the ESA and NEPA. If, however,
> Plaintiffs do not prevail on the merits, the issuance of preliminary relief would
> have hindered the admittedly conflicting public interest in development of outer
> continental shelf resources set forth in the Outer Continental Shelf Lands Act.

Id. at 332.

## C.    The Applicability of the Administrative Procedure Act

The Court must apply the "arbitrary and capricious" standard of the APA, 5 U.S.C. § 706(2)(A),(C), to the FWS's decision making in assessing the likelihood of success on the merits. 5 U.S.C. § 706. Pursuant to the APA, deference is due to the agency and an agency action may be overturned only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . .  in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 376 (1989); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971); Louisiana Ass'n of Independent Producers v. FERC, 958 F.2d 1101, 1117 (D.C. Cir. 1992); National Trust for Historic Pres. v. Dole, 828 F.2d 776, 781 (D.C. Cir. 1987); Underwater Exotics, Ltd. v. Secretary of the Interior, No. 93-1586, 1994 WL 80878 (D.D.C. Feb. 28, 1994); World Wildlife Fund v. Hodel, No. 88-1276, 1988 WL 66193 (D.D.C. June 17, 1988). Accordingly, this Court may not base its judgment on whether it would have made an administrative decision differently. The

Court's only role is to determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Overton Park, 401 U.S. at 416. Hence, the Court is required simply to determine whether the agency has examined the relevant data and made a rational connection between the facts found and the choice made. Southern Co. Services, Inc. v. FCC, 313 F.3d 574, 580 (D.C. Cir. 2002).

## ARGUMENT

### I. PLAINTIFFS HAVE NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS.

The FWS's decision to issue a Section 10(a)(1)(A) permit to Wisconsin was the product of the agency's careful consideration of the applicable law and relevant facts, which included comments received from the public, available scientific research and studies, the opinions of the agency's own experts with decades of experience in successfully managing the gray wolf population, and the ESA and its accompanying regulations. After thoroughly reviewing this information, the FWS rationally concluded that allowing Wisconsin to control wolf depredation would enhance the survival of the species as a whole. Because the FWS is the expert agency charged with implementing the ESA, its decision regarding the issuance of the permit is entitled to substantial deference. Although Plaintiffs strongly disagree, the FWS's decision to issue the permit was in no way arbitrary and capricious. Because FWS's determination was unquestionably rationally related to the facts that were before the FWS, Plaintiffs have no likelihood of success on the merits of their claims.

### A. The Wisconsin permit represents a lawful exercise of the FWS's Section 10(a)(1)(A) permitting authority.

The depredation control program authorized by the Wisconsin permit is a lawful exercise

of the FWS's Section 10 permitting authority.  As noted above, Section 10(a)(1)(A) of the ESA

authorizes the FWS to issue permits allowing the taking of endangered species "for scientific

purposes or to enhance the propagation or survival of the affected species." 16 U.S.C. §

1539(a)(1)(A).  The FWS and the courts have long recognized that depredation control actions

that are part of a comprehensive wolf management strategy to enhance the survival of the gray

wolf.  Plaintiffs disagree and argue that killing endangered gray wolves for depredation control

purposes violates the ESA and further contend that "the ESA does not authorize lethal take under

Section 10(a)(1)(A) of the ESA."  Pls' Mem at 10 (original in bold).   Plaintiffs' broad assertions

are premised on a misunderstanding of both the law and facts as demonstrated below.

    First, Plaintiffs' argument that the ESA does not authorize lethal take under Section

10(a)(1)(A) is flatly incorrect.  See Pls' Mem at 10.  In making their argument, Plaintiffs are

incorrectly attempting to make a distinction between "lethal take" and "non-lethal take."   The

ESA and its implementing regulations make no such distinction.  Section 9 of the ESA makes it

unlawful for any person to "take" a listed species.  16 U.S.C. § 1538(a)(1)(B).  The ESA defines

"take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect . . . . ". 16

U.S.C. § 1532(19).  Section 10 authorizes FWS to permit "any act otherwise prohibited by

[Section 9]." 16 U.S.C. § 1539(a)(1)(A) .  Thus, based on the plain language of the ESA, the

FWS may permit all forms of take under Section 10(a)(1)(A) as long as it is for "scientific

purposes or to enhance the propagation or survival of the species," id., and Plaintiffs' argument

to the contrary is completely without merit.

    Second, Plaintiffs' more specific assertion that recovery permits cannot be utilized for

depredation control actions is equally without merit.  See Pls' Mem at 12-13.  The FWS's

-17-

determination that depredation control programs are properly authorized through a Section

10(a)(1)(A) permit is a reasonable interpretation of the ESA and its implementing regulations

and is fully supported by the case law.  In discussing the proper use of Section 10(a)(1)(A)

permits, the Eighth Circuit Court of Appeals has stated the following:

> While this exception [Section 10(a)(1)(A)] does not authorize establishment of a public
> sport season, it does give the Secretary discretion to permit, for example, the removal of
> depredating animals or the culling of diseased animals from a population, thus allaying
> the dissent's concern that the Secretary would be unduly restricted if faced by such
> problems.

Sierra Club v. Clark, 755 F.2d 608, 614 n. 8 (8th Cir. 1985) (emphasis added) (citation omitted).

This is exactly what the FWS is doing here – issuing Section 10(a)(1)(A) permits that authorize

the removal of depredating wolves. [9]  Thus, the only statement of law made by a United States

Court of Appeals concerning the issue before this Court – whether the FWS may issue Section

10(a)(1(A) permits for depredation control purposes – supports the FWS's position that limited

depredation control actions enhance the survival of the species as a whole and are therefore

properly permitted under Section 10(a)(1)(A).

---

[9] Plaintiffs ignore the Eighth Circuit's statement in Sierra Club v. Clark regarding Section
10(a)(1)(A) in their brief and instead direct the Court to decisions (including Sierra Club v.
Clark) holding that 4(d) rules cannot be utilized to authorize sport hunting seasons.  Pls' Mem at
16-18.   Plaintiffs argue that, because those courts held that a sports hunting season is not a
proper means to "conserve" a listed species under 4(d), then a depredation control program is not
a proper means to enhance the survival of the gray wolf under Section 10(a)(1)(A).   However, if
the Court accepts Plaintiffs' analogy concerning 4(d) rules and Section 10(a)(1)(A) permits,
logic dictates the opposite conclusion.  It is indisputable that 4(d) rules may properly authorize
depredation control actions because those actions, under the appropriate circumstances,
"conserve" the species. 16 U.S.C. § 1533(d).  Thus, accepting the proposition that court
decisions interpreting the "conserve" language of 4(d) apply with equal force to the "enhance the
propagation or survival" language of Section 10, it follows that depredation control actions may
both "conserve" and "enhance the survival" of the species under the correct set of circumstances.

The Eighth Circuit correctly interpreted Section 10(a)(1)(A) because depredation control actions fall well within the FWS's Congressionally entrusted discretion to permit actions that, in the FWS's expert judgment, enhance the survival of the species.  See Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, 515 U.S. 687, 708 (1995) (noting that "[t]he task of defining and listing endangered and threatened species requires an expertise and attention to detail that exceeds the normal province of Congress").  Indeed, in that regard, the Supreme Court made the following clear:

> When it enacted the ESA, Congress delegated broad administrative and interpretive power to the Secretary. . . .  Fashioning appropriate standards for issuing permits under § 10 for takings that would otherwise violate § 9 necessarily requires the exercise of broad discretion. . . . When Congress has entrusted the Secretary with broad discretion, [courts] are especially reluctant to substitute [their] views of wise policy for his.

Id.  Consequently, because Section 10(a)(1)(A) does not define what actions enhance the survival of the species, the FWS is exercising broad discretion when it interprets that phrase, its interpretation is entitled to a high degree of deference, and its interpretation needs only to be a reasonable interpretation of the ESA.  See OSG Bulk Ships, Inc. v. United States, 132 F.3d 808, 814 (D.C. Cir.1998) (holding that "[t]he Court must defer to the agency's interpretation so long as it is reasonable, consistent with the statutory purpose, and not in conflict with the statute's plain language") (quoting Coal Employment Project v. Dole, 889 F.2d 1127, 1131 (D.C. Cir.1989)).

Finally, the FWS's determination that authorizing Wisconsin to take a limited number of depredating wolves will enhance the survival of the species is not based on "unsupported sociological surmise" as Plaintiffs argue.  Pls' Mem 11.  Indeed, rather than being unsupported surmise, the general principle that public opposition can frustrate wolf recovery was recognized

by Congress when it stated that the FWS "could allow for the taking of [red wolves] if depredations occur or if the release of these populations will continue to be frustrated by public opposition." See House Report No. 97-567, 34, reprinted at 1982 U.S.C.C.A.N. 2807, 2834 (1982).[9] Thus, the FWS's rationale and interpretation of Section 10(a)(1)(A) is no way unsound or unsupported; to the contrary, it is supported by the plain language of the statute, case law, and Congressional statements. As discussed in detail below, the public's acceptance of the presence of gray wolves is necessary for the wolf's recovery and long-term survival because the only real threat to wolves – both historically and presently – is from unregulated killing by those opposed to the presence of wolves in their community. See BiOp at 13 (noting that the "gray wolf was extirpated from Wisconsin by 1960 as the result of deliberate actions to minimize or eliminate wolf populations").

> **B.    The FWS's factual determination that the depredation control program will enhance the survival of the species as a whole was correct and is entitled to substantial deference.**

The factual question that was before the FWS in determining whether to issue the Wisconsin permit was whether allowing depredation control activities in Wisconsin would enhance the survival of the gray wolf. The FWS correctly determined that it does because, in the absence of an effective wolf control program, intolerant stakeholders will adopt anti-wolf behaviors including illegal killing. See Findings, AR 8 at 1 (Exhibit 4). The FWS's determination is entitled to substantial deference because it is the FWS's expert opinion and it can only be overturned if it is not rationally related to the facts that were before the agency. The

---

[9] This Congressional statement was made in the context of experimental populations, but it nevertheless demonstrates clear Congressional recognition of the fact that wolf recovery can be frustrated by public intolerance due to depredations.

FWS's decision to issue the Wisconsin permit was more than merely rational; instead, it is fully

supported by the opinions of the leading wolf experts and numerous studies and surveys.

Historically, negative views of gray wolves resulted in human persecution that led to a

nearly complete extirpation of the gray wolf from the contiguous United States.  Findings, AR 8

at 2.  These negative attitudes were based in part on a misunderstanding of wolves and their role

in a healthy ecosystem.  Id.  However, the attitudes were also driven by the very real threat that

wolves posed to domestic animals.  Id.  Both historically and today, wolf depredation on

livestock and pets results in financial and emotional losses that erode the public's tolerance of

wolves.   Findings at 5.  Consequently, developing a more positive human attitude toward

wolves – particularly within the agricultural community – has long been recognized as a key

component in federal and state wolf recovery and management plans.  See, e.g., Recovery Plan

at 20 (noting that ecologically sound management includes "depredation control where wolves

are killing domestic animals"); Interim Wolf Control Plan, AR 14; Wisconsin Management Plan,

AR 16.

Today, as the wolf population expands to the point of recovery and moves into more

developed agricultural landscapes, the livestock and pet predations have naturally increased.

Findings at 2, 5.  In the absence of an effective means to reduce wolf/human conflicts,

individuals will be less likely to accept the presence of wolves in their community.  Finding, AR

8 at 5.  This situation "lowers the social carrying capacity for wolves and could threaten the well

being of the population, both presently and in the future if the situation persists."  Finding at 5.

The threat comes from intolerant stakeholders who – in the absence of an effective government-

sanctioned wolf control program – will engage in unregulated and unsupervised takings to

protect their pets and livelihood.  Id.  The purpose of depredation control is to avoid this scenario

by maintaining public support for a recovering wolf population and thereby increasing the social

carry capacity for wolves.  Id.

In particular, with regard to Wisconsin, the depredation of livestock and pets has

increased as the wolf population has grown.  Findings at 2.  Implementation of an effective

depredation control program will serve to enhance the overall survival of the wolf by

demonstrating that responsible government agencies will act quickly to resolve these increasing

depredation problems.  Id.; see also Justification for Lethal Control Authority for Recovery

Activity under 10(a)(1)(A) of the Endangered Species Act on Gray Wolves in Wisconsin,

Wisconsin DNR ("Wisconsin DNR Justification"), AR 36 at 14-15 (Exhibit 6).  A timely and

effective response to depredations will alleviate the perception of government inaction that often

results in increased landowner frustration, which, in turn may lead to the indiscriminate killing of

wolves.  Findings at 2-5; see also Wisconsin DNR Justification, AR 36 at 18-19 (stating that

"[w]ith the recent loss of lethal control activities in Wisconsin, many people have expressed

major frustration with federal recovery efforts" which commentators have noted "causes people

to take matters into their own hands") (internal quotations omitted).[10]  The removal of problem

---

[10]  Despite Plaintiffs' assertions to the contrary, the threat posed to wolves by illegal killing is
very real.  In 2005 alone, the illegal killing of wolves accounted for 40% of the wolf mortality in
Wisconsin.  See BiOp, AR 3 at 40, table 4.  Wolf experts believe that the illegal killing is
driven, at least in part, by the perception that the professional wildlife management agencies are
not adequately addressing the wolf depredation problem.  See Findings, AR 8 at 3-7.  In an
article describing how to poison wolves, the following sentiments were expressed:

> People will have to decide for themselves just how much they will allow an out of control
> federal agency (USFWS) to destroy their rights, hobbies, businesses . . . Wolves continue
> to breed and expand while the bureaucrats argue about wolves, so if "we the people" do
> nothing, the wolves will destroy our game herds and businesses all on their own.

wolves relieves the pressures or antagonism directed towards the entire wolf population by landowners incurring losses or other members of the public.  Id.  As a result, the wolf population in Wisconsin is in less danger from potential non-selective illegal attempts at damage control.

The FWS's conclusion in this regard is consistent with the available evidence and the opinions of the most preeminent wolf experts from both within and outside of the agency.   For example, Rolf O. Peterson, Team Leader of the Gray wolf eastern population recovery team, stated the following:

> The Recovery Team (Gray Wolf – Eastern Population) supports the use of lethal control of wolves in areas of confirmed depredation on livestock and pets on private lands. . . . [A]s a means to increase public support for a recovered wolf population, we consider it to be a vital part of wolf recovery that is recognized in the recovery plan.   We believe that lethal control helps to reduce illegal killing of wolves and builds public tolerance for wolves, thereby enhancing wolf recovery.

Findings, AR 8 at 11 (Exhibit 4).  Similarly, the Wildlife Society, an international organization of professional wildlife biologists, stated "[c]ontrol of wolves preying on livestock and pets is imperative and should be prompt and efficient if illegal killing is to be prevented and human tolerance of the presence of wolves is to be maintained."   Findings at 12.  Plaintiffs attempt to direct the Court to conflicting data in this regard, but, even assuming that there are conflicting opinions on this issue, this does not demonstrate that the FWS's decision was arbitrary and capricious.  See, e.g., Animal Legal Defense Fund, 204 F.3d at 235.  Instead, Plaintiffs must show that the FWS's conclusion that a depredation control program aids in the survival of the species is irrational.  It was clearly not.

All of Plaintiffs' arguments invite the Court to substitute its judgment for that of the FWS

_____

Findings at 7.  Unfortunately, "the sentiments expressed in the article are neither unique nor are they exclusive to a particular area of the country."  Id.

to one degree or another, which is clearly impermissible.  Davis v. Latschar, 202 F.3d 359, 365

(D.C. Cir. 2000) ("The Court is not empowered to substitute its judgment for that of the agency")

(citing Overton Park, 401 U.S. at 416).  For example, Plaintiffs criticize the FWS for relying on

public opinion surveys and research because they are from "other areas of the country" and

"different areas of the world."  Pls' Mem at 23.  However, weighing the various sources of data

was the FWS's prerogative as the expert agency.  The FWS reviewed both domestic and

international research conducted by some of the most preeminent experts on wolves and wolf

recovery.  See, e.g., Findings, AR 8 at 6 (noting that "[s]tudies demonstrate that public support

for the presence of large carnivores largely depends on confidence that problems caused by

individual animals will be resolved effectively" and that research also demonstrates the

importance of minimizing these negative attitudes because "[i]f no government-sanctioned relief

from the loss of livestock is in sight, intolerant stakeholders will likely adopt anti-wolf behaviors

including illegal killings").  At bottom, it is neither the place of the Plaintiffs nor the Court to

determine what would have been the best course of action had they been charged with reviewing

the available data in the first instance.  The sole inquiry is whether the FWS's decision to issue

the Wisconsin permit was rational.  See Ethyl Corp. v. Environmental Protection Agency, 541

F.2d 1, 36 (D.C. Cir. 1976) (holding that a court "must look at the decision not as the chemist,

biologist or statistician that we are qualified neither by training nor experience to be, but as a

reviewing court exercising our narrowly defined duty of holding agencies to certain minimal

standards of rationality").

　　　　Plaintiffs also complain the FWS has not shown that a majority of Wisconsin residents

support lethal depredation control.  Pls' Mem at 22.  This contention misses the point.  The

decision to issue the Wisconsin permit did not turn on whether it was supported by a majority of the public in Wisconsin. Instead, the FWS decided to issue the Wisconsin permit because it furthers gray wolf recovery. Findings, AR 8 at 1. Moreover, even assuming that the larger urban population may or may not support depredation control, that opinion is not controlling. For wolf recovery to continue its success, the smaller rural populations must accept gray wolves in their communities. See Wisconsin Permit Application, (noting that "[l]ack of control on problem wolves will further erode public attitudes toward wolves by rural people"); Wisconsin DNR Justification, AR 36 at 14-15 (noting that "[s]everal studies in Wisconsin indicate that residents, especially rural people in wolf range accept and expect control of wolves that kill livestock or pets"). This smaller community may not be a majority of the Wisconsin population, but it is the segment of the population that will have to contend with wolf/human conflicts. [11]

_____

[11] In addition, Plaintiffs argue that the FWS has failed to show that actual depredation rates will be reduced as a result of Wisconsin's lethal control program. Pls' Mem at 25. This argument is a classic strawman. The FWS did not attempt to make such a finding nor were they required to do so. The FWS determined that the Wisconsin permit assists in increasing the public's tolerance for wolves by allowing the state to respond effectively to complaints of wolf depredation. Whether the overall depredation numbers will be reduced is a different question, one that may be driven by other factors such as the continued growth of the Wisconsin wolf population. Moreover, the proposition that depredation control programs actually reduce depredation rates is not unsupported. Indeed, Plaintiffs properly noted in their brief that wolf experts have concluded, based on their experience with wolf depredation control in Minnesota, that depredation losses would have been greater in the absence of a depredation control program. Pls' Mem at 25; see also APHIS-WS Comment, AR 36 at 8 (Exhibit 7) (stating that depredation control actions have "helped to mitigate wolf-livestock conflicts"); Wisconsin DNR Justification, AR 36 at 16 (noting that depredation control actions in the Northern Rockies have "kept livestock losses below levels predicted prior to the reintroduction.") (citations omitted).

Similarly, Plaintiffs' assertions that the FWS has failed to conclusively demonstrate that the level of illegal killing will decrease is unavailing. Pls' Mem at 24-25. Plaintiffs would have the Court believe that the FWS was required to cite and rely on conclusive evidence which unequivocally demonstrates that illegal killing would be reduced. That is simply not the case. Instead, the FWS properly reviewed the available information and – based upon the reviewed data and its own expertise – rationally concluded that an effective depredation control program

**C.      The FWS's interpretation of Section 10(a)(1)(A) is consistent with past agency practice.**

Plaintiffs mistakenly contend that "[t]he FWS's issuance of the Wisconsin Permit represents a reversal of long-standing agency interpretation, policy, and practice." Pls' Mem at 18.  More specifically, they assert that "[d]espite its consistent practice for nearly thirty years, the FWS offers no explanation for its sudden decision to allow lethal depredation control for populations that are listed as 'endangered.'" Id. at 20.  Further, Plaintiffs attempt to characterize FWS's interpretation of Section 10(a)(1)(A) as being nothing more than "a back door way of continuing depredation control activities enjoined by Defenders of Wildlife."  Pls' Mem at 6. Nothing could be farther from the truth.  Plaintiffs' arguments in this regard represent either a misrepresentation of the facts or a complete ignorance of the long history of wolf depredation control under the authority of Section 10(a)(1)(A).

The FWS has interpreted Section 10(a)(1)(A) as permitting depredation control actions for almost 20 years.  Indeed, the FWS has published multiple Federal Register notices explaining that Section 10(a)(1)(A) permits could be issued to control depredating wolves.  For example, on April 23, 1998, the FWS published a Federal Register notice stating the following:

> The Service conducts control of problem wolves through its section 10 permit authority. Under section 10(a)(1)(A) of the Endangered Species Act. "The Secretary (of the Interior) may permit, under such terms and conditions as he may prescribe--, (A) any act otherwise prohibited by section 9 for scientific purposes or to enhance the propagation or survival of the affected species." The Service conducts control of problem wolves under the terms and conditions of the section 10 permit which is consistent with the guidance of the Interim Wolf Control. Since issuance of the permit in 1988, the wolf population in Northwest Montana has been reproducing and growing toward recovery levels.

---

would result in fewer indiscriminate and unregulated wolf takes.  See Findings at 2-7.  That is all that was required.

Availability of Draft Reassessment of the Interim Wolf Control Plan for the Northern Rocky

Mountains for Review and Comment, 63 Fed. Reg. 20212 (Apr. 23, 1998); see also, e.g.,

Availability of the Reassessment of the Interim Wolf Control Plan for the Northern Rocky

Mountains, 64 Fed. Reg. 60453 (Nov. 5, 1999).  The Interim Wolf Control Plan referenced in the

1998 and 1999 Federal Register notices was adopted in 1988 and states that "Section 10 permits

will be required for any wolf control actions and according to the requirements of the Act, such

actions or programs must be for scientific purposes or to enhance the survival of the species."

See Interim Wolf Control Plan, AR 14 at 4-5 (Exhibit 9).  In that document, the FWS further

explained that the "[i]mplementation of a control program will serve to enhance the overall

survival of the wolf by [among other things] demonstrating that responsible Federal agencies

will act quickly to resolve wolf depredation problems."  Id. at 5.

Although it is true that Wisconsin applied for a Section 10(a)(1)(A) permit because it

could no longer utilize the enjoined 4(d) rule, the use of Section 10(a)(1)(A) permits for

depredation control purposes is a regulatory tool that had always been available.  The Interim

Wolf Control Plan conclusively demonstrates that FWS's interpretation of Section 10(a)(1)(A)

has been consistent for almost 20 years and belies Plaintiffs' assertions that the Wisconsin permit

represents a "sudden" change in policy.

**D.    Section 10(a)(1)(A) permits are not the regulatory equivalent of the enjoined 4(d) rule.**

Plaintiffs also attack the legality of the Wisconsin permit by arguing that it is the

regulatory equivalent of the 4(d) rule that was enjoined in Defenders of Wildlife, 354 F.Supp.2d

1156.  This argument is without merit for several reasons.  First, the fact that wolf depredation

problems can be addressed by both 4(d) rules and Section 10(a)(1)(A) permits is in no way

untoward or unlawful.  The FWS has multiple regulatory tools at its disposal to accomplish the

overarching goal of bringing listed species "to the point at which the measures provided pursuant

to [the ESA] are no longer necessary."  16 U.S.C. § 1532(3).  With respect to Section

10(a)(1)(A), the FWS authority to utilize and authorize regulated taking of endangered species is

limited only by the requirement that the taking be "for scientific purposes or to enhance the

propagation or survival of the affected species."  16 U.S.C. § 1539(a)(1)(A).  Aiding in the effort

of bringing wolves to the point at which they are accepted by the public and can therefore

survive and propagate in the absence of the ESA's protections satisfies this criteria.  The fact that

a similar form of regulated take may also be authorized under a separate provision of the ESA --

such as Sections 4(d) or 10(j) – is of no moment and certainly does not dictate a specific

outcome in this case.

Second, despite Plaintiffs' assertions to the contrary, the Wisconsin permit is not the

regulatory equivalent of the enjoined 4(d) rule.  Although it is true that the Wisconsin permit and

the 4(d) rule are similar in many respects because they both address the wolf depredation

problem, the Wisconsin permit is in fact more restrictive than the 4(d) rule.  See E, AR 5 at 118-

119 (Exhibit 5) (distinguishing the Wisconsin permit from the 4(d) rule).  For example, the 4(d)

rule conveyed depredation control authority generically to authorized employees or agents of

state wildlife conservation agencies and federally recognized Native American Tribes, while the

permit only provides take authority to specific employees of Wisconsin DNR, APHIS-Wildlife

Services, Ho Chunk Nation, and the Menominee Tribe.  Compare Wisconsin Permit, AR 7 with

68 Fed. Reg. at 15865-67 (describing the enjoined 4(d) rule).  In addition, the Wisconsin permit

authorizes a limited number of takes for scientific research and depredation control purposes.

-28-

<u>See</u> EA at 119; <u>see also</u> Wisconsin Permit (limiting take for depredation control purposes to 43 and expiring on December 31, 2006). The 4(d) rule had no limitation on the number of wolves that could be taken. <u>Id</u>. Similarly, the Wisconsin permit is only valid for a limited time period, while the 4(d) rule had no expiration date. <u>Id</u>. Furthermore, the terms and condition of the Wisconsin permit are more restrictive with respect to the actual manner in which depredation control actions may be carried out. In particular, the Wisconsin permit reduces the allowable trapping distance to 0.5 mile (the 4(d) rule allowed trapping within 1.0 mile of the site of depredation); it restricts the trapping of lactating females (the 4(d) rule had no such restrictions); and it imposes a more restrictive reporting requirement by requiring that all lethal takes be reported to the FWS within 5 days (the 4(d) rule had a 15 day reporting requirement). EA, AR 5 at 119. Finally, the use of the Wisconsin permit (unlike the 4(d) rule) is further restrained by the terms and conditions placed on its use by the Biological Opinion issued by the FWS. <u>See</u> BiOp, AR 3 at 22-24 (setting forth the reasonable and prudent measures and terms and conditions associated with those measures).

For all of these reasons, Plaintiffs' assertion that the Wisconsin permit is the regulatory equivalent of the 4(d) rule is inaccurate and their further attempt to characterize the Wisconsin permit as a "back door" way of continuing the lethal depredation control activities enjoined in <u>Defenders of Wildlife</u> is misplaced.

## II.    PLAINTIFFS HAVE FAILED TO DEMONSTRATE IRREPARABLE HARM.

In addition to failing to demonstrate a likelihood of success on the merits, Plaintiffs have not carried their burden of showing that they will suffer irreparable harm if an injunction does not issue. Despite Plaintiffs' suggestions to the contrary, irreparable harm is not presumed

simply because this case involves an endangered species.  See Pls' Mem at 27.  The appropriate

standard for irreparable harm is not the "take" of individual animals, even if those animals are

endangered or threatened, but rather "jeopardy" to the entire species.[12]  See Water Keeper

Alliance v. United States Dep't of Defense, 271 F.3d 21, 34 (1st Cir. 2001); Fund for Animals,

Inc. v. Turner, Civ. A. No. 91-2201-MB, 1991 WL 206232, *8 (D.D.C. 1991).

        In support of their request for emergency injunctive relief, Plaintiffs cite Fund For

Animals v. Turner, C.A. No. 91-2201 (MB),1991 WL 206232 (D.D.C. 1991).  Pls' Mem at 26.

In that case, the court granted a preliminary injunction setting aside a regulation that authorized

the sport hunting of a limited number of grizzly bears (which are listed under the ESA as a

threatened species).  Id. at *8-9.  The court concluded that plaintiffs had shown a likelihood of

success on the merits because "Congress has specifically limited the hunting of a threatened or

endangered species to extraordinary cases of population pressures . . . ."  Id. at *7.  Based on the

facts present in Fund for Animals, the court also found that plaintiffs had demonstrated

irreparable harm.  The court expressly held, however, that the law -- including the Supreme

Court's decision in TVA v. Hill -- did not compel the issuance of an injunction because there

was "not the remotest possibility that the limited hunting of the grizzly bear during the period in

which a preliminary injunction would be in place will eradicate the species."  Id. at *8.  And the

court rejected plaintiffs' argument that "once the Court finds a likelihood that agency action is in

violation of the ESA, irreparable injury is presumed . . . ."  Id. at *8.  As such, the court's

holding in Fund for Animals is consistent with other cases that have held that plaintiffs must

_____

[12] To "jeopardize the continued existence" of a species means to "reduce appreciably the
likelihood of both the survival and recovery of a listed species in the wild."  50 C.F.R. § 402.02.

demonstrate irreparable harm by showing impacts to species and not simply to individual animals, even if they are endangered.

Thus, in order to demonstrate irreparable harm to the species for the purposes of their request for a preliminary injunction, Plaintiffs need to demonstrate not that individual wolves will be impacted, but that the actions at issue will jeopardize the species as a whole. Plaintiffs cannot make this showing. After reviewing the current status of the gray wolf, the environmental baseline for the action area, the effects of the actions and the cumulative effects, the Service issued a Biological Opinion which correctly concluded the lethal control measures authorized by the Wisconsin permit are "not likely to jeopardize the continued existence of the gray wolf in Wisconsin." BiOp at 20-21.[13] This constitutes the opinion of the FWS -- the expert agency charged with implementing the ESA. Plaintiffs have not challenge the conclusions set forth in the Biological Opinions in this suit. As a result, Plaintiffs cannot seriously claim that the actions authorized by the Wisconsin permit will jeopardize the continued existence of the gray wolf populations in Wisconsin.[14]

---

[13] This conclusion is based on the Service's many years of experience in successfully managing gray wolves and empirical data from the two years of lethal depredation control in Wisconsin, as well as the data from very similar lethal control activities in Minnesota. BiOp, AR 3 at 17-19, Table 3 at 29 (Exhibit 3). The empirical data available demonstrates that: (1) the wolf populations in Wisconsin have surpassed recovery goals; (2) the wolf populations continued to thrive after the initiation of depredation control measures; and (3) the mortality authorized by the Wisconsin permit is not likely to slow the recovery of the species because wolf takes will likely be partially compensatory (fewer wolves will die from starvation, interspecies strife, or other natural causes) and the ability of the states to take problem wolves will likely decrease the illegal take of wolves. BiOp at 17-20.

[14] In addition, Plaintiffs' claim of irreparable injury is undermined by their delay in seeking emergency relief. Courts have noted that, "[a]s a general proposition, delay in seeking preliminary relief cuts against finding irreparable injury." Kansas Health Care Ass'n, Inc. v. Kansas Dept. of Social and Rehabilitation Services, 31 F.3d 1536, 1543-44 (10th Cir. 1994)

III.    **THE ISSUANCE OF AN INJUNCTION WILL HARM OTHER INTERESTED PARTIES.**

The issuance of an injunction will harm the state of Wisconsin by eliminating its ability to effectively manage depredating wolves.  Wisconsin has cooperated with interested stakeholders in the ongoing, and highly successful, effort to restore gray wolves to the state. See, e.g., Wisconsin Management Plan, AR 16.  After the 4(d) rule was enjoined, Wisconsin properly sought the authority to control depredating wolves under Section 10 of the ESA.  An injunction here would harm Wisconsin and its citizens by removing an important wildlife management tool and vital component in the overall gray wolf recovery strategy.

In requesting authority to control depredating wolves, Wisconsin DNR made clear that the requisite authorization was needed immediately for several reasons.  First, because the wolf population has grown so rapidly, wolves are continuing to expand into agricultural areas containing livestock.  Wisconsin Permit Application ("Application"), AR 2 at 5 (Exhibit 8) (noting that "[d]epredation on livestock has been increasing at rapid rates in recent years");

---

(citation omitted).  In this district, Judge Roberts observed that "[t]hough [plaintiffs' eight-month] delay [in seeking emergency relief] is not dispositive of the issue, it further militates against a finding of irreparable harm." Mylan Pharmaceuticals, Inc. v. Shalala, 81 F. Supp. 2d 30, 44 (D.D.C. 2000).  Here, Plaintiffs seek emergency preliminary relief more than three months after the Wisconsin permit was issued.  Plaintiffs will likely contend that this delay is due to the fact that they were required to file a 60-day notice of intent to sue.  However, Plaintiffs waited more than two weeks after the issuance of the Wisconsin permit to provide the requisite 60-day notice.  Additionally, because the 60-day notice, dated May, 9, 2006, ripened on or about July 10, 2006, Plaintiffs delayed an additional two weeks to file their request for a preliminary injunction on July 25, 2006.  Plaintiffs therefore delayed filing their request for emergency relief by approximately one month, a fact that militates against a finding of irreparable harm.  Nat'l Council of Arab Americans v. City of New York, 331 F. Supp. 2d 258, 265 (S.D.N.Y. 2004) (holding that plaintiffs' delay of approximately one and a half months after the Parks Department's final ruling was one of the equities weighing strongly against a preliminary injunction).

-32-

Wisconsin DNR Justification, AR 36 at 12, (describing "drastic increases in depredation by wolves on domestic livestock").  Second, as a result of the fact that wolves occupy nearly all areas of suitable habitat (i.e., areas uninhabited or sparsely populated by humans and livestock), suitable areas for translocating problem wolves are no longer available.  Application at 5 (noting that "[t]ranslocation is no longer an option for Wisconsin"); Wisconsin DNR Justification, AR 36 at 19-21 (same).  An order enjoining the permit would harm Wisconsin DNR and the citizens of Wisconsin by removing the state's ability to address these concerns and thereby effectively manage the wolf population within its borders.

## IV.     AN INJUNCTION WILL NOT SERVE THE PUBLIC INTEREST.

Finally, Plaintiffs correctly point out that furthering the purposes of the ESA is in the public interest.  Pls' Mem at 29.  However, granting Plaintiffs' request for a preliminary injunction will not further the ESA's overarching purpose of recovering species.  16 U.S.C. § 1532(3).  The Wisconsin permit promotes the conservation of the species as a whole for all of the reasons discussed above.  As stated by Wisconsin in its permit application:

> Lack of control on problem wolves will further erode public attitudes toward wolves by rural people and likely will increase illegal kill[ing] throughout the states.  Call for hunting seasons and drastic reductions in the wolf population are becoming common in articles in local papers.  In late winter 2005, possible poisoning attempt on wolves were detected.  In it is our prediction that if the State of Wisconsin is unable to maintain adequate lethal control on problem wolves, illegal kill[ing] will increase throughout [the] wolf['s] range.

Application, AR 2 at 5-6 (Exhibit 8).  For these reasons, the public interest in the long-term health and recovery of the gray wolf population in Wisconsin will be best served by permitting the states to continue their depredation control activities.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction should be

denied.

Dated: August 1, 2006                     Respectfully Submitted,

                                          SUE ELLEN WOOLDRIDGE, Asst. Attorney General
                                          JEAN E. WILLIAMS, Section Chief

                                          s/Jimmy A. Rodriguez
                                          JIMMY A. RODRIGUEZ, Trial Attorney
                                          U.S. Department of Justice
                                          Environment & Natural Resources Division
                                          Wildlife & Marine Resources Section
                                          Ben Franklin Station, P.O. Box 7369
                                          Washington, DC 20044-7369
                                          Phone: (202) 305-0342/ Fax: (202) 305-0275
                                          Email: Jimmy.Rodriguez@usdoj.gov

                                          Attorneys for Federal Defendants

Of Counsel:
Tony Sullins
Office of Solicitor
United States Department of the Interior