

DEPARTMENT OF THE INTERIOR
U.S. FISH AND WILDLIFE SERVICE

# FEDERAL FISH AND WILDLIFE PERMIT

**2. AUTHORITY-STATUTES**
16 USC 1539(a)

**REGULATIONS** *(Attached)*
50 CFR 17.22

50 CFR 13

**3. NUMBER**
TE111360-0

**4. RENEWABLE:** ☒ YES ☐ NO

**5. MAY COPY:** ☒ YES ☐ NO

**6. EFFECTIVE**
04/24/2006

**7. EXPIRES**
12/31/2006

**1. PERMITTEE**

WISCONSIN DEPARTMENT OF NATURAL RESOURCES
101 SOUTH WEBSTER STREET
P O BOX 7921
MADISON, WI 53707-7921
U.S.A.

**8. NAME AND TITLE OF PRINCIPAL OFFICER** *(If #1 is a business)*
LAURIE OSTERNDORF
DIVISION ADMINISTRATOR

**9. TYPE OF PERMIT**
ENDANGERED SPECIES

**10. LOCATION WHERE AUTHORIZED ACTIVITY MAY BE CONDUCTED**

THROUGHOUT THE STATE OF WISCONSIN.

**11. CONDITIONS AND AUTHORIZATIONS:**

A. GENERAL CONDITIONS SET OUT IN SUBPART D OF 50 CFR 13, AND SPECIFIC CONDITIONS CONTAINED IN FEDERAL REGULATIONS CITED IN BLOCK #2 ABOVE, ARE HEREBY MADE A PART OF THIS PERMIT. ALL ACTIVITIES AUTHORIZED HEREIN MUST BE CARRIED OUT IN ACCORD WITH AND FOR THE PURPOSES DESCRIBED IN THE APPLICATION SUBMITTED. CONTINUED VALIDITY, OR RENEWAL, OF THIS PERMIT IS SUBJECT TO COMPLETE AND TIMELY COMPLIANCE WITH ALL APPLICABLE CONDITIONS, INCLUDING THE FILING OF ALL REQUIRED INFORMATION AND REPORTS.

B. THE VALIDITY OF THIS PERMIT IS ALSO CONDITIONED UPON STRICT OBSERVANCE OF ALL APPLICABLE FOREIGN, STATE, LOCAL OR OTHER FEDERAL LAW.

C. VALID FOR USE BY PERMITTEE NAMED ABOVE.

C.1. PERMIT IS ALSO VALID FOR THE FOLLOWING INDIVIDUALS: WDNR PERSONNEL: ADRIAN WYDEVEN (PROGRAM COORDINATOR) BRUCE KOHN, RONALD SCHULTZ, RICHARD THIEL, GREG KESSLER, SHAWN ROSSLER, TIM VAN DEELEN, ELLEN HEILHECKER, TODD NAAS, BRUCE BACON, KENNETH JONAS, WAYNE HALL, THOMAS GEHRING, DARBY MURPHY, AARON BUCHOLZ, AND MICHELE WINDSOR; HO CHUNK PERSONNEL: WILL QUACKENBUSH, RONALD ANWASH, AND JOHN BLACKDEER; MENOMINEE PERSONNEL: DONALD REITER AND BRENDA NORDIN; USDA-APHIS-WILDLIFE SERVICES PERSONNEL: JASON SUCKOW (STATE DIRECTOR), ROBERT WILLGING (SUPERVISOR FOR NORTHERN WS DISTRICT), JOHN SHIVIK, KELLY THIEL, CHAD ALBERG, JAMES ROLLMAN, ED ZYDZIK, WALTER FOLLIS, JAMES MILLER, ERIC FROMM, JEREMY IRISH, PHIL PETERSON, BARRY BENSON, DAVID RUID, CHARLES LOVELL (SUPERVISOR FOR SOUTHERN WS DISTRICT) MIKE EDWARDS, MARK KERR, JOHN NUCE, MIKE PETRIE, DAN HIRCHERT, AARON FREUND, JOHN CARBONARI, JIM THARMAN, BOB SEEFELDT, WESTON SCHMIDT, AND DE WAYNE SOBL. ADDTIONAL ASSISTANTS NOT NAMED MAY WORK UNDER THE DIRECT AND ON-SITE SUPERVISION OF NAMED PERMITTEES.

D. ACCEPTANCE OF THIS PERMIT SERVES AS EVIDENCE THAT THE PERMITTEE AND ITS AUTHORIZED AGENTS UNDERSTAND AND AGREE TO ABIDE BY THE TERMS OF THIS PERMIT AND ALL SECTIONS OF TITLE 50 CODE OF FEDERAL REGULATIONS, PARTS 13 AND 17, PERTINENT TO ISSUED PERMITS. SECTION 11 OF THE ENDANGERED SPECIES ACT OF 1973, AS AMENDED, PROVIDES FOR CIVIL AND CRIMINAL PENALTIES FOR FAILURE TO COMPLY WITH PERMIT CONDITIONS.

E. Permittee is authorized to take an unlimited number of wolves throughout Wisconsin for the purpose of research, monitoring, and abatement activities in accordance to the following conditions:

   E.1. Trapping, and retrapping, of wolves shall be conducted using number 4, 14, or 7 McBride-Button foot-hold traps, LDR 7.5 foot-hold, and cable restraints.

   E.2. Chemically immobilize and radio-collar adult, yearling, and pup (over 30 pounds) wolves. Depredating wolves may be fitted with radio-collars or ear tagged, and tracked as needed to successfully resolve complaints.

☒ ADDITIONAL CONDITIONS AND AUTHORIZATIONS ALSO APPLY

**12. REPORTING REQUIREMENTS**
ANNUAL REPORT DUE: 1/31

**ISSUED BY:** *[signature]*

**TITLE:** PROGRAM MANAGER, TE/HC

**DATE:** 04/24/2006

E.3. Collect blood and other minor tissue samples, carry out routine non-invasive health assessment procedures, administer standard medications to combat health problems, and affix ear tags to all wolves captured.

E.4. Aerially radio-track radio-tagged wolves at daily to weekly intervals.

E.5. Remove and relocate depredating wolves in response to verified landowner complaints.

E.6. Attach electronic avoidance collars, or similar devices, to condition potentially depredating wolves to avoid livestock facilities.

E.7. Place self attaching radio collars with cable restraint devices to allow wolves to walk through and become radio tagged.

E.8. Harass wolves with rubber bullets, other nonlethal projectile devices, or other devices intended to scare wolves and provide aversive conditioning to bold or habituated wolves.

F. Permittee is authorized to take a maximum of 43 wolves for depredation control in accordance to the April 17, 2006 coordination letter to the Great Lakes Indian Fish and Wildlife Commission (attached) and with the following conditions:

F.1. The depredation occurred on lawfully present domestic animals, including livestock as defined by the Wisconsin Wolf Management Plan. Lethal control shall not be used when wolves kill dogs that are free-roaming, hunting, or training on public lands.

F.2. Lethal wolf control is preceded by verification that wolves were involved in the depredation. Such verification shall be made by individuals covered by this permit and will follow Wisconsin DNR guidelines for lethal control of depredating wolves (Wisconsin Guidelines for Conducting Depredation Control on Wolves in Wisconsin While Federal listed as "Threatened" or "Endangered" Status).

F.3. Depredation at the site is likely to continue in the immediate future if the depredating wolf or wolves are not removed.

F.4. Wolf handling and euthanizing are carried out in a humane manner.

F.5. Depredation control activities must occur within ½ mile of the depredation site.

F.6. Traps and cable restraints are checked at least every 24 hours.

F.7. Young of the year captured before August 1 are released near the capture site.

F.8. A lactating female found depredating trapped before June 1 must be released near the capture site, unless it has been involved in a previous depredation event, in which case it may be euthanized.

F.9. Depredation control activities within tribal reservation boundaries are coordinated with tribal natural resource personnel, and opportunities provided for tribal involvement in the verification investigation. In cases when trapped wolves are believed to be primarily residents of a reservation, and if requested by tribal authorities, consideration shall be given to non-lethal control measures upon the first depredation incident.

F.10 If a verified depredation has not occurred in the current calendar year, lethal control shall only proceed in accordance to Conditions E.1. through E.9. and with the following:

- Verified depredation occurred at the site, or in the immediate vicinity, during the previous year.
- There is strong evidence one or more members of the depredating pack has remained in the area since the verified depredation.
- Based on wolf behavior and other factors, the depredation is likely to be repeated.
- Trapping is conducted in a location and in a manner to minimize the likelihood a wolf or wolves from a non-depredating pack is captured.

G. Accidental serious injury or mortality resulting from trapping activities to young of the year prior to August 1 may not exceed 5 individuals. In the event this number is met, all trapping activities shall cease. Such mortalities and serious injuries shall be reported to FWS as specified below within 5 calendar days.

H. Wolves trapped under provisions of this permit that would otherwise result in their release back to the wild may be euthanized when they have moderate to severe signs of mange or other serious contagious diseases that are likely to result in their death or the death of other wolves. A maximum of 3 cases of such euthanization is authorized by this permit.

I. A maximum of 10 wolves that are severely injured or are in very poor condition as a result of activities or situations not related to permitted activities may be euthanized.

J. Prior to June 1, lethal take of lactating females may not exceed 1 individual. Capture of lactating females prior to June 1, regardless of their condition at the time of their release, shall be reported to FWS within 5 calendar days.

K. The authority for lethal depredation control can be delegated to U.S. Department of Agriculture - Wildlife Services and Tribal Natural Resources Agencies. These agents are subject to the same conditions and reporting requirements described above.

L. Wolf trapping and handling by all personnel working under this Permit shall follow Wisconsin Department of Natural Resources wolf trapping and handling protocols, which will be revised to incorporate new information and techniques as appropriate.

M. All trappers working under this permit shall be trained in, and receive annual refresher courses in the trapping, chemical immobilization, and medical handling of animals, with emphasis on wolves, to minimize accidental injury and death to wolves.

N. All mortalities and serious injuries, whether intentional or incidental, shall be reported to the Service's Region 3 Endangered Species Permits Biologist (permitsR3ES@fws.gov), the Green Bay Field Office (joel_trick@fws.gov) within 5 calendar days. Notification by e-mail is sufficient. Wolves, or wolf parts, so taken may be transferred to Native Americans for religious and/or cultural purposes, public educational use, or scientific research purposes. A copy of this Permit, or a letter of authorization from this office, must be retained with all specimens so transferred. All requests for carcasses must be made in writing. Specimens not suitable, or not needed, for such use must be destroyed.

O. An annual report of activities conducted under the authority of this permit is due on January 31, 2007. Failure to furnish any reports that are required by this permit is cause for permit revocation and/or denial of future permit applications. At a minimum, your reports shall include:

    O.1. The date, location, age, sex, ear tag number and general description of the physical condition of each wolf captured.

    O.2. Description of any medications administered to captured wolves.

    O.3. The disposition of any wolves injured, killed, salvaged, held and transported.

    O.4. The results of any blood analysis.

    O.5. The results of efforts to address and resolve depredation issues, including repeat depredations by wolves.

    O.6. A summary that includes the following for each wolf incidental and intentional injury or mortality that occurred (incidental and intentional mortality should be addressed separately in the report):

- Date and time of the taking.
- Name of any persons involved in the takings.
- Circumstances surrounding any taking, including the stimulus for the taking, and/or human activities involved.
- The behavioral responses of any gray wolves trapped and released.
- Actions taken to avoid or minimize taking.

P. Copies of your reports shall be sent to the offices listed below. When possible, electronic copies shall be submitted in lieu of hard copies in MS Word, Rich Text Format, or other file format that is compatible with the receiving office.

   P.1. Pete Fasbender
        Regional Permits Coordinator
        U.S. Fish and Wildlife Service, Region 3
        Ecological Services Operations
        1 Federal Drive
        Fort Snelling, Minnesota 55111-4056
        (612/713-5343; fax 612/713-5292)
        permitsR3ES@fws.gov

   P.2. Joel Trick
        U.S. Fish and Wildlife Service
        Ecological Services Field Office
        2661 Scott Tower Drive
        New Franken, WI 54229
        (920-866-1737; 920-866-1710)

   P.3. Randy Jurewicz
        Endangered Species Coordinator
        Bureau of Endangered Resources
        Wisconsin Department of Natural Resources
        Box 7921
        Madison, WI 53707-7921
        (608/267-7507)

cc: FWS/Green Bay Field Office
    Wisconsin DNR, Endangered Species Coordinator

END



| USDA United States Department of Agriculture APHIS Wisconsin Wildlife Services | Wisconsin Department of Natural Resources |

April 17, 2006

James Zorn
Executive Administrator
Great Lakes Indian Fish and Wildlife Commission
P.O. Box 9
Odanah, WI 54861

Dear Mr. Zorn,

The United States Department of Agriculture, Animal and Plant Health Inspection Service, Wildlife Services (WS); the United States Department of Interior, Fish and Wildlife Service (USFWS); and the Wisconsin Department of Natural Resources (WDNR) would like to thank the Voigt Intertribal Task Force (VITF) for its comments regarding the Environmental Assessment on alternatives for wolf damage management in Wisconsin. We also appreciate GLIFWC's assistance as a consulting agency on the EA and the insight provided by your staff member, Peter David, during the preparation of the EA. The WDNR and WS will be conducting the wolf damage management activities in Wisconsin, therefore our agencies have taken the lead in responding to your letter.

Thanks to the willingness of GLIFWC, the Bay Mills Indian Community, the Ho-Chunk Nation and the Lac du Flambeau Tribe of Lake Superior Chippewa Indians to explain the importance of wolves in tribal beliefs and culture, the agencies have a greater understanding of the concerns of Tribal members regarding wolf damage management and the use of lethal wolf damage management methods. We have included the material provided to us by GLIFWC and the Lac Du Flambeau in the EA. We appreciate that the use of lethal wolf damage management methods is likely to be of great concern to the tribal members. Please know that the agencies do not take the use of lethal wolf damage management methods lightly and would not have proposed these methods in the preferred alternative if we did not truly feel that these methods were an essential part of an integrated strategy to address wolf damage and conflicts with wolves in Wisconsin. We feel that professional assistance is needed to address wolf depredations and to keep intolerant stakeholders from feeling provoked into engaging in anti-wolf behavior that would be detrimental to the wolf population.

Some of the concerns expressed by the VITF have already been addressed in the EA. All individuals requesting assistance with wolf concerns will be provided with technical assistance on ways to live with wolves, ways to prevent adverse wolf-human interactions (e.g., making sure wolves do not learn to associate people or residences with food) and farm management and animal husbandry practices which can reduce the risk of wolf predation (e.g., fencing, livestock guarding animals, carcass disposal, etc.). Compensation payments and operational assistance

with wolf damage management would only be available after livestock producers sign a farm plan which includes recommendations on farm/livestock management practices that can reduce risks of conflicts with wolves. Similarly, livestock producers must comply with state laws regarding carcass disposal and fencing for captive cervids before receiving compensation for and assistance with wolf depredations. Wolf damage management would only be initiated in response to depredations that have been verified as being attributable to wolves by specially trained WDNR or WS staff. Priority will be given to non-lethal damage management methods where practical and effective.

WS strives to target the specific wolves involved in depredation but cannot guarantee that the wolf taken is always the specific individual involved in the depredation. Identification of depredating individuals is complicated by the pack hunting behavior of wolves. In instances when a pack is involved in a depredation incident, multiple individuals may have been involved in the predation event. Likelihood of capturing individuals or packs involved in the depredation is improved by restricting the placement of equipment to a set radius (0.5 miles) around the depredation site, placement of capture equipment based on sign and activity of wolves at the site. Sign from the depredation site can be used to determine if the depredation was caused by an individual wolf or a pack. Traps will be set close to kill sites, and normally wolf packs responsible for making the kills would be the ones mostly readily visiting such kills. Because wolves are very territorial, with typical territories being 6 to 10 miles across, most farms occur within only one pack territory, and strange wolves would not likely enter another packs area or feed on kills made by other packs. Trapping near the depredation site would thus target the pack responsible for making the kill.

The agencies have the following responses to the specific issues listed in your letter

> 1) *The Wisconsin EA should include language parallel to the Michigan EA (under Section 3.5, Standard Operating Procedures by Alternative) indicating that for the first 3 alternatives, "Wildlife Services will inform GLIFWC prior to using lethal techniques to address wolf damage issues on lands in the ceded territories but outside tribal boundaries". This will help ensure that WS obtains an intertribal ceded territory perspective consistent with the nature and extent of the tribes' treaty-guaranteed rights and the court decisions upholding those rights.*
>
> WS will notify GLIFWC whenever a wolf complaint investigated by WS within ceded territory is verified.
>
> 2) *No depredation management activity should be undertaken within the boundaries of any reservation without proper consultation and approval by the respective tribe.*
>
> Text in the EA will be changed to clarify this issue. WS will only conduct depredation management activities on *tribal lands* at the request of the Tribe, and in accordance with any Memorandums of Understanding (MOU's) and Cooperative Service Agreements (CSA's) between the Tribe and WS. WS will notify the Tribe prior to conducting any wolf depredation investigations on private lands within reservation boundaries, and will consult with the Tribe prior to undertaking any depredation management actions on these lands.

*3) No lethal control should be conducted within a 6 mile buffer area around reservation lands (or alternative buffer area agreed to by the state and respective tribe) without consent of the respective tribe. Wolves within the buffer area may be living both on and off-reservation, and it is important that tribal natural resource personnel be provide an opportunity to participate in the damage verification process, and in determining the appropriate course of action.*

WS will notify the designated contact of the respective Tribe prior to conducting any wolf depredation investigations for wolf complaints located within a six mile buffer zone around the boundaries of those reservations with a land base large enough to support wolves (Red Cliff, Bad River, Lac Courte Oreilles, and Lac du Flambeau). The designated tribal contact will have the opportunity to co-investigate the complaint with WS. WS will consult with the Tribe prior to initiating any depredation management actions on these lands. The six mile buffer zone may be replaced with an alternate buffer area agreed to by the Tribe, the state, and WS as the result of a negotiated MOU. Prompt response to wolf complaints is essential to detection and observation of evidence (tracks, carcasses, etc.) needed to fully assess the nature of the complaint and to maintain public confidence in agency response to wolf conflicts. WS strives to respond to all wolf complaints within the same day of the complaint if possible. The tribal opportunity to co-investigate is dependent upon the ability of the tribal representative to respond in a similar time frame.

4) Information on the importance of wolves in tribal culture has already been included in the EA.

*5) Public education about wolves remains a critical priority, and the EA itself must be considered an education document. Thus, the threat that wolves pose to humans should be represented accurately as extremely unlikely. It must also be made clear that lethal control in cases of human safety will be made on actual - not simply perceived - threats; although some people feel threatened simply by being observed by wolves, the reality is that wolves present very little threat to humans.*

WS agrees that one of the purposes of the EA is to serve as an educational document. WS believes that the risk to human safety from wolves is accurately portrayed as very low in the EA Section 1.3.6. Having trained professionals investigate wolf complaints provides an opportunity for the agencies to educate the public on the actual risks associated wolves and ways to prevent wolf conflicts, and also ensures that the response to perceived or real risks is appropriate for the situation. Of the 70 wolves removed for wolf damage management over the last 3 years, only one wolf was euthanized because of human safety concerns. This wolf was euthanized after it had attacked 2 different dogs and approached a small child on a swing in her backyard.

*6) Wolves which prey upon game-farm animals should not be controlled; game farms should be required to have predator-proof fencing to protect their animals.*

Game farm owners in Wisconsin must have fencing in accordance with applicable state regulations. Since game farm animals are classified as livestock by the state, owners of game farm animals are statutorily entitled to the same assistance with wolf predation as other

livestock producers. However, WS will not initiate depredation control actions at game farms where fencing is not in compliance with state regulations. If wolf depredation control activities are conducted for game farms, all control activity will take place inside of the fence. Any wolves trapped after a first-time depredation will be radio-collared and released if suitable habitat exists nearby. Within the Ceded Territory if suitable habitat does not exist nearby, WS and WDNR, in consultation with GLIFWC will decide whether wolves caught in the game farm can be released in other locations or would need to be euthanized. Wolves captured a second time in response to repeated depredation may be euthanized if allowed under state and federal permits and regulations.

7) *An annual report summarizing all activities undertaken under each state's depredation management program should be provided to GLIFWC to allow review of the program and its impact on ma'lingan populations.*

WS produces monthly wolf depredation management activity summaries for cooperators. These reports summarize total number of complaints, number of verified wolf complaints, resources involved, and number of wolves trapped. This report will be provided to GLIFWC on a monthly and annual basis. WS also produces an annual monitoring report for all activities conducted under the wolf depredation management EA. This report will be available for GLIFWC to review.

We would like to help our personnel retain an awareness of and sensitivity to the concerns of tribal members. Therefore, we are requesting that a meeting of GLIFWC, tribal representatives and spiritual leaders, and WS personnel involved in wolf depredation management be held at least annually as a means to communicate and discuss Anishinaabe culture and values regarding wolves. WS would be honored to attend multiple VITF meetings and looks forward to working with GLIFWC staff to make necessary arrangements.

Again, we thank you for your comments on and assistance with our analysis. We look forward to working with you on wolf management in the future. If you have any questions regarding this letter please feel free to contact Jason Suckow, USDA/APHIS/ Wildlife Services, 732 Lois Dr., Sun Prairie, WI 53590 (608) 837-2727 or Adrian Wydeven, WDNR, Park Falls Service Center, 875 S. 4th Ave. Park Falls, WI 54552 (715) 762-1363

Sincerely,

Jason Suckow  
State Director Wisconsin/Minnesota  
USDA/APHIS Wildlife Services

Signe L. Holtz  
Director, Bureau of Endangered Resources  
Wisconsin Department of Natural Resources