# FINAL ENVIRONMENTAL ASSESSMENT FOR THE MANAGEMENT OF WOLF CONFLICTS AND DEPREDATING WOLVES IN WISCONSIN



Prepared by:

UNITED STATES DEPARTMENT OF AGRICULTURE
ANIMAL AND PLANT HEALTH INSPECTION SERVICE
WILDLIFE SERVICES

in cooperation with

UNITED STATES DEPARTMENT OF THE INTERIOR, FISH AND WILDLIFE SERVICE

and

WISCONSIN DEPARTMENT OF NATURAL RESOURCES

732 Lois Dr
Sun Prairie WI 53590

April 2006

# TABLE OF CONTENTS

SUMMARY OF PROPOSED ACTION ...................................................................................... 5
ACRONYMS /ABBREVIATIONS ............................................................................................ 6
CHAPTER 1:  PURPOSE OF AND NEED FOR ACTION ........................................................ 7
   1.0      INTRODUCTION ........................................................................................................ 7
   1.1      PURPOSE .................................................................................................................... 8
   1.2      NEED FOR WOLF DAMAGE MANAGEMENT IN WISCONSIN ....................... 8
   1.3      BACKGROUND ......................................................................................................... 9
        1.3.1      Wolf Distribution and Classification - General ............................................ 9
        1.3.2      Wolves in Wisconsin .................................................................................... 11
        1.3.3      Wolf Ecology ................................................................................................ 13
        1.3.4      Benefits of Wolves and Ecological Impact ................................................. 16
        1.3.5      Importance of Wolves in Native American Culture and Beliefs ................ 17
        1.3.6      Wolf Impact on Elk and Moose in Wisconsin ............................................. 18
        1.3.7      Wolf Predation on Livestock and Pets ........................................................ 18
        1.3.8      Other Types of Wolf Conflicts .................................................................... 23
        1.3.9      Wildlife Services and Wisconsin Department of Natural Resources Efforts to Reduce Wolf Damage in Wisconsin ............................................................................................. 25
        1.3.10    How can killing wolves benefit the recovery of the species? ..................... 26
   1.4      SCOPE OF THIS ENVIRONMENTAL ASSESSMENT ....................................... 29
        1.4.1      Actions Analyzed ......................................................................................... 29
        1.4.2      Native American Lands and Tribes ............................................................. 32
        1.4.3      Period for which this EA is Valid ................................................................ 32
        1.4.4      Site Specificity ............................................................................................. 33
        1.4.5      Public Involvement/Notification .................................................................. 34
   1.5      DECISION TO BE MADE ...................................................................................... 34
   1.6      OBJECTIVES FOR THE WISCONSIN WDM PROGRAM .................................. 34
   1.7      RELATIONSHIP OF THIS EA TO OTHER ENVIRONMENTAL DOCUMENTS ............ 35
        1.7.1      ADC Programmatic EIS .............................................................................. 35
        1.7.2      USDA-APHIS-WS Environmental Assessment: Management of Wolf Conflicts and Depredating Wolves in Wisconsin. ................................................................................ 35
        1.7.3      USDA-APHIS-Wisconsin WS/USFWS Biological Opinion ....................... 35
        1.7.4      USDA-APHIS-Wisconsin WS/WDNR Biological Assessment .................. 35
        1.7.5      USFWS Eastern Timber Wolf Recovery Plan ............................................ 35
        1.7.6      Wisconsin Gray Wolf Management Plan (WWMP) ................................... 35
        1.7.7      Endangered Species Section 6 Cooperative Conservation Agreement Between the United States Fish and Wildlife Service and the Wisconsin Department of Natural Resources .. 36
   1.8      AUTHORITY AND COMPLIANCE ..................................................................... 36
        1.8.1      Agencies involved in WDM in Wisconsin .................................................. 36
        1.8.2      Compliance with Federal and State Statutes ............................................... 39
CHAPTER 2:  ISSUES ............................................................................................................... 43
   2.0      INTRODUCTION ..................................................................................................... 43
   2.1      ISSUES CONSIDERED IN DETAIL IN CHAPTER 4 .......................................... 43
        2.1.1      Effects on Wolf Populations in Wisconsin ................................................. 43
        2.1.2      Effects on Non-target Species Populations, Including Threatened and Endangered Species ............................................................................................................................ 43
        2.1.3      Effects on public safety and pet health and safety ...................................... 44
        2.1.4      Humaneness of methods to be used ............................................................. 44

    2.1.5    Sociological Issues Including Impacts on Aesthetic Values ........................................... 46
  2.2    ISSUES NOT CONSIDERED IN DETAIL AND RATIONALE FOR EXCLUSION ........... 48
    2.2.1    Impacts on 's Biodiversity ........................................................................ 48
    2.2.2    Wolf Damage Should be Managed by Hunters and Trappers ...................................... 48
    2.2.3    Appropriateness of Preparing an EA Instead of an EIS for Such a Large Area ............... 49
CHAPTER 3: ALTERNATIVES .......................................................................................................... 50
  3.0    INTRODUCTION ....................................................................................................................... 50
  3.1    DESCRIPTION OF ALTERNATIVES ....................................................................................... 51
    3.1.1    Alternative 1 - Non-lethal WDM Only .......................................................................... 51
    3.1.2    Alternative 2 - Integrated WDM (No Action/ Proposed Action) .................................... 52
    3.1.3    Alternative 3 - Technical Assistance Only .................................................................... 54
    3.1.4    Alternative 4 - No WS WDM in Wisconsin ................................................................. 54
  3.2    WOLF DAMAGE MANAGEMENT STRATEGIES AND METHODOLOGIES ................. 55
    3.2.1    Integrated Wildlife Damage Management ..................................................................... 55
    3.2.2    Integrated WDM Strategies ............................................................................................ 55
    3.2.3    Wildlife Services Decision Model used for Decision Making ...................................... 56
    3.2.4    Local Decision Making Process ..................................................................................... 57
  3.3    WOLF DAMAGE MANAGEMENT METHODS ..................................................................... 58
    3.3.1    Non-Lethal Methods Available to All Without a USFWS Permit ................................. 58
    3.3.2    Non-lethal Methods Available without Permits for States with Cooperative Conservation Agreements with the USFWS ......................................................................................... 59
    3.3.3    Non-lethal Methods which Require Permits from the USFWS ..................................... 61
    3.3.4    Lethal Methods .............................................................................................................. 62
  3.4    ALTERNATIVES CONSIDERED BUT NOT IN DETAIL, WITH RATIONALE .................. 63
    3.4.1    Bounties ......................................................................................................................... 63
    3.4.2    Eradication and Suppression .......................................................................................... 63
    3.4.3    Damage Management through Birth Control ................................................................. 63
    3.4.4    Non-lethal before Lethal ................................................................................................ 64
    3.4.5    Provide Funding for Damage Prevention Supplies and Equipment .............................. 64
    3.4.6    Lethal Only Program ..................................................................................................... 65
  3.5    STANDARD OPERATING PROCEDURES FOR WILDLIFE DAMAGE MANAGEMENT TECHNIQUES ............................................................................................................................. 65
CHAPTER 4: ENVIRONMENTAL CONSEQUENCES ..................................................................... 69
  4.0    INTRODUCTION ....................................................................................................................... 69
  4.1    SOCIAL AND RECREATIONAL CONCERNS, RESOURCE USE AND IMPACTS ON HISTORIC AND CULTURAL RESOURCES .............................................................................. 69
    4.1.1    Social and Recreational Concerns .................................................................................. 69
    4.1.2    Irreversible and Irretrievable Commitments of Resources ............................................ 69
    4.1.3    Alternative Consistency with Forest Service LRMPs ................................................... 69
    4.1.4    Impacts on Cultural, Archaeological and Historic Resources ....................................... 70
  4.2    ISSUES ANALYZED BY ALTERNATIVES ............................................................................ 70
    4.2.1    Alternative 1 - Non-lethal Damage Management Only ................................................. 70
    4.2.2    Alternative 2 - Integrated WDM (No Action / Proposed Action/) ................................. 74
    4.2.3    Alternative 3 - Technical Assistance Only .................................................................... 89
    4.2.4    Alternative 4 - No WS WDM in Wisconsin ................................................................. 91
  4.3    SUMMARY OF IMPACTS ........................................................................................................ 95
CHAPTER 5: LIST OF PREPARERS AND PERSONS CONSULTED ............................................. 98
  5.1    Preparers ..................................................................................................................................... 98
  5.2    Persons Consulted ...................................................................................................................... 98
CHAPTER 6: SUMMARY OF RESPONSES TO PUBLIC COMMENTS ........................................ 99

APPENDIX A:  LITERATURE CITED..................................................................................123
APPENDIX B:  METHODS EMPLOYED OR RECOMMENDED FOR WOLF DAMAGE
              MANAGEMENT ................................................................................................138
APPENDIX C:  FEDERALLY LISTED ENDANGERED, THREATENED AND CANDIDATE
              SPECIES IN WISCONSIN...............................................................................148
APPENDIX D:  WISCONSIN LIST OF THREATENED AND ENDANGERED SPECIES ..............149
APPENDIX E:  WISCONSIN GUIDELINES FOR CONDUCTING DEPREDATION CONTROL ON
              WOLVES IN WISCONSIN WHILE FEDERAL LISTED.....................................152
APPENDIX F:  SET OF FINDINGS: WISCONSIN DEPARTMENT OF NATURAL RESOURCES
              WOLF DEPREDATION PERMIT ...................................................................156

## SUMMARY OF PROPOSED ACTION

The United States Department of Agriculture (USDA), Animal and Plant Health Inspection Service, Wildlife Services (WS) and the United States Department of the Interior, Fish and Wildlife Service (USFWS), in cooperation with the Wisconsin Department of Natural Resources (WDNR), in accordance with State and Federal regulations and guidance on wolf management, propose to implement an Integrated Wildlife Damage Management (IWDM) program in Wisconsin to protect resources from gray wolf *(Canis lupus)* damage and promote wolf conservation.  The agencies prepared this environmental assessment to analyze the environmental impacts of various alternatives for the management of wolf damage and wolf conflicts in Wisconsin including the proposed action.  This analysis covers wolf damage actions that could be conducted by the USFWS, WS and the WDNR while wolves are federally protected under the Endangered Species Act (ESA).[1]  The proposed action includes the USFWS issuing permits for take of wolves under Section 10(a)(1)(A) of the Endangered Species Act.  WS would act as agents of the WDNR which is the agency requesting a permit for the take of depredating wolves from the USFWS.  Under the preferred alternative, damage management would be conducted on private or public property in Wisconsin when the resource owners/managers request assistance to alleviate wolf damage, wolf damage is verified, and agreements have been completed specifying the details of the damage management action.  The types of wolf conflicts that could be addressed include: 1) depredation on livestock, 2) depredation on pets, and 3) potential threats to human safety.  Under the preferred alternative, the IWDM strategy would encompass the use of the full range of legal, practical and effective methods of preventing or reducing damage while minimizing harmful effects of damage management measures on humans, wolves, other species, and the environment.  Under this action, WS and the WDNR would provide technical assistance and operational damage management, including non-lethal and lethal management methods selected after applying the WS Decision Model (Slate et al. 1992). When appropriate, farm management practices (animal husbandry), frightening devices, and livestock guarding animals could be recommended and utilized to reduce wolf damage.  In other situations, when the damage situation and landowner practices meet USFWS and WDNR requirements, wolves would be removed as humanely as possible using foot-hold traps, foot snares, cable restraints, and shooting.  In determining the damage management strategy, preference would be given to non-lethal methods when they are deemed practical and effective.  Lethal methods would be used to reduce damage after practical and appropriate non-lethal methods have been considered and determined to be ineffective or inappropriate in reducing damage to acceptable levels.  However, non-lethal methods may not always be applied as a first response to each damage problem.  The most appropriate initial response to a wolf damage problem could be a combination of non-lethal and lethal methods, or there could be instances where application of lethal methods alone would be the most appropriate strategy.  All wolf damage management would be conducted in compliance with appropriate federal, state, and local laws and court-mandated restrictions.

---

[1]  Ordinarily, the actions of state agencies are not subject to the requirements of the National Environmental Policy Act.  However, while wolves are federally protected under the Endangered Species Act, actions taken by the WDNR will depend upon the management decisions (permits, 4(d) rules) of the USFWS which are subject to the requirements of NEPA.

# For Pages 6-51
# See AR 5

methods include but are not limited to animal husbandry practices, installation of fencing and use of livestock guarding animals (Section 3.2.1, Appendix B). The WDNR and their appropriately trained and designated agents have access to some non-lethal techniques involving harassment or handling of wolves without permits from the USFWS (Section 3.2.2). Authority for these methods is granted under (50 CFR 17.21) because of the wolf cooperative conservation agreement between the USFWS and WDNR (Section 1.7.7). However, some non-lethal methods require a permit or other authorization from the USFWS, specifically, dog training collars for aversive conditioning and non-lethal projectiles like rubber bullets and bean bags. In the permit/authorization the USFWS has the option of restricting the use of these methods to WS and the WDNR, or the USFWS may grant the WDNR and WS the authority to train and equip personnel outside their agencies to use these methods.

There are provisions within the regulations pertaining to the ESA that allow for the lethal take of an endangered species in response to a demonstrable (either immediate or non-immediate) threat to human safety. Response to less immediate threats and wolf predation on pets will be restricted to non-lethal methods. No lethal take of wolves for damage management could occur.

### 3.1.2    Alternative 2 - Integrated WDM (No Action/ Proposed Action)

Under this alternative, an IWDM program would be used in Wisconsin to protect livestock, pet and human safety from gray wolf damage and promote wolf conservation in accordance with the WWMP (WDNR 1999), the USFWS rules and/or permits for WDM, the Eastern Gray Wolf Recovery Plan (USFWS 1992) any WDNR guidelines for conducting depredation control (Appendix E), and all applicable policies, agreements and guidelines among WDNR, WS, USFWS and the tribes. All WDM activities would also be consistent with other uses of the area and would comply with appropriate Federal, State and local laws and conducted in cooperation with other governmental agencies and tribal governments, as appropriate.

The IWDM strategy would encompass the use of the full range of legal, practical and effective methods of preventing or reducing damage and conserving the wolf population while minimizing harmful effects of damage management measures on humans, wolves, other wildlife species, domestic animals, and the environment. Under this action, WS and the WDNR would provide technical assistance and operational damage management, including non-lethal and lethal management methods selected after applying the WS Decision Model (Slate et al. 1992). Wildlife Services would be able to assist with wolf research and population monitoring. This alternative would be similar to Wisconsin WDM practices that were conducted under the 2003 section 4(d) rule and an April 2004 permit issued by the USFWS. This strategy for WDM was discontinued on September 13, 2005 when all WDM activities allowed under the USFWS permit were enjoined by the U.S. District Court in the District of Columbia.

Wolf damage management would be conducted on private or public property in Wisconsin when the resource owners/ managers (property owners/ land managers) request assistance to alleviate wolf damage, wolf damage is verified by WS, and an *Agreement for Control* or other comparable document has been completed. The WWMP (WDNR 1999) further establishes that in order for lethal WDM methods to be used, the producer/owner must sign a depredation management plan (farm plan) for the property which includes damage abatement recommendations. The cooperator is required to agree to (sign) the plan prior to receiving financial assistance with supplies for non-lethal WDM and before any operational WDM could be conducted. Individuals and agencies with wolf damage and/or concerns about wolves would receive technical assistance in the form of instructional sessions, demonstrations, equipment loans, and information on the availability and use of non-lethal and lethal methods (Section 3.3, Appendix B). In determining the damage

management strategy, preference would be given to non-lethal methods when they are deemed practical and effective. Non-lethal methods used by landowners could include, but would not be limited to, changes in farm management practices and pet care/supervision, frightening devices, exclusion, guarding animals, habitat modification, and behavior modification of problem wolves. Non-lethal methods used operationally by WS and WDNR may include foot-hold traps and cable restraints (Olson & Tischaefer 2004) with "stops" (used to live capture wolves for relocation and/or attaching radio collars, and collars used to activate frightening devices), frightening devices and aversive conditioning (e.g., with modified dog training collars) and non-lethal projectiles (Appendix B). In its permit request, the WDNR has requested that USFWS grant the WDNR and WS the authority to train and equip landowners/managers to use non-lethal projectiles such as rubber bullets.

Lethal methods would be used to reduce damage after practical and appropriate non-lethal methods have been considered and determined to be ineffective or inappropriate in reducing damage to acceptable levels. In some instances, the most appropriate initial response to a wolf damage problem could involve concurrent use of a combination of non-lethal and lethal methods, or there could be instances where application of lethal methods alone would be the most appropriate strategy. Lethal methods could include shooting, calling and shooting, cable restraints, and euthanasia of wolves live-captured in foot-hold traps, cable restraints or other live-capture devices.

The WDNR has also asked for authority for lethal take of up to 10% of the annual wolf population estimate each year.[8] Actual annual lethal take of wolves for WDM is anticipated to usually be much lower than this level. The annual maximum value of 10% was estimated based on review of similar WDM program which has been in effect in Minnesota since 1986. For the period of 1993 to 2002 intentional take for WDM in Minnesota ranged from 3.9 to 9.4% (average 6.4%) of the estimated state population. During the period of 2003- 2005 when an integrated WDM approach was used in Wisconsin, annual lethal take was 17 wolves in 2003, 24 in 2004, and 29 in 2005. This level of take represents approximately 5.1, 6.4, and 6.8 percent of the late-winter Wisconsin wolf population for 2003, 2004, and 2005, respectively.

Wolves in Wisconsin are currently a federally protected "endangered" species. Except in situations of threat to human safety[9] or to aid an individual wolf[10], endangered wolves can only be taken by WDNR, or agents of the WDNR, using non-lethal means. Additional forms of take of endangered wolves, including lethal take, can be authorized by a permit from USFWS. Taking wolves by members of the public without a permit are subject to stiff penalties, including fines and imprisonment. If wolves are reclassified as a threatened species, the USFWS could grant limited authority for the take of depredating wolves in a 4(d) rule. The USFWS would issue permits or authorization via special rules under section 4(d) for the use of non-lethal (i.e., aversive conditioning and non-lethal projectiles) and lethal WDM techniques. The permits or authorizations would stipulate the number of animals that can be taken and the methods that can be used; requirements for reporting take and disposition of carcasses; and provides measures to

---

[8] These estimates are derived from surveys conducted during late winter, prior to pup production, when population size is at an annual low.

[9] While federally protected under the ESA, anyone can take a wolf in defense of human life, that is, when a wolf is attacking a person. Additionally, USFWS, Federal land management agencies, MDNR or their designated agents can take wolves in cases of non-immediate but demonstrable threats to human safety without a permit or other authorization from the USFWS.

[10] USFWS, MDNR, federal land management agencies, or their designated agents, may take a wolf to aid a sick, injured, or orphaned wolf.

# For Pages 54-117
# See AR 5

We agree that prompt response to depredations are necessary. WS is required to visit potential depredation sites within 48 hours, but normally visit the site on the same day as the call. More than half are not verified wolf depredation, but producers are educated about non-lethal methods and animal husbandry methods for reducing wolf depredation. All persons filing complaints were probably dissuaded from attempting to kill wolves on their own. However, producers generally expect *effective* WDM. As discussed in the EA, the agencies believe that access to the full range of WDM methods is needed to most effectively respond to wolf damage and risks to human safety from wolves. If WDM methods are not effective, "doing something" will not necessarily reduce the inclination to engage in illegal killing of wolves.

**65. We note that ranchers are required to sign a depredation management plan before any lethal control is administered but they are not required to follow any of the suggested methods. Producers should be required to implement these suggestions.**

A signature implies that the producer is required to follow the plan. If producers do not follow the plan, payments may be denied and lethal WDM methods would not be used until the plan is followed.

**66. Agencies should consider using the minimally invasive capture system developed by the Eurasian lynx researchers in Switzerland. This system is accurate and has no effect on non-target species. It also eliminates human interaction with conscious wolves so animals and handlers are at less risk of injury.**

The method is currently too experimental to broadly apply. The MICS basically consists of a teleguided dart-gun used in conjunction with two cameras and a remote control system via radio-signal. Initial review of the system indicates that the estimated cost to produce such a unit is approximately $4,000, and requires someone to be onsite during the capture event monitoring the scene in order to activate the dart gun. Based on WS and MDNR experience with wolf damage in Wisconsin, during some parts of the year multiple units would be needed at the same time. While this may work for more limited research applications, for WDM in Wisconsin this method is cost prohibitive, would require an inordinate amount of personnel time to monitor. In addition, it would appear that the target animal has to be conditioned to come to bait site. Wolves often visit farms infrequently or randomly making the utilization of this method for wild wolves impractical if they were not conditioned to a specific location. WS and DNR are interested in learning new methods as they become available, and will continue to monitor the development of this technique.

**67. Agencies should use tranquilizer tab devices on all traps and snares.**

WS & DNR have considered use of these devices but worry about leaving controlled substance on the landscape, the potential over-dosage of small non-target animals, and the potential for complicating/averse reaction with chemical immobilization procedures. However, analysis in the EA does permit use of these devices under Alternatives 1 and 2.

**68. Commenter can not fully support Alternative 2 because it proposed the same lethal control management for wolves protected under both endangered and threatened status.**

The WDM measures that would be allowed under the permit are similar to those allowed when the wolf was listed as threatened. However, the permit is more restrictive in certain areas. The former rule (50 CFR § 17.40(o)(2)(iv) that dealt with depredating wolves read.

> When acting in the course of official duties, any authorized employee or agent of the Service, of the wildlife conservation agency of a State, or of a federally recognized Native American

118

tribe, who is designated by his/her agency for such purposes, may take a gray wolf or wolves within the person's State or, in the case of a tribal employee, within that person's Reservation boundaries, in response to depredation by a gray wolf on lawfully present livestock or domestic animals. However, such taking must be preceded by a determination by one of the agencies listed in paragraph (o) of this section that the depredation was likely to have been caused by a gray wolf and depredation at the site is likely to continue in the absence of a taking. In addition, such taking must be performed in a humane manner and occur within 1 mile of the place where the depredation occurred if in Michigan or Wisconsin, and within 4 miles of the place where the depredation occurred if in the remaining area covered by paragraph (o) of this section. Any young of the year taken by trapping on or before August 1 of that year must be released. Any take for depredation control must reported to the Service within 15 days as outlined in paragraph (o)(4) of this section. The specimen may be retained or disposed of only in accordance with directions from the Service.

The permit is more restrictive than the 4d rule of a threatened population in several ways. 1. The permit restricts who can take wolves in responses to cases of confirmed depredation. While listed as threatened, any authorized employee or agent of the Service, of the wildlife conservation agency of a State, or of a federally recognized Native American tribe, who is designated by his/her agency for such purposes could take wolves in response to depredation events. The permit restricts those persons who may take wolves in response to confirmed depredation to the permittee or authorized agents of the permittee. 2. The permit would place clear limits on the number of wolves that could be taken within the permit period. There was no such limit on allowable take of wolves while listed as threatened. 3. The permit reduces trapping distance from depredation site to 0.5 mile from 1.0 mile under the 4d rule. 4. The permit restricts any taking of lactating females prior to June 1, while the 4d rule did not include any restrictions on taking of lactating females. 5. The permit requires a much stricter reporting requirement on take of wolves. In order to more effectively monitor the number of wolves taken, the permittee is required to report all takings to the USFWS within 5 days. While in threatened status, persons taking wolves were required to report no more than 15 days within the taking. The issue of USFWS authority to issue a permit for this type of take is addressed for comment 7.

Effective resolution of wolf-related conflicts provides relief for those individuals experiencing wolf damage and helps prevent development of negative public attitudes and thus reduces indiscriminate killing of wolves. Change in the regulatory status of wolves does not change the agencies' belief that an integrated WDM program would be the most effective way to promptly and professionally address conflicts with wolves and prevent decline in local tolerance for wolf populations. Therefore, it is not surprising that the WDM strategy allowed when wolves were threatened is similar to the response proposed in this EA.

**69. Commenter believes it is an important approach to prevent depredations before they occur and work collaboratively to provide alternative deterrents to lethal WDM. Agencies should work to procure funds to ensure that preventive measures are not an undue economic burden. State should take advantage of federal funding for predator deterrent practices provided through the Environmental Quality Incentives Program administered by the NRCS. Bailey Wildlife Foundation Proactive Carnivore Conservation Fund supports research on non-lethal methods and provides compensation to ranchers who have lost livestock due to wolves.**

WS routinely implements non-lethal abatement on farms prior to depredations occurring when wolves are present near cattle and calves. During the past two years WS has installed fladry, electronic guards and flashing lights on 15 different farms. The efficacy of some non-lethal methods declines as cattle are released onto grazing pastures and the herd begins to separate over a much larger area. WS provides literature and when applicable recommends the use of livestock guard animals. WS has referred several

119

# For Pages 120-151
# See AR 5

# APPENDIX E

# WISCONSIN GUIDELINES FOR CONDUCTING DEPREDATION CONTROL ON WOLVES IN WISCONSIN WHILE FEDERAL LISTED AS "THREATENED" OR "ENDANGERED" STATUS.

## By the Wisconsin Department of Natural Resources

## October 14, 2005

The gray wolf (*Canis lupus)* was listed as Endangered by the federal government in 1974, and listed as Endangered by the State of Wisconsin in 1975. In 1999 the State of Wisconsin reclassified wolves to threatened status, and in on August 1, 2004 was removed from the threatened species list, and classified as protected wild animal. The U. S. Fish and Wildlife Service federally reclassify wolves in Wisconsin as Threatened on April 1, 2003, but a district judge decision on wolf reclassification in Oregon on January 31, 2005, caused wolves to be relisted as endangered.

The 1999 Wisconsin Wolf Management Plan prescribes how wolves should be managed in the state following federal and state reclassified to Threatened and delisted status. The following, more specific, guidelines were developed by the Wisconsin Wolf Science Advisory Committee to determine appropriate depredation control activity when and while listed as a **Threatened or Endangered Species** by the federal government, but delisted by the state. These guidelines will need to be updated when wolves are federally de-listed.

Note: *These guidelines will be reviewed annually with scientists and stakeholders, and will be revised as necessary.*

**Authority**—Authority to control and manage problem wolves will be held by the Wisconsin Department of Natural Resources (DNR), USDA-APHIS-Wildlife Services (WS), U. S. Fish and Wildlife Service (USFWS), tribal agents on Indian reservations, and other federal, state and tribal agents authorized by DNR and USFWS.

## Definitions

**Abatement—**Techniques for reducing risk of depredation by creating exclusions, establishing barriers, or using scare devices.

**Aversive Conditioning**—Conditioning of animals to eliminate undesired behavior by associating such behavior with a disagreeable stimulus.

**Chronic Farm—**Farm with verified wolf depredation in 2 or more years in the past 5 year-period.

**Control**—Attempt to capture or shoot problem wolves, and may include translocating, placing in captivity for study or research, euthanizing, or dispatching.

**Depredation**—Refers to predation on domestic animals.

**Depredation Site----**Location where depredation has occurred. On private land this includes contiguous property under the same ownership or lease of the affected landowner renter.

**Dispatch**—Attempting to humanely kill an animal in field situations.

**Domestic Animal—**Animal owned by people.

**Euthanize—**Humane killing of an animal.

**Guard Animal----**Use of one species of domestic animal to provide predator protection for another species of domestic animal, and may include Guarding dogs, llamas, donkeys, and other animals. Guarding dogs are dogs specifically bred for the protection of livestock, and have historically been used for this purpose; specific breeds include Maremma, Shar Planinetz, Anatolian shepherd, Komondor, Great Pyrenees, Akbash, and various crosses of these breeds.

**Significant Loss**—The killing or maiming of one or more domestic animals by wolves where the imminent threat of attacks on additional domestic animals is apparent. For poultry or other small animals, loss of $250 or likely to exceed $250 would be considered a significant loss.

**Verified Depredation**—Depredation verified by trained personnel from an authorized agency, and defined either as **Confirmed,** clear evidence that one or more wolves were responsible, or **Probable**, sign strongly suggesting that one or more wolves were responsible.

### Wolf Depredation Management Guidelines

1) **Use of Aversive Conditioning or Other Non-Lethal Methods----**
a) Where appropriate, WS will offer suitable non-lethal alternatives.
b) Upon the first verification of depredation by wolves, a depredation management plan will be made for the farm, which will include recommended suitable nonlethal methods and other practices that may reduce depredation on the farm. A signed plan will be required before any control actions can proceed on any farm.
c) If cost effective abatement is feasible, cost-shared abatements will be offered by DNR if money is available; DNR and WS will jointly determine suitable practices.
d) A depredation management plan would be developed on farms before cost-share abatements are offered; DNR and USDA-WS will develop the plan in consultation with county and state livestock specialists.
e) Experimental non-lethal abatement measures, such as the use of shock collars will be

   done by DNR in consultation with WS; control trapping will normally not be conducted
   by WS in areas where DNR is conducting experimental abatement measures.

2) **Verifications Necessary to Begin Wolf Control —**
a) Control may begin in any zone after one significant loss during the current grazing season if authorized by the USFWS.

3) **Determination to Begin Wolf Control** —
a) <u>On private land</u>, WS determines when trapping will begin, and will notify the local DNR wildlife biologist or other DNR representative, and DNR will notify tribes where appropriate, that trapping has begun.
b) <u>On public lands</u>, WS, the local DNR wildlife biologist or other DNR representative, and the manager of the public land to be trapped, will jointly determine if trapping will occur on such land, and will notify affected tribes.
c) <u>On private lands in Indian Reservations, and any area surrounding the reservation negotiated between tribes and State</u>: WS and DNR will consult with the tribe before trapping and dispatching of wolves.
d) <u>On tribal lands</u> will only be trapped by WS if requested by the tribe.

4) **Maximum Distance Trapping Will Occur From Depredation Site:**
a) Trap to 0.5 or 1.0 mile or whatever distance from depredation site is permitted by the U.S. Fish and Wildlife Service throughout the state.

5) **Duration of Trapping at a Depredation Site**---
a) WS will use its discretion to determine trapping effort needed to effectively resolve depredation problems and will generally trap up to 10 to 15 days for first time depredation, and up to 21 days for chronic farms.

6) **Treatment of Special Sex/Age Group**---
a) Prior to August 1, all pups will be released at site.
b) On certain areas of highly suitable wolf habitat, the local DNR wildlife biologist, after being notified by WS that depredation control trapping has begun, may request that lactating females be released nearby. Such actions would only be done with consultation with the affected landowner and if an effective abatement or aversive conditioning method is available to keep the wolf off the depredation site. Lactating females would not be released near chronic farms after June 15.

7) **Treatment of Radio-Collared or Tagged Wolves**---
a) Radio-collared or tagged wolves will be treated as any other depredating wolf (dispatch or translocate as appropriate).
b) Consult with tribal officials on any wolves that are clearly from an Indian reservation in areas near such reservations or near Indian lands.

8) **Capture of Dogs or Wolf-Dog Hybrids**---
a) Dogs caught at depredation sites will be turned over to town chairman, dog owner, or animal shelter.
b) Wolf-dog hybrids caught at depredation sites will be dispatched by USDA-WS or DNR if no collar or other identifying mark occur on the animal.

**9) Wolf Control on Depredation to Dogs----**
a) Control could be conducted on wolves killing dogs leashed, confined, or under the owner's control on the owner's land if there is likeliness of additional depredation.
b) No control trapping would be conducted on wolves killing dogs that are free-roaming, roaming at large, hunting, or training on public lands, and all other lands except land owned or leased by the dog owner.
c) Other abatement and aversive conditionings will be considered on public lands where depredation occurs on dogs or other domestic animals.
d) Guard animals would be treated as other domestic animals for verification and control purposes.

**10) Wolf Control on Deer or Game Farms**----
a) Wolf control would be conducted on deer and game farms using the guidelines listed above.
b) Normally, trapping would only be allowed within the fenced area of the game farm, unless unusual circumstances makes it necessary to trap up to 100 yards beyond. Trapping outside fence areas would only be considered following additional consultation among WS, DNR, and adjacent landowners.

**11) Information Sharing-----**
a) DNR will share radio locations of potential depredating wolves with USDA-WS
b) DNR will notify landowners and publish information of wolf depredation problems through local news releases when appropriate.
c) DNR will share information with tribes on wolves that travel onto Indian reservation lands.
d) USDA-WS will turn all wolves euthanized at depredation sites over to the U. S. Fish and Wildlife Service, who will normally turn these carcasses over to the Wisconsin DNR or Tribes for final designation. Wolf carcasses will be used for research, education, and cultural purposes.
e) DNR will develop publications and educational materials on wolf depredation focused toward specific organizations or groups most affected by depredation by wolves.
f) DNR will provide press releases to explain lethal and non-lethal forms of control.
g) DNR will provide timely response to depredations with news releases.
h) DNR will cooperate with USDA-WS and other organizations to test and research nonlethal methods of control, including methods of exclusion and aversive conditioning; results of such research will be published in scientific reports and in popular media.
i) DNR will cooperate with USDA-WS and others to conduct cooperative research on wolf/livestock relationships and will attempt to determine means for preventing and educating landowners on wolf depredation on pets and livestock.

# APPENDIX F

## SET OF FINDINGS: WISCONSIN DEPARTMENT OF NATURAL RESOURCES WOLF DEPREDATION PERMIT

156