


Department of the Interior
U.S. Fish and Wildlife Service
Federal Fish and Wildlife Permit Application Form

RECEIVED
Region 3
SEP 0 9 2005
U.S. FISH AND WILDLIFE SERVICE
Ecological Services

Expires September 30, 2007
OMB No. 1018-0094

Return to: *Click here for addresses*

Endangered Species - USFWS
BHW Federal Bldg., 1 Federal Drive
Fort Snelling, MN 55111-4056

**Type of Activity:**

Native Endangered & Threatened Species –
Scientific Purposes, Enhancement of Propagation or Survival Permits
(i.e., Recovery Permits) and Interstate Commerce Permits

Complete sections A. OR B. and C. on this page, plus the attached pages of this application. Application will not be considered complete without all sections. See additional instructions on attached pages.

**A.    Complete if applying as an individual**

| 1.a Last name | 1.c First name | 1.c Middle name or initial | 1.d Suffix |
|---|---|---|---|
| 2.a Street address (line 1) | 2.b Street address (line 2) | 2.c Street address (line 3) | |
| 3.a City | 3.b Province | 3.c State | 3.d Zip code/Postal code | 3.e Country |
| 4. Date of birth (mm/dd/yyyy) | 5. Social Security No. | 6. Occupation | 7.a Home telephone number | |
| 7.b Work telephone number | 7.c Fax number | 8. E-mail address | 9. County | |

10. List any business, agency, organizational, or institutional affiliation associated with the wildlife or plants to be covered by this permit (see C.1.)     11. Doing business as (dba)

**B.    Complete if applying as a business, corporation, public agency or institution**

| 1.a. Name of business, agency, or institution | 1.b. Doing business as (dba) |
|---|---|
| Wisconsin Department of Natural Resources, Land Division | Manage Endangered Resources for the State of Wisconsin. |

| 2.a Street address (line 1) | 2.b Street address (line 2) | 2.c Street address (line 3) |
|---|---|---|
| 101 S. Webster St. | | |

| 3.a City | 3.b Province | 3.c State | 3.d Zip code | 3.e Country |
|---|---|---|---|---|
| Madison | | WI | 54707-7921 | USA |

| 4. Tax identification no. | 5. Describe the type of business, agency, or institution and provide state of incorporation |
|---|---|
| na | Natural Resource Management |

| 6.a. Principal officer (President, director, etc) Last name | 6.b. First name | 6.c. Middle name or initial | 6.d. Suffix |
|---|---|---|---|
| Osterndorf | Laurie | | |

| 7. Principal officer title: | 8. Home telephone number |
|---|---|
| Division Administrator, Land | na |

| 9. Work telephone number | 10. Fax number | 11. E-mail address | 12. County |
|---|---|---|---|
| 608-267-7552 | 608-266-6983 | laurie.osterndorf@dnr.state.wi.us | Dane |

**C.    All applicants complete**

2. Have you obtained all required State, Federal, or foreign government approval(s) to conduct the activity you propose?
   Yes ☐   If yes, provide a copy of the approval(s).    Have applied ☐    Not required ☒

3. Enclose check or money order payable to the U.S. FISH AND WILDLIFE SERVICE in the amount of $100 for a new permit/to renew an existing permit, or $50 to make substantive amendments to an existing permit [50 CFR 13.11(d)(3)]. The attached pages provide information on who is exempt from paying the fee.

4. Certification: I hereby certify that I have read and am familiar with the regulations contained in Title 50, Part 13, of the Code of Federal Regulations and the other applicable parts in subchapter B of Chapter I of Title 50, and I certify that the information submitted in this application for a permit is complete and accurate to the best of my knowledge and belief. I understand that any false statement herein may subject me to the criminal penalties of 18 U.S.C. 1001.

5. Signature (in blue ink) of applicant/person responsible for permit in Section A. or B. (no photocopied/stamped signatures)    6. Date (mm/dd/yyyy)
   *[signature: Laurie Osterndorf]*    9/6/05

Form 3-200-55 (Rev. 05/2005)        Please continue to next page

## PERMIT APPLICATION FORM INSTRUCTIONS

The following instructions pertain to the standard permit form 3-200 that must be completed as an application for a U.S. Fish and Wildlife Service (FWS) or CITES permit. The General Permit Procedures in 50 CFR 13 address the permitting process. For simplification, all licenses, permits, registrations, and certificates will be referred to as a permit.

Complete all appropriate blocks/lines/questions in Sections A. OR B. and C on page 1, plus the attached pages of this application. Print clearly or type in the information. Applications will not be considered complete without these pages. An incomplete application may cause delays in processing or may be returned to the applicant.

Sign the application in blue ink and send the original to the address at the top of the application. Faxes or copies of the original signature will not be accepted.

Please plan ahead. Allow at least 60 days for your application to be processed (50 CFR 13.11). However, some applications for a Recovery or Interstate Commerce permit may take longer than 90 days to process. Applications are processed in the order they are received.

Additional forms and instructions, plus copies of the FWS permit regulations, are available from the FWS permit web site at http://permits.fws.gov/.

Most of the application form is self-explanatory, but the following provides some assistance for completing the form

**COMPLETE EITHER SECTION A. OR SECTION B.**

Section A   "Complete if applying as an individual" - Enter the complete name of the responsible individual who will be the permittee if a permit is issued. Enter personal information that identifies the applicant. All blocks must be completed. If you are applying on behalf of a client, the personal information must pertain to the client; and a notarized document evidencing power of attorney must be included with the application.

Section B   "Complete if applying as a business, corporation, public agency, or institution" - Enter the complete name and address of the business, corporation, public agency or institution that will be the permittee if a permit is issued. Give a brief description of the type of business the applicant is engaged in, the name and phone number of the person in charge (i.e., principal officer), and if the company is incorporated, the State in which it is incorporated.

**ALL APPLICANTS COMPLETE SECTION C.**

Section C   "Do you currently have or have you had any Federal Fish and Wildlife permits? List the number(s) of your most current FWS or CITES permit or the number of the most recent permit if none are currently valid.

Section C   "Have you obtained all required State, Federal or foreign government approval(s) to conduct the activity you propose?" (Please be aware that there may be other requirements necessary to conduct this activity such as a hunting license, import permit, or collection permit.) If "yes," list the State, Federal or foreign countries involved and type of document required. Include a copy of these documents with the application. If you have applied for the documents, check the "have applied" box and list the State, Federal or foreign countries involved and type of documents required. If the proposed activity is not regulated, check "not required."

Section C.3   "Enclose check or money order (if applicable)" You must enclose an application processing fee unless you are fee exempt. Consult the Application Processing Fee section on the next page for details. If you are fee exempt, write "EXEMPT" in this space. Make your check or money order payable to the "U.S. Fish and Wildlife Service" and attach it to the application form.

Section C.4-6   "CERTIFICATION" The individual identified in Section A., the principal officer named in Section B., or person with a valid power of attorney (notarized documentation must be included in the application) must sign and date the application in blue ink. This signature binds the applicant to the statement of certification. This means that you certify that you have read and understand the regulations that apply to the permit. You also certify that everything included in the application is true to the best of your knowledge. Be sure to read the statement and re-read the application and your answers before signing.

# APPLICATION FOR A NEW FEDERAL RECOVERY PERMIT

Text in Bold corresponds to items identified on Form-3-200-55

## A. IDENTIFY SPECIES AND ACTIVITY

**Provide the common and scientific names of the species being requested for coverage in the permit and their status.**

Gray wolf, *Canis lupus*, endangered

**A.1b.   Provide the number, age and sex of such a species to the extent known.**

The Wisconsin population for 2005 prior to birth of pups in the spring was 425 to 455 wolves in the state, including about 35% pups born in spring 2004, and about 50:50 ratio of males to females. About 15 to 30 would be live-captured each year and fitted with VHF, GPS, or Satellite radio collars. Up to 50 wolves or about 10% of the population may be removed by trapping or shooting at situation where wolves have attacked and killed or injured domestic animals.

**Identify the activities sought to be authorized for each species.**

Activities requested include research, monitoring and depredation abatement activities:
1. Conduct live-trapping & re-trapping of wolves in number 4, 14, 7 McBride-Sutton, or CDR 7.5 foot-hold trap, or cable-restraints or self attaching cable transmitter throughout Wisconsin.
2. Chemically immobilize adult, yearling, and pup (> 30 lbs.) wolves and fit with transmitter, ear tags, and pit tags.
3. Collect blood and conduct non-invasive health checks, administer standard medications, and collect non-invasive specimens as necessary.
4. Aerially track collared wolves weekly or 2 to 3 per month, or more frequently if making rapid moves. Daily radio tracking may be done on some animals if being intensely monitored on the ground, and some may be followed for up to 24 hours from distance locations using tri-angulations.
5. Remove and relocate depredating wolves in response to verified landowner complaints.
6. Attach electronic radio collar to condition potential depredating wolves to avoid areas of livestock concentration or test collars on non-depredating wolves in wildland situations.
7. Harass wolves with rubber bullets, other projectile nonlethal devises, or other devises intended scare wolves and to provide aversive conditioning to bold or habituated wolves that pose threats to domestic animals or human safety.
8. Remove through live-capture and euthanizing, or shooting, up to 10% of the previous winter wolf population at depredation sites or a total of 43 wolves for the remaining portions of 2005, and the total for 2006 to be determined

2

after winter surveys in winter 2005-2006. The conditions for taking of these wolves would include the following:

8 (a)  The depredations have occurred during the calendar year.

8 (b)  The depredation occurred on lawfully present livestock (as defined by the 1999 Wisconsin Wolf Management Plan), livestock guarding animals, and pets that are near residences, farm buildings, or held in confinement. Taking would not occur for depredations by wolves on pets running at large or used in hunting and training.

8 (c)  Takings of wolves will be preceded by a verification of wolf depredation by trained persons working for USDA-Wildlife Service, Wisconsin Department of Natural Resources, other agents of the state listed on this subpermit, U.S. Fish and Wildlife Service, and Tribal natural resource personnel.

8 (d)  Additional wolf depredations are likely to continue in the immediate future if depredating wolf or wolves are not removed.

8 (e)  The Taking will be performed in a humane manner.

8 (f)  Takings of wolves will occur within ½ mile of the depredation site.

8 (g)  Pups of the year will be released back to the wild prior to August 1, and will marked with ear tags, and/or microchips, and if available and pups are at least 30 pounds may be fitted with radio collars.

8 (h)  Taking for more than the current calendar year can only occur in accordance to 8 (a) through 8 (g), and if the following conditions exit:

8 (h) (1), verified depredations occurred at the site in the immediate vicinity during the previous year.

8 (h) (2), there is strong evidence that one or more members of the depredating pack has remained in the area since the verified depredation,

8 (h) (3), based on wolf behavior and other factors, depredation is likely to be repeated,

8 (h) (4), trapping is conducted in a location and in a manner to minimize the likelihood a wolf or wolves from non-depredating pack is captured.

8 (h) (5), and affected landowners follow proper carcass disposal and other reasonable means to minimize wolf depredation.

9. Conduct wolf depredation control activities on Indian reservations with close coordination with tribal natural resources personnel, and provide opportunities for tribal involvement in verification investigation. On private land within reservations, any taking of wolves would be closely coordinated with tribal officials, and if depredating wolves are believed to mainly exist on tribal lands, efforts would be made to use nonlethal controls whenever feasible. USDA-Wildlife Services or Wisconsin Department of Natural Resources would not conduct any lethal control on tribal lands unless specifically requested by affected tribes.

10. Euthanize live-captured wolves severely affected by mange or other contagious disease, when such diseases may further spread to other wolves in the population, or pose disease threats to domestic animals, or humans.

3

11. Euthanize wolves that are severely injured or are in very poor conditions as a result of activities or situations not related to this subpermit, such as vehicle collisions, other accidents, or highly malnourished pups due to loss of adult pack members.
12. Request authority for up to 4 accidental injuries or mortality resulting from trapping activities under this subpermit
13. Dead wolves found dead in the field will be presented for necropsies. Wolves that are radio collared and suspected federal legal cases that die in Wisconsin will be sent to the USGS, National Wildlife Health Center in Madison for necropsies. Noncollared wolves and state legal cases will be necropsied by Wisconsin DNR, Wildlife Health Lab in Monona.
14. Wolf specimens will be sent to research and scientific collections at museums in the state for future research, as well as for educational use by educational organizations, cultural use by tribes, and display by conservation organizations for public outreach. A copy of this subpermit will be maintained with all carcasses. Carcasses not suitable for specimens will be discarded

Reporting:
1. All wolves that die or are severely injured as the result of this permit will be reported to the U.S. Fish and Wildlife Service within 5 days.
2. Annually reports will be made to the US Fish and Wildlife Service on the following:
   2 (a) date location, age, sex, number, and general physical condition of wolves captured,
   2 (b) administration of medications to captured wolves,
   2 (c) disposition of wolves killed, injured, salvaged, and/ or transported to Madison or Monona for necropsy,
   2 (d) results of any blood analysis,
   2 (f) and results of all depredation control actions.

B. IDENTIFY LOCATION OF THE PROPOSED ACTION

Provide the name of the state, county, and specific location...

Statewide in Wisconsin, with major emphasis, in heavily forested areas of northern and central parts of the state.

If specific location is known.....attach map...

Not applicable

If your request is for aquatic species...

Not applicable

4

**C.        DESCRIBE THE PROPOSED ACTIVITY:**

C.1.    Provide a statement justifying the permit request, including the following:

The purpose of this subpermit request is to enable the Wisconsin Department of Natural Resources to conduct activities critical to recovery of gray wolf population in the state, including determining the state wolf population size, distribution, health, habitat use, major mortality factors, productivity, population growth and change, impact of management activities, and reduce and manage wolf depredation problems. The strategies for wolf conservation for Wisconsin are described in the 1999 Wisconsin Wolf Management Plan, and a sub-permit or permit is required for the State to exercise these wolf management activities.

C.1.a   Describe in detail the purpose(s) and objective (s) of the project.

The purpose of this project is to determine the characteristics of the Wisconsin wolf population to assess progress of recovery, allow for federal delisting to occur in the state and region, and allow for the state to plan future management. Objectives include: 1. Attempt to maintain radio collared wolves in about 1/3 to ½ of wolf packs in the state and locate each wolf weekly year-round.
2. Attempt to capture & collar 5 to 10% of the adult and yearling wolves in the state each year. 3. Attempt to retrieve all collared wolves that die in the state, and attempt to retrieve all non-collared wolves that are known to die, and present all wolves for necropsies by qualified wildlife pathologists. 4. Attempt to eliminate depredating wolves and packs from the state to resolve depredation problems and maintain public support for wolf conservation.

C.1.a.i.   Include study design, sampling methodologies and equipment to be used.

.Research on wolves have shown that radio tracking is the most reliable means for accurately counting/ censusing wolves in heavily forested environments. The percent of population captured and collared has declined as the population has grown, but remains at reasonable levels so that a large portion of the population is observed annually from the air, while the remainder of the population is surveyed by less precise snow track surveys, and reports of wolf observations. Most radio-collared wolves will be monitored by VHF collars monitored by radio telemetry tracking using airplanes, but a limited number may also be monitored by GPS collars if available.

Studies in Wisconsin have shown that generally less than 10% of state wolf packs cause depredation on livestock, and these include mainly packs at the edge of wolf range. Packs in the core of wolf range, rarely cause depredation on livestock, and thus would be unlikely to be exposed to control trapping. Studies in other locations have indicated that generally >30% of wolves

need to be controlled by humans to cause declines in the population. At the requested level of depredation control of up to 10% of the winter population, little impact will occur on the Wisconsin wolf population, which is currently at 4.5 X the federal delisting level. Lethal control of 24 wolves in 2004, and 17 in 2003 did not prevent the wolf population from continuing to grow in the following year. Trapping will occur only in packs with depredation on livestock (generally <10% of state packs) or pets at people's home (generally <2% of state packs). Generally successful trappings occurs at only about ½ the sites at which trapping is attempted, thus most years only about 6% of the population is removed by control trapping. Most packs in the core of wolf range will not be exposed to any trapping and will represent source populations for re-populating wolves in other areas. Allowable take should be held at 10% in case unusually high depredations occur some years, especially as more packs settle into agricultural areas. Methods for taking wolves are listed above.

C.1.a.ii. Identify any null hypothesis or other anticipated results from the project that will support the reasoning why the protect is justified for enhancement of propagation or survival of the affected species.

Several studies have suggested wolves will restrict themselves mainly to areas of low road density or densely forested areas, but some wolf researchers have suggested wolves will occupy any habitat with adequate prey if adequately protected. Intense monitoring is necessary to assess status of wolf recovery and determine accurately where wolf packs will settle into the state.

Depredation on livestock farms has been increasing at rapid rates in recent years. In 2002 a record 8 farms suffered from depredation on livestock, in 2003 a new record of 14 farms suffered wolf depredation, in 2004 another new record of 22 farms suffered wolf depredation, and so far in 2005 > 30 farms have suffered wolf depredation.

Translocation of problem wolves is no longer an option for Wisconsin. Eight northern Wisconsin counties have passed resolutions against release of problem wolves into their counties. Areas of suitable wolf habitat (heavily forested area without farms) are saturated in northwest and north-central Wisconsin, and new packs are establishing at the edge of agricultural area with high risk of wolf depredations. Although some potential unoccupied wolf habitat seems to exist in northeast Wisconsin, wolf packs do not appear to be able to persist in the area, and previous wolves released into this area, moved away into other areas of the state. Translocated wolves are likely to be killed by local wolves if released in occupied range or move out into areas of unsuited habitat (farm land ) and cause further depredation problems.

Lack of control on problem wolves will further erode public attitudes toward wolves by rural people and likely will increase illegal kill throughout the state. Calls for hunting seasons and drastic reductions in the wolf population are

6

becoming common in articles in local papers. In late winter 2005, possible poisoning attempts on wolves were detected. It is our prediction that if the State of Wisconsin is unable to maintain adequate lethal control on problem wolves, illegal kill will increase throughout wolf range.

C.1.a.iii.  Include planned disposition of specimens upon completion of the project.

Carcasses will be disposed as listed above and described in the 1999 Wisconsin wolf plan, and will include use for research, educational, and cultural uses.

C.1.b  Describe how the proposal will help recover each species.

As described above, the proposal would allow accurate counting of wolves to assess level and extent of recovery and determine overall health of the population. Depredation control activities would allow removal of problem wolves so that non-depredating wolves can continue to flourish and public tolerance of wolves would remain more positive.

C.1.b.i.  If there is an approved recovery plan, identify the recovery tasks by number and name, if applicable.

The proposal addresses many aspects of the approved Eastern Timber Wolf Recovery Plan including the following (pp. 49-51):
Task 21, Protect and enhance existing wolf populations to restore a viable population of at least 100 wolves in Wisconsin and Michigan (outside of Isle Royale).
Task 211, Continue monitoring numbers, status, and distribution of wolves in Wisconsin and Michigan using radio-telemetry.
Task 212, Continue monitoring disease exposure
Task 213, Have each wolf found dead necropsied.
Task 215-3, Continue research on road density and wolf mortality
Task 217, Conduct research in wolf population in peripheral areas of Minnesota …..in proximity to Wisconsin and Michigan…..
Task 22, Determine where wolf establishment is ecologically sound…..
Task 225, Estimate effects of re-established wolves on other wildlife and domestic animals.
Task 23, Gain public support for re-establishing the eastern (sic) timber wolf.
Task 232, Obtain support of local people.
Task 234, Develop management practices, including the potential taking of problem wolves, to be applied when wolf populations are re-established.

C.1.b.ii.  Identify or provide copies of any previous or similar research conducted on this species.

     Reports of Wisconsin wolf population monitoring are listed on Wisconsin DNR web sites including the following:
http://dnr.wi.gov/org/land/er/publications/wolfreports/
http://dnr.wi.gov/org/land/er/publications/reports/mammals.htm#Timber%20Wolf
http://dnr.wi.gov/org/land/wildlife/harvest/harvest.htm
http://dnr.wi.gov/org/land/er/publications/wolfplan/toc.htm

C.1.b.iii.  If this information exists, explain how the project will answer questions not answered by earlier research.

    As the wolf population continues to expand, knowledge of areas of potential suitable habitat, and attitudes of rural people toward wolves will continue to be modified. Impact of wolves on livestock in areas of more intense agriculture may continue changing if wolves are allowed to occupy more developed landscapes, although such continued expansion may not be very desirable.

C.1.b.iv.  Explain how you will coordinate your efforts with past and ongoing research studies.

    Wolf population monitoring has followed similar protocol since 1979, which was adapted from long-term ecological studies by Dr. David Mech in Minnesota, Alaska, and other locations as well as research by other biologists throughout North America and Europe. Wolf depredation management follow similar standards as established by Dr. Steven Fritts and Bill Paul in Minnesota. Wisconsin biologists meet annually with biologists from Michigan and Minnesota to compare and contrasts wolf population surveys, and wolf depredation management. Results of wolf population monitoring, research, and depredation management are reported periodically in peer-reviewed journals and international conferences.

C.1.c.  Can this project result in the injury, death, or removal from the wild of any individuals of the species.

    Yes

C.1.c.i.  If yes, describe all that apply (i.e. injury, death, removal from the wild).

    Death or serious injury can occur for trapped wolves if traps get badly tangled on large piles of debris or brush, from over-heating after injected by drugs, and negative reaction to drugs. Traps themselves can cause minor injuries, if animals are captured incorrectly. Generally 2 or less wolves die as the result of trap injuries in any one year, and most years there are no mortalities. Rubber bullets and other aversive conditioning may cause minor injuries. Depredating wolves captured in live-traps are intentionally killed, and removal of some or all the adults from a pack may result in the unintentional

8

        death of pups due to starvation

C.1.c.ii. For species, please state the maximum number of individuals that would be injured, killed, or removed from the wild [If applicable, please identify, based on reasonable expectation, the number of individuals likely to be injured or killed per activity.]

        The maximum wolves likely to die or receive serious injury as the result of live-trapping and handling is requested to be set at 4 wolves, although most year this will be 1 or no wolves.

        Maximum take for wolves on lethal depredation control actions should be set at 10% of the previous winter population. This approximately the rate of recent population growth, but only half the rate observed in most of the 1990s (20%). For the remainder of the 2005 season the maximum take should be set at 43 Wolves and the rate for 2006 should be based on the wolf count during winter 2005-2006, and probably would be in the range of 40 to 50 wolves.

C.1.c.iii. Please state what will be done to minimize the possibilities of injury to or death of individuals.

1. Only traps that minimize risk of injury or death will be used for live-trapping wolves, and searches will continue for traps and methods that further reduce risk of injury.
2. All traps will be check at least once every 24 hours and on extremely warm days will be check 2 times daily.
3. Only trappers trained in use of chemical tranquilizers and with adequate experience handling wolves, would be allowed to live-trap and process wolves.
4. Wolf trappers will be trained in the selection of trap sites, to avoid setting traps in areas with higher risk of injury.
5. Pups born prior to August 1, would be released at site in depredation situations.
6. Technical assistance will be provided to pet and livestock owners in areas of wolf range to practices proper carcass disposal and other practices to reduce wolf depredation.
7. Experimental aversive conditioning will be tried at some farms to reduce risk of depredation by using dog shock collars, rubber bullets, fladry, or various scare devices on farms with wolf threats, prior to actual depredations.

C.1.c.iv. If the proposed activity would cause death of individuals from the wild or remove individuals from the wild, describe your attempt to obtain the wildlife ...currently held captivity...or produced in captivity. You must demonstrate conclusively that existing specimens are unavailable....

9

        The intent of the proposed action is to improve and deal with recovery of wild wolves, and this cannot be done with captive wolves.

C.1.d.    Identify contacts and agreements held for the proposed activities.

        The 1999 state wolf management plan
        http://dnr.wi.gov/org/land/er/publications/wolfplan/toc.htm
        and the Federal Eastern Timber Wolf Recovery Plan of 1992 serves as documents that designate that wolf population monitoring and depredation control activity will be done part of wolf recovery and management.

C.1.d.i.    State whether full funding will be available for the completion of the for the proposed activity.

        Full funding appears to be available for wolf depredation control activity by USDA-Wildlife Services, and had been available in the last 3 years. Funding for population monitoring activity has been through state, federal and private funds that have generally been made available for most years. The US Fish and Wildlife Service requires high level of wolf population monitoring for delisting and for 5 years post-delisting to occur, and thus as a federal mandate requirement, it is expected that US Fish and Wildlife Service will proved funds to assist in wolf population monitoring.

C.1.e    If live wildlife …to be covered by this permit are to be held in captivity:

        Normally wolves will not be held in captivity, unless being temporarily treated for injuries, or wolves being considered for translocation may be held for up to 45 days on facilities owned by Ronald N. Schultz at 1920 Mitten Lake Drive, Box 325, Minocqua, WI 54548, or NW, SE, Sec. 15, T40N, R4E, Vilas County, Wisconsin. The facilities at this site meet all the standards for captive facilities for gray wolf in the Wisconsin Captive Wildlife Regulations. Care of wolves will be done by Ron Schultz, who is listed under this permit and is an employee of the Wisconsin DNR. Other portions of this section do not apply.

D    IDENTIFY THE PERSONS WHO WILL CONDUCT THE PROPSED ACTIVITIES

D.1.    Provide the full name of all individuals, including first, middle initial, and last name, who you propose will work on this permit.

        Wisconsin DNR Personnel: Adrian P. Wydeven (Program Coordinator), Bruce E. Kohn, Ronald N. Schultz, Richard P. Thiel, Greg Kessler, Shawn Rossler, Tim Van Deelen, Ellen Heilhecker, Todd A. Naas, Bruce R. Bacon, Kenneth W. Jonas, Wayne H. Hall, Thomas M. Gehring, Darby Murphy, Aaron D. Buchholz, and Michele A. Windsor.
        HoChunk Personnel: Ritchie Brown, Will Quackenbush, Ronald Anwash and

10

John Blackdeer.
Menominee Personnel: Donald J. Reiter and Brenda Nordin.
USDA-APHIS-Wildlife Services Personnel: William J. Paul (Acting State Director), Robert C. Willging (Supervisor for Northern WS District), John Shivik, Kelly A. Thiel, Chad O. Alberg, James C. Rollman, Ed W. Zydzik, Walter W. Follis, James Miller, Eric A. Fromm, Jeremy J. Irish, Phil V. Peterson, Barry F. Benson, David Ruid, Charles D. Lovell (Supervisor for Southern WS District), Mike Edwards, Mark Kerr, John Nuce, Mike Petrie, Dan Hirchert, Aaron Freund, John Carbonari, Jim Tharman, Bob Seefeldt, Weston Schmidt, and DeWayne A. Sobl. Additional assistants will work under direct and on-site supervision of named permittees.

D.1.a   If more than one activity is included in the permit application, indicate which activity (ies) will be completed by each individual.

Generally Wisconsin DNR and Tribal personnel will mainly be involved in Wolf population and research monitoring activities, while USDA-WS will be mainly involved in depredation control activities, but all groups could potentially conduct any of the activities listed in the proposal.

D.1.b   For each listed individual, please also provide a copy of each person's resume and/or curriculum vitae, plus specific information on previous professional experience working with the species affected by the permit request.

All listed individuals are trained wildlife biologists or wildlife technicians and will have taken a 3-day training course in handling wolves with immobilization drugs, and will have been involved in the trapping and handling of at least 2 wolves before being put in charge of a wolf trapline. Additional resume information can be requested from the listed agencies for any individual listed.

E.   **IDENTIFY THE LOCATION OF THE AFFECTED SPECIES**

All wolves relevant to this permit are in the wild. Other portions of this segment are not applicable

F.   **IDENTIFY OTHER PERMITS REQUIRED**

Additional permits are not required by Wisconsin DNR personnel, but non-DNR workers would be required to obtain state permits for trapping and handling gray wolves. Other parts of this segment are not applicable.