**Safari Club International and Safari Club International Foundation's Motion for Leave to Participate in the Determination of Plaintiffs' Motion for a Preliminary Injunction**

# Exhibit "A"

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

|   |   |
|---|---|
| HUMANE SOCIETY OF THE UNITED STATES et al. | ) ) ) ) ) ) ) ) |
| Plaintiffs | )    1:06-cv-01279(CKK) |
| v. | ) ) |
| DIRK KEMPTHORNE, Secretary of the Interior, et al. | ) ) ) |
| Defendant | ) ) |
| and | ) ) |
| SAFARI CLUB INTERNATIONAL, et al. | ) ) ) |
| Defendant-Intervenor Applicants | ) |

**PROPOSED OPPOSITION OF SAFARI CLUB INTERNATIONAL AND SAFARI CLUB INTERNATIONAL FOUNDATION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

**INTRODUCTION**

Safari Club International and Safari Club International Foundation (collectively "SCI") by and through counsel, hereby file this Proposed Opposition to Plaintiffs' Motion for a Preliminary Injunction.[1]  Plaintiffs have asked this Court to enjoin

---

[1] On August 1, 2006, SCI requested leave to participate in this litigation as a Defendant-Intervenor and to participate in the determination of Plaintiffs' Motion for a Preliminary Injunction. Counsel for Plaintiffs and Counsel for Defendants have each communicated

2

immediately the permit authority given by the U.S. Fish and Wildlife Service to the state of Wisconsin to use lethal and non-lethal methods to control a limited number of the state's problem wolves. Plaintiffs are not entitled to such immediate and drastic relief because they cannot meet the required burden of proving 1) a substantial likelihood of success on the merits of their claim, 2) that irreparable harm will result without the injunction, 3) that the others will not be injured if the injunction is granted, and 4) that the injunction will serve the public interest. Plaintiffs do not have a substantial likelihood of success on the merits because the ESA empowers the FWS to permit any activity that enhances the survival of the species and the FWS has reasonably exercised this discretion. No irreparable harm will come to the Plaintiffs if the State continues its limited control of depredating problem wolves (within a recovered and stable population) in the relatively short time the Court takes to decide this case on the merits. On the other hand, without the permit in place, the harm caused by problem wolves will continue to affect citizens of Wisconsin. And finally, the public interest, as represented by the professional and scientific judgment of officials of the FWS and the State of Wisconsin – both of whom have determined that the permit should remain in place – will be best served by denying the injuction.

---

to SCI's Counsel that Plaintiffs and Defendants neither support nor oppose SCI's intervention and participation in the determination of Plaintiffs' request for a Preliminary Injunction. SCI has filed with this Opposition, a Motion for Leave to Participate in the Determination of Plaintiffs' Motion for a Preliminary Injunction.

3

## BACKGROUND

## RELEVANT LAW

A.   **The Endangered Species Act**

Congress has given the U.S. Fish and Wildlife Service ("FWS" or "Service")[2] the authority to do whatever is necessary to enhance the survival of "endangered" and "threatened" wildlife. That authority includes complete discretion about the types of activities that will "enhance the survival" of "endangered" and "threatened" wildlife. Congress has given the Service the power and discretion to permit even those activities that are otherwise prohibited by the ESA, so long as the FWS determines that those activities will enhance the species' survival.

The FWS designates a species as "endangered" when one or more of the following risk factors place the species in danger of extinction throughout all or a significant portion of its range.

> (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
> (B) overutilization for commercial, recreational, scientific, or educational purposes;
> (C) disease or predation;
> (D) the inadequacy of existing regulatory mechanisms; or
> (E) other natural or manmade factors affecting its continued existence.

16 U.S.C. §§ 1532(6) and 1533. For a species listed as "endangered," certain types of activities become prohibited, including the "taking" of that species within the United States. *Id.* § 1538(a)(1)(B). The term "take" is defined to mean "harass, harm, pursue,

---

[2] The Endangered Species Act ("ESA") grants the authority to the Secretary of the Interior, who has delegated that authority to the FWS.

4

hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id*. § 1532(19).

The ESA's prohibition against the "taking" of an "endangered" species is not absolute. The law empowers the FWS to issue "permits" to allow any action otherwise prohibited by Section 1538, including the taking of an "endangered" species, if such action is to be conducted "to enhance the propagation or survival of the affected species." *Id.* § 1539(a)(1)(A). ("enhancement permits" or "10(a)(1)(A) permits").

The FWS's discretion to issue enhancement permits is broader and less restricted than most of the agency's other ESA administrative authorities. Much of the FWS's authority to administer the ESA is governed by the statute's underlying conservation policies.

> It is further declared to be the policy of Congress that all Federal departments and agencies shall seek to *conserve* endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter.

*Id.* § 1531(c) *(emphasis added)*. For example, the FWS is authorized to promulgate regulations to govern activities concerning "threatened" species only insofar as the conduct will promote the "conservation" of that species.

> Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide *for the conservation* of such species.

*Id.* §1533(d) *(emphasis added)*. Congress has defined the term to set parameters for the types of conduct that the FWS may authorize to further "conservation."

> The terms "conserve", "conserving", and "conservation" mean to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary. Such

5

> methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, ***in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking.***

*Id.* § 1532(3) (emphasis added).

Although the term "conservation" appears throughout the ESA, the term is noticeably absent from the criteria Congress used to describe the FWS's authority to issue "enhancement" permits.

> The Secretary may permit, under such terms and conditions as he shall prescribe –
> (A) any act otherwise prohibited by section 1538 of this title for scientific purposes or to enhance the propagation or survival of the affected species . . .

*Id*. § 1539(a)(1)(A).  The language used by Congress establishes that any statutory limits suggested by the "term" conservation" do not apply to enhancement permits.  Instead of giving the FWS the power to issue permits to promote "conservation," Congress gave the agency the authority to grant permits to allow whatever is necessary to *enhance the survival of the species*.  Also, noticeably missing from the ESA is any definition for the phrase "enhancement of survival," further confirming the Service's complete discretion in this area.

What the FWS may be unable to do through regulation, because of "conservation" policy requirements, the Service can facilitate through permit authority.  Through the use of a detailed permit application and approval process, the Service can establish limits and requirements to the permitted activity that would otherwise be difficult through regulation. The Service can extend the permitted activity to a finite and sometimes small number of wildlife subjects and can establish detailed controls and requirements for the

6

exercise of the permitted activity. For example, Wisconsin's depredation control permit authority extends to a maximum of 43 wolves and the permit requires that depredation control activities be conducted with ½ mile of the depredation site.

The Service issues individual "enhancement permits" pursuant to 50 C.F.R. § 17.22. That regulation identifies the following criteria that the FWS considers when deciding whether to issue a permit:

> (i) Whether the purpose for which the permit is required is adequate to justify removing from the wild or otherwise changing the status of the wildlife sought to be covered by the permit;
>
> (ii) The probable direct and indirect effect which issuing the permit would have on the wild populations of the wildlife sought to be covered by the permit;
>
> (iii) Whether the permit, if issued, would in any way, directly or indirectly, conflict with any known program intended to enhance the survival probabilities of the population from which the wildlife sought to be covered by the permit was or would be removed;
>
> (iv) Whether the purpose for which the permit is required would be likely to reduce the threat of extinction facing the species of wildlife sought to be covered by the permit;
>
> (v) The opinions or views of scientists or other persons or organizations having expertise concerning the wildlife or other matters germane to the application; and
>
> (vi) Whether the expertise, facilities, or other resources available to the applicant appear adequate to successfully accomplish the objectives stated in the application.

As with their statutory source, the regulations pertaining to enhancement of survival permits include nothing that would restrict taking or lethal control as a valid tool by which to enhance the survival of an "endangered" species.

    **B.**    **Administrative Procedure Act**

Section 1539 of the ESA unquestionably gives the FWS the authority and complete discretion to permit legal taking for the enhancement of survival of the species. Consequently, the only real question that this Court need answer is whether the FWS appropriately exercised that discretion. Judicial review of agency conduct, including the exercise of discretion in administering the ESA, is controlled by § 706 of the Administrative Procedures Act ("APA"), 5 U.S.C. §701 et seq. Pursuant to the APA, a court may set aside an agency's action if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *See also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 41, 103 S.Ct. 2856, 2865 (1983); *Citizens to Preserve Overton Pak v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823 (1971); *overruled on unrelated grounds by Califano v. Sanders*, 430 U.S. 99, 105, 97 S.Ct. 980 (1977). The arbitrary and capricious scope of review is narrow and a court is not permitted to substitute its judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 30, 103 S.Ct. at 2860. A court may not set aside an agency action that is rational, based on consideration of relevant factors and is within the scope of the authority that the agency has been statutorily granted. Id. at 42-43, 103 S.Ct. 2866. In cases where the challenged activity involved the agency's scientific expertise, courts must be "most deferential" to the agency's decisionmaking. *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc*. 462 U.S. 87, 103, 103 S.Ct. 2246, 2255 (1983).

## **RELEVANT FACTS**

In 1974, the FWS listed gray wolves as "endangered" throughout most of the conterminous U.S.[3] As a result of recovery efforts by the FWS and the states of Wisconsin, Michigan and Minnesota, the wolf populations of the western Great Lakes area increased dramatically in size and range. Wisconsin's Department of Natural Resources ("DNR") has monitored the state's wolf population annually since 1979-80. In that first year, the state's wolf population was only 25. In 2005, the population had grown to between 425-455 wolves.[4]

Similar strides were made by the neighboring states of Minnesota and Michigan. By the year 2000, the number of wolves in Wisconsin, Michigan and Minnesota increased collectively to the point where the FWS determined that it could designate this metapopulation as a Distinct Population Segment ("DPS") of the gray wolf species and could reclassify this DPS from "endangered" to "threatened" status. Similar recovery successes were achieved for the wolves populating Idaho, Montana and Wyoming and the Service similarly designated this western population as a DPS ready for reclassification to "threatened" status. After proposing to downlist these two gray wolf DPSs, the FWS published a Final Rule on April 1, 2003, 69 Fed. Reg. 15804 (April 1, 2003) ("Final Rule") in which the Service divided the conterminous U.S.'s wolf populations into three DPSs, the Eastern, Western and Southwestern, and broadly designated geographical range for each of the DPSs. The Eastern DPSs range included

---

[3] Wolves in Minnesota were listed as "threatened."
[4] From "Justification for Lethal Control Authority for Recovery Activity under Section 10(a)(1)(A) of the Endangered Species Act on Gray Wolves in Wisconsin," Wydeven, Adrian and Randle L. Jurewicz, October 14, 2005, Wisconsin Department of Natural Resources, (hereinafter referred to as "Justification") attached as Exhibit "1."

9

Wisconsin, Michigan and Minnesota as well as North Dakota, South Dakota, Nebraska, Kansas, Iowa, Missouri, Illinois, Indiana, Ohio, Pennsylvania, New York, New Jersey, Massachusetts, Connecticut, Rhode Island, Delaware, Vermont, New Hampshire and Maine.

As the populations and ranges of the gray wolves grew, so did the number of human/wolf interactions. Wisconsin experienced increasing numbers of "wolf depredation" incidents, in which wolves entered Wisconsin residents' farms or yards and attacked and feasted on livestock and/or household pets. Wolves that became repeat offenders were recognized as problem wolves and state wildlife officials sought a means to reduce the number of depredation incidents and to maintain human tolerance for these aggressive predators.

The downlisting of wolves from "endangered" to "threatened" status provided the states with some authority to control their problem wolves. When the FWS reclassified the Eastern DPS from "endangered" to "threatened" status, the Service acquired the statutory power to promulgate regulations designed to give states the authority to manage the "threatened" species. Section 4(d) of the ESA provides that "[w]henever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species." 16 U.S.C. § 1533(d). In accordance with this statutory authority, the Service promulgated a regulation that enabled some states, including Wisconsin, to undertake certain wolf management authority over their newly "threatened" wolf populations. ("4(d) Rule"). The Final Rule explained the nature of wolf management authority:

10

> This new special regulation allows us, the Michigan and Wisconsin DNRs, the wildlife management agencies of North Dakota, South Dakota, Nebraska, Kansas, Iowa, Missouri, Illinois, Indiana, and Ohio, or tribes within these States, or the designated agents of these agencies and tribes to carry out the full spectrum of depredation control actions, from nonlethal opportunistic harassment to lethal control of depredating wolves. The restrictions for lethal depredation control actions will be similar to those used for the Minnesota wolf depredation control program since 1985: (1) Wolf depredation on lawfully present domestic animals must be verified, (2) the depredation is likely to be repeated, (3) the taking must occur within one mile of the depredation site in Michigan and Wisconsin, and within 4 miles of the depredation site in other area of the Eastern DPS that are west of Pennsylvania, (4) taking, wolf handling, and euthanizing must be carried out in a humane manner, which includes the use of steel leghold traps, and (5) any young of the year trapped before August 1 must be released.

68 Fed. Reg. 15804, 15867 -15868 (April 1, 2003).

Wisconsin utilized the 4(d) regulations to lethally remove problem members of the states' wolf population. In 2003 and 2004, the state removed 41 wolves. Despite these lethal control efforts, between 2002 and 2005, Wisconsin's wolf population grew from 327 to 425 wolves. Justification at 6. From 2003-2004, Wisconsin's wolf population increased by 11.3% even though 5.1% of the wolf population was lethally removed by the state's DNR. From 2004-2005, the wolf population increased by 13.9% even though 6.4 % of the population was taken for depredation control. Set of Findings: Wisconsin Department of Natural Resources Wolf Depredation Permit (TE111360) (hereinafter referred to as "Findings") at 5, attached as Exhibit "2"

Several animal rights and environmental groups, including several of the Plaintiffs to this litigation, filed suit to challenge the Final Rule. Two separate cases were filed, one in federal court in Oregon and a second in Vermont. SCI participated as a Defendant-Intervenor in the former and as an amicus in the latter. Both the Oregon and Vermont Courts enjoined and vacated the Final Rule, upon rejecting the Service's

11

application of its own DPS policy and the FWS's interpretation and application of statutory listing criteria. Neither court offered any opinion about the propriety of or need for lethal control of depredating wolves. However, since the Courts' ruling caused wolves to lose their "threatened" status, the 4(d) rule, which could apply only to "threatened" species, also became invalid.

When the two Courts' rulings returned wolves to "endangered" status, the state of Wisconsin found itself without any means of controlling the state's increasing difficulties with human/wolf encounters and wolves preying on Wisconsin residents' livestock and pets. Although regulatory management authority was no longer available, depredation control of "endangered" species remained possible via permit authority pursuant to ESA Section 10(a)(1)(A), 16 U.S.C. § 1539(a)(1)(A). Wisconsin applied for that authority and the FWS granted the state a subpermit in April of 2005. Several animal rights organizations, including several of the Plaintiffs to this litigation, filed suit to challenge the procedure by which the FWS issued the subpermit to Wisconsin. The U.S. District Court of the District of Columbia, on the Plaintiffs' motion for a preliminary injunction, determined that the subpermit had been issued in violation of the procedures required by the ESA, 16 U.S.C. § 1539 and the APA. As a result, the FWS was forced with withdraw Wisconsin's wolf depredation control authority on September 13, 2005.

On September 6, 2005, Wisconsin submitted a new permit application for wolf depredation control authority. Notice of the application was published in the Federal Register on September 14, 2005. 70 Fed. Reg. 54401. A Draft Environmental Assessment for the Management of Wolf Conflicts and Depredating Wolves was published in March 2006 and public comment was solicited. After consulting a vast

array of scientific studies, articles and treatises, including Wisconsin's own research and analysis of the need for and potential impact of lethal depredation control authority,[5] the FWS granted Wisconsin's permit application. The FWS also prepared a Final Environmental Assessment, a Decision and Finding of No Significant Impact for the Environmental Assessment: Management of Wolf Conflicts and Depredating Wolves in Wisconsin, and a Formal Intra-Service Section 7 Consultation: Issuance of a section 10(a)(1)(A) permit for research, monitoring, and depredation abatement activities involving the gray wolf in Wisconsin. (hereinafter referred to as "Consultation"). In each of those documents, the FWS expressed its determination that the permit authority would enhance the survival of Wisconsin's wolf population and that the planned permitted activity would pose no harm for the gray wolf's long term existence.

> For example, in the Consultation, the Service concluded that
>
> after reviewing the current status of the gray wolf, the environmental baseline for the action area, the effects of the proposed trapping of wolves for monitoring, research, and depredation abatement, and the cumulative effects, it is the Service's biological opinion that he trapping of wolves for monitoring, research, and depredation abatement, as proposed, is not likely to jeopardize the continued existence of the gray wolf in Wisconsin.

Consultation at 20-21. Utilizing Wisconsin's population data as well as data obtained from the neighboring state of Minnesota, the FWS was able to conclude that no harm would be posed to the viability of the species. The Service explained:

> Based on literature and experiences from the Minnesota wolf depredation control program, purposeful and incidental take of up to 13.6% is unlikely to cause a decline in the wolf population. The expectation is that the most

---

[5] "Justification for Lethal Control Authority for Recovery Activity under Section 10(a)(1)(A) of the Endangered Species Act on Gray Wolves in Wisconsin," Wydeven, Adrian P., and Randle L. Jurewicz, October 14, 2005, Wisconsin Department of Natural Resources, attached as Exhibit "1.".

13

adverse consequence is that the current rate of increase in the Wisconsin population may slow as a result of the proposed action.

Findings at 5.

In support of Wisconsin's application for wolf depredation control authority, Wisconsin wolf biologist, Adrian Wydeven explained that the state had experienced a "dramatic increase in wolf depredation as wolves have saturated most large wildland areas in northwest and north-central Wisconsin, and have begun to occupy more agricultural areas." Justification at 5. In 2002, the state had eight wolf depredation incidents. In 2003, the number jumped to 14 and by 2004 there were 22. By October of 2005, Wisconsin had already experienced 23 incidents where wolves had preyed upon livestock or pets. Wydeven described how the scientific community supported lethal control methods both to reduce depredation and to improve human acceptance of wolf conservation efforts.

> The concept of lethal controls on wolves preying on livestock is strongly supported by wolf managers and biologists/scientists throughout wolf range, even in recovering populations. The Wildlife Society, an international organization of professional wildlife biologists, especially focused on North America, states that "Control of wolves preying on livestock and pets is imperative and should be prompt and efficient if illegal killing is to be prevented and human tolerance of the presence of wolves is to be maintained (Peek et al. 1991)." This statement was made in a Technical Review by the Wildlife Society on the "restoration of wolves in North America.".

Justification at 2. Wydeven also described and quoted several scientific studies that had researched and reported the benefits of lethal control of problem wolves.

> In an extensive literature review of strategies for reducing carnivore/livestock conflict by Norwegian biologists, it was concluded that lethal control should [be] considered on endangered carnivores such as wolves to prevent expansion into areas of big conflict (Linnell et al.

14

> 1996).  They state that "Failure to control individuals in such areas will turn public opinion against their conservation in general . . .(Linnell et al. 1996)".  Rate of expansion of depredation has been less than the rate of wolf population growth in western North America and was attributed to elimination of individuals and packs from the population that had learned to kill livestock (Musiani et al. 2004).  Others have said that "the selective removal of problem animals can lead to increased success and better carnivore conservation" (Sillero-Zubiri and Laurenson 2001).

Justification at 3.

Wisconsin's wolves have increased to reasonably abundant numbers.  In fact, wolves in Wisconsin have recovered from the circumstances that prompted the FWS to list them as "endangered" and to place them within the protections of the ESA.  Their recovery was noted by Oregon U.S. District Court Judge Robert Jones in *Defenders of Wildlife v. Norton*, 354 F. Supp.2d 1156, 1172 (D.Or. 2005).  Wolves in Wisconsin, Michigan and Minnesota have recovered to such an extent that the FWS, on March 27, 2006, published a Proposed Rule to delist gray wolves, which would remove wolves from both the "endangered" and "threatened" species lists.  71 Fed. Reg. 15266 (March 27, 2006).

## PRELIMINARY INJUNCTION

A preliminary injunction is "an extraordinary remedy that should be granted only when the party seeking the relief can make a clear showing that he or she carries the burden of persuasion."  *Chaplaincy of Full Gospel Churches v. England*, 2006 WL 1867203 *4 (D.C. Cir. 2006).  To succeed, the applicant must show 1) a substantial likelihood of success on the merits, (2) that he or she would suffer irreparable injury if the injunction was denied, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction.

15

*Id.* The Court balances the strength of the applicants' four arguments. The weakness of one element of proof can be offset by the strength of another. *City Fed. Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995). Although all four elements are important, Courts have determined that proof of irreparable injury is essential to the applicant's success. Unless the applicant can show some irreparable harm, he cannot prevail, regardless of the strength of his or her presentation on the other three factors. *Chaplaincy*, 2006 WL 1867203*4.

### A. Plaintiffs Cannot Show a Substantial Likelihood of Success on the Merits

As explained in the foregoing pages, Congress gave the FWS authority to permit activities that will enhance the survival of "endangered" species, even if those activities would otherwise be prohibited by the ESA. It is undeniable that depredation control can be authorized, pursuant to 16 U.S.C. § 1539(a)(1)(A) for a listed species. In fact, the Eight Circuit confirmed that very fact when, in the case of *Sierra Club v. Clark,* 755 F.2d 608 (8th Cir. 1985) the Court explained that 16 U.S.C. § 1539(a)(1)(A) gives the FWS "discretion to permit, for example, the removal of depredating animals." 755 F.2d at 614 n. 8 (distinguishing "taking" authority available through regulation from similar authority available via enhancement permits).

Since Plaintiffs cannot dispute that the FWS had the authority and discretion to issue the enhancement permits at issue in this litigation, Plaintiffs' only alternative is to challenge the Service's exercise of discretion and to attempt to persuade this Court that the Service acted in an arbitrary and capricious manner. That attempt must also fail, since the FWS relied upon multiple scientific sources to support the premise that

16

depredation control is a viable and effective means of enhancing the survival of a predator species.

Nothing is changed by the fact that not all the scientific authorities available may have agreed on the enhancement value of depredation control. Courts uniformly recognize that "[w]hen specialists express conflicting views, we defer to the informed discretion of the agency." *Environmental Protection Information Center v. U.S. Forest Service*, 451 F.3d 1005, 1016 (9th Cir. 2006); *Earth Island Institute v. USFS*, 442 F.3d 1147, 1160 (9th Cir. 2006). Plaintiffs have produced insufficient proof that they can succeed in proving that the FWS acted in an arbitrary and capricious manner in deciding upon and issuing the enhancement permit.

### B. Plaintiffs Cannot Show Irreparable Harm

Plaintiffs assert that they are harmed by the taking of the individual, depredating problem wolves that are the subject of Wisconsin's permit authority. Their concern is with individual species members rather than with the long-term survivability of the population or species as a whole. The alleged loss of individual animals fails to meet the requirement of irreparable harm. The standard for irreparable harm in a case involving an ESA challenge for purposes of a preliminary injunction requires a showing that the challenged conduct is likely to jeopardize the continued existence of the species as a whole. *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) In the case of *Fund for Animals v. Frizzell*, 530 F.2d 982 (D.C. Cir. 1975), the D.C. Circuit explained why they were forced to reject a similar preliminary injunction request:

> We cannot accept [Plaintiffs'] extreme contention that the *loss of only one bird* is sufficient injury to warrant a preliminary injunction; rather, a proponent of such an injunction must raise a substantial possibility that the harvest of excessive numbers of these waterfowl will irretrievably damage

17

the species.

530 F.2d at 987 (emphasis added).[6]  Similarly, District of Columbia District Court Judge Walton, in the case of *Fund for Animals v. Mainella*, 294 F. Supp. 2d 46, 58 (D.D.C. 2003) rejected animal rights plaintiffs' allegations that a regulated hunt of a limited number of New Jersey's bear population would, simply because of the taking of individual members of the species, constitute the requisite irreparable harm necessary for preliminary injunctive relief.  Judge Walton determined that the Plaintiffs had not met their burden of showing a detrimental impact to the New Jersey population as a whole.

The scientific data upon which the FWS relied reveals that despite past depredation control measures conducted by Wisconsin and by neighboring states, the populations of wolves continued to grow.  Wisconsin's gray wolf population, as a whole, will not be harmed and will likely benefit, from the permitted authority.  Plaintiffs simply cannot show harm to themselves or to the wolves they seek to protect.

### C. Plaintiffs Cannot Show that the Relief that They Seek Will Not Harm Others

In support of their Motion to Intervene, SCI submitted affidavits of SCI members whose encounters with aggressive problem wolves resulted in threats to or loss of beloved pets, hunting opportunities, prey, and safety and peace of mind.[7]  SCI also supported its Motion to Intervene with the incident reports, logged by the Wisconsin DNR and its agents, that prompted state wildlife officials to remove several problem

---

[6] Gray wolves qualify as a "reasonably abundant" species due to their profound recovery and imminent removal from the endangered species list as well as their documented population increases in spite of previous depredation control activities.

[7] The Declarations of these SCI members are attached as Exhibits, "B," "C", "D," and "E" to SCI's Motion to Intervene.

18

wolves. [8] These incidents will continue and will likely increase if Plaintiffs obtain their preliminary injunction. Plaintiffs' success would rob state officials of an effective means of controlling problem wolves and a means of preventing wolves from returning to homes and farms to attack and devour livestock and pets. Plaintiffs' proposed relief will also harm the long-term survival of the wolf populations themselves. The wolves' long-term survival is dependent, at least in part on the wolves' ability to peacefully co-exist with their human neighbors. If Plaintiffs succeed in preventing state wildlife officials from achieving this balance, more and more residents will seek to take wolf control into their own hands.

### D.     Plaintiffs' Requested Relief Will Not Serve the Public's Interest

Plaintiffs are seeking a remedy that will save the lives of a limited number of problem wolves on a short-term basis. It is a myopic plan and it will do nothing to ensure the long-term survival of an aggressive predator species that must co-exist with humans within Wisconsin's borders. Although Plaintiffs may speak for some who oppose lethal methods of wolf depredation control, they do not speak for the public at large. That job has been given to the FWS, an agency that has been statutorily directed to decide how best to enhance the survival of the wolf. The FWS's job, in part, is to mediate between the competing approaches to wildlife conservation, enhancement and/or management and to find the solution that best serves the species. The Service has made the appropriate choice and it is one that serves the wolves and the public who hopes to peacefully co-exist with wolves into the future.

WHEREFORE, as Plaintiffs are unable to meet any of the four criteria necessary

---

[8] The Incident Reports are attached as Exhibit "I" to SCI's Motion to Intervene.

19

for preliminary injunctive relief, SCI requests that this Court deny Plaintiffs' Motion for a Preliminary Injunction.

Dated August 1, 2006.

Respectfully submitted.

Anna M. Seidman
(D.C. Bar No. 417091)
501 2nd Street N.E.
Washington, D.C. 20002
Tel: 202-543-8733
Fax: 202-543-1205
aseidman@sci-dc.org
Counsel for
Safari Club International
Safari Club International Foundation

Douglas S. Burdin
(D.C. Bar No. 434107)
501 2nd Street N.E.
Washington, D.C. 20002
Tel: 202-543-8733
Fax: 202-543-1205
dburdin@sci-dc.org
Counsel for
Safari Club International
Safari Club International Foundation