## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

---

The Humane Society of the United States,
Animal Protection Institute, Friends of
Animals and Their Environment ("FATE"),
Help Our Wolves Live ("HOWL"), Indigenous
Environmental Network, Klamath Forest
Alliance, and RESTORE: The North Woods

              Plaintiffs,

v.

Dirk Kempthorne, Secretary of the Interior,
United States Department of the Interior, H.
Dale Hall, Director of the United States Fish
and Wildlife Service, and United States Fish
and Wildlife Service,

              Defendants.

**Civ. File No: 06-1279 (CKK)**

---

## PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

ARGUMENT ...................................................................................................................1

I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS....................................1

       A.     The FWS's Issuance Of A Permit Under Section 10(a)(1)(A) Is
              Not Entitled To Deference Because It Contravenes The Plain
              Language And Structure Of The ESA. ................................................................1

       B.     Even If The Statute Is Ambiguous, The FWS's Decision To Issue
              A Lethal Take Permit To Increase Social Tolerance Would Be
              Entitled To Only Minimal Deference. ................................................................9

       C.     The FWS Incorrectly Asserts That Its Decision Is Subject To
              Nothing More Than A Rational Basis Test. .......................................................14

       D.     Whether The FWS Believes The Wisconsin Wolves Are On The
              Brink Of Recovery Is Irrelevant To The Legal Mandates At Issue
              In This Case. ....................................................................................................17

II.    IRREPARABLE HARM DOES NOT REQUIRE THE PLAINTIFFS TO
       SHOW THAT WOLVES WOULD RETURN TO THE BRINK OF
       EXTINCTION ABSENT A PRELIMINARY INJUNCTION.......................................18

III.   THE BALANCE OF HARMS WEIGHS IN FAVOR OF PLAINTIFFS IN
       THIS CASE.....................................................................................................................21

IV.    THE PUBLIC INTEREST DEMANDS THE FWS AFFORD
       ENDANGERED SPECIES THE PROTECTIONS MANDATE BY THE
       ESA.................................................................................................................................22

CONCLUSION........................................................................................................................24

# TABLE OF AUTHORITIES

## FEDERAL CASES

American Rivers v. U.S. Army Corps of Eng'rs, 271 F. Supp. 2d 230
(D.D.C. 2003) .......................................................................................... 18, 22

America Trucking Association v. EPA, 283 F.3d 355 (D.C. Cir. 2002) ......................... 15

Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531 (1987) ....................................... 18

Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,
515 U.S. 687 (1995) ....................................................................................................... 6

Bensman v. United States Forest Service, 984 F. Supp. 1242 (W.D. Mo. 1997) ............. 19

California State Board of Optometry v. FTC, 910 F.2d 976 (D.C. Cir. 1990) .................. 2

Chevron U.S.A. v. National Resources Defense Council, 467 U.S. 837 (1984) ..... 2, 9, 10

Davis v. Michigan Department of Treasury, 489 U.S. 803 (2001) ............................... 2, 15

Defenders of Wildlife v. Administrator, EPA, 882 F.2d 1294 (8th Cir. 1989) ............... 19

Defenders of Wildlife v. Andrus, 627 F.2d 1238 (D.C. Cir. 1980) .................................. 21

Defenders of Wildlife v. Norton, Civil Action No. 05-1573 (ESH) (D.D.C. Sept.
13, 2005) ......................................................................................................................... 11

Defenders of Wildlife v. Norton, 354 F. Supp. 2d 1156 (D. Or. 2005) ..................... 11, 19

FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2001) ........................... 2, 15

Federation of Japan Salmon Fisheries Cooperative Association,
679 F. Supp. at 49 .......................................................................................................... 23

Fund for Animals v. Turner, 1991 U.S. Dist. LEXIS 13426 ......................... 18, 19, 20, 22

Gilbert v. Babbitt, 214 F.3d 483 (4th Cir. 2000) ............................................................. 9

Greater Yellowstone Coalition v. Flowers, 321 F.3d 1250 (10th Cir. 2003) .................. 18

Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.,
484 U.S. 49 (1987) .......................................................................................................... 2

K Mart Corp. v. Cartier, Inc., 486 U.S. 281 (1988) ......................................................... 2

Mausolf v. Babbitt, 125 F.3d 661 (8th Cir. 1997)..........................................................21

Medtronic, Inc. v. Lohr, 518 U.S. 470 (1996) ...................................................................2

Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile
Insurance Co., 463 U.S. 29 (1983)...................................................................................16

National Public Radio, Inc. v. FCC, 254 F.3d 226 (D.C. Cir. 2001) .................................2

National Wildlife Federation v. Burford, 835 F.2d 305 (D.C. Cir. 1987).......................18

Sierra Club v. Clark, 577 F. Supp. 783 (D. Minn. 1984) ...........................................21, 22

Sierra Club v. Clark, 755 F.2d 608 (8th Cir. 1985)...................................................6, 7, 8

Skidmore v. Swift & Co., 323 U.S. 134 (1944)..................................................10, 12, 18

Tennessee Valley Authority v. Hill, , 437 U.S. 153 (1978)......................................20, 22

The Wilderness Society v. FWS, 353 F.3d 1051 (9th Cir. 2003) ...................................10

United States v. Mead Corp., 533 U.S. 218 (2001)..........................................................10

## FEDERAL STATUTES AND REGULATIONS

5 U.S.C. § 706................................................................................................................15

50 C.F.R. § 17.22(a)(1).....................................................................................................5

16 U.S.C. § 1531(b)..........................................................................................................6

16 U.S.C. § 1539(d)..........................................................................................................6

1982 U.S.C.C.A.N. 2807 (1982).....................................................................................8, 9

H.R. Rep. No. 97-567 (1982)............................................................................................9

## FEDERAL REGISTER

Revisions to the Regulations Applicable to Permits Issued Under the Endangered
Species Act, 68 Fed. Reg. 53327, 53327-28 (Sept. 10, 2003).........................................16

Endangered and Threatened Wildlife and Plants; Removing the Eastern Distinct
Population Segment of the Gray Wolf From the List of Endangered and
Threatened Wildlife, 69 Fed. Reg. 43664 (July 21, 2004)..............................................12

**ARGUMENT**

Since 2003, 87 wolves have been killed in Wisconsin as a result of unlawful FWS decision-making. AR at 3-17. In 2003 and 2004, 41 wolves were killed in Wisconsin under the Section 4(d) lethal depredation control program accompanying the FWS's decision to downlist the wolf to threatened status – a decision held to be arbitrary and capricious. Id. In 2005, 29 wolves were killed in Wisconsin pursuant to a Section 10(a)(1)(A) permit that the FWS unlawfully issued in blatant violation of the procedural mandates of the ESA. Id. Now, in 2006, 17 wolves have already been killed in Wisconsin pursuant to a FWS decision that – like its predecessors – is without basis in the law or fact. See Federal Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction ("Fed. Def. Opp.") at 11.

The FWS would have the Court uphold its decision by deferring heavily to so-called agency expertise. No such deference is appropriate here, where the plain language and structure of the ESA makes clear that the FWS exceeded the scope of its authority by using Section 10(a)(1)(A) to implement a lethal depredation control program for endangered wolves. Moreover, given that the FWS has previously shown a propensity to disregard the mandates of the ESA in order to implement lethal depredation control programs in Wisconsin, and given that endangered wolves continue to be killed under the Wisconsin Permit, the Court should reject the FWS's invitation to use its equitable discretion to deny Plaintiffs' preliminary injunction motion.

I. **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.**

A. **The FWS's Issuance Of A Permit Under Section 10(a)(1)(A) Is Not Entitled To Deference Because It Contravenes The Plain Language And Structure Of The ESA.**

Because the FWS's decision to issue the Wisconsin Permit contravenes congressional intent as demonstrated by the language and framework of the ESA, the agency is not entitled to deference under Chevron U.S.A. v. Nat. Res. Def. Council, 467 U.S. 837 (1984). In Chevron,

1

the Supreme Court set forth a two-step test for judicial review of administrative agency interpretations of federal law.  Under the first step, a court considers whether the intent of Congress is clear.  Id. at 842-43.  To make this determination, a court uses the "traditional tools of statutory construction," including the language of the statute, structure of the statute, and its underlying legislative history.  See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 56 (1987) (stating that "[i]t is well settled that the starting point for interpreting a statute is the language of the statute itself").  See also California State Bd. of Optometry v. FTC, 910 F.2d 976, 979 (D.C. Cir. 1990) (stating that tools of statutory construction include "the language and structure of the Act, its legislative history, and any applicable canons of statutory construction").  In addition, the Supreme Court has previously explained that it is "a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."  FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000) (quoting Davis v. Michigan Dep't of Treasury, 489 U.S. 803, 809 (1989).  See also K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291 (1988) ("In ascertaining the plain meaning of [a] statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole").

If a court determines that the Congress had a clear intent on the question at issue, that intent must be given effect as law and no agency deference is permissible.  Chevron, 467 at 843 n.9; Medtronic, Inc. v. Lohr, 518 U.S. 470, 512 (1996) (stating that "[w]here the language of the statute is clear, resort to the agency's interpretation is improper"); Nat'l Pub. Radio, Inc. v. FCC, 254 F.3d 226, 228 (D.C. Cir. 2001) ("[o]nly if the statute is silent or ambiguous do we defer to the agency's interpretation").

In this case, Congress has made clear – through the narrow language of Section 10(a)(1)(A), through the fundamental framework of the ESA, and through ESA's legislative history – that the Act prohibits the killing of endangered wolves for social policy reasons.  See Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction ("Pl. Mem. in Supp.") at 10-18.  In other words, by implementing a lethal depredation control program for endangered wolves, the FWS exceeded its authority under Section 10(a)(1)(A) as a matter of law and no agency deference is appropriate.

The FWS's unavailing arguments in support of its position ignore the plain language and purpose of Section 10(a)(1)(A) and disregard the overall language and structure of the Act, which affords the highest level of protection to endangered species and broadly prohibits the taking of those species except under narrow circumstances.  First, the FWS argues that there is no justification for distinguishing between the FWS's decision to authorize lethal and non-lethal takes under the ESA.  See Fed. Def. Opp. at 17.  In other words, the FWS suggests that when Congress included Section 10(a)(1)(A) in the ESA, Congress would have been indifferent to whether endangered species are killed or merely pursued, hunted or merely harassed.  Far from justifying an expansive reading of Section 10(a)(1)(A), the ESA's sweeping definition of "take" underscores the high level of protection that Congress intended to afford endangered species. Juxtaposed with the broad definition of "take" and the ESA's strict prohibition on the taking of endangered species is the limited exception provided by Section 10(a)(1)(A), which allows taking only in connection with specific circumstance – for scientific purposes or to affirmatively enhance the survival of the species.  Like the definition of "take," the limited exception provided in Section 10(a)(1)(A) is designed to further the survival of species that are otherwise on the brink of extinction.  To that end, Congress recognized that, under certain circumstances, taking is

-3-

necessary to implement scientific programs designed to enhance species survival, such as

scientific research programs to study disease, captive breeding to ensure that the population will

thrive when released into the wild, or reintroduction programs to increase the range of

endangered populations.  In fact, without the scientific take exception provided in Section

10(a)(1)(A), the broad definition of taking (which includes activities such as capture) could

actually interfere with scientific, breeding, or reintroduction programs that are otherwise

necessary for bringing species back from the brink of extinction.

     In light of the context of the exception – the broad take prohibition in combination with a

limited scientific take exception meant to further species survival – the FWS cannot honestly

contend that its authorization of a lethal, as opposed to non-lethal, depredation control program is

irrelevant to the issue of whether it has exceeded the scope of its authority under Section

10(a)(1)(A).  While it is true that Section 10(a)(1)(A) does not distinguish between lethal and

non-lethal takes, the purpose of the exception makes clear that Congress would neither be

indifferent to the severity nor degree of taking permitted by the FWS.  In this case, three aspects

of the Wisconsin Permit show that the permit goes well beyond the normal scope intended for

Section 10(a)(1)(A).  First, the FWS has authorized lethal take, the most severe form of taking.

Second, the permit applies to endangered species, which are afforded the greatest level of

protection under the Act.  Third, the permit does not authorize an isolated taking based on

particularized fact, but rather implements a program for lethal depredation control throughout

Wisconsin.  Certainly the implementation of a lethal depredation control program for endangered

species is beyond the scope of any scientific take or enhancement program that Congress could have intended to be part of the systematic application of Section 10(a)(1)(A).[1]

The FWS's argument that Section 10(a)(1)(A) should be broadly construed to authorize lethal depredation control activities is belied by its own implementing regulations. These implementing regulations set forth several categories of information that a permit applicant must submit to obtain a Section 10(a)(1)(A) permit. The type of information requested by the FWS under its regulations make clear that the FWS has long understood Section 10(a)(1)(A) to fill the narrow niche of facilitating scientific research, captive breeding, and reintroduction programs:

> (ii) A statement as to whether, at the time of application, the wildlife sought to be covered by the permit (A) is still in the wild, (B) has already been removed from the wild, or (C) was born in captivity;
>
> (iii) A resume of the applicant's attempts to obtain the wildlife sought to be covered by the permit in a manner which would not cause the death or removal from the wild of such wildlife;
>
> . . .
>
> (v) A complete description and address of the institution or other facility where the wildlife sought to be covered by the permit will be used, displayed, or maintained;
>
> . . .
>
> (viii) If the application is for the purposes of enhancement of propagation, a statement of the applicant's willingness to participate in a cooperative breeding program and to maintain or contribute data to a studbook;

50 C.F.R. § 17.22(a)(1). Neither the regulations nor the preambles to those regulations contemplate using Section 10(a)(1)(A) as a mechanism for implementing a lethal depredation control program or allaying social tolerance concerns.

---

[1] Plaintiffs are not contending that lethal take can never be appropriate under Section 10(a)(1)(A). Under some circumstances, for instance, killing a diseased animal may be necessary to ensure the survival other endangered individuals. But such a measure is obviously in accord with the mandate of Section 10(a)(1)(A)'s exception for taking the species and stands

(continued on next page)

The FWS also argues that its authorization of a lethal depredation control program under Section 10(a)(1)(A) is supported by case law. See Fed. Def. Opp. at 18. To support this contention, the FWS cites to Sierra Club v. Clark, 755 F.2d 608 (8th Cir. 1985). [2] In that case, the Eighth Circuit Court of Appeals addressed whether Section 4(d) authorized the FWS to implement a sport hunting season for the threatened wolf population in Minnesota. Neither Section 10(a)(1)(A) nor endangered wolf populations were at issue in that case. Nonetheless, in a footnote the court surmises that Section 10(a)(1)(A) gives the FWS discretion to permit the

---

(continued from previous page)

in stark contrast to the program at issue here, which authorizes killing based on the FWS's concerns for social tolerance.

[2] The FWS also relies on Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, 515 U.S. 687 (1995), for its claim that the agency has broad discretion to grant permits under Section 10(a)(1)(A). See Fed. Def. Opp. at 19. That case addressed the Secretary's discretion to promulgate regulations defining the term "harm" to include significant habitat modification. Babbitt v. Sweet Home, 515 U.S. at 690. The Supreme Court upheld the regulation, concluding that the Secretary acted within his discretion by enacting regulations that provide greater protection to endangered and threatened species, as those regulations were consistent with the ESA's broad purpose to conserve and protect species and consistent with the ordinary meaning of the word "harm." Id. at 697-98. The Court further supported its holding by relying on the Secretary's ability to authorize permits under Section 10(a)(1)(B) for incidental takings (such as those that may result from habitat modification). Id. at 700-01. Babbitt v. Sweet Home did not involve the level of discretion afforded to the Secretary or the FWS to grant permits under Section 10(a)(1)(A).

In its motion to intervene, Safari Club International also argues that the FWS has "complete discretion" to grant Section 10(a)(1)(A) permits based on its assertion that the FWS is not constrained by the ESA's conservation goals and policy. See Motion of Safari Club International et al. to Intervene and Memorandum of Points and Authorities in Support Thereof, 10-12. This argument is without any merit, as it contravenes several express provisions of the ESA. See 16 U.S.C. § 1539(d) (stating that Secretary may grant permits only if they are "consistent with the purposes and policy set forth in section 1531 of this title"); 16 U.S.C. § 1531(b) (declaring that "[t]he purposes of this chapter are to . . . provide a program of conservation of such endangered species and threatened species"); 16 U.S.C. § 1531(c)(1) (mandating "[i]t is further declared to be the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter").

"removal of depredating animals or the culling of diseased animals from a population."  Sierra

Club v. Clark, 755 F.2d at 614 n.8.  This footnote is pure dicta and wholly devoid of legal

analysis.  The court also provides no factual context for its statement, failing even to explain

whether its use of "removal" refers to killing or translocating depredating animals.  Far more

important than that dicta is the court's careful and searching inquiry of the statutory language,

framework, and Congressional intent of the Act, which lead the court to conclude that "before

the taking of a threatened animal can occur, a determination must be made that population

pressures within the animal's ecosystem cannot otherwise be relieved."  Id. at 613.  In other

words, the court rejects social tolerance as a driving factor for justifying the regulated taking of

even  threatened species, determining that the Act requires instead a biological basis for such

taking.  Certainly the same standard, if not a more protective one, must apply to endangered

animals.

        In Sierra Club v. Clark, unlike in this case, the FWS acknowledged that the restrictions

on the taking of endangered species are greater than those on taking threatened species, and that

taking endangered species turns on a biological (as opposed to social) carrying capacity: "The

[FWS] argues that . . . the proper scheme [under the ESA] is one in which endangered species

can be taken under strictly controlled circumstances only when their numbers exceed the

carrying capacity of their ecosystems while threatened species can be taken pursuant to

regulatory measures which address the problems contributing to species' decline."  Id. at 614

(internal quotation marks omitted).  The true impact of Sierra Club v. Clark on this case is the

court's reasoned conclusion that biological factors, and not social policy reasons, must drive the

management of species under the ESA.

The FWS's reliance on the unilluminating dicta in a footnote in <u>Sierra Club v. Clark</u> underscores the reality of the issue presented by this case – it is one of first impression. No court has been asked to rule on the issue of whether the lethal taking of endangered species, supported not by science but justified solely by social policy reasons, exceeds the scope of the scientific take exception provided in Section 10(a)(1)(A).

In addition to its purported reliance on case law, the FWS asserts that its position is supported by the legislative history of the ESA. <u>See</u> Fed. Def. Opp. at 20. The only piece of legislative history cited by the FWS, however, relates to reintroduced populations: "[The FWS] could allow for the taking of [red wolves] if depredations occur or if the release of these populations will continue to be frustrated by public opposition." <u>Id.</u>, quoting House Report No. 97-567, 34, reprinted at 1982 U.S.C.C.A.N 2807, 2834 (1982). While the FWS argues that the legislative history nonetheless "demonstrates clear Congressional recognition of the fact that wolf recovery can be frustrated by public intolerance due to depredations," <u>see</u> Fed. Def. Opp. at 20 n.9, the greater context of that quotation actually undermines the FWS's position that Congress intended lethal depredation control of endangered species to be allowed under Section 10(a)(1)(A). In fact, the full passage references depredation control programs as an example of the management flexibility that the 1982 amendments would give to reintroduced populations, flexibility that Congress recognized would not otherwise be available for endangered populations:

> To encourage efforts to establish such experimental populations when the conservation needs of a species would be served by doing so, <u>this amendment relaxes certain restrictions otherwise applicable to listed species</u> . . . . The Committee also expects that, where appropriate, the regulations could allow for the directed taking of experimental populations. For example, the release of experimental populations of predators, such as red wolves, could allow for the taking of these animals if depredations occur or if the

release of these populations would be frustrated by public
opposition.

See H.R. Rep. No. 97-567 (1982), as reprinted in 1982 U.S.C.C.A.N. 2807, 2833-2834

(emphasis added). See also, Gilbert v. Babbitt, 214 F.3d 483 (4th Cir. 2000) (noting that because

reintroduced populations were treated the same as endangered species prior to 1982, the ESA

was amended to give greater management flexibility for reintroduced populations in order to

encourage reintroducing endangered species into portions of their historic range).

In sum, congressional intent, manifested in the language and structure of the statute,

makes clear that the FWS exceeded its authority under Section 10(a)(1)(A) when it issued the

Wisconsin Permit. In contrast to the language and overall structure of the ESA that support a

narrow interpretation of the FWS's authority under Section 10(a)(1)(A), the FWS offers no

compelling statutory basis for concluding that the lethal taking of endangered species for the

purpose of increasing social tolerance would fall within the scope of a scientific take exception

intended to facilitate scientific research, captive breeding, or reintroduction programs.

    **B.**    **Even If The Statute Is Ambiguous, The FWS's Decision To Issue A Lethal Take Permit To Increase Social Tolerance Would Be Entitled To Only Minimal Deference.**

Even if this Court were to determine that the ESA is silent or ambiguous as to whether

Section 10(a)(1)(A) gives the FWS the authority to implement a lethal depredation control

program for social tolerance reasons, the FWS would still not be entitled to Chevron deference.

While step two of Chevron provides that the reviewing court must defer to an agency

interpretation of an ambiguous statute so long as the agency interpretation is not arbitrary,

capricious, or manifestly contrary to the statute, 467 U.S. at 844, Chevron considered only

formal notice-and-comment rule-making and did not state what other types of agency decisions

should be given such deference. In United States v. Mead Corp., 533 U.S. 218 (2001), the

Supreme Court clarified that "administrative implementation of a particular statutory provision qualifies for <u>Chevron</u> deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, <u>and</u> that the agency interpretation claiming deference was promulgated in the exercise of that authority." 533 U.S. at 226-227 (emphasis added). <u>Mead</u> also clarified the weight that a reviewing court should give to administrative decisions not meeting these standards. Quoting <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134 (1944), the Supreme Court held that the deference to be accorded to such decisions depends upon "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." <u>Mead</u>, 533 U.S. at 228 (quoting <u>Skidmore</u>, 323 U.S. at 140).

        Because the Wisconsin Permit does not have the force of law as applied to parties outside the scope of the permit, the FWS's issuance of the Wisconsin Permit is not the type of agency action that would otherwise be afforded <u>Chevron</u> deference. <u>See</u> <u>The Wilderness Soc'y v. United States Fish and Wildlife Serv.</u>, Case No. 01-35266, 2003 U.S. App. LEXIS 27248 (9th Cir. Mar. 16. 2004) (en banc) (holding that the agency was not acting with the force of law by granting a permit allowing commercial enterprise in a wilderness area). Therefore, even if the court were to conclude that ESA is ambiguous on the question presented here, the FWS's decision to issue the Wisconsin Permit would at most be afforded only that level of respect warranted by the quality of the underlying decision-making in accordance with <u>Mead</u> and <u>Skidmore</u>. The level of respect afforded to the FWS's decision in this case would be minimal given the reactionary context in which the FWS's decision arises, the decision's inconsistency with the FWS's own regulations and past practice, and decision's general lack of persuasiveness.

First, as discussed above, the FWS's own implementing regulations suggest that Section 10(a)(1)(A) is a narrow take exception meant to facilitate scientific research, breeding in captivity, and reintroduction programs – activities that directly and affirmatively enhance the survival of the species.  See supra at Section I.A.   Moreover, those regulations do not contemplate using Section 10(a)(1)(A) to implement lethal depredation control programs.  See id.

Second, the FWS's reliance on Section 10(a)(1)(A) to implement a lethal depredation control program in Wisconsin is not the culmination of any thoughtful legal analysis but is rather a reactionary attempt to implement a lethal depredation control program that was previously part of the Section 4(d) rules enjoined by the federal district court in Defenders of Wildlife v. Norton, 354 F. Supp. 2d 1156, 1159-60 (D. Or. 2005).   On the heels of that decision, the FWS issued a Section 10(a)(1)(A) permit to Wisconsin in April 2005 that implemented a lethal control program nearly identical to the court-enjoined Section 4(d) rules.  See Wisconsin Memo, Exh. C to Pl. Mem. in Support, at C-6.  The reactionary nature of the FWS's action is underscored by the FWS's blatant disregard for any of the procedural mandates required under the ESA, most notably its decision to issue the permit without public notice or input.  That permit was vacated by this Court in Defenders of Wildlife v. Norton, Civil Action No. 05-1573 (ESH) (D.D.C. Sept. 13, 2005).  The Wisconsin Permit is identical to the previous permit but for an increase in the number of wolves allowed to be killed, demonstrating that it is similarly the product of a reactionary effort to implement lethal depredation control programs after the Section 4(d) rules were enjoined.[3]  Given the context of this permit, the FWS's decision to use Section 10(a)(1)(A)

---

[3] In its response brief, the FWS attempts to differentiate the lethal depredation control program implemented by the Section 4(d) regulations and the program authorized by the Wisconsin

(continued on next page)

to implement a lethal depredation control program in Wisconsin is entitled to only minimal

deference under Skidmore, which is not enough to save the FWS's irrational decision-making.

  Any deference owed to the FWS's decision is further diminished by the fact that, prior to

the FWS attempt to reclassify the gray wolf to threatened status in 2003, the FWS had never

issued a Section 10(a)(1)(A) permit to implement a lethal depredation control program for

endangered wolf populations.  In fact, the FWS has previously represented that between the time

that wolves were protected under the Act in 1978 as endangered and downlisted to threatened in

2003, only one wolf was killed in Wisconsin and Michigan in response to specific "chronic

depredation problem at a private deer farm after the failure of extensive efforts to live-trap and

remove the wolf."  See Endangered and Threatened Wildlife and Plants; Removing the Eastern

Distinct Population Segment of the Gray Wolf From the List of Endangered and Threatened

Wildlife, 69 Fed. Reg. 43664 (July 21, 2004).  An isolated instance authorizing the lethal take of

one wolf is not the same as the present attempt to implement a full-fledged lethal depredation

control program under Section 10(a)(1)(A).  The recent decision to use Section 10(a)(1)(A) to

implement a lethal depredation control program in Wisconsin, without first downlisting the

species to threatened status, is inconsistent with past agency practice and contradicts the

Wisconsin Wolf Management Plan.  See Excerpts from Wisconsin Wolf Management Plan,

attached to Plaintiffs Memo. in Supp., at P-7 (recognizing that "[f]ederal reclassification from

---

(continued from previous page)

 Permit.  See Fed. Def. Opp. at 27-29.  Such an argument is belied by statements made by FWS
at the time that it granted the nearly identical permit to Wisconsin in 2005: "The depredation
control that would be carried out by [Wisconsin] is identical in scope and methodology to that
which has been carried out through January 2005 by Wildlife Services, acting as an agency of
the State and carrying out the control of depredating wolves as authorized for the State under
the 2003 special regulations under ESA section 4(d)."  See Wisconsin Memo at C-6, attached
to Pl. Memo. in Supp. as Exh. C.

endangered to threatened will allow [the Wisconsin Department of Natural Resources] and USDA-WS to kill wolves causing depredation to livestock and pets").

The FWS argues that the use of Section 10(a)(1)(A) to implement lethal depredation control programs is not a change in agency position. See Fed. Def. Opp. at 26-27. In support of its position, the FWS relies on the 1988 Interim Wolf Control Plan for the Northern Rocky Mountains. Id. While that Plan indicates that the FWS may have contemplated using Section 10 to carry out depredation control programs, the Plan specifically states that "Section 10 permits will be required for any wolf control action and according to the requirements of the Act, such actions or programs must be for scientific purposes or to enhance propagation or survival of the species." AR at 14-15. After conducting an exhaustive search of the Federal Register, Plaintiffs could locate no notice stating that Section 10(a)(1)(A) permits were ever actually issued to implement the Interim Wolf Plan.[4] This, along with the acknowledgment in the Wisconsin Wolf Management Plan that federal downlisting would have to precede the implementation of a lethal control program, demonstrates that the FWS's tactic is a new one.

Finally, the FWS's decision should be afforded minimal, if any, deference because it fundamentally contravenes the ESA and is irrational on its face. As its most base level, the FWS forces a narrow statutory provision to accommodate the FWS's desired outcome. The FWS

---

[4] The FWS derides Plaintiffs' arguments regarding past agency practice as "either a misrepresentation of the facts or a complete ignorance of the long history of wolf depredation control under authority of Section 10(a)(1)(A)." See Fed. Def. Opp. at 26. First, Plaintiffs' arguments regarding past agency practice concern the agency's recent attempts to implement lethal depredation control programs through Section 10(a)(1)(A). Second, despite its chiding, the FWS provides no copy in the administrative record of a Section 10(a)(1)(A) permit issued prior to the 2003 reclassification for lethal depredation control programs. There are some Federal Register notices referencing a Section 10 permit under the 1988 Interim Wolf Control Plan, but as explained above, Plaintiffs have been unable to locate a Federal Register notice corresponding to an actual permit.

argues that "the public's acceptance of the presence of gray wolves is necessary for the wolf's recovery and survival because the only real thereat to wolves – both historically and presently – is from unregulated killing by those opposed to the presence of wolves in their community." <u>See</u> Fed. Def. Opp. at 20.  There is no support for the idea that Congress intended the FWS to cater to criminal behavior and cotton to social intolerance as a strategy for endangered species recovery.  Indeed, as discussed above, Congress specifically rejected the idea that social carrying capacity has any place in the management of endangered species.  To that end, the notion that the FWS can authorize the taking of wolves to lessen people's hostility them turns the ESA on its head.  Public opinion on whether an animal should continue to exist, or exist in certain areas, is not what Congress intended.  The ESA is congressional recognition that the value of species trumps the social tolerance that a person or group of people may have for a particular species.

### C.    The FWS Incorrectly Asserts That Its Decision Is Subject To Nothing More Than A Rational Basis Test.

The FWS states that the Court must apply the "arbitrary and capricious" standard of the APA to all aspects of the FWS decision.  In explaining this standard, the FWS confuses the standards of review by incorrectly asserting that "the Court is simply required to determine whether the agency has examined the relevant data and made a rational connection between the facts found and the choices made." <u>See</u> Fed. Def. Opp. at 16.  As explained above, the FWS's decision regarding the scope of its authority to allow killing of endangered wolves for social policy reasons is a first and foremost an issue of statutory interpretation.  To that end, this court must consider whether the issue presented is ambiguous in light of the plain language and framework of the Act.  <u>FDA v. Brown & Williamson Tobacco Corp.</u>, 529 U.S. 120, 132 (2000) ("a reviewing court should not confine itself to examining a particular statutory provision in

isolation" as the "meaning-or ambiguity-of certain words or phrases may only become evident when placed in context"). See also Davis v. Michigan Dep't of Treasury, 489 U.S. 803, 809 (1989) (finding that it is "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme"). As discussed above, because the language and structure of the ESA makes clear that killing endangered wolves to increase social tolerance is inconsistent with the congressional intent underlying the Act, the FWS is afforded no deference here. The FWS's action in granting the permit is therefore a violation of the APA as a matter of course because it is "not in accordance with the law" and in excess of the statutory authority granted by the ESA. 5 U.S.C. § 706(2)(A), (2)(C).

The arbitrary and capricious standard, as articulated by the FWS, applies to this case only if this Court finds that lethal take to increase social tolerance is permitted by the language and structure of the ESA. See FDA, 529 U.S. at 125-126 (a reviewing court must "give effect to the unambiguously expressed intent of Congress"). If the Court finds that this type of action is permitted, it must then conduct a "searching and careful" review of the FWS's factual determinations that implementing a lethal depredation control program would increase social tolerance and thereby enhance the survival of the species.[5] Am. Trucking Ass'ns v. EPA, 283 F.3d 355, 362 (D.C. Cir. 2002). In order to uphold the permit, the court must find that the agency has articulated a rational connection between the facts before it and the choice made and has considered all of the relevant factors. Id. If the agency has failed to "examine the relevant data and articulate a satisfactory explanation for its action," the action must be declared arbitrary

---

[5] For this reason, Plaintiffs do not think it is appropriate to consolidate this preliminary injunction motion with the merits as proposed by Defendants.

and capricious and must be vacated.  Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.
Co., 463 U.S. 29, 43 (1983).

        In this case, the FWS's decision not only violates the APA because it exceeds the scope
of authority under Section 10(a)(1)(A), but the decision is also arbitrary and capricious because
the FWS has failed to demonstrate, as a factual matter, that lethal depredation control will
enhance the survival of the species.  See Revisions to the Regulations Applicable to Permits
Issued Under the Endangered Species Act, 68 Fed. Reg. 53327, 53327-28 (Sept. 10, 2003)
(setting forth the FWS policy statement that Section 10(a)(1)(A) permits are granted when "there
is a clear link between the proposed activity and the enhancement of propagation or survival of
the affected species" and for "activities that directly aid in the recovery of endangered and
threatened species") (emphasis added).  While the FWS claims that such a program will increase
social tolerance and decrease illegal killings, the FWS offers no empirical evidence for either of
these premises.  See Plaintiff's Memorandum in Support of Motion for Preliminary Injunction,
22-25.

        This is not a case in which the Court must weigh the science underlying the conclusions
of dueling experts.  Rather, in this case the FWS has simply failed to demonstrate any rational,
scientific link between its decision (the implementation of a lethal depredation control program)
and its stated rationale (enhancement of the survival of wolf through increased social tolerance
and decreased illegal killings).  Instead of relying on scientific studies, facts, or data to
demonstrate that lethal depredation control will directly aid in the enhancement of the survival of
the gray wolf, the FWS justifies its position through broad conclusory statements and vague
assertions.  See Defendants' Opposition, 20-26.  Because the FWS's counterintuitive conclusion
– that it is necessary to kill wolves to save wolves – is unsupported by sociological studies or

other relevant scientific evidence, the issuance of the Wisconsin Permit was arbitrary and capricious.

**D.    Whether The FWS Believes The Wisconsin Wolves Are On The Brink Of Recovery Is Irrelevant To The Legal Mandates At Issue In This Case.**

The FWS spends considerable effort explaining why the agency believes that wolves have met recovery goals in Wisconsin.  The FWS's contentions regarding wolf recovery in Wisconsin are irrelevant to the issue of whether the scope of Section 10(a)(1)(A) allows the implementation of a lethal depredation control program for endangered populations.  There is no dispute that Wisconsin wolves are classified as endangered.  Until such time as that status changes, the Wisconsin wolf population must be afforded the full suite of protections under the ESA.  The only way for the FWS to change that status is through the formal downlisting or delisting procedures.  Section 10(a)(1)(A) cannot serve as an end-around the formal processes under the ESA to downlist or delist endangered species.  That the court afford the Wisconsin wolf population the same level of protection as would be afforded any other endangered population is especially critical given that the court's decision regarding the legal scope of Section 10(a)(1)(A) will impact wolf populations in areas outside of Wisconsin.  Indeed, the court's decision will impact endangered species other than the wolf.

In sum, the Plaintiffs are likely to succeed on the merits because the FWS has exceeded the plain language ESA.  Moreover, because the language and structure of the ESA make clear that the FWS has exceeded the authority of Section 10(a)(1)(A), the FWS's decision is entitled to no deference.  Even if the court were to find the statute ambiguous, the FWS's decision would be afforded only minimal deference under Skidmore because of the reactionary context of the decision, the agency's inconsistent with past practice, and the overall unpersuasiveness of its

decision.  Regardless of the amount of deference afforded to the FWS, the decision violates the ESA and cannot stand.

## II.     IRREPARABLE HARM DOES NOT REQUIRE THE PLAINTIFFS TO SHOW THAT WOLVES WOULD RETURN TO THE BRINK OF EXTINCTION ABSENT A PRELIMINARY INJUNCTION.

The FWS asserts that no irreparable harm will result from the continuation of activities under unlawfully issued permits.  See Fed. Def. Opp. at 1, 29-31.  Those contentions are without merit.  First, environmental injury, by its very nature, is irreparable.  See Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 545 (1987); Nat'l Wildlife Fed'n v. Burford, 835 F.2d 305, 323 (D.C. Cir. 1987) (grant of preliminary injunction proper as federal government's lifting of protective land restrictions could result in irreparable injury by "permanently destroying wildlife habitat, air and water quality, natural beauty, and other environmental and aesthetic values and interests").  The illegal killing of wolves is irreparable harm that can be remedied only by enjoining the activities authorized by the unlawfully issued permits.

Second, contrary to the FWS's assertions, the showing of irreparable harm does not require showing that the entire species will be jeopardized absent the injunction.  In fact, this Court has already recognized that the strong congressional mandates in the ESA to protect endangered and threatened species supports the finding that the loss of even a few members of a listed species through agency action constitutes "a significant, and undoubtedly irreparable, harm." Am. Rivers v. U.S. Army Corps of Eng'rs, 271 F. Supp. 2d 230, 259 (D.D.C. 2003); The Fund for Animals Inc. v. Turner, C.A. No. 91-2201, 1991 U.S. Dist. LEXIS 13426, *26 (D.D.C. Sept. 27, 1991) (unpublished opinion).  Other courts have taken a similar view.  See Greater Yellowstone Coalition v. Flowers, 321 F.3d 1250, 1258 (10th Cir. 2003) (holding that "denial of a preliminary injunction [based] on the plaintiffs' failure to establish harm to the species as a whole . . . was an abuse of discretion"); Defenders of Wildlife v. Administrator, EPA, 882 F.2d

-18-

1294, 1303 (8th Cir. 1989) (affirming the district court's decision to enjoin the continued

registration of a pesticide until that registration could be accomplished without illegally taking

endangered species, which included the wolf); Bensman v. United States Forest Serv., 984 F.

Supp. 1242, 1250 (W.D. Mo. 1997) (recognizing that "death is certainly an irreparable harm"

and granting a preliminary injunction to halt timber sales that may adversely impact the Indiana

bat, an endangered species, because the court determined that the Forest Service violated the

ESA).

 The district court in Defenders of Wildlife v. Norton, the case that vacated the FWS's

April 2003 Rule downlisting wolves, addressed whether the taking of wolves constitutes

irreparable harm.  After determining that "the death or injury of endangered wolves . . . is

irreparable injury," the district court enjoined the implementation of the FWS's Section 4(d)

regulations that authorized the lethal taking of wolves for depredation control purposes.

Defenders of Wildlife v. Norton,  354 F. Supp. 2d at 1174.  The lethal control provisions

contained in the permits at issue in this case are nearly identical to the Section 4(d) regulations

that were enjoined in Defenders of Wildlife v. Norton.  Notably, the court did not make any

finding that the enjoined regulations would jeopardize the entire species; rather, the court rooted

its determination of irreparable harm in the taking of individual wolves would result from the

regulations.  Indeed, the court rejected the FWS's argument that "an injunction is not appropriate

because the impact on the gray wolf is modest."  Defenders of Wildlife, 354 F. Supp. 2d at 1174.

 The FWS relies on this Court's decision in Fund for Animals v. Turner to support its

contention that irreparable harm requires a showing that takings under the unlawfully issued

permits will jeopardize the species as a whole.  See Fed. Def. Opp. at 30-31.  The FWS simply

misreads the case – Turner in no way suggests that a showing of irreparable harm requires

showing impacts to an entire species.  In fact, <u>Turner</u> explicitly states the opposite: "the loss even of the relatively few grizzly bears that are likely to be taken through a sport hunt . . . is a significant, and undoubtedly irreparable, harm."  1991 U.S. Dist. LEXIS 13426 at *26.  After determining that plaintiffs had shown irreparable injury – the killing of a threatened species – and after determining that plaintiffs had shown a likelihood of success on the merits, the court in <u>Turner</u> issued a preliminary injunction.  <u>Id.</u> at *28.  Notably, <u>Turner</u> concluded that taking individual members of a threatened species constitutes irreparable harm, whereas this case involves endangered species, which are afforded even greater protection under the ESA.

The FWS incorrectly bootstraps <u>Turner</u>'s analysis of <u>TVA v. Hill</u> to suggest that irreparable harm requires showing jeopardy to an entire species.  After analyzing the Supreme Court's decision in <u>TVA v. Hill</u>, <u>Turner</u> merely concluded that a district court is not <u>required</u> to issue an injunction unless the absence of a preliminary injunction would jeopardize the existence of a species.  <u>See id.</u> at *24-25.  This conclusion has nothing to do with the showing that is necessary for demonstrating irreparable harm.

Requiring Plaintiffs to show jeopardy to the existence of a species in order to secure injunctive relief would stand the ESA on its head.  Without the ability to enjoin illegal taking under the ESA, courts would be without power to prevent harm to endangered species before a species was on the brink of extinction.  This means that the irreparable harm standard suggested by the FWS would impede the agency's own ability to enforce the ESA.  Courts, for example, would not be able to enjoin private land owners or other third parties from violating the ESA unless the FWS could prove that jeopardy to a species would result.  To that end, the suggestion that irreparable harm requires a showing of jeopardy to an entire species contravenes the

mandates of the ESA, which protect individual members of an endangered species as well as

ensure the existence of the endangered species:

> In keeping with Congress's stated purpose to protect wildlife, the
> ESA prohibits federal agencies from taking any action that is
> 'likely to jeopardize the continued existence of any endangered
> species or threatened species," 16 U.S.C. § 1536(a)(2), and
> prohibits any person, including a governmental agency, from
> "taking" any individual member of a threatened or endangered
> species population, see 16 U.S.C. § 1538(a)(1)(B) (endangered
> species). . . . Under these two provisions, the ESA operates to
> protect both the survival of entire populations of endangered or
> threatened species and the survival of individual members of each
> such species.

Mausolf v. Babbitt, 125 F.3d 661, 668 (8th Cir. 1997) (emphasis added).

Because endangered wolves in Wisconsin will be unlawfully killed absent an injunction

in this case, Plaintiffs have made the requisite showing of irreparable harm.

## III.    THE BALANCE OF HARMS WEIGHS IN FAVOR OF PLAINTIFFS IN THIS
         CASE.

States have long touted their interest in reducing wolf-human conflicts as an excuse for

implementing programs that kill wolves.  See, e.g., Sierra Club v. Clark, 577 F. Supp. 783, 790

(D. Minn. 1984) (federal and state agencies claiming that the sport hunting of wolves is "needed

to enhance the value of the wolf in the eyes of the public").  See also, Defenders of Wildlife v.

Andrus, 627 F.2d 1238 (D.C. Cir. 1980) (addressing NEPA challenge to Alaska state program

that authorized the aerial killing of approximately sixty percent of its wolf population).  Courts

have equally as long rejected the states' claimed interest in killing wolves as a basis for relaxing

the strict congressional mandates of the ESA.  See, e.g., Sierra Club v. Clark, 577 F. Supp at 790

(holding that regulations establishing a wolf sport-hunting season in Minnesota violate the ESA

and rejecting the argument that such regulations were necessary to conserve the wolf in the long

term), aff'd in relevant part, 755 F.2d 608 (8th Cir. 1985).  See also Fund for Animals v. Turner,

1991 U.S. Dist. LEXIS 13426 at *21 (rejecting the FWS's argument that creating a limited hunt of grizzly bears would in the long run promote conservation and recovery of the species by confining bears to their range and reducing bear-human conflicts).

The interests of the states in implementing depredation programs to kill wolves do not trump the unequivocal congressional mandate that prohibits the taking of endangered species absent a valid permit. Nor does the claimed need for wolf depredation control justify a free pass on compliance with the ESA's strict restrictions on the taking of endangered species. Congress has already "spoken in the plainest of words, making it abundantly clear that it has given the policy of conservation of endangered species the highest of priorities." Am. Rivers, 271 F. Supp. 2d at 261 (internal quotation marks omitted) (citing Tennessee Valley Auth. v. Hill, 437 U.S. 153 (1978)). In Sierra Club v. Clark, the court acknowledged the need to adhere to the mandates of the ESA in the face of the Nation's sordid history of killing wolves:

> The wolf has long been depicted in story and song as a mysterious menace to man's very existence. This concept of the wolf has become engrained in our attitudes and approach to the wolf. As a result, we have been driven by an ethic which would lead to the wolf's extinction. But Congress has now mandated that each person who would slay the wolf must stay his hand. When Congress took cognizance of the fact that thousands of species of plants and animals had disappeared in past decades, and undertook to curb that desecration, it declared that the wolf had a value as an individual species in danger of extinction.

577 F. Supp at 790.

## IV.    THE PUBLIC INTEREST DEMANDS THE FWS AFFORD ENDANGERED SPECIES THE PROTECTIONS MANDATE BY THE ESA.

By enacting the ESA, Congress has already made the determination that prohibiting the taking of endangered species is in the public interest. See TVA v. Hill, 437 U.S. 153, 174 (1978) ("examination of the language, history, and structure of the [ESA] . . . indicates beyond a doubt

that Congress intended endangered species to be afforded the highest priorities").  See also

Federation of Japan Salmon Fisheries Coop. Ass'n, 679 F. Supp. at 49 (issuing injunction

preventing take of marine mammals in accordance with unlawfully issued permits because

Congress, in enacting the Marine Mammal Protection Act, has already determined that takings

are harmful to the environment and that protection is in the public interest).  While the FWS

claims that a preliminary injunction will not serve the overarching purpose of the Act to recover

species, see Fed. Def. Opp. at 33, as discussed above, the FWS has not shown in this case that

killing wolves will save wolves. Even if the Court were to accept the FWS's rationale for issuing

the permit at face value – a rationale that is not rooted in science – the benefits to wolf recovery

and conservation are tangential, indirect and hypothetical at best.

   In the face of certain killing of endangered wolves, such speculative furtherance of wolf

recovery by the Wisconsin Permit cannot support a denial of a preliminary injunction in this

case.  Moreover, neither the balancing of harms nor FWS's statements regarding the necessity of

implementing a lethal take program supports the use of Section 10(a)(1)(A) to accomplish the

ends sought by the FWS in this case.  At the base level, neither an agency nor the Court can

overlook the fact that the FWS is attempting to use a statutory provision wholly and plainly

intended for another purpose to accomplish its desires in this situation.  The ESA is the

framework for ensuring the survival of all endangered species, not just the wolf and not just in

Wisconsin.  Interpreting the statute in the context of Congress's overall framework is therefore

of the utmost importance to ensuring the scheme will not merely serve the ad hoc whims of

special interests, but will serve as a principled template for endangered species recovery across a

wide range of animals.

## CONCLUSION

For the foregoing reasons, and for the reasons stated in Plaintiffs' Memorandum in Support of the Motion for Preliminary Injunction filed on July 25, 2006, this Court should issue a preliminary injunction preventing the killing of any wolves under the Section 10(a)(1)(A) permits unlawfully issued to the Wisconsin DNR.

Dated: August 3, 2006

/s/ _____

Patricia Lane, DC # 382842
plane@hsus.org
Jonathan R. Lovvorn, DC # 461163
jlovvorn@hsus.org
The Humane Society of the United States
2100 L Street
NW Washington DC 20037
(202) 955-3669
(202) 778-6132 (facsimile)

Brian B. O'Neill, MN # 82521
boneill@faegre.com
Richard A. Duncan, MN # 192983
rduncan@faegre.com
Elizabeth H. Schmiesing, MN # 229258
eschmiesing@faegre.com
Sanne H. Knudsen, MN # 0344552
sknudsen@faegre.com
**FAEGRE & BENSON LLP**
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-3901
(612) 766-7000
(612) 766-1600 (facsimile)

Attorneys for Plaintiffs The Humane Society of the United States, Animal Protection Institute, Friends of Animals and Their Environment ("FATE"), Help Our Wolves Live ("HOWL"), Indigenous Environmental Network, Klamath Forest Alliance, and RESTORE: The North Woods.

M1:1344406.01