UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| |
|---|
| HUMANE SOCIETY OF THE UNITED STATES, *et al.*, |
| Plaintiffs, |
| v. |
| DIRK KEMPTHORNE, Secretary of the Interior, *et al.*, |
| Defendants. |

Civil Action No. 06–1279 (CKK)

**MEMORANDUM OPINION**
(August 9, 2006)

The gray wolf (*Canis lupus*) is classified as an endangered species in the state of

Wisconsin and throughout all but one of the remaining coterminous United States.  At issue in

the instant case is the legality of a lethal depredation control program allowing up to forty-three

*endangered* wolves to be killed in Wisconsin pursuant to a permit issued by the United States

Fish and Wildlife Service ("FWS") with the purpose of fostering greater social tolerance for

wolves.

Plaintiffs The Humane Society of the United States, Animal Protection Institute, Friends

of Animals and Their Environment ("FATE"), Help Our Wolves Live ("HOWL"), Indigenous

Environmental Network, Klamath Forest Alliance, and RESTORE: The North Woods filed a

Complaint on July 19, 2006 for injunctive and declaratory relief against Defendants Dirk

Kempthorne in his capacity as Secretary of the Interior, the United States Department of the

Interior, H. Dale Hall in his capacity as Director of FWS, and FWS.  Presently before the Court is

the [5] Motion for Preliminary Injunction filed by Plaintiffs on July 25, 2006, requesting that the Court enjoin Defendants, their employees, agents, and all others acting in concert or participation with Defendants from allowing the killing of gray wolves pursuant to the lethal depredation control provisions of Permit No. TE111360–0, and that the Court direct FWS to immediately stop the Wisconsin Department of Natural Resources, its employees, agents, and any and all others acting in concert or participation with it, from any further killing of gray wolves pursuant to the lethal depredation control provisions of the same.

The Parties participated in a conference call on the record on July 26, 2006. Defendants filed an Opposition to Plaintiffs' Motion for Preliminary Injunction on August 1, 2006. Additionally, Safari Club International and Safari Club International Foundation filed a Motion to Intervene, which the Court has granted as of right, and an Opposition to Plaintiffs' Motion for Preliminary Injunction. Plaintiffs filed a Reply on August 3, 2006. After considering all of the aforementioned filings, the relevant statutes and case law, and the administrative record, the Court shall GRANT Plaintiffs' Motion for Preliminary Injunction. Based on the foregoing analysis, the Court concludes that Plaintiffs have demonstrated a substantial likelihood of success on the merits that a lethal depredation control program applied to an endangered species contravenes the plain meaning and clear intent of Congress as set forth in Section 10(a)(1)(A) of the Endangered Species Act. Plaintiffs have additionally demonstrated irreparable injury, shown that the issuance of a preliminary injunction would on balance cause minimal harm to Defendants and Defendant-Intervenors, and demonstrated that the public interest supports granting preliminary injunctive relief.

## I: BACKGROUND

A.    *The Endangered Species Act*

"[T]he Endangered Species Act of 1973 represented the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978) (hereinafter "*TVA v. Hill*"). "'The plain intent of Congress in enacting this statute,' we recognized, 'was to halt and reverse the trend toward species extinction, whatever the cost. This is reflected not only in the stated policies of the Act, but in literally every section of the statute.'" *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 699 (1995) (quoting *TVA v. Hill*, 437 U.S. at 184)). The ESA further includes a congressional mandate to federal agencies, including the statement that "[i]t is further declared to be the policy of Congress that all Federal departments and agencies shall seek to *conserve* endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter." 16 U.S.C.A. § 1531(c)(1) (emphasis added). To "conserve" is defined pursuant to 16 U.S.C. § 1532(3) as "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary. Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the *extraordinary* case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking." 16 U.S.C. § 1532(3) (emphasis added).

The ESA allows the Secretary of the Interior to designate certain species of animal life as having protected status. 16 U.S.C. § 1533(a)(1). *See also TVA v. Hill*, 437 U.S. at 159–60;

*Rancho Viejo, LLC v. Norton*, 323 F.3d 1062, 1064 (D.C. Cir. 2003).  There are three different

categories of federally-protected species under the ESA–endangered species, threatened species,

and experimental populations.  Endangered species are defined pursuant to 16 U.S.C. § 1532(6)

as "any species which is in danger of extinction throughout all or a significant portion of its range

other than a species of the Class Insecta determined by the Secretary to constitute a pest whose

protection under the provisions of this chapter would present an overwhelming and overriding

risk to man."  16 U.S.C. § 1532(6).  Threatened species are defined pursuant to 16 U.S.C. §

1532(20) as "any species which is likely to become an endangered species within the foreseeable

future throughout all or a significant portion of its range."  16 U.S.C. § 1532(20).  And

experimental populations, sometime referred to as "10(j)" populations, are defined pursuant to 16

U.S.C. § 1539(j) and are treated similarly to threatened species with some defined exceptions.

*See* 16 U.S.C. § 1539(j).  Endangered species are afforded the highest level of protection of any

species classification.  *See TVA v. Hill*, 437 U.S. at 174 ("[E]xamination of the language, history,

and structure of the [ESA] indicates beyond doubt that Congress intended endangered species to

be afforded the highest of priorities.").

     Section 9 of the ESA makes it unlawful to "take any [endangered] species within the

United States or the territorial sea of the United States."  16 U.S.C. § 1538(a)(1)(B).  To "take"

an endangered species is defined by the ESA to include "to harass, harm, pursue, hunt, shoot,

wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. §

1532(19).  Pursuant to Section 10(a)(1)(A) of the ESA, 16 U.S.C. § 1539(a)(1)(A), the Secretary

of the Interior "may permit, under such terms and conditions as he shall prescribe–any act

otherwise prohibited by [Section 9] of this title for scientific purposes or to enhance the

propagation or survival of the affected species, including, but not limited to, acts necessary for the establishment and maintenance of experimental populations pursuant to subsection (j) of this section."  Section 10(a)(1)(A) permits are generally referred to as either "scientific" or "recovery" permits.  *See Nat'l Ass'n of Home Builders v. Norton*, 298 F. Supp. 2d 68, 72 (D.D.C. 2003), *aff'd*, 415 F.3d 8 (D.C. Cir. 2005).  Regulations have been issued by the FWS which set forth the factors that the FWS "shall" consider when determining whether to issue a Section 10(a)(1)(A) permit:

> (i) Whether the purpose for which the permit is required is adequate to justify removing from the wild or otherwise changing the status of the wildlife sought to be covered by the permit;

> (ii) The probable direct and indirect effect which issuing the permit would have on the wild populations of the wildlife sought to be covered by the permit;

> (iii) Whether the permit, if issued, would in any way, directly or indirectly, conflict with any known program intended to enhance the survival probabilities of the population from which the wildlife sought to be covered by the permit was or would be removed;

> (iv) Whether the purpose for which the permit is required would be likely to reduce the threat of extinction facing the species of wildlife sought to be covered by the permit;

> (v) The opinions or views of scientists or other persons or organizations having expertise concerning the wildlife or other matters germane to the application; and

> (vi) Whether the expertise, facilities, or other resources available to the applicant appear adequate to successfully accomplish the objectives stated in the application.

50 C.F.R. § 17.22(a)(2).  The Court notes that these regulations are not at issue in the instant case (in other words, Plaintiffs do not contend that Defendants arbitrarily and capriciously applied such regulations in the issuance of the permit in question), but rather Plaintiffs contend that the authorization of a lethal depredation control program is contrary to Section 10(a)(1)(A) itself.

B.    *The Endangered Gray Wolf*

On March 9, 1978, the gray wolf was listed as an endangered species throughout the coterminous United States, with the exception of Minnesota where the gray wolf was classified as threatened.  *See* Pls.' Mem. Prelim. Inj. at 3; Defs.' Opp'n at 6 (citing 43 Fed. Reg. 9607 (March 9, 1978)); Final Rule to Reclassify and Remove the Gray Wolf from the List of Endangered and Threatened Wildlife in Portions of the Coterminous United States, 68 Fed. Reg. 15804, 15806 (April 1, 2003) ("April 2003 Final Rule").  On April 1, 2003, the FWS reclassified the gray wolf from endangered to threatened.  *See* April 2003 Final Rule.  Reclassifying the gray wolf from endangered to threatened allowed FWS to promulgate regulations with respect to the gray wolf pursuant to Section 4(d) of the ESA.  16 U.S.C. § 1533(d) ("Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species.").  FWS implemented Section 4(d) regulations as part of the April 2003 Final Rule that authorized "the full spectrum of depredation control actions, from nonlethal opportunistic harassment to lethal control of depredating wolves."  April 2003 Final Rule, 68 Fed. Reg. at 15868.  *See* Pls.' Mem. Prelim. Inj. at 4; Defs.' Opp'n at 8.  However, in *Defenders of Wildlife v. Norton*, 354 F. Supp. 2d 1156 (D. Or. 2005), the court held that the April 2003 Final Rule violated the ESA such that the gray wolf regained its endangered status.  *Defenders of Wildlife v. Norton*, 354 F. Supp. 2d 1156, 1174 (D. Or. 2005).  The court also enjoined FWS from implementing the depredation abatement program that had been authorized by FWS under Section 4(d) of the ESA.  *Id.*

C.    *The 2005 Wisconsin Subpermit and 2006 Wisconsin Permit*

6

In February of 2005, in light of the gray wolf's return to endangered status and Wisconsin's continued desire to control depredations by wolves, Wisconsin submitted a permit application to FWS requesting the authority to implement a depredation control program with respect to the endangered gray wolf pursuant to Section 10(a)(1)(A) of the ESA. Pls.' Mem. Prelim. Inj. at 5, Ex. C (Memorandum from Ron Refsnider, Region 3 Listing Coordinator & Wolf Recovery Coordinator, to TJ Miller, Region 3 Endangered Species Program Manager (Mar. 17, 2005)). On April 1, 2005, the FWS issued a Section 10(a)(1)(A) permit to the Wisconsin Department of Natural Resources, authorizing the lethal take of up to 34 wolves in 2005. *See* Pls.' Mem. Prelim. Inj. at 6, Ex. D (Subpermit No. 05–03 A1, hereinafter "2005 subpermit"); Defs.' Opp'n at 9. However, the 2005 subpermit was vacated via the issuance of a permanent injunction in *Defenders of Wildlife v. Norton*, Civil Action No. 05–1573 (D.D.C.), as Judge Ellen Huvelle determined during a hearing on plaintiffs' motion for preliminary injunction that FWS had failed to provide an opportunity for notice and comment before issuing the 2005 subpermit. Pls.' Mem. Prelim. Inj. at 6, Ex. E (*Defenders of Wildlife v. Norton*, Order Granting Permanent Injunction, Civil Action No. 05–1573 (D.D.C. September 13, 2005)); Defs.' Opp'n at 9. At the time the permanent injunction was granted, 29 of the 34 wolves authorized to be lethally taken in Wisconsin had already been killed. *See* Pls.' Mem. Prelim. Inj. at 7, Ex. F (Tr. of Prelim. Inj. Hearing at 7, *Defenders of Wildlife v. Norton*, Civil Action No. 05–1573 (D.D.C.)).

After the 2005 subpermit was vacated by the court, Wisconsin's resubmitted permit application was published in the Federal Register on September 14, 2005. *Id.* at 7, Ex. G (Memorandum from Field Supervisor, ES Field Office, Green Bay, WI, to Assistant Regional Director-Ecological Services, Fort Snelling, MN (ES/TE) (Apr. 20, 2006); Defs.' Opp'n at 9

(citing 70 Fed. Reg. 54401–02 (Sept. 14, 2005)).  The public comment period with respect to

Wisconsin's resubmitted permit application expired on October 14, 2005.  *Id.*  FWS prepared a

draft environmental assessment, which was made available for public comment on March 2,

2006, and thereafter issued the Final Environmental Assessment and an accompanying Decision

and Finding of No Significant Impact in April of 2006.  *See* Pls.' Mem. Prelim. Inj. at 8, Exs. B

& H; Defs.' Opp'n at 10.

  On April 24, 2006, the FWS issued the permit at issue in the instant case, authorizing

Wisconsin to implement a lethal depredation control program with respect to the endangered

gray wolf.  *See* Pls.' Mem. Prelim. Inj. at 8, Ex. A (Permit Number TE111360–0, hereinafter

"permit" or "2006 permit"); Defs.' Opp'n at 10–11.  Section F of the permit allows the lethal

take of up to 43 endangered wolves for depredation control purposes.  *Id.*  Defendants state that

the rationale behind a lethal depredation control program "is that, in the absence of adequate

measures to control known depredating wolves, public support for wolf recovery and wolf

reintroduction programs will likely erode and individuals will resort to illegal killing to protect

their pets and livelihood."  Defs.' Opp'n at 8; *see also* Pls.' Mem. Prelim. Inj. at Exh. I at 2 (Set

of Findings: Wisconsin Department of Natural Rescoures Wolf Depredation Permit

(TE111360)).

  On May 9, 2006, Plaintiffs sent a 60-day notice letter to FWS pursuant to 16 U.S.C. §

1540(g) requesting that FWS rescind the 2006 permit.  *See* Pls.' Mem. Prelim. Inj., Ex. J (Letter

re: Notice of Intent to Sue from Sanne H. Knudsen to Lynn Scarlett and H. Dale Hall (May 9,

2006)).  As of August 1, 2006, 17 wolves had been taken for depredation control purposes

pursuant to the permit at issue.  Defs.' Opp'n at 11 n.6.

## II: LEGAL STANDARD

*A.    Standard for Preliminary Injunctive Relief*

The decision whether to grant preliminary injunctive relief under Federal Rule of Civil Procedure 65(a) is reserved to the sound discretion of the Court. *See* Fed. R. Civ. P. 65(a); *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1208 (D.C. Cir. 1989). In assessing whether to grant preliminary injunctive relief, which is considered an extraordinary remedy in this circuit, *see Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969), a court must balance four factors: (1) whether the movant is substantially likely to succeed on the merits; (2) whether the movant would suffer irreparable injury if the injunction were not granted; (3) whether an injunction would substantially injure other interested parties; and (4) whether the public interest would be furthered by the injunction. *See Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)); *Serono Labs, Inc. v. Shalala*, 158 F.3d 1313, 1317–18 (D.C. Cir. 1998).

"These factors interrelate on a sliding scale and must be balanced against each other. 'If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in the other areas are rather weak.'" *Serono Labs*, 158 F.3d at 1318 (quoting *CityFed Fin. Corp.*, 58 F.3d at 746). Accordingly, "[a]n injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *CityFed Fin. Corp.*, 58 F.3d at 747. Notwithstanding the fluid nature of this familiar four-part inquiry, "[i]t is particularly important for the [movant] to demonstrate a substantial likelihood of success on the merits." *Barton v. Dist. of Columbia*, 131 F. Supp. 2d 236, 242 (D.D.C. 2001) (citing *Benten v. Kessler*, 505 U.S. 1084, 1085 (1992)). If

9

the movant fails to do so, "it would take a very strong showing with respect to the other preliminary injunction factors to turn the tide in plaintiffs' favor." *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 366 (D.C. Cir. 1999).

In addition, a party seeking preliminary injunctive relief must demonstrate at least some irreparable injury because "the basis for injunctive relief in the federal courts has always been irreparable harm." *CityFed Fin.*, 58 F.3d at 747 (quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974)) (alterations omitted). In order to establish irreparable injury justifying preliminary injunctive relief, a plaintiff must establish injury that is great, certain, and actual, not merely theoretical. *Wisconsin Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985). "'The injury complained of [must be] of such *imminence* that there is a "clear and present" need for equitable relief to prevent irreparable harm.'" *Id.* (quoting *Ashland Oil, Inc. v. FTC*, 409 F. Supp. 297, 307 (D.D.C. 1976), *aff'd*, 548 F.2d 977 (D.C. Cir. 1976)) (emphasis in original).

B.    *Standard for Agency Review*

Plaintiffs in this case challenge Defendants' authorization of the lethal taking of up to 43 gray wolves for depredation control pursuant to Permit No. TE111360–0 as beyond the statutory authority conferred by and in direct violation of Section 10(a)(1)(A) of the ESA. The standard for the Court's review of such challenges is known as *Chevron* review, after the Supreme Court's decision in *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). The central question for the reviewing court under *Chevron* "is whether the agency's construction of the statute is faithful to its plain meaning, or, if the statute has no plain meaning, whether the agency's interpretation 'is based on a permissible construction of the statute.'" *Arent v. Shalala*,

10

70 F.3d 610, 615 (D.C. Cir. 1995) (quoting *Chevron*, 467 U.S. at 843). Under the *Chevron*

analysis, a court first asks "whether Congress has directly spoken to the precise question at issue.

If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency,

must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at

842–43; *see also id*. at 843 n.9 ("[A]dministrative constructions which are contrary to clear

congressional intent" must be rejected by the court). "When performing this first step, [courts]

employ traditional tools of statutory construction." *Indep. Ins. Agents of Am., Inc. v. Hawke*, 211

F.3d 638, 643 (D.C. Cir. 2000) (citing *Chevron*, 467 U.S. at 842–43; *INS v. Cardoza-Fonseca*,

480 U.S. 421, 446 (1987)). Among these tools is a statute's framework and legislative history.

*See Am. Fed'n of Labor & Congress of Indus. Orgs. v. Fed. Election Comm'n*, 333 F.3d 168, 172

(D.C. Cir. 2003) ("*AFL-CIO*"); *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F. Supp. 2d

114, 134 (D.D.C. 1999); *see also Natural Res. Def. Council v. Browner*, 57 F.3d 1122, 1127

(D.C. Cir. 1995) ("Reference to statutory design and pertinent legislative history may often shed

new light on congressional intent, notwithstanding statutory language that appears 'superficially

clear.'") (quoting *Am. Scholastic TV Programming Found. v. Fed. Commc'ns Comm'n*, 46 F.3d

1173, 1178 (D.C. Cir. 1995)). However, canons of construction are only to be used during step

one of the *Chevron* analysis to determine if "Congress had a *specific* intent on the issue in

question." *Mich. Citizens for an Indep. Press v. Thornburgh*, 868 F.2d 1285, 1292–93 (D.C. Cir.

1989) (emphasis in original). In conducting this stage of the *Chevron* analysis, the Court "giv[es]

no deference to the agency's interpretation." *AFL-CIO*, 333 F.3d at 173.

   If the court finds that "the statute is silent or ambiguous with respect to the specific issue,

the question for the court is whether the agency's answer is based on a permissible construction

of the statute." *Chevron*, 467 U.S. at 843. "A statute is considered ambiguous if it can be read more than one way." *AFL-CIO*, 333 F.3d at 173. "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron*, 467 U.S. at 843 n.11. However, if the Agency's interpretation unduly compromises the statute's "purposes, it is not a 'reasonable accommodation' under the Act, and it would therefore not be entitled to deference." *Orloski v. Fed. Election Comm'n*, 795 F.2d 156, 164 (D.C. Cir. 1986) (quoting *Chevron*, 467 U.S. at 845); *see also Chevron*, 467 U.S. at 845 (providing that if the agency's "choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.") (quoting *United States v. Shimer*, 367 U.S. 374, 382 (1961)); *Common Cause v. Fed. Election Comm'n*, 692 F. Supp. 1391, 1396 (D.D.C. 1987) ("[W]here the agency interprets its statute in a way that flatly contradicts Congress's express purpose, the court may – indeed must – intervene and correct the agency.").

    C.    *Application of* Chevron *in the Instant Case*

The first step of *Chevron* provides a statute-based review mechanism to determine whether the statute itself provides the agency with any discretion to act in a particular way, rather than providing a measure of the reasonableness of agency action. The instant Circuit has addressed the differences between *Chevron* review and "arbitrary and capricious" review under the APA. *See Arent v. Shalala*, 70 F.3d 610, 615–16 (D.C. Cir. 1995). "[A] reviewing court's inquiry under *Chevron* is rooted in statutory analysis and is focused on discerning the boundaries

of Congress' delegation of authority to the agency; and as long as the agency stays within that

delegation, it is free to make policy choices in interpreting the statute, and such interpretations

are entitled to deference." *Id*. at 615. However, the two issues overlap at the margins such that

judicial review can exemplify such overlap between step two of *Chevron* and "arbitrary and

capricious" analysis. *See Animal Legal Defense Fund, Inc. v. Glickman*, 204 F.3d 229, 234 (D.C.

Cir. 2000).[1]

The Court notes that Defendants misconstrue the proper standard of review to be applied

in the instant case, largely ignoring the first step of *Chevron* analysis. Defendants state that

"[t]he Court must apply the 'arbitrary and capricious' standard of the APA, 5 U.S.C. §

706(2)(A),(C), to the FWS's decision making in assessing the likelihood of success on the

merits. 5 U.S.C. § 706." Defs.' Opp'n at 15. However, review pursuant to the APA also

requires the Court to determine if agency action is "not in accordance with law" or "in excess of

statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §

706(2)(A),(C). In the instant case, the Court concludes that because Defendants' authorization of

a lethal depredation control program contravenes the clear and express intent of Congress and

consequently fails under the first step of *Chevron*, the Court should not proceed to the second

step of the *Chevron* analysis nor is there a need to determine whether Defendants were arbitrary

and capricious in their actions, as the actions at issue are contrary to an unambiguous statute and

---

[1] Analysis under *Chevron* is sometimes inappropriate, particularly when neither of the Parties contests that the statutory provision at issue is ambiguous or leaves room for ample agency discretion. *See, e.g., Fund for Animals, Inc. v. Turner*, Civ. No. 91–2201, 1991 WL 206232 at *3 (D.D.C. Sept. 27, 1991) (applying deferential standard of review to "agency rulemaking" resulting in the promulgation of an FWS *regulation* authorizing a sport hunt of the threatened grizzly bear).

consequently not in accordance with law and in excess of statutory authority.

### III:  DISCUSSION

A.    *Substantial Likelihood of Success on the Merits*

Plaintiffs make two umbrella arguments on the merits of why the Court should enjoin the lethal taking of gray wolves for depredation control purposes pursuant to Permit No. TE111360–0.  First, Plaintiffs argue that the lethal depredation control program authorized by the permit is "outside of the scope of the narrow take exception allowed by Section 10(a)(1)(A) of the Endangered Species Act ("ESA"), 16 U.S.C. § 1539(a)(1)(A)" because the lethal depredation control program–"to increase social tolerance"–contravenes the plain language, purposes, and policy of the ESA.  Pls.' Mot. Prelim. Inj. at 1–2; Pls.' Mem. Prelim. Inj. at 10–18.  Second, Plaintiffs argue that even if authorized killing to increase social tolerance were permissible under the ESA, the FWS nonetheless "has failed to provide any scientifically based factual support to show that the lethal depredation control program will affirmatively 'enhance the propagation or survival' of the wolf.  16 U.S.C. § 1539(a)(1)(A)."  Pls.' Mot. Prelim. Inj. at 2; Pls.' Mem. Prelim. Inj. at 21–25.  The Court shall examine fully Plaintiffs' first argument, concluding that it need not proceed to examine Plaintiffs' second argument under the second step of the *Chevron* analysis because it is clear from the language, framework, and legislative history of the ESA that a depredation control program involving the lethal taking of an endangered species[2] contravenes

---

[2]  The Court notes that despite Defendants' pages of arguments describing the alleged recovery of the gray wolf, see generally Defs.' Opp'n, and Defendant-Intervenors' statement that a Proposed Rule was published to delist gray wolves in Wisconsin, see Intervs' Opp'n at 15, these passages are irrelevant to the Court's decision, which is predicated on the fact that the gray wolf is currently listed as an endangered species and as such is subject to the protections afforded to it pursuant to the ESA.

the clear intent of Congress as set forth in the ESA.

As noted above, under APA review, a court must first apply the "traditional tools of statutory construction to determine whether Congress has spoken to the precise question at issue." *Cal. Indep. Sys. Operator Corp. v. Fed. Energy Regulatory Comm'n*, 372 F.3d 395, 399 (D.C. Cir. 2004) (citing *Chevron*, 467 U.S. at 842–43 & n.9). Under step one of the *Chevron* analysis, if the intent of Congress is clear, the court (as well as the agency) must give effect to the unambiguously expressed intent of Congress. *Id.*; *see also Chevron*, 467 U.S. at 842–43. The court is to proceed to step two of the *Chevron* analysis – wherein it considers (1) whether the agency acted within its delegated authority, and (2) whether the agency's interpretation of the statute is reasonable – *only* if the statute is silent or ambiguous with respect to the specific issue. *Id.*; *see also Chevron*, 467 U.S. at 843–44. Defendants, who as noted above misconstrue the standard of review to be applied, are not entitled to any deference if, as in this case, the court determines that the statutory provision in question is neither silent nor ambiguous in precluding the specific action in question.

The instant Court recognizes that it is in uncharted legal waters, as the issue of whether lethal taking of endangered species for depredation control purposes violates the ESA is one of first impression. Plaintiffs' statement that "[n]o court has been asked to rule on the issue of whether the lethal taking of endangered species, supported not by science but justified solely by social policy reasons, exceeds the scope of the scientific take exception provided in Section 10(a)(1)(A)" is substantiated by the Court's own research. Pls.' Reply at 8. However, review of the existent statutory framework and case law reflective of the extremely high level of protection afforded to endangered species, coupled with the cautious approach courts have taken in

analyzing the lethal taking of threatened species pursuant to the ESA, leads the Court to conclude that the lethal depredation control program authorized by the permit at issue in this case violates Section 10(a)(1)(A) of the ESA.

        1.    <u>Plain Language of Section 10(a)(1)(A) of the ESA</u>

With respect to statutory construction, the Supreme Court has emphasized that "[i]n ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291(1988) (citations omitted). The "first step" in the canon of statutory construction is to "begin with a 'plain language' analysis of the statutory text." *Cal. Indep. Sys. Operator Corp.*, 372 F.3d at 400. That is, the court is to assume "that the legislative purpose is expressed by the ordinary meaning of the words used." *Sec. Indus. Ass'n v. Bd. of Governors*, 468 U.S. 137, 149 (1984) (internal quotation and citations omitted). "Where [] the plain language of the statute is clear, the court generally will not inquire further into its meaning." *Qi-Zhuo v. Meissner*, 70 F.3d 136, 140 (D.C. Cir. 1995).

Section 9 of the ESA makes it unlawful to "take any [endangered] species within the United States or the territorial sea of the United States." 16 U.S.C. § 1538(a)(1)(B). To "take" an endangered species is defined by the ESA to include "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). Pursuant to Section 10(a)(1)(A) of the ESA, the Secretary of the Interior "may permit, under such terms and conditions as he shall prescribe–any act otherwise prohibited by [Section 9] of this title for scientific purposes or to enhance the propagation or survival of the affected species, including, but not limited to, acts necessary for the establishment and maintenance of

experimental populations pursuant to subsection (j) of this section."  16 U.S.C. § 1539(a)(1)(A).

The permit issued by Defendants at issue in this case authorizes the lethal "take" of up to 43 gray

wolves for depredation control purposes relying on the language of "propagation or survival of

the affected species."[3]

The language "propagation or survival of the affected species," is, on its face, antithetical

to the killing of 43 members of an endangered species barring some direct and immediate danger

imposed by the individual animals killed to other members of the species.  While the Court can

contemplate one circumstance in particular where a lethal take might be permitted to enhance the

propagation or survival of the species–where an individual wolf had mange or some other

communicable disease that could ultimately result in the death of other *wolves*–it is

counterintuitive to authorize the killing of *endangered* animals rather than to authorize some

non-lethal method of "take" to enhance their propagation or survival.

Defendants argue that Plaintiffs "incorrectly attemp[t] to make a distinction between

'lethal take' and 'non-lethal take,'" and that "[t]he ESA and its implementing regulations make

no such distinction," citing to the definition of "take" included in Section 9 of the ESA.  Defs.'

Opp'n at 17.  Defendants conclude that since Section 10 authorizes the FWS to permit "any act

otherwise prohibited by [Section 9]," that "based on the plain reading of the ESA, the FWS may

permit all forms of take under Section 10(a)(1)(A) as long as it is for 'scientific purposes or to

enhance the propagation or survival of the species.'"  Defs.' Opp'n at 17.   However, the Court

--------

[3]  While the permit at issue includes provisions for the non-lethal take of wolves for
scientific purposes pursuant to Section 10(a)(1)(A), Plaintiffs do not contest these provisions in
the instant case.  *See* Pls.' Mem. Prelim. Inj., Ex. A (2006 permit).

notes that a plain reading of Section 10(a)(1)(A) requires at least a basic comprehension of the phrase "propagation or survival of the affected species."  Defendants' approach in the issuance of the permit at issue–that killing 43 allegedly depredating wolves will increase social tolerance for wolves and ultimately result in fewer illegal killings of wolves[4]–simply applies a labyrinthian analysis that does not comply with the text of the statute on its face.[5]

When faced with this precise issue during a hearing on a motion for preliminary injunction in *Defenders of Wildlife v. Norton*, Civil Action No. 05–1573 (D.D.C.), Judge Ellen Huvelle also noted the contradictions in Defendants' logic (or lack thereof).  While granting injunctive relief to Plaintiffs based on Defendants' failure to provide a notice and comment period with respect to the lethal depredation program permit issued in that case, during the course of the hearing, Judge Huvelle stated with respect to the merits of Plaintiffs' position, "I am baffled by the government's position here.  I have to be perfectly frank.  I have a hard time understanding the notion you kill the wolves to save the wolves."  Pls.' Mem. Prelim. Inj., Ex. F (Tr. of Prelim. Inj. Hearing at 11, *Defenders of Wildlife v. Norton*, Civil Action No. 05–1573 (D.D.C.)).  The instant Court is similarly confounded by Defendants' approach as applied to an *endangered* species in light of the language found in Section 10(a)(1)(A), which the Court finds

---

[4]  Defendants build their entire authorization policy around "[t]he threat [that] comes from intolerant stakeholders who–in the absence of an effective government-sanctioned wolf control program–will engage in unregulated and unsupervised takings to protect their pets and livelihood."  Defs.' Opp'n at 21–22.

[5]  Nonetheless, the Court will also address Defendants' argument in Section III(A)(2) of the instant Opinion to demonstrate that in addition to the plain language of Section 10(a)(1)(A), the statutory structure of the ESA also contradicts Defendants' assertion that Congress intended to make no distinction between lethal and non-lethal takings of endangered animals pursuant to Section 10(a)(1)(A) of the ESA.  *See infra* Section III(A)(2).

on its face would preclude a lethal depredation control program.

However, even assuming *arguendo* that the plain text of Section 10(a)(1)(A) left some room for interpretation, the first step of *Chevron* analysis requires the Court to rely on traditional methods of statutory interpretation that exceed in scope an isolated reading of the statutory provision in question.  In analyzing both the statutory framework of the ESA and its legislative history, the Court has little doubt that Plaintiffs will succeed on the merits (as they have certainly demonstrated a substantial likelihood of doing so) in proving that a lethal depredation control program is unlawful pursuant to Section 10(a)(1)(A) of the ESA.

2.    Statutory Framework of the ESA

A review of Section 10(a)(1)(A) *in pari materia* with the ESA as a whole supports the Court's reading of the plain language of the statute and contradicts the Agency's construction. This Circuit follows the canon of statutory construction that holds that "[s]tatutory provisions *in pari materia* normally are construed together to discern their meaning."  *Motion Picture Ass'n of Am., Inc. v. Fed. Commc'ns Comm'n*, 309 F.3d 796, 801 (D.C. Cir. 2002) (citing *Erlenbaugh v. United States*, 409 U.S. 239, 244 (1972) ("noting that the rule that statutes *in pari materia* should be construed together 'is . . . a logical extension of the principle that individual sections of a single statute should be construed together'")); *see also Holyoke Water Power Co. v. Fed. Energy Regulatory Comm'n*, 799 F.2d 755, 766 (D.C. Cir. 1986) ("The three sections are *in pari materia* and must be read together."); *FAIC Secs., Inc. v. United States*, 768 F.2d 352, 363 (D.C. Cir. 1985) ("[T]hese two statutes are *in pari materia* and must be construed together.").  It is therefore appropriate for the Court to examine the statutory framework of the ESA in its

determination of the role that Section 10(a)(1)(A) plays therein. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) ("In determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation" as the "meaning–or ambiguity–of certain words or phrases may only become evident when placed in context."). *See also Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989) (a "fundamental canon of statutory construction [is] that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). Upon the Court's consideration of the statutory framework of the ESA as a whole and the heightened protection afforded to endangered species therein, the Court cannot construe Section 10(a)(1)(A) to authorize the lethal taking of the endangered gray wolf for depredation control purposes.

The ESA allows the Secretary of the Interior to designate certain species of animal life as having protected status. 16 U.S.C. § 1533(a)(1). *See also TVA v. Hill*, 437 U.S. at 159–60; *Rancho Viejo, LLC v. Norton*, 323 F.3d 1062, 1064 (D.C. Cir. 2003). As the Court noted in Section I(A) of this Opinion, there are three different categories of federally-protected species under the ESA–endangered species, threatened species, and experimental populations. Endangered species are defined pursuant to 16 U.S.C. § 1532(6) as "any species which is in danger of extinction throughout all or a significant portion of its range other than a species of the Class Insecta determined by the Secretary to constitute a pest whose protection under the provisions of this chapter would present an overwhelming and overriding risk to man." 16 U.S.C. § 1532(6). Threatened species are defined pursuant to 16 U.S.C. § 1532(20) as "any species which is likely to become an endangered species within the foreseeable future throughout

20

all or a significant portion of its range." 16 U.S.C. § 1532(20). And experimental populations,

sometime referred to as "10(j)" populations, are defined pursuant to 16 U.S.C. § 1539(j) and are

treated similarly to threatened species with some defined exceptions. *See* 16 U.S.C. § 1539(j).

Endangered species are afforded the highest level of protection of any species classification. *See*

*TVA v. Hill*, 437 U.S. at 174 ("[E]xamination of the language, history, and structure of the [ESA]

indicates beyond doubt that Congress intended endangered species to be afforded the highest of

priorities.").

A number of cases have held that *threatened* species, which as indicated in the above

framework are afforded fewer protections than endangered species under the ESA, cannot be

lethally taken with the ultimate goal of fostering fewer human-animal conflicts as a mechanism

for allegedly preserving the species. In *Fund for Animals v. Turner*, the court enjoined FWS

from authorizing a limited hunt of threatened grizzly bears in the Northern Continental Divide

Ecosystem. *Fund for Animals, Inc. v. Turner*, Civ. No. 91–2201, 1991 WL 206232 (D.D.C.

Sept. 27, 1991). The court rejected defendants' rationale that "a limited hunt of the grizzly bear

creates a wariness of humans, which protects the bears by confining them to their range and

reducing bear-human conflicts, and which, in the long run, promotes the conservation and

recovery of the species[,]" *id*. at *7, instead ascertaining that

> [t]he difficulty is that the statute, as currently interpreted, does not authorize
> hunting whenever it would be a sound conservational tool. Congress has specifically
> limited the hunting of a threatened or endangered species to extraordinary cases of
> population pressures, and the Court is constrained to enforce that legislative restriction.
> *See Sierra Club v. Clark*, 577 F. Supp. 783, 790 (D. Minn. 1984) (concluding that
> "reduc[ing] the level of wolf-human contact" is not a valid basis for authorizing a
> regulated taking under the ESA), *aff'd in part and rev'd in part on other grounds*, 755
> F.2d 608 (8th Cir. 1985).

21

*Id*.

Additionally, in *Sierra Club v. Clark*, the Eighth Circuit held that a public sport hunting season of a *threatened* species (the Eastern Timber Wolf in Minnesota) was unlawful and contrary to the plain language, statutory structure, and legislative history of the ESA. *Sierra Club v. Clark,* 755 F.2d 608 (8th Cir. 1985). The Court notes that Defendants' attention to *Sierra Club v. Clark* ignores the Eighth Circuit's actual holding while quoting dicta from the opinion very selectively. Defendants state that "[t]he only statement of law made by a United States Court of Appeals concerning the issue before this Court–whether the FWS may issue Section 10(a)(1)(A) permits for depredation control purposes–supports the FWS's position that limited depredation control actions enhance the survival of the species as a whole and are therefore properly permitted under Section 10(a)(1)(A)." Defs.' Opp'n at 18. However, the Eighth Circuit's comment to this effect is dicta (particularly as applied to endangered species, as *Sierra Club v. Clark* pertains to a threatened species), found in a footnote, and completely unaccompanied by any analysis. *See id*. at 614 n.8. Furthermore, the footnote refers to the potential for "the removal of depredating animals or the culling of diseased animals from a population" pursuant to Section 10(a)(1)(A) without distinguishing whether the provision refers to endangered or threatened species, which appears to be qualitatively and quantitatively different in its animal-focused approach from a lethal depredation control *program*. *Id*. Moreover, the footnote's mention of "removal" does not necessarily imply a lethal taking.

In light of the statutory framework set out above and the heightened level of protection given to endangered species by Congress and acknowledged by the courts, the Court will also return to Defendants' argument discussed in Section III(A)(1) that "[t]he ESA and its

implementing regulations make no such distinction" between a lethal and a non-lethal take.

Defs.' Opp'n at 17. Defendants cite to the definition of "take" included in Section 9 of the ESA

as including to "kill" amongst a variety of other actions including to harass, harm, pursue, and so

forth. *Id*. As noted in Section III(A)(1), Defendants conclude that since Section 10 authorizes

the FWS to permit "any act otherwise prohibited by [Section 9]," that "based on the plain reading

of the ESA, the FWS may permit all forms of take under Section 10(a)(1)(A) as long as it is for

'scientific purposes or to enhance the propagation or survival of the species.'" Defs.' Opp'n at

17. However, as Plaintiffs point out, the broad definition of "take" in the ESA and prohibition

thereof in Section 9 "underscores the high level of protection that Congress intended to afford

endangered species." Pls.' Reply at 3. In considering the statutory framework providing the

highest level of protection to endangered species and the narrow exception provided via Section

10(a)(1)(A) to enhance species survival, the Court agrees that

> [i]n light of the context of the exception–the broad take prohibition in combination with a limited scientific take exception meant to further species survival–the FWS cannot honestly contend that its authorization of a lethal, as opposed to non-lethal, depredation control program is irrelevant to the issue of whether it has exceeded the scope of its authority under Section 10(a)(1)(A). While it is true that Section 10(a)(1)(A) does not distinguish between lethal and non-lethal takes, the purpose of the exception makes clear that Congress would neither be indifferent to the severity nor degree of taking permitted by the FWS.

Pls.' Reply at 4.

In summary, the Court agrees that "[b]y using Section 10(a)(1)(A) to implement a lethal

depredation control program for endangered wolves in Wisconsin, the FWS expands the scope of

this otherwise limited exception to effectively erase any meaningful distinctions between the

management measures permitted for endangered, threatened, and experimental populations."

23

Pls.' Mem. Prelim. Inj. at 15.  The case law supports Plaintiffs' position, as both the Eighth

Circuit and instant District have explicitly disallowed programs involving the lethal taking of

*threatened* species, which are afforded lesser protections under the structure of the ESA than the

*endangered* gray wolf presently at stake.

3.    Legislative History

When the plain language of the statute in question and the reading of that provision in

relation to its related subparts contradicts the Agency's construction, the Agency may establish

the legitimacy of its construction by looking to the legislative history of the law at issue.

However, the presumption in favor of the plain language of the provision is rebuttable only in the

"rare cases [in which] the literal application of a statute will produce a result demonstrably at

odds with the intentions of its drafters."  *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235,

242 (1989) (internal quotation omitted).  The Agency's burden in rebutting the clear language is

onerous:  the Agency must "show either that, as a matter of historical fact, Congress did not

mean what it appears to have said, or that, as a matter of logic and statutory structure, it almost

surely could not have meant it."  *Engine Mfrs. Ass'n v. Envtl. Prot. Agency*, 88 F.3d 1075, 1089

(D.C. Cir. 1996); *see also Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982) (courts

may ignore plain language in a narrow category of cases where "the literal application of a statute

will produce a result demonstrably at odds with the intentions of its drafters . . . .").

Here, Defendants cannot meet this high standard.  Indeed, Defendants do not even make

much of an attempt in this regard.  Defendants state that "the general principle that public

opposition can frustrate wolf recovery was recognized by Congress when it stated that the FWS

24

'could allow for the taking of [red wolves] if depredations occur or if the release of these

populations will continue to be frustrated by public opposition.'  *See* House Report No. 97–567,

34, reprinted at 1982 U.S.C.C.A.N. 2807, 2834 (1982)."  Defs.' Opp'n at 19–20.  Defendants

rightfully qualify their citation with a footnote, stating that "[t]his Congressional statement was

made in the context of experimental populations, but it nevertheless demonstrates clear

Congressional recognition of the fact that wolf recovery can be frustrated by public intolerance

due to depredations."  *Id*. at 20 n.9.  However, as Plaintiffs demonstrate, see Pls.' Reply at 8–9,

Defendants' selective quotation of the House Report does not reveal the context in which the

statement was made–as an example of the management flexibility provided by the inclusion of

the classification of experimental populations in the 1982 amendments:

> To encourage efforts to establish such experimental populations when the
> conservation needs of a species would be served by doing so, this amendment relaxes
> certain restrictions otherwise applicable to listed species . . . .  The Committee also
> expects that, where appropriate, the regulations could allow for the directed taking of
> experimental populations.  For example, the release of experimental populations of
> predators, such as red wolves, could allow for the taking of these animals if depredations
> occur or if the release of these populations will continue to be frustrated by public
> opposition.

H.R. Rep. No. 97–567 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 2807, 2833–34.  *See also*

*Gibbs v. Babbitt*, 214 F.3d 483, 487 (4th Cir. 2000) ("In order to increase the Service's flexibility

in reintroducing endangered species into portions of their historic range, Congress extensively

amended the ESA in 1982 . . . add[ing] section 10(j), which allows the FWS to designate as

'experimental populations' some reintroduced populations of endangered or threatened species.

Under the looser standards of section 10(j), members of an experimental population are generally

to be treated as threatened rather than endangered." (internal citations omitted)).

Because the plain language of Section 10(a)(1)(A) and the statutory framework of the ESA are clear, the Court agrees with Plaintiffs' assessment that "The ESA is congressional recognition that the value of species trumps the social tolerance that a person or group of people may have for a particular species." Pls.' Reply at 14. The legislative history of the ESA clearly demonstrates that Congress did not intend to authorize a lethal depredation control program of an endangered species.

"[T]he Endangered Species Act of 1973 represented the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *TVA v. Hill*, 437 U.S. at 180. "'The plain intent of Congress in enacting this statute,' we recognized, 'was to halt and reverse the trend toward species extinction, whatever the cost. This is reflected not only in the stated policies of the Act, but in literally every section of the statute.'" *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 699 (1995) (quoting *TVA v. Hill*, 437 U.S. at 184)). For a comprehensive review of the legislative history preceding the enactment of the ESA in 1973, the Court directs the reader to the seminal case *Tennessee Valley Authority v. Hill. See id.* at 174–181. The ESA further includes a congressional mandate to federal agencies, including the statement that "[i]t is further declared to be the policy of Congress that all Federal departments and agencies shall seek to *conserve* endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter." 16 U.S.C.A. § 1531(c)(1) (emphasis added).

In the course of congressional debates during the enactment of the ESA with respect to how "conserve" would be interpreted, the Senate's definition of conservation included instructions to manage protected species "at the optimum carrying capacity of their habitat,"

through techniques including "regulation and taking necessary to these ends."  S. 1983, 93rd

Cong., 1st Sess. §§ 4(e) & 3(1) (1973) (emphasis added), *cited in Sierra Club v. Clark*, 755 F.2d

at 616.  The conference eliminated this language such that the final Act's definition of

conservation includes a mandate that regulated taking can take place only "in the extraordinary

case where population pressures within a given ecosystem cannot otherwise be relieved."  16

U.S.C. § 1532(3).  The circumstances under which "taking" of endangered animals were to be

allowed were set forth in Section 10(a)(1)(A) and are "extremely narrow."  *See TVA v. Hill*, 437

U.S. at 180.  The conference report submitted with the ESA further iterates the level of caution

that Congress intended to be applied to the taking of endangered and threatened species covered

by the ESA:

> In extreme circumstances, as where a given species *exceeds the carrying capacity of its particular ecosystem* and where this pressure can be relieved in no other feasible way, this "conservation" might include authority for carefully controlled taking of surplus members of the species.  To state that this possibility exists, however, in no way is intended to suggest that this extreme situation is likely to occur–it is just to say that the authority exists in the unlikely event that it ever becomes needed.

Conf. Rep. No. 740, 93rd Cong., 1st Sess. 23, *reprinted in* 1973 *U.S. Code Cong. & Admin.*

*News* 2989, 3001–02, *cited in Fund for Animals, Inc. v. Turner*, 1991 WL 206232 at *5

(concluding that populations pressures cannot be defined to include increased movement of

threatened bears into inhabited areas and increased human-bear conflicts in and of themselves)

(emphasis added).  *Also cited in Sierra Club v. Clark,* 755 F.2d at 615–16 ("Because a

'conference report represents the final statement of terms agreed to by both houses, next to the

statute itself it is the most persuasive evidence of congressional intent.'  *Demby v. Schweiker*,

671 F.2d 507, 510 (D.C. Cir. 1981).  The unambiguous language of this conference report must

be given great weight.").

In summary, after analyzing the plain language, statutory framework, and legislative history of the statute, the Court concludes that congressional intent with respect to Section 10(a)(1)(A) of the ESA is remarkably clear and unambiguous in precluding the authorization of a lethal depredation program on the gray wolf where it is classified as endangered. As such, the Court will not proceed with step two of the *Chevron* analysis, as the statute is neither silent nor ambiguous in its preclusion. *See Cal. Indep. Sys. Operator Corp.*, 372 F.3d at 399 (D.C. Cir. 2004); *Chevron*, 467 U.S. at 843–44.[6] Plaintiffs have therefore demonstrated a substantial likelihood (indeed, a *strong* likelihood) of success on the merits in demonstrating that Defendants acted contrary to law in their issuance of the permit at issue.[7]

B.      *Irreparable Injury*

Plaintiffs, citing to case law, argue that the deaths of a finite number of endangered wolves constitutes irreparable injury for the purposes of issuing a preliminary injunction. *See*

---

[6] The Parties include arguments stating their positions as to whether or not the lethal depredation program at issue comports with past agency position and practice. *See* Pls.' Mem. Prelim. Inj. at 18–21; Defs.' Opp'n at 7–8. These arguments need not be addressed, as they fall outside of the interpretative boundaries of step one of the *Chevron* analysis.

[7] Defendants, in their Opposition, state that they "have no objection to the Court consolidating its ruling on Plaintiffs' motion for a preliminary injunction with a decision on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2)." Defs.' Opp'n at 1 n.1. But for Plaintiffs objection thereto in their Reply ("Plaintiffs do not think it is appropriate to consolidate this preliminary injunction motion with the merits as proposed by Defendants," Pls.' Reply at 15 n.5), the Court may have been inclined to consolidate its consideration of the instant preliminary injunction request with an ultimate determination on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2) in the Court's conclusion that Defendants' authorization of the lethal depredation control program in question was contrary to law and thus a violation of 5 U.S.C. § 706(2)(A).

28

Pls.'s Mem. Prelim. Inj. at 26–27. Defendants argue that irreparable harm occurs only when the take of endangered or threatened animals jeopardizes the entire species. Defs.' Opp'n at 29–31 ("[I]n order to demonstrate irreparable harm to the species for the purposes of their request for a preliminary injunction, Plaintiffs need to demonstrate not that individual wolves will be impacted, but that the actions at issue will jeopardize the species as a whole.").[8] Notwithstanding the Parties' conflicting views as to the appropriate legal basis under which the Court should evaluate irreparable injury, it is clear to the Court that the existing case law as well as the language, purpose, and history of the ESA as discussed in Section III(A) prohibit the Court from adopting the standard espoused by Defendants. The Court agrees with Plaintiffs' contention that "[r]equiring Plaintiffs to show jeopardy to the existence of a species in order to secure injunctive relief would stand the ESA on its head. Without the ability to enjoin illegal taking under the ESA, courts would be without power to prevent harm to endangered species before a species was on the brink of extinction." Pls.' Reply at 20.

"Environmental injury, by its nature, can seldom be adequately remedied by money

---

[8] Defendants cite to *Water Keeper Alliance v. Dep't of Defense*, 271 F.3d 21 (1st Cir. 2001) in support of their position. However, while this First Circuit opinion suggests that something more than "the death of even a single member of an endangered species" is required to demonstrate irreparable injury, the level of injury to the species required by the First Circuit via this opinion is not as great as Defendants suggest. *See, e.g., id*. at 34 ("In the absence of a more concrete showing of probable deaths during the interim period and of how these deaths may impact the species, the district court's conclusion that [Plaintiff] has failed to show potential for irreparable harm was not an abuse of discretion."). In the instant case, as will be explained further in Section III(C), Plaintiffs have demonstrated a very concrete probability of death of endangered wolves (in fact, 17 endangered wolves had been killed pursuant to the lethal take depredation provision of the permit as of August 1, 2006). Additionally, Defendants have neither refuted that the permit authorizes lethal taking of up to 10 percent of the endangered wolf population in Wisconsin, nor that such deaths will cause intra-pack hardships and stress on the species as indicated in affidavits submitted with Plaintiffs' Motion. *See infra* § III(C).

damages and is often permanent or at least of long duration, *i.e.*, irreparable.  If such injury is

sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction

to protect the environment."  *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).  A

number of cases assessing irreparable injury in the context of the ESA emphasize that harm to a

small number of animals is sufficient to demonstrate irreparable harm to an endangered, or even

a threatened, species.  *In Fund for Animals v. Turner,*  the court rejected defendants' argument

that irreparable injury should be predicated on the possible eradication of a species, holding that

the killing of an estimated three *threatened* grizzly bears constituted irreparable injury.

> *TVA* does underscore the weight Congress has placed on the protection of
> endangered and threatened species.  As the Court stated, "the [ESA] indicates beyond
> doubt that Congress intended endangered species to be afforded the highest of priorities,"
> *id.* at 174, and a threatened species is one that the Secretary believes likely to become
> endangered within the foreseeable future.  In light of this Congressional mandate, the loss
> even of the relatively few grizzly bears that are likely to be taken through a sport hunt
> during the time it will take to reach a final decision in this case is a significant, and
> undoubtedly irreparable, harm.

*Turner*, 1991 WL 206232 at *8 (quoting *TVA v. Hill*, 437 U.S. at 174), *cited in Am. Rivers v.*

*U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 259 (D.D.C. 2003).  *See also Defenders of*

*Wildlife v. Norton*, 354 F. Supp. 2d 1156, 1174 (D. Or. 2005) ("[t]he death or injury of

endangered wolves due to the [Section] 4(d) rules is irreparable injury.").  *Compare Greater*

*Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1257 (10th Cir. 2003) ("Plaintiffs contend that a

proponent of a preliminary injunction under these circumstances, seeking to prevent harm to

members of a threatened or endangered species, need not show harm to the species as a whole.

We agree.").

The irreparable harm caused to the gray wolf absent injunctive relief is clear, as the

permit at issue authorizes the lethal take of 43 wolves–which Plaintiffs' stipulate (and Defendants do not refute) constitutes approximately 10 percent of the gray wolf population in Wisconsin.  *See* Pls.' Mem. Prelim. Inj. at 9.  In the FWS Biological Opinion dated April 20, 2006, with respect to the permit at issue, the FWS Field Supervisor, ES Field Office, Green Bay, WI, acknowledged that "[t]he gray wolf is expected to be adversely affected by the proposed action."  Pls.' Mem. Prelim. Inj., Ex. G at 7.  The Court concludes that applying the standard articulated in the above cases, which recognizes the heightened degree of protection afforded to endangered species, the lethal taking at issue in this case constitutes irreparable injury.

C.      *Balance of Harms*

"Congress' enactment of the ESA clearly indicates that the balance of interests weighs *heavily* in favor of protected species."  *Am. Rivers*, 271 F. Supp. 2d at 261 (internal quotation and citation omitted).  As explained in Section III(B), it is clear that wolves taken pursuant to the lethal take provision of the permit at issue will suffer irreparable injury.  While death is the most obvious harm inflicted upon endangered wolves in the absence of injunctive relief, Defendants do not contest the more subtle effects such takings will have on the endangered wolf population.  According to the Declarations of Tom Herschelman and Karlyn Berg, taking of wolves pursuant to the permit will "lead to the deaths of individual animals, disturb and stress intra-pack relationships, and cause a decline in the area wolf population."  Pls.' Mem. Prelim. Inj. at 28, Herschelman Decl. ¶ 8, Berg Decl. ¶ 7.

Defendants claim that "[t]he issuance of an injunction will harm the state of Wisconsin by eliminating its ability to effectively manage depredating wolves."  Defs.' Opp'n at 32.

31

Defendants cite Wisconsin's need to control depredating wolves through the lethal depredation program at issue "because the wolf population has grown so rapidly." *Id*. Defendants further claim that "as a result of the fact that wolves occupy nearly all areas of suitable habitat . . . , suitable areas for translocating problem wolves are no longer available." Defs.' Opp'n at 33. Defendants and Defendant-Intervenors seem to miss the point–that wolves are presently classified as *endangered* species and congressionally are viewed first and foremost as such, rather than as a nuisance to residents or a threat to livestock or other game that residents may choose to hunt.[9] As the lethal take of 43 wolves allowed by the permit at issue qualifies as irreparable environmental injury, see Section III(B), such that " injury is sufficiently likely," the Court shall apply the principle that "the balance of harms will usually favor the issuance of an injunction to protect the environment" in granting Plaintiffs' request for preliminary injunctive relief. *See Amoco Prod. Co.*, 480 U.S. at 545. While 17 wolves had been killed as of August 1, 2006, more wolves would be lethally taken while the Parties await a final decision on the merits in the absence of preliminary injunctive relief.

D.    *Public Interest*

"Examination of the language, history, and structure of the [ESA] . . . indicates beyond a doubt that Congress intended endangered species to be afforded the highest of priorities." *TVA v.*

---

[9]  The Court notes that a number of affidavits attached to Defendant-Intervenors' Opposition to Plaintiffs' Motion for Preliminary Injunction reflect resident complaints about "competing" with wolves as hunters for other game when hunting for sport, a concern which, in light of the gray wolf's endangered classification, clearly does not carry sufficient weight to be factored into the Court's balancing of the harms in issuing a preliminary injunction. Furthermore, the Court notes that Plaintiffs only challenge the lethal take provisions of the Wisconsin permit such that state agencies have other methods available for dealing with depredation concerns as authorized by the permit. *See* Pls.' Mem. Prelim. Inj. at 29.

*Hill*, 437 U.S. at 174.  The Supreme Court in *TVA v. Hill* "underscore[d] the weight Congress has placed on the protection of endangered and threatened species."  *Fund for Animals, Inc. v. Turner*, 1991 WL 206232 at *8.  "Congress' enactment of the ESA clearly indicates that the balance of interests weighs *heavily* in favor of protected species."  *Am. Rivers*, 271 F. Supp. 2d at 261 (internal quotation and citation omitted).  In enacting the ESA, Congress has "spoken in the plainest of words, making it abundantly clear that it has given the policy of conservation of endangered species the highest of priorities."  *Id*. (internal quotation marks omitted).

Defendants state that "the public interest in the long-term health and recovery of the gray wolf population in Wisconsin will be best served by permitting the states to continue their depredation control activities," and that "granting Plaintiffs' request for a preliminary injunction will not further the ESA's overarching purpose of recovering species," citing the allegedly increased public support that will accompany lethal control of "problem" wolves.  Defs.' Opp'n at 33.  The Court finds this argument disingenuous, particularly in light of Defendants focus in its Opposition just a page earlier reflecting concerns about the "rapi[d]" growth of the gray wolf population in Wisconsin.  Congressional intent behind the adoption of the ESA and iterated throughout the language of the Act itself makes crystal clear that the "public interest" lies in the protection of the endangered gray wolf–not in the lethal taking of "problem" gray wolves in the hopes of creating a selected-for gray wolf population that never interferes with livestock or hunters' kills.  Simply put, the recovery of the gray wolf is not supported by killing 43 gray wolves.

## IV:  CONCLUSION

As succinctly stated by Plaintiffs, "[t]here is no support for the idea that Congress intended the FWS to cater to criminal behavior and cotton to social intolerance as a strategy for endangered species recovery."  Pls.' Reply at 14.  Based on the reasoning articulated throughout this Memorandum Opinion, the Court shall GRANT [5] Plaintiffs' Motion for Preliminary Injunction, preliminarily enjoin and restrain Defendants and their agents from authorizing the lethal take of any more gray wolves for depredation control purposes pursuant to Permit Number TE111360–0, and direct FWS to immediately stop the Wisconsin Department of Natural Resources and its agents from any further killing of gray wolves pursuant to the same.  An appropriate Order accompanies this Memorandum Opinion.

Date:   August 9, 2006

                                                            _/s/_____

                                                            COLLEEN KOLLAR-KOTELLY
                                                            United States District Judge

34